1  of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants *Steve*

2  *Jobs*. Def Emanuel was bluffing that Fox Searchlight had agreed to take the film.  He never

3  had a deal with Searchlight. He was just playing hardball; trying to get Sony to offer more

4  money, and keep them clueless about his relationship with **Universal Pictures.**

5      142.  The deal dragged on over 8 months. Three weeks before the previous exchange,

6  Sony Pictures' Andrew Gumpert, spotted Def Emanuel's chicanery and bad motives. In an

7  email to Sony Pictures execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

8              2014-10-18 16:59:16  From: Andrew Gumpert
                   To: lynton, michael; pascal, amy; belgrad, doug
9    **Andrew Gumpert:**
10            "The fact is there is only so much in the kitty. Unless the movie
                massively breaks out they can never make real money, nor can we
11            and our investors.They have a 50pt pool with the best definition and
                5m of box office bonuses. **Do they want to make MORE than the**
12            **equity? I think they do.** There is a huge philosophical gap (given
                the rude and insolent responses from Ari and Scott)..."
13
14

15      143.  Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott

16  Rudin were not adhering to established guidelines.

17      144.  Michael Lynton, CEO of Sony Pictures, does not responds to Gumpert —because

18  Def Ari Emanuel is his close friend and his secret business partner in Screenbid.

19      145.  The Sony Pictures' email hack revelation of Emanuel's secret business relationship

20  with Lynton is surely why Lynton was out as Sony Pictures' CEO by January 2017.

21          ***Steve Jobs* Film's Not-So Surprising *Twist* Ending:**

21      146.  In the end, Fox Searchlight never touched "Steve Jobs," of course.

22      147.  Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the price

23  of the film above market value, to increase his profit margin. He didn't need Sony Pictures

24  to give him standard market value for "Steve Jobs", he could get standard value from

25  Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari

26  Emanuel took the film to the studio that has helped distribute his films, since around 1999.

27      148.  On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs",

28  after so much posturing and tumult, "Steve Jobs" was distributed by **Universal Pictures.**

**Sony Pictures Emails Show Defs Emanuel, Block & Sony Pictures' Ceo**

**(M. Lynton) Maintain Unethical Relationships,**

**As They Co-own "Screenbid" Together (A Conflict Of Interests)**

149.   The *Steve Jobs* emails reveal Defs Emanuel and Bill Block were in a secret and illegal business relationships with Sony Pictures' (then) CEO Michael Lynton, as co-owners of Screenbid (in violation of Cal Business and Professions Code §17000, et seq, which makes unfair practices illegal). Thus, the Defendants profited as business owners, AND as secret business subcontractors. These unlawful relationships are revealed  when Def Ari Emanuel writes Lynton to ask Lynton to check on *Screenbid.*

> On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com
> To: lynton, michael;
> **ARI EMANUEL:**
>    Michael -
>    What are we doing on Screenbid? We had success on our early tests,
>    nothing since. You guys own a piece of this company, we've had
>    nothing since our early success. We have to keep the engines going.

150.   In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of Screenbid is confirmed by the use of pronouns "we" and "our."  Def Emanuel asks "What are **we** doing..." Then he states "**We** had success on **our** early tests..." Then, pressing Lynton to take responsibility, he reminds Lynton that Lynton—and Block—also own shares of Screenbid, stating, "**You guys own a piece of this company...**" Then, Def Emanuel exhorts Lynton to action, saying: "**We** have to keep the engines going."

151.   These are not the messages of quiet stockholders. These men are active owners.

152.   Sony Pictures' CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his partners a business report, pasted below his reply text. Block's reply email  reads:

> 2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
> From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
> michael_lynton@spe.sony.com
> **BILL BLOCK:**

| | |
|---|---|
| 1 | Going well gentlemen. |
| 2 | Bill |
| | From: Jeffrey A. Dash [mailto:jdash@screenbid.com] |
| 3 | Sent: Monday, October 27, 2014 10:13 AM |
| 4 | To: Bill Block |
| | Subject: SCREENBID AUCTION UPDATE |
| 5 | AUCTION UPDATE: |
| 6 | TRUE BLOOD: (HBO) We are winding down aftermarket sales and fulfillment and are on schedule to present audited reports to HBO |
| 7 | accounting within 14 days. |
| 8 | SONS OF ANARCHY: (FOX) We visited the set on Friday 10/24/14 and met with the department heads for props, wardrobe, transportation and set |
| 9 | decoration. They are scheduled to wrap next week and we will take delivery by 11/5/14, immediately inventory and shoot. Writing began about 2 weeks |
| 10 | ago The auction is scheduled to go live on 12/01/14 and bidding will end on |
| 11 | 12/10/14. Fulfillment time will be tight. In order to get everything shipped prior to XMAS  we will have extra staff in place to facilitate…" |
| 12 | |

13   153.   Defs Emanuel, Block, and Sony Pictures' CEO Lynton unlawfully profited as

14   Screenbid's owner. Lynton diverted Sony Pictures' assets, to auction them on Screenbid,

15   where Lynton, Emanuel and Block profited as Screenbid owners. These  secret and unlawful

16   relationships are why Sony Pictures did not properly vet Def Blomkamp's Elysium script.

17

18   **Sony Emails Show Def Emanuel Performs Producorial Services:**

19   **Calling Sony Picture Execs To Arrange Hasbro Deal**

20   154.   On March 28, 2014, Def Emanuel emailed Def Sony's Pictures' Chairman, Amy

21   Pascal, to close a co-financing deal with Hasbro. Def Emanuel's email reads:

21   2014-03-28  re: HASBRO Animation deal
From: aemanuel@wmeentertainment.com

22   To:amy_pascal@spe.sony.com;  michael_lynton@spe.sony.com

23   **ARI EMANUEL:**
"HASBRO Animation deal

24   Amy & Michael -

25   We have sent Ronni our proposal for the animation co-financing deal.
Please take a look when you get a chance and lets lock this down.

26   Ari

27   155.   Talent Agents don't arrange co-financing deals with Hasbro —producers do.

28

## Sony Emails Show The Defendants Committed Numerous
## Acts Of Concealment During Discovery In Briggs V Blomkamp

156.   The Sony emails show (in an exchange between Def Wiczyk, Amy Pascal and Simon Kinberg) that Kinberg (the Defs' agent) committed perjury answering interrogatories in *Briggs v Blomkamp*, as Kinberg falsely stated that he merely gave the Elysium Script a "polish", when, in fact, he gave the film a massive rewrite and re-edit. (A portion of said Sony Pictures emails, with explanatory notes, are attached as "**Exhibit X**".)

157.   Additionally, During *Briggs v Blomkamp* discovery, the Defendants willfully suppressed evidence and violated Rule 37, by failing to have one of their employees (Lee Smith) respond to an interrogatory. This incident concerns Def Blomkamp effort to erase incriminating evidence from Elysium, with editor Lee Smith's assistance.  Plaintiff brought this matter to the Court, and it was briefly attended in a teleconference with magistrate Laurel Beeler, but Plaintiff had to abandon the matter as moot, due to time constraints, as motions for summary judgment and replies were due.

## MRC & Sony Pictures Neglected To Do Basic Due Diligence,
## Buying The Rights To Elysium, Without Even Reading A Script

158.  Def Neill Blomkamp filmed *District 9* (2009) without a screenplay.  District 9's star, Sharlto Copley, has given many interviews discussing the fact that he improvised every line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article with Sharlto Copley is attached as "**Exhibit Y**" and is incorporated by reference as if fully set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO Michael Lynton and Def Bill Block (QED), Emanuel was able to get QED and Sony Pictures (and subsidiary *TriStar*) to produce and distribute District 9, without a screenplay—using only Def Blomkamp's notes. Countless writers and fans, in online forums, have tried to find a copy of a District 9 script. All have failed. (NOTE: The fact that *District 9*—a film without a script—was absurdly nominated for an Academy Award for *Best Screenplay*, suggests Def Emanuel exerted his influence with the Academy's Board of Governors.)

159.  Similarly, MRC and Sony Pictures bought the film and distribution rights to

1    *Elysium* from Def Blomkamp, without ever reading a screenplay.

2      160.  Sony Pictures bought the rights to Elysium in a hasty meeting in 2011. In this well

3 documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of

4 scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures

5 agreed to buy the rights, immediately, never bothering to read the script.

6 HollywoodReporter.com reported the details of the stunningly hasty meeting between

7 Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011.

8 MRC scheduled meetings with several other distributors that same day, but Sony Pictures

9 was so rushed and eager to buy the film that MRC canceled all other distribution meetings

10 scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that

11 secured this deal, but never mentions a "screenplay" or a "script".   (Said Hollywood

12 Reporter article about Blomkamp and MRC closing the deal with Sony Pictures is attached

13 as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.)

14      161.  This same meeting and concept art were also recounted in the book "Elysium: The

15 Art of the Film" —a book primarily made up of interviews with Def Blomkamp, himself.

16 On August 6th, 2013, Deep Focus Review (deepfocusreview.com) reviewed the book

17 *Elysium: The Art of the Film*.  (Said Deep Focus Review article is attached as "**Exhibit AA**"

18 and and is incorporated by reference as if fully set out herein.)   Upon interviewing

19 Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and MRC staged

20 50-60 concept art paintings "and set them against the screenplay", explaining:

21
> "On the strength of these images—not to mention the strength of his first film,
21 > *District 9*—he garnered himself a $100 million budget and signed stars Matt
22 > Damon and Jodie Foster."

23      162.  The Defendants used the amazing artwork to strategically distract attention from

24 the flawed screenplay—and Sony Pictures took the bait. An hour later a $100 million deal

25 was made, and no executive from Sony Pictures ever read the script. Def MRC (and Defs

26 Emanuel, Wiczyk, Satchu and Blomkamp) did not do due diligence because they stood to

27 make millions.  Sony Pictures did not do due diligence because their corporate practices

28 were poor, and CEO Michael Lynton had a secret business partnership with Def Emanuel.

| | |
|---|---|
| 1 | **Defendants Take Extreme Measures** |
| 2 | **To Hide and Protect Their Stolen Screenplay** |

3.  163.  Def Blomkamp's script was so riddled with evidence of misappropriation that Defs

4  Blomkamp, MRC and Sony Pictures took extreme measures to protect the script during film

5  production. The website Games Radar (gamesradar.com) interviewed one of Elysium's star,

6  **Jodie Foster**, who revealed the producer's paranoia as she explained she wasn't allowed to

7  possess a script.  (Said Games Radar interview with Foster is attached as **"Exhibit BB"** and

8  is incorporated by reference as if fully set out herein.)  Jodie Foster said:

9
10  **"They won't even give me a screenplay. I've read it, but they won't give me one to physically keep in my home 'cause they're so worried about everybody."**
11

12  164.  <u>The fact that Sony Pictures and MRC committed $100 million to a movie **without**</u>

13  <u>**reading a screenplay**, then invested millions to keep the screenplay secret defies reason</u>.

14  This was done to keep the Plaintiff from learning details of the film's plot before it was

15  released, to prevent the Plaintiff from getting an injunction to stop  production.

16  165.   Had Sony Pictures observed standard best practices and done due diligence, they

17  would have read Blomkamp's screenplay. Then they would have seen his unfocused ideas,

18  plot problems, story weakness, and his poor mechanics. These shortcomings should have

19  raised red flags that Blomkamp's story was likely misappropriate, thus killing the deal.

20

21  **Sony Pictures' Email Hack Shows The Defendants' Extreme Efforts**

21  **To Hide Their Infringement Of Plaintiff's Work,**

22  **And Confirms The Defendants Committed Perjury in Briggs v Blomkamp**

23  166.  When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing

24  skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk

25  described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v

26  Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal.  Wiczyk wrote:

27  2014-10-27 13:36:12  <u>Fwd: CHAPPIE NOTES</u>
28  From: mwiczyk@mrcstudios.com To: pascal, amy

COMPLAINT
36

**MODI WICZYK:**

"hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then</u>. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

167.  A company has a responsibility to observe best practices and do due diligence, to be sure their products are what they allege: original works. Having a CEO at Sony Pictures who is secret business partners with the CEO of a talent agency subcontractor (WME) is not a best practice. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" (Kinberg) to disguise infringement is not a best practice. Rather, these are the methods of corrupt, mob-like conspirators.

168.  Further, during discovery in *Briggs v Blomkamp*, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants did not, would not, and could not produced such documentation.

169.  **NOTE:** In *Briggs v Blomkamp*, in his first amended complaint (FAC), the Plaintiff informed the Court that Daniel Loeb (billionaire  CEO of Third Point, Sony's largest shareholder, 7%) advised Sony Corporation that Sony Pictures needs greater scrutiny, and said Sony Pictures lacks *transparency*, *accountability* and *discipline.*

## <u>Defendant Blomkamp Gets Caught Lying To The World</u>
## <u>About His "Aliens 5" Script (Which Also Did Not Exist), In 2017</u>

170.  Just as Def Blomkamp  sold Elysium to Sony Pictures without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" franchise film, without a script —but this time he did it openly, for the world to see.  Unfortunately, in the process, he induced several other Hollywood notables into his strange world of lies.

171.  On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his

Twitter account, and expressed his hope of one day shooting the film. Soon dozens of Blomkamp fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, documented in an article on Nerdist.com. (Said article from Nerdist.com is attached as "**Exhibit CC**" and is incorporated by reference as if fully set out herein.)

172.   July 2016, ScreenRant.com reported that Sigourney Weaver and James Cameron were out praising Blomkamp's script. (Said ScreenRant article is attached as "**Exhibit DD**" and is incorporated by reference as if fully set out herein.)  Sigourney Weaver said:

> **"There is an incredible script by Neill. I didn't want to do a fifth one. I thought going to earth wouldn't be fun. I got this script that was amazing..."**

173.   And director James Cameron applauded the script:

> **Director James Cameron (*Avatar*) then went on to throw in his two cents, saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"**

174.   "Gangbusters."  Then, in April 2017, ScreenCrush.com reported that director Ridley Scott (owner of the Aliens franchise) announced there would be no *Aliens 5*.  Mr. Scott explained Def Blomkamp **never even had a script**. (Said Screen Crush article is attached as "**Exhibit EE**" and incorporated by reference as if fully set out herein.)   Ridley Scott stated:

> **"I don't think it will ever see the light of day. <u>There was never a script</u>. Just an idea that evolved from a dozen or so pages."**

175.   So *Aliens 5* will never be made.   By following best practices and doing the due diligence of asking to see Defendant Blomkamp's script before signing the contract, Ridley Scott foiled Defendant Blomkamp's half-baked plan of making an *Aliens* franchise film without a script.

176.  NOTE: In 2011, director James Cameron (who was publicly humiliated after he said Defendant Blomkamp's nonexistent *Aliens 5* script "works gangbusters") was sued by Brant Moore, who alleged Cameron's film *Avatar* was an infringement of Moore's work (Moore v. Lightstorm Ent., Inc.). In that matter, Cameron's legal team also hired "fixer" Jeff Rovin to submit an expert report to the court.  The Plaintiff suspects that in that matter too, Rovin's expert report was falsified.

## The Defendants Hired An "Expert," Who Falsified His Report,
## Then Went On Fox News To Admit He Was A Professional "Fixer"

177.  In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of California's thousands of intellectual property attorneys for an expert witness, the Defs hired Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description).

178.  Two years after Briggs v Blomkamp went to appeals (October 19, 2016), Rovin confessed to the *National ENQUIRER*, then confessed (on **Fox News'** telecast of ***Hannity***, Oct 24, 2016, hosted by Sean Hannity) that he was a professional "fixer" for president Bill Clinton, during Clinton's presidency.  Rovin admitted to writing false "smear" reports on people who disparaged President Bill and Hillary Clinton, then he published these smear articles in tabloid newspapers. Rovin's interview with Hannity can be seen at https://www.youtube.com/watch?v=L3mzoKuFN5o. The story carried in many publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit FF**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER article is attached as as "**Exhibit GG**" and is incorporated by reference as if fully set out herein.)

179.   Rovin also admitted that he bribed the victims of his smears to stay quiet. Shockingly, Rovin said the bribes were so effective that they rarely needed to resort to **other measures**. Rovin said, "**Most of the time** it was just money, it never had to be any threats." Absently, Rovin admitted threats—or worse—might ensue if the money wasn't accepted. This is the man the Defs and their attorneys proffered as an upstanding, trustworthy expert.

180.  Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

181.  Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort." Rovin went on to explain he had worked as a "fixer" many times in the past.

182.  In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.  Rovin's fraud was so extensive that the Plaintiff moved the court to exclude Rovin's *expert* report, as Rovin had falsified citations and fabricated evidence to substantiate his own claims. (Said Motion to Exclude is attached

1    as "**Exhibit HH**" and is incorporated by reference as if fully set out herein.)

2    183.  The fact that the Defendants knew such a sinister man is stunning. When asked how

3    he came to be involved with the Clintons, Rovin explained that the Clintons became aware

4    of Rovin because he was "**fixing something for an actor who was in their** (the Clinton's)

5    **inner circle.**" Rovin does not identify who this person was, but during the time Rovin was

6    involved with the Clintons (1993-1998), **Rahm Emanuel** was senior adviser to President

7    Clinton (1993-1998). <u>Rahm Emanuel is Defendant Ari Emanuel's brother</u>.

8

9                          **<u>Final Note Re Universal Pictures/NBCUniversal</u>**

10    184.   Universal Pictures was originally expected to be the studio to distribute *Elysium*.

11    After seeing the extent of Blomkamps's infringement of the Plaintiff's script, Def Emanuel

12    likely decided to protect Universal from risk. Thus, the Defs  took *Elysium* to Sony Pictures.

13    (An MTV.com article from 2011, mentioning Universals Pictures' expected involvement in

14    *Elysium* is attached as **Exhibit II**, and incorporated by reference as if fully set out herein.)

15

16                          **CONCERNING INJURY & DAMAGES**

17    185.    The Defendants' unlawful and unethical actions caused the Plaintiff various

18    (emotional, monetary, reputational, creative, professional, physical, etc.) injuries. The extent

19    of many of the injuries will never be known. For example:

20    a.   The Defendants' spoliation of evidence (destroying the TS social network)

21          simpedes Plaintiff's ability to defend his copyright protected property, if the U.S.

21          Supreme Court remands *Briggs v Blomkamp* for trial.

22    b.   The Defendants efforts to cheat the judicial process (hiring *fixer*, etc.) in *Briggs v*

23          *Blomkamp*, resulted in the Plaintiff losing substantial, rightful damages.

24    c.   The impact of the Defs' infringing exportation cannot be calculated, as it is possible

25          the Plaintiff's work may have been misappropriated in countless foreign markets.

26    186.  For these reasons, and due to the Defendants' established willingness to deceive the

27    Court, an accounting of Defendants profits and records is necessary to assess damages.

28

1

## CLAIMS FOR RELIEF

2

**FIRST CLAIM FOR RELIEF**
CIVIL CONSPIRACY

3

Define By CACI 3600

4

**(Against All Defendants)**

5     187.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

6    198, as if fully set out herein.

7     188.  The Defendants engaged in Civil Conspiracy (as defined and provided for under

8    California Civil Jury Instructions 3600)

9          "A conspiracy may be inferred from circumstances, including the nature of the
            acts done, the relationships between the parties, and the interests of the alleged
10          coconspirators. [Name of plaintiff] is not required to prove that [name of
            defendant] personally committed a wrongful act or that [he/she] knew all the
11          details of the agreement or the identities of all the other participants."
12                                      *California Civil Jury Instructions, 3600.*

13

14     189. California "Plain Language" Jury Instructions defines "conspiracy" as follows:

15          "A conspiracy is an agreement by two or more persons to commit a wrongful
            act. Such an agreement may be made orally or in writing <u>or may be implied by</u>
16          <u>the conduct of the parties.</u>"

17

18     190.  The Defendants engaged in one large conspiracy, which was comprised of five

19    smaller conspiracies, which resulted in injury to the Plaintiff.  In the execution of these

20    conspiracies, the Defendants conspired to commit the following civil infractions and/or

21    violations: Breach Of Contract, Fraud and Intentional Misrepresentations, Fraudulent

21    Deceit, Fraudulent Concealment, Negligence, Gross Negligence, Willful Suppression Of

22    Evidence, Spoliation Of Evidence, Violations Of California Labor Code, Copyright

23    Infringement, Infringing Exportation.

24     191. California Civil Jury Instructions (CACI) requires that a Plaintiff show that one or

25    more of the Defendants committed an overt act to further the conspiracy. Adhering to this

26    requirement, the Plaintiff will show that, while engaged in these conspiracies, the

27    Defendants committed many clear, overt acts in furtherance of their conspiracy(s).

28

**First Conspiracy**

192.   To unlawfully enrich themselves, the Defendants conspired to create a social network for screenwriters and filmmakers, with little or no security features. The Defendants would then mislead screenwriters that the website was safe, then the Defendants could access and misappropriate the screenwriters' work. In the execution of this first conspiracy the Defendants took the following overt actions:

1. The Defendants created the social network *Trigger Street* (TS), for screenwriters and filmmakers, a website with effectively no security features; celebrity endorsed by Def Kevin Spacey.

2. A month before the creation of TS, the Defendants also created the screenwriter website *Project Greenlight*; celebrity endorsed by Defs Damon and Affleck.

3. In 2001, in the nadir of his career, Universal cast Spacey in the leading role of KPAX, for Universal Pictures. This would be the only film with a budget of over $60 million that Spacey would be cast as a lead for 8 years (1998-2006). Universal Pictures cast Spacey as payment for Spacey's involvement in the conspiracy(s).

4. In 2002 the Defendants launched TS. Three (3) months later Universal Pictures distributed Spacey's production company's first film in years, *United States of Leland* (this also was payment for Spacey's involvement in the conspiracy(s).

5. The Defendants misled TS members that the social network had reasonable security features, when it had none.

6. The Defendants added an anti-security feature to TS in 2007, which erased all access records and information if members removed their screenplays. This feature also automatically restored the user's three (3) spent review credits. Once the Defendants saw that the user's access history was erased, they knew it was safe to misappropriate the work—because no one could ever prove they had previously accessed the work, since the access history was conveniently erased.

7. The Defendants created a *Terms of Use* page that stated the website was intended solely for use in USA. But, in fact, Def Spacey went around the globe outside of the USA to recruit new TS members, in violation of the TS *Terms of Use* agreement.

8. Also in violation of the Terms of Use agreement the Defendants secretly advertised TS on international websites like Bud.TV, and other international media outlets.

9. In 2011, after MRC closed a $100,000,000 deal with Netflix, Defs Spacey and Brunetti moved TS from labs.triggerstreet.com, and began to use the web address "triggerstreet.com" as their production company's website.

10. Immediately after TS closed (November 2014), the Defendants reactivated Project Greenlight (the HBO TV show), which had been dead for 12 years; starting the show up again in early 2015, with new episodes airing September 2015. With the cancellation of TS, the Defendants reactivated the Project Greenlight HBO TV show to give the Defendants a pathway to access new screenplays.

11. Project Greenlight (the HBO TV show) was cancelled after the 2015 season. Immediately, after TV show's cancellation, in 2016, the Defendants activated ProjectGreenlight.com (the social network website). **After being inactive for 10 years**, Project Greenlight.com began accepting new screenplays for its "contest"—to give the Defs a pathway to access new screenplays (after the cancellation of the Project Greenlight HBO TV show).

12. In 2013, Universal Pictures bought the film rights to 50 Shades of Grey. Universal Pictures hired new and untested Def Brunetti to produce the film. This was payment for Brunetti's involvement in the conspiracy.

**Second Conspiracy**

193. Once the Defendants began to produce the film Elysium (which they knew was an infringement of the Plaintiff's work), the Defendants then conspired to prevent the Plaintiff from discovering the film *Elysium* was in production. In this second conspiracy, the Defendants took the following overt actions in furtherance of their conspiracy(s):

1. The Defendants agreed not to leak information about the production of *Elysium*.

2. While producing *Elysium*, the Defs conspired to keep the script an absolute secret, not even allowing Hollywood giants like Jodie Foster to take the script home.

**Third Conspiracy**

194. When the Plaintiff learned of the infringement of his screenplay, he prepared to sue.

1    As he prepared, he mistakenly emailed KWIKA Law, asking them to consider represening
2    him (unaware that they represented the Defendants). Plaintiff believes KWIKA Law
3    informed the Defendants of the coming suit.

4    195.  Two months later, as the Plaintiff prepared to sue, he went to see the film *Elysium*.
5    The Plaintiff observed that the "headache" scenes were <u>not</u> depicted as described in the
6    screenplay. The Plaintiff immediately realized that the Defendants attempted to remove the
7    headaches from the film, but could not completely remove them, for technical reasons.

8    196.  When the Plaintiff wrote his Briggs v Blomkamp Complaint, he mentioned the
9    film's headaches and shared his theory that the Defendants attempted to erase the
10   headaches, after KWIKA Law informed the Defendants of the impending lawsuit. The
11   Plaintiff explained that Def Blomkamp said (in an article published in March 2013) that the
12   film was completely edited and finished.  However, the Plaintiff predicted that evidence
13   would prove that the Defendants returned to the editing room, around June of 2016, to try to
14   remove or change the headaches, to hide their infringement.

15   197.  However, During discovery, the Defs would not make editor Lee Clark available to
16   answer interrogatory(s), to confirm that he and Blomkamp edited the headache scenes.

17   198.  In execution of this third conspiracy, to conceal infringement, the Defs committed
18   the overt actions of:

19   1.  The Defendants removed or attempted to remove evidence of infringement from the
20       film *Elysium*.

21   2.  The Defendants conspired to prevent editor, Lee Smith, from answering the
21       Plaintiff's interrogatory(s) concerning the Defendants' effort to re-edit the film and
22       conceal infringement.

23                                  **Fourth Conspiracy**

24   199.  Once the Plaintiff realized that the Defendants misappropriated his work, he sued.

25   200.  In response, the Defendants devised a fourth conspiracy: the Defendants conspired
26   to prevent the Plaintiff from prevailing in his copyright lawsuit (*Briggs v Blomkamp*). Their
27   plan involved deceiving the Plaintiff and the US federal justice system. In the execution of
28   this fourth conspiracy the Defendants took the following actions in furtherance of their plan:

1. Rather than hiring an intellectual property attorney for an expert witness in *Briggs v Blomkamp*, the Defendants hired a self-confessed *fixer*, who was hired and paid by the Defendants to produce and submit to the Court a falsified expert report;

2. The Defendants made false statements in their interrogatory answers, as Simon Kinberg stated that he merely "polished" Def Blomkamp's script;

3. 6 days after the Plaintiff filed his Notice Of Appeal, Nov 6, 2014, the Defendants conspired to shut-down and destroy the TS social network —to destroy the place of access (re *Briggs v Blomkamp*), and to destroy all evidence contained on or about TS, and to prevent any Court from ever obtaining that information.

**Fifth Conspiracy**

201.  To greatly increase their rate of personal enrichment, the Defendants conspired to break California business, labor and ethics codes. Breaking these codes accelerated an erosion in the Defendants' business practices, causing them to act even more recklessly. In the execution of this fifth conspiracy the Defendants took the following negligent actions:

1. The initial acts of this conspiracy were <u>Universal Pictures' hiring of Def Wiczyk in 1999, then MRC's hiring of Wiczyk in 2000</u>. Universal and MRC hired Def Wiczyk to implement the unethical business structure contemplated in Wiczyk's "memo" (Wiczyk stated in his memo that the studio that was "suffering" would implement his scheme; Universal Pictures was suffering the most of the major studios).

2. After repeated news reports of Def MRC's unlawful and unethical practices, Def Sony Pictures repeatedly engaged in business with Def MRC.

3. The Defendants conspired to commit to invest over $100,000,000 to make the film Elysium, without reading a script.

4. To distract Sony Pictures' attention away from the poorly executed script, the Defendants recklessly staged attractive film concept art, proximate to the screenplay, to entice Sony Pictures to buy the film rights without reading the script.

5. The Defendants conspired to create an arrangement where Universal Pictures, or its parent or its subsidiaries, would finance and/or distribute any project Def Ari Emanuel brought to Universal Pictures.

6. The Defendants conspired to engage in inappropriate business relationships, such as Def Emanuel and Sony Pictures' CEO Michael Lynton co-owning Screenbid, and Defendant Emanuel co-owning MRC (violating Cal Labor Code 1700.39).

202. The Defendants were aware that they and the other Defendants were engaged in unlawful or unethical actions.

203. The Defendants willfully agreed with the other co-conspirators to commit various actions and infractions.

204. The Defendants knowingly, willfully, with disregard for the the law and the Plaintiff's rights or welfare, engaged in these actions and conspiracies.

205. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' conspiring actions, including, but not limited to, such injuries as: lost rightful legal damages, any unknown lost profits, lost income and expenses, emotional and physical injuries due to distress and loss of sleep, reputational and career injuries, and other such injuries, in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
BREACH OF CONTRACT
Violating California Civ. Code § 1473 (Defined Under CACI 303)
**(Against Defs Spacey, Brunetti, Trigger Street Productions, Sound Point Capital)**

206. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 205, as if fully set out herein.

207. When the Plaintiff joined the Trigger Street social network, by agreeing to the *Terms of Use* and other agreements, the Plaintiff entered into a contract with the Defendants.

208. The TS "About Us" page suggested certain attractive possibilities for joining.

209. **Consideration: something of value exchanged for something of value.** After reading TS's various *Terms of Use, About Us*, and other contract pages, the Plaintiff agreed to post his crown jewel (his most meaningful work—his screenplay *Butterfly Driver*) on the TS website. Having quality works posted on TS attracted other writers and filmmakers to the TS social network, to read and learn. Uncommonly strong screenplays, like the Plaintiff's, increased membership and member activity. This active membership allowed TS and the Defendants to receive massive sponsorship deals from sponsors like Budweiser.

1    Thus, obtaining screenplays was TS's reason for existing.  The things of value that TS and

2    the Defendants sought from TS user/members (for sponsorship deals—and for their

3    previously stated objective of finding a screenplay to misappropriate) were screenplays.

4    In exchange for trusting the Defendants and TS with his thing of great value (his screenplay,

5    which he had never posted on another website), the Plaintiff expected to receive a safe USA

6    based website (intended solely for use by members in the USA) for the Plaintiff to post his

7    work—with the possibility that an industry professional might notice his work, and then

8    perhaps make a substantial financial offer for the rights to his work. This expectation of a

9    safe USA based website and membership, and the possibility of exposure to an industry

10   professional came from TS's *Terms of Use, Security* and its *About Us* pages. TS's "*About*

11   *Us*" page stated:

12        "... Spacey has sought out a way to inspire, nurture, and **help bring**
          **exposure** to new and undiscovered talent. If you are in a position to help
13        others, if you find yourself in the building of life and you can send the
14        elevator back down, that becomes your earnest duty. This philosophy has
          become the catalyst for the second step of his vision - TriggerStreet.com.
15             TriggerStreet.com was founded in January 2002 as the web-based
16        filmmaker and screenwriter's community of record - an interactive mechanism
          **for the purpose of discovering and showcasing new and unique talent.**
17        Based on the principles of creative excellence, it provides **industry access**
18        **and exposure to help build the careers of notable new filmmakers and**
          **screenwriters of our day.**"
19

20   210.  The Plaintiff honored, kept and obeyed his duty to all TS terms and agreements.

21   211.  However, unbeknownst to the Plaintiff, the Defendants violated those terms and

21   agreements, from TS's inception, and in every moment that TS was operative.

22   212.  The TS *Terms of Use* stated that TS was made solely for use in the USA.

23   213.  The Plaintiff reasonably believed and relied on this claim.

24   214.  But the claim was false, and the Defendants secretly made the TS social network

25   available around the world. In November 2002, Defs Spacey and Brunetti went to London

26   to recruit members, have a "launch party," and they did interviews.  Then in 2009, Spacey

27   went to a Barcelona film festival to recruit members and boast of TS's "400,000 member

28   around the world."

COMPLAINT

47

1   215.   In these actions, the Defendants knowingly, wantonly, willfully, and deliberately
2   committed breaches of contract, violating Cal Civil Code § 1473.

3   216.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the
4   Defendants' breaches of contract (including, but not limited to, such injuries as: 1. lost
5   profits from related infringing exportation and any subsequent misappropriation; 2. the
6   emotional distress of being deceived into agreeing to a contract, then not knowing in what
7   nation's one's work has truly been displayed in—and possibly misappropriated in—as a
8   result of that breached contract; and many other injuries) in an amount to be determined at
9   trial.

**THIRD CLAIM FOR RELIEF**
FRAUD / INTENTIONAL MISREPRESENTATIONS
Defined By California Civ. Code § 1572
**(Against Defendants Spacey, Brunetti, Emanuel, Satchu, Wiczyk, Blomkamp, All MRC Entities, Trigger Street Productions, Sound Point, and Sony Pictures Ent., Inc.)**

14   217.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through
15   216, as if fully set out herein.

16   218.   The Defendants engaged in fraud and misrepresentations, defined by Cal. Civ. Code
17   § 1572.

18   219.   The Defendants made numerous false representations, as true; such as:

19   a.   The Defendants falsely claimed TS was solely for use in the USA;

20   b.   The Defendants falsely claimed that TS employed "industry standard" security.

21   c.   The Defendants falsely claimed that TS "encapsulates every aspect of the user's
21       desires and needs."

22   d.   The TS "Security" page falsely stated:

23       "When you submit information via the Site, your information is protected
24       using secure data networks protected by industry standard firewall and
         password protection systems. Our security practices and policies are
25       periodically reviewed and updated as necessary, and only authorized
         individuals have access to the information provided by our users."
26

27   e.   The Defendants knowingly hired a "fixer," and knowingly submitted said fixer's
28       falsified expert report to the District Court.

COMPLAINT
48

1    220. The Defendants knew these claims were false.

2    221. The Defendants intended for the Plaintiff to rely on these misrepresentations.

3    222. The Plaintiff relied on the Defendants' claims.

4    223. The District Court relied on the false claims of the Defendants' expert.

5    224. The Plaintiff was injured as as a direct, foreseeable and proximate consequence of

6    the Defendants' fraud and misrepresentations; including, but not limited to, such injuries as:

7    lost damages, lost profits, lost income, lost expenses, emotional injuries, reputational and

8    career injuries, and other such injuries, in an amount to be determined at trial.

9    **FOURTH CLAIM FOR RELIEF**
     FRAUDULENT DECEIT
10   Defined Under California Civ. Code §§ 1709 & 1710
11   **(Against Defendants Sony Pictures Ent Inc., All MRC Entities, Blomkamp, Spacey,**
     **Brunetti, Trigger Street Productions, Sound Point, Wiczyk, Satchu, Emanuel)**
12

13   225. The Plaintiff hereby realleges and incorporates by reference paragraphs 1 through

14   224, as if fully set out herein.

15   226. The Defendants committed fraudulent deceit as defined under California Civ. Code

16   §§ 1709 & 1710.

17   227. The Defendants' acts of deceit include, but are not limited to, such actions as:

18   a.  The Defendant encouraged/intimidated TS members into using false identities;

19   b.  The Defendants falsely claimed TS was solely for use in the USA, but then made TS

20       available around the world, and Defs Spacey went to various foreign countries to

21       recruit new members;

21   c.  The Defendants failed to disclose that the Defendants implemented counter security

22       features on the TS social network, whereby all of a member's script's access history

23       was erased when that member removed his/her script from the TS social network.

24   d.  The Defendants falsely claimed that TS employed "industry standard" security.

25   e.  The Defendants knowingly hired a *fixer*, and knowingly submitted said fixer's

26       falsified expert report to the District Court.

27   f.  The Defendants' employee or agent, Simon Kinberg, stated under oath that he only

28       *polished* Defendant Blomkamp's screenplay. But the record and evidence proves

1        Kinberg did much more than polish Blomkamp's script and film.

2        228.   The Defendants knew these claims were false—or knew that withholding the truth

3    was unlawful, a breach of trust, a breach of obligation, and/or unethical.

4        229.   The Defendants made these false statements and omissions to deceive the Plaintiff,

5    with the intent that the Plaintiff rely on the misrepresentations and omissions as true.

6        230.   The Plaintiff reasonably relied on the Defendants' representations, as true.

7        231.   The Plaintiff was injured as as a direct, foreseeable and proximate consequence of

8    the Defendants' fraudulent deceit, including, but not limited to, such injuries as: lost income

9    and expenses, lost damages, emotional and physical injuries related to distress and the

10   emotional and intellectual challenges of defending one's intellectual property, and other

11   such injuries, in an amount to be determined at trial.

12                          **FIFTH CLAIM FOR RELIEF**
                            FRAUDULENT CONCEALMENT
13          Defined by California Civ. Code §§ 1709 & 1710, and CACI 1901
14   **(Against Defendants Sony Pictures Ent. Inc., All MRC Entities, Blomkamp, Spacey,
        Brunetti, Trigger Street Productions, Emanuel, Blomkamp, Wiczyk, Satchu)**
15

16   232.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

17   231, as if fully set out herein.

18   233.   The Defendants engaged in concealment as defined by California Civ. Code §§

19   1709 & 1710, and as contemplated in California Civil Jury Instructions § 1901.

20   234.   The Defendants willful and deliberate acts of concealment include, but are not

21   limited to, such acts as:

21   a.   The Defendants closed TS without sending a customary email notification to TS

22        members (as the Defs did not want the Plaintiff to be aware of the closure).

23   b.   To prevent Plaintiff from discovering the Defendant's misappropriations of his

24        screenplay, the Defendants took the extraordinary step of refusing to allow Elysium

25        actors to take the Elysium script home.

26   c.   The Defendants did not inform TS members that Def Spacey (and/or Def Brunetti)

27        went to various foreign countries to recruit new TS members.

28   d.   The Defendants failed to disclose that the Defendants implemented counter security

1 features on the TS social network, whereby all of a member's script's access history

2 was erased when that member removed his/her script from the TS social network.

3 e. In *Briggs v Blomkamp*, the Defendants would not permit their employee/agent, Lee

4 Smith, to answer a central discovery interrogatory.

5 235. The Plaintiff was injured as as a direct, foreseeable and proximate consequence of

6 the Defendants' fraudulent concealment, including, but not limited to, such injuries as: lost

7 ability to defend Plaintiff's copyright if matter is remanded for trial, emotional injuries, and

8 other injuries, in an amount to be determined at trial.

9

**SIXTH CLAIM FOR RELIEF**

NEGLIGENCE

Violating Cal. Civ. Code § 1714(a)

**(Against All Defendants)**

10

11

12 236. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

13 235, as if fully set out herein.

14 237. The Defendants engaged in negligent conduct, violating Cal. Civ. Code § 1714(a).

15 ""Due Diligence" actually means a ***complete and appropriate review*** of

16 *documentation and facts by a potential buyer or its agents before purchasing an asset or engaging in business with a prospect.* It was NOT the legal

17 equivalent to kicking the tires on a car; it WAS the legal equivalent to taking the car to a garage, having it checked over completely, and personally

18 checking out every part of the car that did not require the expertise of the

19 garage mechanic. It was a full and complete review using lawyers and CPAs

20 to assist so that when one is done, one knows all that one needs to know before engaging in business with or buying a company or other asset or piece

21 of property.""

21        —*From the Law Offices of Stimmel, Stimmel & Smith*

22 238. The Defendants willfully engaged in a variety of negligent actions and practices,

23 including, but not limited to, such actions as:

24 A. The Defendants engaged in a brazenly negligent culture. (In 1999, Defs Universal

25 and MRC hired Def Wiczyk to implement the unethical business structure

26 contemplated in Wiczyk's "memo" —although Wiczyk' memo actually predicted

27 that only a studio that was *suffering*, like Universal, would implement his scheme).

28 B. Defendants (Emanuel and Block) went into secret and unethical relationships with

COMPLAINT

51

1    Sony Pictures' CEO (M. Lynton), forming the business (Screenbid).  Then, to enrich
2    themselves, the Defendants used Screenbid as a subcontractor for Sony Pictures,
3    —profiting from selling Sony Pictures' property, in violation of California's
4    Business and Professions Code, and violating California's Unfair Practices Act.
5  C.  The Defendants ethics were so negligent that in *Briggs v Blomkamp* the Defendants
6    hired "fixer," Jeff Rovin, to falsify an expert report.
7  D.  Def Sony Pictures bought the rights to Elysium, without reading a script.
8  E.  The Defendants encouraged TS members to use false identities.
9  F.  The Defendant failed to disclose to TS members that Spacey and Brunetti went to
10    London and Spain to market TS.
11  G.  The Defendants failed to contact TS members to disclose that TS was contemplating
12    closing.  This was done to prevent the Plaintiff from discovering the planned closure,
13    so Plaintiff could not inform the Ninth Circuit—who were, at the time, reviewing the
14    District ruling—of the suspicious closure of TS.
15  H.  The Defendants also failed to contact TS members to disclose that TS had closed;
16    this was also done to prevent the Plaintiff from discovering the closure.
17    239.  The Plaintiff was injured as as a direct, foreseeable and proximate consequence of
18  the Defendants' negligent actions, including, but not limited to such injuries as: Plaintiff's
19  judicial process was subverted and denied by the Defendant's conduct (e.g., Jeff Rovn's
20  falsified expert report; Defendants did not inform TS members of TS's closure—so Plaintiff
21  could not present this information to the 9th Circuit), emotional injuries, reputational and
21  career injuries, and other such injuries, in an amount to be determined at trial.
22                    **SEVENTH CLAIM FOR RELIEF**
23                    GROSS NEGLIGENCE
                    Violating Cal. Civ. Code § 1714(a)
24                    **(Against All Defendants)**
25    240.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through
26  239, as if fully set out herein.
27    241.  Gross negligence is the lack of any care, or an extreme departure from what a
28  reasonably careful person would do to prevent harm to oneself or to others.

## **PRAYER FOR RELIEF:**

WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

1. For actual/compensatory damages.
2. For exemplary damages (as provided for under Cal Civ. Code § 3294, etc.)
3. For special damages in an amount according to proof at trial;
4. For the recovery from the Defendants, and for the Plaintiff, of all profits from the film Elysium (DVD, video games, etc), per 17 USC § 505;
5. For Plaintiff's costs and attorney's fees (as provided under 17 USC § 505);
6. For such injunctions and additional relief the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all triable issues.


DATED: August 15, 2018

Respectfully Submitted,

By: _____

Steve Wilson Briggs

Plaintiff In Propria Persona

# Exhibit

# A

INTERNET ARCHIVE
WayBackMachine
12 captures
10 Feb 2007 - 17 Jul 2011

http://...rw.triggerstreet.com:80/gyrobase/Page?mode=print&oid=303    Go

JAN FEB AUG
◀ 10 ▶
2006 2007 200

SEARCH          Short Films  ▼ Go    Create an account | Login

# Terms of Use

## PLEASE READ THESE TERMS OF USE CAREFULLY BEFORE USING THIS WEBSITE.

Last updated June 29, 2006

Triggerstreet.com, Inc. ("TSCI," "we," "our" or "us"), provides the Triggerstreet.com World Wide Web Site (the "Site," located at http://www.triggerstreet.com), together with the advertising and content on the Site and any related services (collectively, the "Services"), subject to your compliance with the terms and conditions set forth in this agreement ("Agreement"). By using the Site or the Services, you agree to be bound by these terms and conditions, our Privacy Policy, and any other agreement you are required to enter into with TSCI in conjunction with your participation in the Site. If you do not agree to these terms and conditions, please do not use the Site or the Services. This Agreement is made between TSCI and you, as a registered member or visitor ("you"). The words "you" or "your" shall also mean heirs, executors, administrators, successors and legal representatives. We reserve the right at any time to impose or change any fees or charges for use of the Site or Services, change the Site or the Services, including eliminating or discontinuing any content on or feature of any Site or change the terms of this Agreement. Any changes we make will be effective immediately on notice, which we may give by posting the revised Agreement on the Site. Your use of the Services after such notice will be deemed acceptance of such changes.

While using the Site and/or Services, you agree to comply with all applicable laws, rules and regulations. We have no obligation to monitor the Site or any materials that you transmit to the Site (including, without limitation, any submission or other material) and we expressly reserve the right to remove any materials from the Site at any time for any reason without notice. You acknowledge and agree that we have the right to monitor the Site and the materials you transmit, from time to time, and to disclose any information (including your personally identifiable information) to any third party in order to operate the Site properly; to protect TSCI, the Site, the Services, our sponsors, partners, affiliates, and our members and visitors; and to comply with any legal obligations, regulations, or governmental requests. TSCI may condition your right to participate on the Site or in the Services on your furnishing to TSCI and keeping updated at all times such personal identifying information as TSCI may require.

You may only have one active account on the Site at any given time and only you may use your designated account to access the Site (i.e., no member may have multiple accounts on the Site).

## RULES OF CONDUCT

While using the Site or the Services, you agree not to:

-Restrict or inhibit any other visitor or member from using the Site or the Services;

http://...vw.triggerstreet.com:80/gyrobase/Page?mode=print&oid=303    Go

INTERNET ARCHIVE
WayBackMachine    12 captures
                  19 Feb 2007 - 17 Jul 2011

JAN FEB AUG
◀ 10 ▶
2006 2007 2008

-Transmit any content or information that is unlawful, harmful, threatening, abusive, harassing, defamatory, libelous, vulgar, obscene, hateful, fraudulent or otherwise objectionable content, or infringes on our or any third party's intellectual property or other rights;

-Transmit any information, software, or other material that contains a virus, worm, time bomb or other harmful or disruptive component;

-Post or transmit chain letters or pyramid marketing schemes;

-Post or transmit unsolicited advertising, promotional materials, or other forms of solicitation;

-Modify, adapt, sublicense, translate, sell, reverse engineer, decompile or disassemble any portion of the Site, the Services, or the software underlying either of them, or modify any materials downloaded from the Site;

-Modify, copy, or tamper with any film or screenplay or any other content that you may access through the Site, or use any content that you might access through the Site or the Services for any reason other than reading, viewing, listening to or reviewing such screenplay or content;

-Collect, harvest or disclose information about other Site visitors or members without their consent;

-Do any act which interferes with or slows the operation of the Site or the Services;

-Use any application or other device or process to retrieve, index or reproduce or circumvent the navigational structure or presentation of the Site, the Services or their contents; or

-Use the Site or Services for any unlawful purpose.

## SUBMISSIONS

Any material (other than the Material [as defined and more fully addressed in the Triggerstreet Screenplay Forum Participation Agreement]) that you transmit to us or post anywhere on the Site or through the Services, including, without limitation, the Shorts, may be used by TSCI throughout the world in perpetuity for any purpose whatsoever, including, but not limited to, reproduction, disclosure, transmission, publication, broadcast, posting and sublicensing, and may be modified to enable or complement any such use; it being agreed that such uses may include, without limitation, display on the Anheuser Busch family of websites and inclusion on videodiscs prepared by CustomFlix Labs, Inc.

You shall not post, send or otherwise make us aware of any creative materials of any kind, apart from your submissions, if any, submitted in connection with a TSCI sponsored festival, contest or the Screenplay Forum section of the Site, such as stories or character ideas, titles, screenplays, songs, or original artwork (collectively, "unsolicited submissions"), unless you agree to our use thereof as described hereinabove. If you send us any unsolicited submissions despite your foregoing obligation not to do so, we take no responsibility and will have no liability with respect to the use by TSCI or any third party of such unsolicited submissions or any portion thereof. The TSCI Parties shall not be liable for any use or disclosure of any unsolicited submissions. By sending us unsolicited submissions you release, waive any claims with regard to, and hold harmless the TSCI Parties from and against any and all claims of any kind that are or could be

INTERNET ARCHIVE
WayBackMachine
12 captures
10 Feb 2007 - 17 Jul 2011
http://...w.triggerstreet.com:80/gyrobase/Page?mode=print&oid=303    Go
JAN FEB AUG
◄ 10 ►
2006 2007 2008

hereafter developed, for any purpose whatsoever. TSCI expressly reserves the right to remove any submissions or postings on the Site at any time for any reason.

## PROPRIETARY RIGHTS

The Site and the Services are owned and operated by TSCI and others pursuant to contractual arrangements. You acknowledge and agree that all content and materials available on the Site and in the Services are protected by copyrights, trademarks, service marks, patents, trade secrets, or other proprietary rights and laws. You agree not to sell, license, rent, modify, distribute, copy, reproduce, upload, post, transmit, publicly display, publicly perform, publish, adapt, edit, or create derivative works from such materials or content from the Site or the Services in any way. Modification or use of any materials contained on the Site or in the Services is a violation of TSCI's copyright and other proprietary rights, and is strictly prohibited. You acknowledge that you do not acquire any ownership rights by using the Site or the Services. The following trademarks: TRIGGERSTREET, and all associated logos, graphics, images and domain names, including, without limitation, TRIGGERSTREET.COM, are the trade names, trademarks, service marks, logos, and/or domain names of TSCI. You agree that you will not challenge the respective ownership rights of TSCI or any third party in or to the TSCI Marks or any third party marks, and that you will not register or attempt to register any trademark, service mark, logo, and/or domain name that is identical or confusingly similar to any of the TSCI Marks or third party marks contained on the Site or in the Services.

## PLEASE INDICATE YOUR ACCEPTANCE OF ALL OF THE ABOVE TERMS AND CONDITIONS BY ENTERING YOUR INITIALS BELOW:

## PROCEDURE FOR MAKING CLAIMS OF COPYRIGHT INFRINGEMENT

If you believe that your material has been copied and is accessible on the Site in a way that constitutes copyright infringement, you may notify TSCI at inquiries@triggerstreet.com by providing our copyright agent with the following information:

1. The electronic or physical signature of the owner of the copyright or the person authorized to act on the owner's behalf;

2. A description of the copyrighted work that you claim has been infringed and a description of the infringing activity;

3. Identification of the location where the original or an authorized copy of the copyrighted work exists, for example the URL of the website where it is posted or the name of the book in which it has been published;

4. Identification of the URL or other specific location on this site where the material that you claim is infringing is located; you must include enough information to allow us to locate the material;

5. Your name, address, telephone number, and email address; and

6. A statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law; and

INTERNET ARCHIVE
WayBackMachine

http://w...w.triggerstreet.com:80/gyrobase/Page?mode=print&oid=303   Go

12 captures
10 Feb 2007 - 17 Jul 2011

JAN FEB AUG
◀ 10 ▶
2006 2007 2008

## PRIVACY POLICY

We require you to read our Privacy Policy, which (in addition to this Agreement and any other agreement by which you may be bound) sets out how we collect and use any information you submit to TSCI or through the Site or the Services. You must be at least 18 years old to register to use this Site or the Services.

## INTERNATIONAL USE

Unless otherwise specified, the materials on the Site and in the Services are presented solely for the purpose of promoting the entertainment, information, and community resources and services available in, and other uses in, the United States of America. We control and operate the Site and the Services from within the United States. We make no representation that materials on the Site or the Services are appropriate or available for use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose to access the Site from other locations do so on their own initiative and are responsible for compliance with local laws.

## SUSPENSION AND TERMINATION

TSCI reserves the right, in its sole discretion, to suspend or terminate your access to all or part of the Site or the Services, at any time, with or without notice.

## DISCLAIMERS

YOU EXPRESSLY AGREE THAT USE OF THE SITE AND THE SERVICES ARE AT YOUR SOLE RISK. THE SITE AND THE SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. TSCI PROVIDES NO ASSISTANCE INCLUDING, WITHOUT LIMITATION, ANY TECHNICAL OR CUSTOMER SUPPORT.

TSCI MAKES NO WARRANTY THAT THE SITE OR THE SERVICES WILL MEET YOUR SYSTEM'S REQUIREMENTS, OR THAT THE SITE OR THE SERVICES (OR THE SERVERS THAT MAKE THEM AVAILABLE) WILL BE UNINTERRUPTED, TIMELY, SECURE, ERROR FREE OR FREE OF HARMFUL COMPONENTS; NOR DOES TSCI MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE SITE OR THE SERVICES OR AS TO THE ACCURACY OR RELIABILITY OF ANY INFORMATION OBTAINED THROUGH THE SITE OR THE SERVICES OR THAT DEFECTS IN THE SITE OR THE SERVICES WILL BE CORRECTED.

TSCI EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. YOU UNDERSTAND AND AGREE THAT ANY MATERIAL AND/OR DATA DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE SITE OR THE SERVICES IS DONE AT YOUR OWN DISCRETION AND RISK AND THAT YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR LOSS OF DATA THAT RESULTS FROM THE DOWNLOAD OF SUCH MATERIAL AND/OR DATA.



INTERNET ARCHIVE
WayBackMachine

http://w...w.triggerstreet.com:80/gyrobase/Page?mode=print&oid=303   Go

12 captures
10 Feb 2007 - 17 Jul 2011

JAN FEB AUG
◀ 10 ▶
2006 2007 2008

READER, OR THAT SUCH MATERIAL IS FREE OF OFFENSIVE, INDECENT, OBSCENE, DEFAMATORY OR OTHER POTENTIALLY INAPPROPRIATE ELEMENTS. YOU ACKNOWLEDGE THAT WE DO NOT AND CANNOT REVIEW AND MONITOR CONTENT ON THE SITE OR IN THE SERVICES, AND YOU HEREBY AGREE THAT WE SHALL HAVE NO LIABILITY FOR ANY DAMAGES OR COSTS THAT MAY ARISE FROM OUR PUBLICATION OR YOUR VIEWING OR READING OF, EXPOSURE TO, OR ACCESS TO ANY FILM, POSTING, SCREENPLAY OR OTHER CONTENT ON THE SITE OR THE SERVICES.

THE SITE AND SERVICES MAY CONTAIN LINKS TO THIRD-PARTY SITES. THOSE THIRD-PARTY SITES ARE NOT UNDER THE CONTROL OF TSCI AND TSCI IS NOT RESPONSIBLE FOR THE CONTENT ON ANY LINKED SITE. IF YOU ACCESS A THIRD-PARTY SITE FROM OUR SITE, THEN YOU DO SO AT YOUR OWN RISK. THE INCLUSION OF THE LINK DOES NOT IMPLY THAT WE ENDORSE OR ACCEPT ANY RESPONSIBILITY FOR THE CONTENT ON THOSE THIRD-PARTY SITES.

TSCI MAKES NO WARRANTY REGARDING ANY GOODS OR SERVICES PURCHASED OR OBTAINED THROUGH THE SITE OR THE SERVICES OR ANY TRANSACTIONS ENTERED INTO THROUGH THE SERVICE OR BY WAY OF THE SERVICES. NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM TSCI OR THROUGH THE SITE OR THE SERVICES SHALL CREATE ANY WARRANTY NOT EXPRESSLY MADE HEREIN.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES, SO SOME OF THE ABOVE EXCLUSIONS MAY NOT APPLY TO YOU.

**LIMITATION OF LIABILITY**

UNDER NO CIRCUMSTANCES SHALL TSCI, ITS LICENSEES, SUCCESSORS, ASSIGNS, RELATED OR AFFILIATED ENTITIES, ADVERTISERS, SPONSORS, PROVIDERS, CONTRACTORS, CONSULTANTS OR PROFESSIONAL ADVISORS OR THE PARENT, SUBSIDIARY OR AFFILIATED COMPANIES OF EACH OF THEM AND ANY OF ITS OR THEIR EMPLOYEES, OFFICERS, DIRECTORS, MEMBERS, SHAREHOLDERS, REPRESENTATIVES OR AGENTS (THE "TSCI PARTIES") BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES THAT RESULT FROM THE USE OF, OR INABILITY TO USE, THE SITE OR THE SERVICES. THIS LIMITATION APPLIES WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER BASIS, EVEN IF TSCI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. TO THE EXTENT SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, THE TSCI PARTIES' LIABILITY IN SUCH JURISDICTIONS SHALL BE LIMITED TO THE EXTENT REQUIRED BY LAW.

**INDEMNIFICATION**

You shall be fully responsible for any violation of this Agreement or of any other agreement between you and TSCI (including, but not limited to, the Privacy Policy, and any other agreement). You agree to defend, indemnify, and hold harmless the TSCI Parties from all liabilities, claims, and expenses, including attorneys' fees that arise from your use or misuse of the Site or the Services. TSCI reserves the right to assume the exclusive defense and control of

INTERNET ARCHIVE
WayBackMachine

12 captures
10 Feb 2007 - 17 Jul 2011

http://www.triggerstreet.com:80/gyrobase/Page?mode=print&oid=303   Go

JAN FEB AUG
◀ 10 ▶
2006 2007 2008

## GOVERNING LAW

This Agreement, the Privacy Policy and any other agreement between you and TSCI shall be governed by and construed in accordance with the laws of the State of California, United States of America, excluding its conflicts of law rules. In the event of any dispute arising out of or in connection with your use of the Site or the Services, such dispute shall be submitted to arbitration in the County of Los Angeles, State of California, United States of America in accordance with the rules and regulations of the American Arbitration Association then in effect (as amended herein), provided that said arbitration shall be heard before a single arbitrator, selected pursuant to such rules and regulations, and shall be conducted on an expedited basis and in confidence. Each party hereby waives any and all rights and benefits which it might otherwise have or be entitled to under United States federal law or the laws of the State of California, United States of America or any other state or country to litigate any such dispute in court, it being the intention of the parties to arbitrate, according to the provisions of this Agreement, all such disputes. The arbitrator's decision shall be controlled by the terms and conditions of this Agreement and any other agreements you may enter into with TSCI, and shall be final and binding, and shall provide for each party to bear its own costs of arbitration and attorneys' fees. Each party expressly waives any right to a jury. Judgment upon the award of the arbitrator may be entered or enforced in any court of competent jurisdiction. If either party shall fail to appear at the hearing on the date designated in accordance with the rules of the American Arbitration Association, or shall otherwise fail to participate in the arbitration proceeding, the arbitrator is hereby empowered to proceed ex parte. In the event of any dispute concerning this Agreement or any other agreement between you and TSCI, your sole and exclusive remedy shall be to seek damages pursuant to an arbitration authorized herein, and in no event will you be entitled to seek rescission, or injunctive or other equitable relief. If you do not agree to these requirements (or any other provision herein), do not use the Site or the Services.

## SEVERABILITY AND INTEGRATION

This Agreement, together with any agreement referred to herein (including the Privacy Policy) and any other agreement between you and TSCI, constitutes the entire agreement between you and TSCI with respect to the Site and the Services and supersedes all prior or contemporaneous communications and proposals (whether oral, written, or electronic) between you and TSCI with respect to the Site and the Services. If any part of this Agreement is held invalid or unenforceable, that portion shall be construed in a manner consistent with applicable law to reflect, as nearly as possible, the original intentions of the parties, and the remaining portions shall remain in full force and effect.

## MISCELLANEOUS

This Agreement is not assignable or otherwise transferable by you, and any such transfer, assignment or sublicense shall be null and void. No agency, partnership, joint venture or employment relationship between you and TSCI is intended or created by this Agreement. No waiver by either party of any breach or default hereunder shall be deemed to be a waiver of any preceding or subsequent breach or default. Any heading, caption or paragraph title contained in this Agreement is inserted only as a matter of convenience and in no way defines or explains any paragraph or provision hereof. Any notifications or other communications that we undertake to send to you hereunder will be deemed conclusively given if sent to the email address submitted as part of your registration with TSCI. If such email address does not function, TSCI

 http://www.triggerstreet.com:80/gyrobase/Page?mode=print&oid=303   Go

12 captures
10 Feb 2007 - 17 Jul 2011

JAN FEB AUG
◄ 10 ►
2006 2007 2008

clicking "I AGREE" or similar buttons provided in conjunction with any such agreement, your submission of any agreement with your initials and/or name entered into a box provided for that purpose together with the agreement, and/or your registration to use the Site or the Services governed by this Agreement, shall constitute your electronic signature and, according to the provisions of federal law (including, without limitation, copyright law), shall be of the same effect as if you had signed such agreement manually. Your access and use of the Site or the Services also constitutes your acceptance of this Agreement. Upon our request, you agree to sign a non-electronic version of this Agreement. A printed version of this Agreement and/or of any notice given in electronic form shall be admissible in judicial, administrative, or arbitration proceedings based upon or relating to this Agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form.

**NOTICE FOR CALIFORNIA USERS: California Civil Code Section 1789.3 entitles California users to the following specific consumer rights notice: The Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs may be contacted in writing at 400 R. Street, Sacramento, CA 95814 or by telephone at (916) 445-1254.**

**PLEASE INDICATE YOUR ACCEPTANCE OF ALL OF THE ABOVE TERMS AND CONDITIONS BY ENTERING YOUR INITIALS BELOW:**

# Exhibit

# B

INTERNET ARCHIVE
WayBackMachine

61 captures
12 Jul 2000 - 13 Mar 2016

http://www.triggerstreet.com:80/gyrobase/Page?oid=305   Go

DEC FEB MAY
◄ 09 ►
2006 2007 200

SEARCH                                    Short Films ▼  Go    Create an account | Login

> UPDATES

> TRIGGER DIGEST

> INDUSTRY NEWS

> HALL OF JUSTICE





# About Us

Trigger Street Productions, Inc., was formed in 1997 by Kevin Spacey to develop and produce entertainment in a variety of mediums. Realizing that the path to his own success would have been much rockier without the support and encouragement of many outstanding mentors, Spacey has sought out a way to inspire, nurture, and help bring exposure to new and undiscovered talent. If you are in a position to help others, if you find yourself in the building of life and you can send the elevator back down, that becomes your earnest duty. This philosophy has become the catalyst for the second step of his vision - TriggerStreet.com.

TriggerStreet.com was founded in January 2002 as the web-based filmmaker and screenwriter's community of record - an interactive mechanism for the purpose of discovering and showcasing new and unique talent. Based on the principles of creative excellence, it provides industry access and exposure to help build the careers of notable new filmmakers and screenwriters of our day.

Our mission is to encourage the creative process of filmmaking and screenwriting by providing hands on, peer-to-peer, objective criticism and letting the material be judged on its own merit. We offer an engaging avenue of exploration for both first time and veteran film directors, writers, and enthusiasts, anyone at all, who is attempting to bring his or her vision to the screen.

Our team has been extensively researching and designing TriggerStreet.com to ensure that it encapsulates every aspect of the user's desires and needs. We are using the Internet with its initial intention and design in mind: a tool to communicate. As such a constructive tool, we hope that it will be an inventive, productive, and exciting experience for all.

Welcome to TriggerStreet.com.

**Quote Of The Day**
*"In life it is more necessary to lose than to gain. A seed will only germinate if it dies."*
- Boris Pasternak



Powered by        Design by BrinkMedia

# Exhibit
# C

INTERNET ARCHIVE
WayBackMachine

http://www.triggerstreet.com:80/gyrobase/Page?oid=304   Go

90 captures
12 Jul 2000 - 10 Aug 2011

DEC FEB MA
◀ 09 ▶
2006 2007 200

SEARCH    Short Films ▼ Go   Create an account | Login

▷ UPDATES
▷ TRIGGER DIGEST
▷ INDUSTRY NEWS
▷ HALL OF JUSTICE

# Privacy Policy

Last updated November 4, 2002

Triggerstreet.com, Inc. ("TSCI" or "we," "us" or "our") respects the privacy rights of our online visitors and members and recognizes the importance of protecting the information collected about you. We have adopted this online privacy policy (our "Policy") that guides how we collect, store and use the information you provide online through your participation on the World Wide Web site located at http://www.triggerstreet.com (the "Site") and any related services (collectively, the "Services").

**Information Collection and Use**

We are the sole owner of the information collected on the Site unless specifically stated otherwise. We will not sell, share, or rent this information to others in ways different from what is disclosed in our Policy. We collect information from our users at several different points on the Site. When registering to become a member of the Site, we may need you to provide your name, email address, mailing address, phone number, fax number and other personally identifiable and non-personally identifiable information. Members of the Site must create a user name and password. This information, among other things, allows us to keep a user profile that we may use to monitor or improve the use and satisfaction of the Site and to customize the Site. Although certain parts of the Site allow you to use them without submitting any personally identifiable information, some areas, such as participation in certain contests or the submission of material, chat areas, bulletin boards and other specialized sections of the Site, do require registration and/or your submitting personally identifiable information. We also collect non-personally identifiable information, such as certain demographic information, for users of the Site. We use non-personally identifiable information to build a more useful Site and better Services by examining the characteristics and behavior of the Site's users, and by measuring demographics and interests regarding specific areas of the Site and the Services. We also may provide statistical information based on this data to our current and future entertainment and sponsorship partners and strategic alliances.

**Information Disclosure**

We reserve the right to disclose information submitted by or concerning any user as we feel is necessary to protect our systems or business. Specifically, but without limitation, we reserve the right to disclose such information when a visitor or member is in violation of our Terms of Use or any other agreement with us, or engages (or is suspected of engaging) in any harmful, infringing or illegal activity; any threatening or abusive behavior or in any manipulation of the Site or the Services including, without limitation, to law enforcement agencies for investigation or prosecution. You hereby agree that we may disclose such information in connection with such events and/or concerns, with or without a subpoena, warrant, or other court order, and that we may disclose such information in response to court and governmental orders, civil subpoenas, discovery requests and as otherwise required by law, as well as in response to allegations of infringement or as we feel may be required to protect TSCI, the Services, the Site, our users, or other third parties. We also reserve the right to suspend or terminate your membership in connection with any suspected illegal, infringing, or inappropriate activity.

Subject to the foregoing, TSCI may use your personally identifying information: (1) to customize various aspects of the Site and the Services to your preferences; (2) to determine which advertisements or sponsor messages will be served to your browser; (3) to send you announcements, updates, and other third party materials that we feel may be of interest to you (you may "opt out" of receiving these





**Quote Of The Day**
*"In life it is more necessary to lose than to gain. A seed will only germinate if it dies."*
- Boris Pasternak

INTERNET ARCHIVE
WayBackMachine
90 captures
12 Jul 2003 - 10 Aug 2011

http://www.triggerstreet.com:80/gyrobase/Page?oid=304    Go

DEC  FEB  MA
◀ 09 ▶
2006  2007  200

advertisement and development partners and strategic alliances; and (2) TSCI's contractors, consultants, and professional advisors to the extent necessary for them to perform services on our behalf, and only under disclosure restrictions.

Notwithstanding anything contained herein, because the Site is "powered by" Brink Media, Inc. and DesertNet, LLC, and is hosted by RealNetworks, Inc., TSCI will disclose both personally identifiable and non-personally identifiable information to Brink Media, Inc., DesertNet, LLC and RealNetworks, Inc. In addition, we may partner or otherwise contract with other parties to provide specific services. When you sign up for these services we will share names, or other contact information that is necessary for the third party to provide these services; provided that these parties are not allowed to use personally identifiable information except for the purpose of providing these services.

### User Names and User Disclosure

The user name you select or are provided with upon registration with the Site is deemed non-personally identifiable information. Your user name may be published on the Site and may be disclosed to others, including, without limitation, to the public, and to any third parties with whom we elect to share such information. In addition, if you include your name or any other personally identifying information in any material transmitted or posted on public areas of the Site or the Services (including, without limitation, message boards, reviews and chat rooms), such information will become public information and will be published on the Site and will be disclosed to other users of the Site and to other third parties who may have access to or otherwise see a display of such information. You hereby release, waive any claims against, and hold harmless TSCI and its related or affiliated entities, as well as all of its and their respective partners, parent, members, subsidiaries, affiliates, sponsors, officers, directors, shareholders, representatives, agents, contractors, consultants, and professional advisors and any of their employees, from and against any and all claims relating to such disclosure, sharing, or publication.

### Festivals, Contests, Submissions and Promotions

When you enter a festival, contest, submission or other promotional feature, we may again ask for your name, address, email address, user name, password, and other various submission information, demographic information and consumer preferences so that we are able to, for example, properly administer the festival and notify winners. We reserve the right in our sole discretion to sell, trade or otherwise transfer outside TSCI personally identifiable information that users voluntarily provide in any registration or festival, contest or material submission. In connection with TSCI's festivals, contests, submissions or other promotions, TSCI may post relevant privacy information in the official rules, and/or in the registration area or another area on the Site for the festival, contest, promotion or submission. That privacy information, to the extent it conflicts with our Policy, will govern that particular promotion, festival, contest or submission.

### Cookies

A cookie is a piece of data stored on the user's hard drive containing information about the user. Usage of a cookie is in no way linked to any personally identifiable information while on the Site. Once the user closes their browser, the cookie simply terminates. For instance, by setting a cookie on the Site, you would not have to log in a password more than once, thereby saving time while on the Site. If you reject the cookie, you may still use the Site, however, you will be limited in some areas of the Site. Cookies can also enable us to track and target the interests of our users to enhance the experience on the Site. Some of our business partners use cookies on the Site (for example, advertisers). However, we have no access to or control over these cookies. Most browsers will allow you to erase cookies from your computer hard drive, block acceptance of cookies, or receive a warning before a cookie is stored.

### Log Files

We use IP addresses to analyze trends, administer the Site and the Services, track user movement, and gather broad demographic information for aggregate use.

### Information Access, Review and Updating



**90 captures**
12 Jul 2006 - 19 Aug 2011

http://www.triggerstreet.com:80/gyrobase/Page?oid=304   [Go]

DEC  FEB  MA
◀ 09 ▶
2006  2007  200

**Third Party Uses and Links**

TSCI cannot and does not assume any responsibility for any actions of any third parties, including their use of information received either from TSCI through the Site, the Services or independently. The Site and the Services may contain links to other World Wide Web sites. We are not responsible for the privacy practices or the content of such other web sites. You are encouraged when you leave the Site and to read the privacy statements and terms of use of all websites to which you are linked. Our Policy applies solely to information collected by TSCI on the Site and through the Services.

**Security**

When you submit information via the Site, your information is protected using secure data networks protected by industry standard firewall and password protection systems. Our security practices and policies are periodically reviewed and updated as necessary, and only authorized individuals have access to the information provided by our users. You are ultimately responsible for the security of your user name and password. If you have any questions about the security at the Site, you can send an email to inquiries@triggerstreet.com.

**Choice/Opt-out**

You may choose to "opt out" of receiving promotional or other certain materials from TSCI and/or its affiliates, advertisers, or other business partners at any time by checking any "opt-out" boxes that may be provided during the registration process. You may also contact third parties directly. Users will not be able to "opt out" of receiving certain email messages from us that are important to your use of the Site or the Services.

**Consent**

By using the Site or the Services, you signify your assent to our Policy. If you do not agree to our Policy, please do not use the Site or the Services. We reserve the right to make changes in our Policy at any time. Amendments to our Policy will be posted at this URL and will be effective when posted. Please check our Policy regularly to ensure you are aware of any changes in our privacy practices. Your continued use of the Site or the Services will signify your acceptance of the changes to our Policy. If you have any questions regarding our Policy, please email us at inquiries@triggerstreet.com.

ABOUT US | PRIVACY | TERMS | HELP | LINKS

Powered by                    Design by BrinkMedia

242.   The Defendants willfully engaged in grossly negligent conduct and practices, in violation of Cal. Civ. Code § 1714(a).

243.   The Defendants' gross negligence include, but are not limited to, such actions as:

A.   Defendants (Emanuel and Block) went into secret and unethical relationships with other Defendants, forming *Screenbid*; then used this company as a subcontractor for Sony Pictures, in violation of California's Business and Professions Code, and violating California's Unfair Practices Act.

B.   The Defendants participated in an openly negligent culture. In 1999 and 2000, respectively, Defendants Universal and MRC hired Def Wiczyk to implement the unethical business structure contemplated in Wiczyk's "memo".

C.   Rather than hiring an IP attorney as an expert, in Briggs v Blomkamp, the Defs hired "fixer," Jeff Rovin, to falsify an expert report and cheat the judicial process.

D.   To distract Sony Pictures' attention away from the poorly executed script, the Defendants recklessly staged film concept art near the screenplay, to entice Sony Pictures to buy the film rights without reading the script (which Sony Pictures did).

E.   The Defendants encouraged TS members to use false identities. This made the Defs' (and their associates) use of false identities seem normal and not suspicious.

F.   The Defendant failed to disclose to TS members that Spacey and Brunetti went to London and Spain to market TS.

G.   Six days after Plaintiff filed *Notice Of Appeal* the Defendants closed TS, to destroy evidence, and prevent Plaintiff from prevailing if case were remanded.

H.   Immediately after the Plaintiff filed his first lawsuit against the Defendants (Briggs v Blomkamp, October 2013), the Defendants updated their *Elysium* Wikipedia page, adding the false claim that: **"The basic plot** (of Elysium) **is similar to the *Star Trek: The Original Series* episode "The Cloud Minders" and to classic *Metropolis (1927 film)*."**   But, In fact, neither of those productions has a plot remotely similar to *Elysium* or *Butterfly Driver*—no <u>poor hero</u> racing to a <u>giant satellite</u> for the <u>rich</u> (<u>orbiting Earth</u>) to get medicine for his daughter.  "Cloud Minders" involves a <u>castle that floats in a **fixed place** about 1000 feet above the</u>

1   surface of a **distant planet, using reverse magnetism**, and houses artists and
2   intellectuals. *Metropolis* also does not feature any of the Plaintiff's structures. Using
3   the Internet Archives website, one sees this passage was added to Elysium's
4   Wikipedia page after Plaintiff's lawsuit, late 2013. The Defs negligently and
5   unethically added this passage to sway opinion.

6   244.  The Plaintiff was injured as as a direct, foreseeable and proximate consequence of
7   the Defendants' grossly negligent actions, including, but not limited to such injuries as:
8   Plaintiff's judicial process was subverted by the Defendants' action —resulting in lost
9   damages, emotional and physical injuries due to distress, lost income and expenses, and
10  other such injuries, in an amount to be determined at trial.

11  **EIGHTH CLAIM FOR RELIEF**
WILLFUL SUPPRESSION OF EVIDENCE / SPOLIATION OF EVIDENCE
12  As Defined, Contemplated and Provided for Under CACI 204
13  **(Against Defendants Emanuel, Spacey, Brunetti, Trigger Street Productions, Wiczyk,
Satchu, Block, Blomkamp, All MRC Entities, Sony Pictures Ent. Inc.)**
14

15  245.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through
16  244, as if fully set out herein.

17  246.  California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression of
18  evidence unlawful; stating: **"You may consider whether one party intentionally
19  concealed or destroyed evidence. If you decide that a party did so, you may decide that
20  the evidence would have been unfavorable to that party."**

21  247.  The Defendants knowingly, willfully and deliberately engaged in willful
21  suppression (or destruction) of evidence, through such  actions as:

22  1.  (**Spoliation; Destruction of Evidence**) Knowing TS was the central access point in
23      an ongoing legal case, after operating for 12 years, the Defendants closed TS six (6)
24      days after Plaintiff filed *Notice Of Appeal* to the 9th Circuit (re *Briggs v Blomkamp*).
25  2.  The Defendants hired a "fixer" to suppress actual facts, and provide a falsified
26      expert report to the District Court.
27  3.  The Defendants refused and failed to make one of their agents (Lee Smith) available
28      to answer central interrogatory(s), during *Briggs v Blomkamp* discovery;

4.  The Defendants proffered as true, a false discovery statement from writer Simon Kinberg stating that he merely "polished" Def Blomkamp's screenplay. But, in fact, Kinberg performed massive rewriting and re-editing.

248.  Pertaining to **spoliation** (destruction of evidence), California has identified **five** elements of intentional spoliation (all elements were present in *Briggs v Blomkamp*, at the time of the evidence destruction): (1) pending or probable litigation involving the plaintiff; (2) knowledge by the defendant of the existence or likelihood of litigation; (3) intentional "acts of spoliation" on the part of defendant designed to disrupt plaintiff's case; (4) disruption of plaintiff's case; and (5) damages proximately resulting therefrom.

249.  The Defendants knowingly, willfully, maliciously, with wrongful intent to harm the Plaintiff, and with disregard for the law, endeavored to suppress and destroy evidence.

250.  The evidence that the Defendants suppressed and destroyed would have been very unfavorable to the Defendants.

251.  Plaintiff was injured as a direct, foreseeable and proximate result of the Defendants' willful suppression and destruction of evidence, including, but not limited to such injuries as: (A) the Defendants' action resulted the destruction of the TS social network, which impedes the Plaintiff's ability to defend his copyright at trial, if remanded; (B) the Defs' actions resulted a wrongful judgment in the Defendants' favor—thereby costing the Plaintiff due legal damages and profits; additionally, the Defendants' actions resulted in lost income, lost expenses, emotional and physical injuries, reputational and career injuries, and other such injuries, in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**
INFRINGING EXPORTATION
Violating  17 USC § 602(a)(2) [Enforceable Under 17 USC § 501]
**(Against Defendants Trigger Street Productions, Sound Point, Spacey and Brunetti)**

252.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 251, as if fully set out herein.

253. 17 U.S. Code § 602(a)(2) states:

**(2) Importation or exportation of infringing items.**—
Importation into the United States or exportation from the United States,

1   without the authority of the owner of copyright under this title, of copies or
2   phonorecords, the making of which either constituted an infringement of
    copyright, or which would have constituted an infringement of copyright if
3   this title had been applicable, is an infringement of the exclusive right to
    distribute copies or phonorecords under section 106, actionable under sections
4   501 and 506.
5

6   254. Thus, by displaying the Plaintiff's work in countless nations outside of the United

7   States, without the Plaintiff's permission or knowledge, Defendants Spacey and Brunetti

8   knowingly, willfully and deliberately committed Infringing Exportation of the Plaintiff's

9   original copyright protected screenplay, under 17 USC § 602(a)(2). In doing so, the

10  Defendants violated the Plaintiff's exclusive right to distribute his work under 17 USC

11  106(3), enforceable under 17 USC § 501(a): Copyright Infringement.

12  255. Under 17 USC § 504(a) and (b) the Plaintiff is entitled to actual (compensatory)

13  damages, as well as any additional profits of the infringer.

14  256. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

15  Defendants' infringing exportation and copyright infringement of the Plaintiff's original and

16  copyright protected work, in an amount to be determined at trial.

17                          **TENTH CLAIM FOR RELIEF**
                            COPYRIGHT INFRINGEMENT
18                             Violating 17 USC § 501(a)
19  **(Against Defendants Trigger Street Productions, Sound Point, Spacey and Brunetti)**

20  257. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

21  256, as if fully set out herein.

21  258. The Defendants (by marketing TS around the world, and making the Plaintiff's

22  work available around the world on the TS social network, without the Plaintiff's

23  knowledge or consent) willfully violated 17 USC § 602(a)(2). In doing so, the Defendants

24  violated the Plaintiff's exclusive right to distribute his work under 17 USC 106(3),

25  enforceable under 17 USC § 501(a): Copyright Infringement.

26  259. Under 17 USC § 504(a) and (b) the Plaintiff is entitled to actual (compensatory)

27  damages, as well as any additional profits of the infringer.

28  260. Under 17 USC § 505, this Court can award costs and reasonable attorney's fee to

1 the prevailing party.

2     261.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

3 Defendants' copyright infringement, including, but not limited to, such injuries as:

4 emotional, intellectual and physical injuries and risks due to loss of sleep from the rigors of

5 litigation; legal expenses; reputational and career injuries; and other such injuries, in an

6 amount to be determined at trial.

7 **ELEVENTH CLAIM FOR RELIEF**

8 AN ACCOUNTING

9     262.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

10 261, as if fully set out herein.

11     263.  The Defendants have demonstrated a willingness to deceive and lie to the court.

12     264.  The Defendants have demonstrated a willingness to destroy and suppress evidence,

13 and a disregard for all common professional, business and corporate best practices and

14 ethics.

15     265.  The Plaintiff has alleged that the Defendants may have sold derivatives of his work

16 to various foreign markets.

17     266.  The Plaintiff has alleged that the Defendants used the many MRC entities and

18 subsidiaries as shell companies, to launder money.

19     267.  The Defendants won a favorable judgment in *Briggs v Blomkamp* by deceiving the

20 court and falsifying documents, thereby cheating the judicial system, and cheating the

21 Plaintiff out of his right to due process and a fair hearing, and to to rightful profits and

21 damages.

22     268.  The actual total amount of money due from the Defendants can only be ascertained

23 from a complete accounting of the Defendants profits from (1) all TS revenue; (2) all MRC

24 entities financial transactions; (3) Elysium profits (film, DVD, video games, etc.); (4) all

25 profits from *Elysium* earned by all Defendants. Due to the Defendants' violations, negligent

26 business practices, and to their propensity to mislead the Court, the Plaintiff is entitled to

27 such an accounting.

28

COMPLAINT
57