1   Stephen G. Larson (SBN 145225)
    *slarson@larsonobrienlaw.com*
2   Jonathan E. Phillips (SBN 233965)
    *jphillips@larsonobrienlaw.com*
3   A. Alexander Lowder (SBN 269362)
    *sbledsoe@larsonobrienlaw.com*
4   **LARSON O'BRIEN LLP**
    555 South Flower Street, Suite 4400
5   Los Angeles, CA  90071
    Telephone:   213.436.4888
6   Facsimile:    213.623.2000

7   Attorneys for TRIGGER STREET
    PRODUCTIONS INC.

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11  | STEVE WILSON BRIGGS, | Case No: 3:18-cv-04952-VC |
12  | | Related Case No. 3:17-CV-6552-VC |

STEVE WILSON BRIGGS,                    Case No: 3:18-cv-04952-VC
                                         Related Case No. 3:17-CV-6552-VC
              Plaintiffs,

       v.                                [Hon. Vince Chhabria]

KEVIN SPACEY; ARI (ARIEL);              **DECLARATION OF A. ALEXANDER**
EMANUEL; MATT DAMON; BEN                **LOWDER IN SUPPORT OF**
AFFLECK; NBC UNIVERSAL                  **DEFENDANTS' MOTION TO DISMISS**
MEDIA, LLC; SONY PICTURES ENT           **COMPLAINT PURSUANT TO FED. R.**
INC.; TRIGGER STREET                    **CIV. P. 12(b)(6) AND/OR 12(b)(1)**
PRODUCTIONS INC.; NEILL
BLOMKAMP; ASIF SATCHU;                  *[Filed concurrently with Notice of*
MORDECAI (MODI) WICZYK;                 *Motion and Motion to Dismiss;*
WILLIAM (BILL) BLOCK; DANA              *Request for Judicial Notice; and*
BURNETTI; SOUND POINT CAPITAL           *[Proposed] Order]*
MANAGEMENT, LC; MRC (and all
MRC entities and subs.),                Date: December 6, 2018
                                         Time: 10:00 a.m.
              Defendants.                Crtrm.: 4

## DECLARATION OF A. ALEXANDER LOWDER

I, A. Alexander Lowder, hereby declare and state as follows:

1.     I am an attorney licensed to practice law before this Court and am currently a partner at the law firm of Larson O'Brien LLP, attorneys for Defendants Kevin Spacey in the above-captioned matter.  I have personal knowledge of all facts stated herein, except where stated otherwise, and if called upon to do so, I can and will testify thereto.

2.     A true and correct copy of the docket in the matter entitled *Steve Wilson Briggs v. Neill Blomkamp*, et al., N.D. Cal. Case No. 13-cv-4679-PJH ("*Briggs I*") is attached hereto as Exhibit 1.

3.     A true and correct copy of the Complaint in *Briggs I*, is attached hereto as Exhibit 2.

4.     A true and correct copy of the docket in the matter entitled *Briggs v. Universal Pictures, et al*, N.D. Cal. Case No. 3:17-cv-06552-VC ("*Briggs II*") is attached hereto as Exhibit 3.

5.     A true and correct copy of the Complaint in *Briggs II*, is attached hereto as Exhibit 4.

6.     A true and correct copy of the First Amended Complaint in *Briggs II*, is attached hereto as Exhibit 5.

7.     A true and correct copy of the Dismissal in *Briggs II*, is attached hereto as Exhibit 6.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 29th day of October, 2018, at Los Angeles, California.

_A. Alexander Lowder

# EXHIBIT 1

ADRMOP,AO279,CLOSED,E-ProSe,ProSe

# U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:13-cv-04679-PJH

| | |
|---|---|
| Briggs v. Blomkamp et al | Date Filed: 10/08/2013 |
| Assigned to: Hon. Phyllis J. Hamilton | Date Terminated: 10/03/2014 |
| Referred to: Magistrate Judge Laurel Beeler | Jury Demand: None |
| Case in other court: Ninth Circuit Court of Appeals, 14-17175 | Nature of Suit: 820 Copyright |
| U.S. Supreme Court, 18-00063 | Jurisdiction: Federal Question |
| Cause: 17:501 Copyright Infringement | |

**Plaintiff**

**Steve Kenyatta Wilson Briggs**                    represented by    **Steve Kenyatta Wilson Briggs**
681 Edna Way
San Mateo, CA 94402
510-200-3763
Email: snc.steve@gmail.com
PRO SE

V.

**Defendant**

**Sony Pictures Ent., Inc.**                    represented by    **Michael Joseph Kump**
Kinsella Weitzman et al LLP
808 Wilshire Blvd 3FL
Santa Monica, CA 90401
310-566-9855
Fax: 310-566-9850
Email: mkump@kwikalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory Philip Korn**
Kinsella Weitzman et al LLP
808 Wilshire Blvd 3FL
Santa Monica, CA 90401
310-566-9800
Fax: 310-566-9850
Email: gkorn@kwikalaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tristar Pictures, Inc.**                    represented by    **Michael Joseph Kump**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory Philip Korn**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Media Rights Capital**                    represented by **Michael Joseph Kump**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Gregory Philip Korn**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**QED International**                        represented by **Michael Joseph Kump**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Gregory Philip Korn**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Neill Blomkamp**                          represented by **Michael Joseph Kump**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Gregory Philip Korn**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/08/2013 | 1 | COMPLAINT against Neil Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. (Filing fee $ 400.). Filed bySteve Wilson Briggs. (Attachments: # 1 Part 2, # 2 Part 3, # 3 Civil Cover Sheet)(vlkS, COURT STAFF) (Filed on 10/8/2013) (Entered: 10/10/2013) |
| 10/08/2013 | 2 | **ADR SCHEDULING ORDER: Case Management Statement due by 1/2/2014. Case Management Conference set for 1/9/2014 02:00 PM. (Attachments: # 1 Standing Order)(vlkS, COURT STAFF) (Filed on 10/8/2013) (Entered: 10/10/2013)** |
| 10/10/2013 | 3 | REPORT on the filing of an action regarding copyright infringement (cc: form mailed to register). (vlkS, COURT STAFF) (Filed on 10/10/2013) Modified on 10/11/2013 (jlmS, COURT STAFF). (Entered: 10/10/2013) |
| 10/15/2013 | 4 | Summons Issued as to Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (vlk, COURT STAFF) (Filed on 10/15/2013) (Entered: 10/15/2013) |
| 11/27/2013 | 5 | NOTICE of Appearance by Michael Joseph Kump *For Defendants* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) (Entered: |

| | | |
|---|---|---|
| | | 11/27/2013) |
| 11/27/2013 | 6 | NOTICE of Appearance by Gregory Philip Korn *For Defendants* (Attachments: # 1 Certificate/Proof of Service)(Korn, Gregory) (Filed on 11/27/2013) (Entered: 11/27/2013) |
| 11/27/2013 | 7 | *DEFENDANTS'* ANSWER to Complaint *and Affirmative Defenses to Complaint for Copyright Infringement* byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) (Entered: 11/27/2013) |
| 11/27/2013 | 8 | Certificate of Interested Entities identifying corporate parent Media Rights Capital II, L.P. by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) Modified on 11/29/2013 (vlkS, COURT STAFF). (Entered: 11/27/2013) |
| 11/27/2013 | 9 | Corporate Disclosure Statement of Defendants by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) Modified on 11/29/2013 (vlkS, COURT STAFF). (Entered: 11/27/2013) |
| 12/19/2013 | 10 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 11 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by Neill Blomkamp* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 12 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by QED International, LLC* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 13 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by Tristar Pictures, Inc.* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 14 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by Sony Pictures Entertainment Inc.* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 15 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by MRC II Distribution Company, L.P.* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 16 | Proof of Service re 10 Notice of need of ADR Phone Conference (ADR L.R. 3-5 d) by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Kump, Michael) (Filed on 12/19/2013) Modified on 12/20/2013 (kcS, COURT STAFF). (Entered: 12/19/2013) |
| 12/19/2013 | 17 | AMENDED COMPLAINT against Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. Filed bySteve Wilson Briggs. (Attachments: # 1 Part 2, # 2 Part 3)(vlkS, COURT STAFF) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 18 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (vlkS, COURT STAFF) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 19 | SUMMONS Returned Executed by Steve Wilson Briggs. Neill Blomkamp served on 11/26/2013, answer due 12/17/2013; Media Rights Capital served on 12/5/2013, answer |

| | | |
|---|---|---|
| | | due 12/26/2013; QED International served on 12/4/2013, answer due 12/26/2013; Sony Pictures Ent., Inc. served on 11/7/2013, answer due 12/2/2013; Tristar Pictures, Inc. served on 11/7/2013, answer due 12/2/2013. (vlkS, COURT STAFF) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/20/2013 | 20 | ADR Clerk's Notice Setting ADR Phone Conference on 1/6/2014 at 10:00 a.m. Pacific time. Please note that you must be logged into an ECF account of counsel of record in order to view this document. (Attachments: # 1 Certificate/Proof of Service)(cmf, COURT STAFF) (Filed on 12/20/2013) (Entered: 12/20/2013) |
| 12/30/2013 | 21 | STIPULATION WITH PROPOSED ORDER re 17 Amended Complaint *re Extension to Answer and Continue January 9, 2014 Case Management Conference* filed by Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Proposed Order to Continue January 9, 2014 Case Management Conference)(Kump, Michael) (Filed on 12/30/2013) (Entered: 12/30/2013) |
| 12/30/2013 | 22 | Declaration of Gregory Korn in Support of 21 STIPULATION WITH PROPOSED ORDER re 17 Amended Complaint *re Extension to Answer and Continue January 9, 2014 Case Management Conference* filed byMedia Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) 21 ) (Kump, Michael) (Filed on 12/30/2013) (Entered: 12/30/2013) |
| 01/02/2014 | 23 | **ORDER GRANTING STIPULATION TO CONTINUE JANUARY 9, 2014 CASE MANAGEMENT CONFERENCE by Hon. Phyllis J. Hamilton granting 21 Stipulation. (Attachments: # 1 Certificate/Proof of Service)(nahS, COURT STAFF) (Filed on 1/2/2014) (Entered: 01/02/2014)** |
| 01/02/2014 | | Set Deadlines/Hearings: Case Management Statement due by 1/9/2014. Initial Case Management Conference set for 1/16/2014 02:00 PM. (nahS, COURT STAFF) (Filed on 1/2/2014) (Entered: 01/02/2014) |
| 01/03/2014 | 24 | MOTION for Sanctions filed by Steve Wilson Briggs. Responses due by 1/17/2014. Replies due by 1/24/2014. (vlk, COURT STAFF) (Filed on 1/3/2014) (Entered: 01/06/2014) |
| 01/06/2014 | 25 | AMENDED MOTION for Sanctions filed by Steve Wilson Briggs. Motion Hearing set for 2/19/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 1/21/2014. Replies due by 1/28/2014. (Attachments: # 1 Proposed Order)(vlkS, COURT STAFF) (Filed on 1/6/2014) (Entered: 01/07/2014) |
| 01/07/2014 | | ADR Remark: ADR Phone Conference held 1/6/2014 with Howard Herman, ADR Program Director. (cmf, COURT STAFF) (Filed on 1/7/2014) (Entered: 01/07/2014) |
| 01/09/2014 | 26 | CASE MANAGEMENT STATEMENT *and Rule 26(f) Report* filed by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 1/9/2014) (Entered: 01/09/2014) |
| 01/09/2014 | 27 | *Defendants'* ANSWER to Amended Complaint *and Affirmative Defenses* byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 1/9/2014) (Entered: 01/09/2014) |
| 01/09/2014 | 28 | CASE MANAGEMENT STATEMENT filed by Steve Wilson Briggs. (vlk, COURT STAFF) (Filed on 1/9/2014) (Entered: 01/09/2014) |
| 01/09/2014 | 29 | MOTION for Permission for Electronic Case Filing filed by Steve Wilson Briggs. (Attachments: # 1 Proposed Order)(vlk, COURT STAFF) (Filed on 1/9/2014) (Entered: 01/09/2014) |

| 01/16/2014 | [30](#) | Minute Entry: Initial Case Management Conference held on 1/16/2014 before Phyllis J. Hamilton (Date Filed: 1/16/2014). Bench Trial set for 5/18/2015 08:30 AM before Hon. Phyllis J. Hamilton. Final Pretrial Conference set for 4/30/2015 02:00 PM. (Court Reporter Not Reported.) (Attachments: # [1](#) Certificate/Proof of Service) (nahS, COURT STAFF) (Date Filed: 1/16/2014) (Entered: 01/17/2014) |
|---|---|---|
| 01/17/2014 | [31](#) | **CASE MANAGEMENT AND PRETRIAL ORDER re [30](#) Case Management Conference - Initial. Signed by Judge Phyllis J. Hamilton on 1/17/14. (Attachments: # [1](#) Certificate/Proof of Service)(nahS, COURT STAFF) (Filed on 1/17/2014) (Entered: 01/17/2014)** |
| 01/23/2014 | [32](#) | Answer to Amended Complaint [17](#) Amended Complaint *(Answer Filed By Media Rights Capital II, L.P.)* byMedia Rights Capital. (Attachments: # [1](#) Certificate/Proof of Service PROOF OF SERVICE)(Kump, Michael) (Filed on 1/23/2014) (Entered: 01/23/2014) |
| 01/23/2014 | [33](#) | Certificate of Interested Entities by Media Rights Capital identifying other affiliate MRC II Distribution Company L.P. (Attachments: # [1](#) Certificate/Proof of Service)(Kump, Michael) (Filed on 1/23/2014) Modified on 1/24/2014 (vlkS, COURT STAFF). (Entered: 01/23/2014) |
| 01/23/2014 | [34](#) | Certificate of Interested Entities by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. *CORPORATE DISCLOSURE STATEMENT OF DEFENDANT MEDIA RIGHTS CAPITAL II., L.P.* (Attachments: # [1](#) Certificate/Proof of Service)(Kump, Michael) (Filed on 1/23/2014) (Entered: 01/23/2014) |
| 04/08/2014 | [35](#) | MOTION For a Further CMC and Continuance of Case Management and Pretrial Order Deadlines filed by Steve Wilson Briggs. Motion Hearing set for 5/14/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 4/22/2014. Replies due by 4/29/2014. (Attachments: # [1](#) Proposed Order)(vlkS, COURT STAFF) (Filed on 4/8/2014) (Entered: 04/08/2014) |
| 04/09/2014 | [36](#) | **ORDER by Judge Hamilton granting in part and denying in part [35](#) Motion for further case management conference and Motion to continue pretrial dates. (pjhlc1, COURT STAFF) (Filed on 4/9/2014) (Additional attachment(s) added on 4/10/2014: # [1](#) Certificate/Proof of Service). (Entered: 04/09/2014)** |
| 04/17/2014 | [37](#) | Minute Entry: Further Case Management Conference held on 4/17/2014 before Judge Phyllis J. Hamilton (Date Filed: 4/17/2014). Discovery due by 6/17/2014. Motions due by 7/30/2014. (Court Reporter: Not Reported.) (Attachments: # [1](#) Certificate/Proof of Service) (nahS, COURT STAFF) (Date Filed: 4/17/2014) Modified on 4/21/2014 (jlmS, COURT STAFF). (Entered: 04/18/2014) |
| 04/17/2014 | [38](#) | **FIRST NOTICE OF FILING OF MOTION FOR SUMMARY JUDGMENT re [37](#) Case Management Conference - Further. Signed by Judge Phyllis J. Hamilton on 4/17/14. (Attachments: # [1](#) Certificate/Proof of Service)(nahS, COURT STAFF) (Filed on 4/17/2014) (Entered: 04/18/2014)** |
| 04/25/2014 | [39](#) | MOTION for Permission for Electronic Case Filing filed by Steve Wilson Briggs. (Attachments: # [1](#) Proposed Order)(vlk, COURT STAFF) (Filed on 4/25/2014) (Entered: 04/29/2014) |
| 04/25/2014 | [40](#) | Declaration in Support of [39](#) MOTION for Permission for Electronic Case Filing filed bySteve Wilson Briggs. (Related document(s) [39](#) ) (vlk, COURT STAFF) (Filed on 4/25/2014) (Entered: 04/29/2014) |
| 04/29/2014 | [41](#) | **ORDER by Judge Phyllis J. Hamilton finding as moot [39](#) Motion for Permission for Electronic Case Filing; granting [29](#) Motion for Permission for Electronic Case Filing** |

| | | |
|---|---|---|
| | | **(Attachments: # 1 Certificate/Proof of Service) (nah, COURT STAFF) (Filed on 4/29/2014) (Entered: 04/29/2014)** |
| 05/16/2014 | 42 | See document 43 for attachment.<br>NOTICE of Rebuttal to Defendants' Expert Report of Jeff Rovin by Steve Kenyatta Wilson Briggs (vlk, COURT STAFF) (Filed on 5/16/2014) Modified on 5/16/2014 (vlk, COURT STAFF). Modified on 5/16/2014 (vlk, COURT STAFF). (Entered: 05/16/2014) |
| 05/16/2014 | 43 | NOTICE of Rebuttal to Defendants' Expert Report of Jeff Rovin by Steve Kenyatta Wilson Briggs (vlk, COURT STAFF) (Filed on 5/16/2014) (Entered: 05/16/2014) |
| 05/16/2014 | 44 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs re 43 Notice (Other) (vlk, COURT STAFF) (Filed on 5/16/2014) (Entered: 05/16/2014) |
| 06/12/2014 | 45 | MOTION To Disqualify Export Report of Jeff Rovin filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 7/23/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 6/26/2014. Replies due by 7/3/2014. (Attachments: # 1 Proposed Order)(vlkS, COURT STAFF) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/12/2014 | 46 | **Document STRICKEN per 49 Order.**<br>MOTION for Leave to File a Second Amended Complaint filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Proposed Order)(vlkS, COURT STAFF) (Filed on 6/12/2014) Modified on 6/17/2014 (vlkS, COURT STAFF). (Entered: 06/13/2014) |
| 06/12/2014 | 47 | Amended Rebuttal to Defendants' "Export Report of Jeff Rovin" by Steve Kenyatta Wilson Briggs (vlkS, COURT STAFF) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/12/2014 | 48 | Correction by Steve Kenyatta Wilson Briggs re 43 Notice (vlkS, COURT STAFF) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/16/2014 | 49 | **ORDER by Hon. Phyllis J. Hamilton STRIKING 46 Motion for Leave to File.(nah, COURT STAFF) (Filed on 6/16/2014) (Entered: 06/16/2014)** |
| 06/26/2014 | 50 | RESPONSE (re 45 MOTION To disqualify Export Report of Jeff Rovin ) filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Declaration of Jeff Rovin in Opposition to Motion to Disqualify Expert Report, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Korn, Gregory) (Filed on 6/26/2014) (Entered: 06/26/2014) |
| 07/09/2014 | 51 | MOTION to Compel Production of Documents filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 8/13/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 7/23/2014. Replies due by 7/30/2014. (vlkS, COURT STAFF) (Filed on 7/9/2014) (Additional attachment(s) added on 8/31/2015: # 1 Corrected attachment) (vlkS, COURT STAFF). (Entered: 07/10/2014) |
| 07/09/2014 | 52 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs re 51 MOTION to Compel (vlkS, COURT STAFF) (Filed on 7/9/2014) (Entered: 07/10/2014) |
| 07/10/2014 | 53 | Amended MOTION to Compel *Production of Documents* filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 8/20/2014 09:00 AM in Courtroom 3, 3rd Floor, Oakland before Hon. Phyllis J. Hamilton. Responses due by 7/24/2014. Replies due by 7/31/2014. (Attachments: # 1 Proposed Order, # 2 Exhibit A -Blomkamp Articles, # 3 Exhibit B -Tenley Titles, # 4 Exhibit C -Plaintiff Interrogatories)(Wilson Briggs, Steve) (Filed on 7/10/2014) (Entered: 07/10/2014) |
| 07/10/2014 | 54 | Notice of Withdrawal of Motion *Notice of Motion and Motion to Compel Production of Documents; and Memorandum and Points and Authorities* (Wilson Briggs, Steve) (Filed on 7/10/2014) (Entered: 07/10/2014) |

| 07/11/2014 | 55 | **ORDER REFERRING CASE to Magistrate Judge for Discovery purposes. Signed by Judge Phyllis J. Hamilton on 7/11/14. (nahS, COURT STAFF) (Filed on 7/11/2014) (Entered: 07/11/2014)** |
|---|---|---|
| 07/14/2014 | 56 | ERRATA re 53 *Correction Concerning Motion to Compel and Proposed Order,* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 7/14/2014) Modified on 7/15/2014 (jlmS, COURT STAFF). (Entered: 07/14/2014) |
| 07/15/2014 | 57 | **NOTICE OF REFERRAL AND ORDER REGARDING DISCOVERY PROCEDURES. See order for deadlines regarding Plaintiff's pending amended motion to compel. Signed by Judge Laurel Beeler on 7/15/2014. (Attachments: # 1 Standing Order)(lblc2, COURT STAFF) (Filed on 7/15/2014) (Entered: 07/15/2014)** |
| 07/17/2014 | 58 | **ORDER re 45 MOTION To disqualify Export Report of Jeff Rovin filed by Steve Kenyatta Wilson Briggs. Signed by Judge Hamilton on 7/17/2014. (pjhlc1, COURT STAFF) (Filed on 7/17/2014) (Entered: 07/17/2014)** |
| 07/18/2014 | 59 | MOTION for Leave to File *Amended Notice of Motion and Motion to File a Second Amended Complaint* filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Proposed Order, # 2 Exhibit Ex A Butterfly Driver, # 3 Exhibit Ex B Elysium, # 4 Exhibit Exhibits C-Z and AA-DD)(Wilson Briggs, Steve) (Filed on 7/18/2014) (Entered: 07/18/2014) |
| 07/18/2014 | 60 | Notice of Withdrawal of Motion *for Leave to File Amended Notice of Motion and Motion to File a Second Amended Complaint* (Wilson Briggs, Steve) (Filed on 7/18/2014) (Entered: 07/18/2014) |
| 07/18/2014 | 61 | Second MOTION for Leave to File *Second Amended Complaint* filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit Second Amended Complaint, # 2 Exhibit Exhibit A - Butterfly Driver, # 3 Exhibit Exhibit B - Elysium, # 4 Exhibit Exhibit C-Z and AA-DD, # 5 Proposed Order Proposed Order)(Wilson Briggs, Steve) (Filed on 7/18/2014) (Entered: 07/18/2014) |
| 07/25/2014 | 62 | RESPONSE (re 53 Amended MOTION to Compel *Production of Documents* ) *and Declaration of Gregory Korn in Support Thereof* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Korn, Gregory) (Filed on 7/25/2014) (Entered: 07/25/2014) |
| 07/30/2014 | 63 | MOTION for Summary Judgment filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 9/3/2014 09:00 AM in Courtroom 3, 3rd Floor, Oakland before Hon. Phyllis J. Hamilton. Responses due by 8/13/2014. Replies due by 8/20/2014. (Attachments: # 1 Proposed Order proposed order, # 2 Exhibit Exhibit A Butterfly Driver, # 3 Exhibit Exhibit B Elysium, # 4 Exhibit Exhibit C Copyright reg, # 5 Exhibit Exhibit D email of script, # 6 Exhibit Exhibit E WGA reg, # 7 Exhibit Exhibit F query letters, # 8 Exhibit Exhibit G Philly logline, # 9 Exhibit Exhibit H Slamdance, # 10 Exhibit Exhibit I Ibktip, # 11 Exhibit Exhibit J TriggerStreet 1, # 12 Exhibit Exhibit K TriggerStreet 2, # 13 Exhibit Exhibit L TriggerStreet 3, # 14 Exhibit Exhibit M website logline, # 15 Exhibit Exhibit N Uber Headache, # 16 Exhibit Exhibit O signed declarations)(Wilson Briggs, Steve) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 64 | MOTION for Summary Judgment *Memorandum of Points and Authorities* filed by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. Motion Hearing set for 9/3/2014 09:00 AM in Courtroom 3, 3rd Floor, Oakland before Hon. Phyllis J. Hamilton. Responses due by 8/13/2014. Replies due by 8/20/2014. (Attachments: # 1 Proposed Order, # 2 Certificate/Proof of Service [of Exhibit 2 to the Declaration of Gregory Korn)(Kump, Michael) (Filed on 7/30/2014) Modified on 8/13/2014 (kcS, COURT STAFF). (Entered: 07/30/2014) |
| 07/30/2014 | 65 | Declaration of Neill Blomkamp in Support of 64 MOTION for Summary Judgment |

| | | |
|---|---|---|
| | | *Memorandum of Points and Authorities* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) [64] ) (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | [66] | Declaration of Gregory Korn in Support of [64] MOTION for Summary Judgment *Memorandum of Points and Authorities* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) [64] ) (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | [67] | Declaration of Jeff Rovin in Support of [64] MOTION for Summary Judgment *Memorandum of Points and Authorities* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) [64] ) (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | [68] | NOTICE by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. re [64] MOTION for Summary Judgment *Memorandum of Points and Authorities [OF MANUAL FILING OF EXHIBIT 2 - MOTION PICTURE ELYSIUM IN DVD FORMAT]* (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | [69] | NOTICE by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. *TO PLAINTIFF RE: APRIL 17, 2014 FIRST NOTICE OF FILING OF MOTION FOR SUMMARY JUDGMENT* (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 70 | EXHIBIT 2 in Support of [66] Declaration filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (vlkS, COURT STAFF) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 08/01/2014 | [71] | RESPONSE (re [61] Second MOTION for Leave to File *Second Amended Complaint* ) *AND DECLARATION OF GREGORY KORN IN SUPPORT THEREOF* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Korn, Gregory) (Filed on 8/1/2014) (Entered: 08/01/2014) |
| 08/01/2014 | 72 | CLERK'S NOTICE. The court sets a short telephone conference call regarding Mr. Briggs's pending motion to compel for Thursday, August 7, 2014 at 11 a.m. Mr. Briggs and Defendants' counsel must email their direct-dial telephone numbers to lbpo@cand.uscourts.gov. If there are any issues regarding the timing of this conference call, the parties must call the court's chambers at 415-522-4660 to work out another time. Discovery Hearing set for 8/7/2014 11:00 AM in Courtroom C, 15th Floor, San Francisco before Magistrate Judge Laurel Beeler. (lblc2, COURT STAFF) (Filed on 8/1/2014) (Entered: 08/01/2014) |
| 08/04/2014 | [73] | **ORDER re [63] MOTION for Summary Judgment filed by Steve Kenyatta Wilson Briggs. Signed by Judge Hamilton on 8/4/2014. (pjhlc1, COURT STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014)** |
| 08/06/2014 | [74] | Declaration of Steve Wilson Briggs in Support of [17] *for authentication in support of FAC* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 8/6/2014) Modified on 8/7/2014 (vlkS, COURT STAFF). (Entered: 08/06/2014) |
| 08/06/2014 | [75] | Declaration of Steve Wilson Briggs in Support of [30] *authentication in support of motion for summary judgment* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 8/6/2014) Modified on 8/7/2014 (vlkS, COURT STAFF). (Entered: 08/06/2014) |
| 08/06/2014 | [76] | Request for Judicial Notice in Support of [17] *Plaintiff's Motion For Summary Judgment - and FAC* filed by Steve Kenyatta Wilson Briggs. (Attachments: # [1] Exhibit 1 Exhibit B - Elysium Script, # [2] Exhibit 2 Exhibit C -Copyright Reg, # [3] Exhibit 2 Exhibit D MRC |

| | | |
|---|---|---|
| | | exec(s) do marketing interview, # 4 Exhibit 4 Exhibit E MRC website markets Elysium, # 5 Exhibit 5 Exhibit F NYT article about MRC's ethics concerns, # 6 Exhibit 6 Exhibit G - first few pages of script in email, # 7 Exhibit 7 Exhibit H - WGA registration, # 8 Exhibit 8 Exhibit J -Piladelphia logine, # 9 Exhibit J K -Slamdance, # 10 Exhibit 10 Exhibit L -Inktip emails, # 11 Exhibit 11 Exhibit M -TriggerStreet emails, # 12 Exhibit 12 Exhibit N -TS member Tom Gilman emails, # 13 Exhibit 13 Exhibit O -TS member Jason Beck emails, # 14 Exhibit 14 Exhibit P -TS member Bob Thielke emails, # 15 Exhibit 15 Exhibit Q -logline posted on old personal website, # 16 Exhibit 16 Exhibit R - Jody Foster discusses extreme set secrecy on Elysium, # 17 Exhibit 17 Jodie Foster says her role was originally written for a man, # 18 Exhibit 18 Exhibit T -email to Kinsella Weitzman, # 19 Exhibit 19 Exhibit U -Hollywood Accounting, # 20 Exhibit 20 Exhibit V -Loeb says Sony Pictures lacks transparency, # 21 Exhibit Exhibit 21-TriggerStreet 50 best, # 22 Exhibit Exhibit 22 -TS 100,000 mebers)(Wilson Briggs, Steve) (Filed on 8/6/2014) Modified on 8/7/2014 (vlkS, COURT STAFF). (Entered: 08/06/2014) |
| 08/07/2014 | 77 | Minute Entry: Discovery Hearing held on 8/7/2014 before Judge Laurel Beeler (Date Filed: 8/7/2014). (FTR Recording: 11-58 a.m. - 12:02 p.m.) (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Date Filed: 8/7/2014) (Entered: 08/07/2014) |
| 08/07/2014 | 78 | **ORDER REGARDING 53 PLAINTIFF'S JULY 10, 2014 MOTION TO COMPEL. Signed by Magistrate Judge Laurel Beeler on 8/7/2014.(lblc2, COURT STAFF) (Filed on 8/7/2014) (Entered: 08/07/2014)** |
| 08/12/2014 | 79 | RESPONSE (re 64 MOTION for Summary Judgment ) *Opposition Brief* filed bySteve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit genetic reprogramming, # 2 Exhibit millions of $ to live on Uberopolis, # 3 Exhibit commoners long for treatments on Uberopolis, # 4 Exhibit more treatments available on Sky Town, # 5 Exhibit the poor long for medicine from Uberopolis, # 6 Exhibit F -plot points, # 7 Exhibit G -Syd Field, # 8 Exhibit H -Syd Field's plot points, # 9 Exhibit I -more Syd Field's plot points, # 10 Exhibit J -more Syd Field's plot points, # 11 Exhibit K -more Syd Field's plot points, # 12 Exhibit L -Inciting Incident, # 13 Exhibit M -more inciting incident, # 14 Exhibit N -Law360 article, # 15 Exhibit O -Examiner.com article, # 16 Exhibit P -The Wrap article) (Wilson Briggs, Steve) (Filed on 8/12/2014) (Entered: 08/12/2014) |
| 08/13/2014 | 80 | Declaration of Steve Wilson Briggs *to authenticate and support attachment to 79 brief in opposition to Defendant's Motion for Summary Judgment* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 8/13/2014) Modified on 8/14/2014 (kcS, COURT STAFF). (Entered: 08/13/2014) |
| 08/13/2014 | 81 | Request for Judicial Notice *for exhibits attached to 79 Brief In Opposition To Defendants' Motion for Summary Judgment* filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Wilson Briggs, Steve) (Filed on 8/13/2014) Modified on 8/14/2014 (kcS, COURT STAFF). (Entered: 08/13/2014) |
| 08/13/2014 | 82 | RESPONSE (re 63 MOTION for Summary Judgment ) filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Kump, Michael) (Filed on 8/13/2014) (Entered: 08/13/2014) |
| 08/20/2014 | 83 | **ORDER by Judge Hamilton denying 61 Motion for Leave to File (pjhlc1, COURT STAFF) (Filed on 8/20/2014) (Entered: 08/20/2014)** |
| 08/20/2014 | 84 | REPLY (re 64 MOTION for Summary Judgment ) filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Korn, |

| | | |
|---|---|---|
| | | Gregory) (Filed on 8/20/2014) (Entered: 08/20/2014) |
| 09/03/2014 | 85 | Minute Entry: Motion Hearing held on 9/3/2014 before Phyllis J. Hamilton (Date Filed: 9/3/2014) re 64 MOTION for Summary Judgment filed by Media Rights Capital, Neill Blomkamp, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc., 63 MOTION for Summary Judgment filed by Steve Kenyatta Wilson Briggs. (Court Reporter Kelly Polvi.) (nahS, COURT STAFF) (Date Filed: 9/3/2014) (Entered: 09/03/2014) |
| 10/03/2014 | 86 | **ORDER by Judge Hamilton denying 45 Motion to Exclude Expert; denying 63 Plaintiff's Motion for Summary Judgment; granting 64 Defendants' Motion for Summary Judgment (pjhlc1, COURT STAFF) (Filed on 10/3/2014) (Entered: 10/03/2014)** |
| 10/03/2014 | 87 | **JUDGMENT. Signed by Judge Hamilton on 10/3/2014. (pjhlc1, COURT STAFF) (Filed on 10/3/2014) (Entered: 10/03/2014)** |
| 10/31/2014 | 88 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Steve Kenyatta Wilson Briggs. Appeal of Judgment 87 , Order on Motion for Summary Judgment, 86 (Filing fee: $505.00, Receipt no. 44611011957.) (vlkS, COURT STAFF) (Filed on 10/31/2014) Modified on 11/6/2014 (vlkS, COURT STAFF). (Entered: 10/31/2014) |
| 10/31/2014 | | USCA Appeal Fees received $ 505.00 receipt number 44611011957 re 88 Notice of Appeal, filed by Steve Kenyatta Wilson Briggs. (cjlS, COURT STAFF) (Filed on 10/31/2014) (Entered: 11/10/2014) |
| 11/03/2014 | 89 | USCA Case Number 14-17175 Ninth Circuit Court of Appeals for 88 Notice of Appeal filed by Steve Kenyatta Wilson Briggs. (cjlS, COURT STAFF) (Filed on 11/3/2014) (Entered: 11/03/2014) |
| 11/04/2014 | 90 | ORDER of USCA as to 88 Notice of Appeal filed by Steve Kenyatta Wilson Briggs re filing fees (vlk, COURT STAFF) (Filed on 11/4/2014) (Entered: 11/05/2014) |
| 11/05/2014 | 91 | TRANSCRIPT ORDER by Steve Kenyatta Wilson Briggs for Court Reporter Kelly Polvi. (Wilson Briggs, Steve) (Filed on 11/5/2014) (Entered: 11/05/2014) |
| 11/05/2014 | 92 | RESPONSE TO 90 USCA ORDER by Steve Kenyatta Wilson Briggs . (Attachments: # 1 Exhibit receipt for docketing fees)(Wilson Briggs, Steve) (Filed on 11/5/2014) Modified on 11/6/2014 (vlkS, COURT STAFF). (Entered: 11/05/2014) |
| 12/06/2014 | 93 | Transcript of Proceedings held on 09/03/14, before Judge Phyllis J. Hamilton. Court Reporter Kelly Polvi, Telephone number 503.779.7406; email kpolvi@comcast.net. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 91 Transcript Order ) Release of Transcript Restriction set for 3/6/2015. (Related documents(s) 91 ) (Polvi, Kelly) (Filed on 12/6/2014) (Entered: 12/06/2014) |
| 12/08/2017 | 94 | **Judicial Referral for Purpose of Determining Relationship of Cases 13-cv-4679-PJH and 17-cv-6552-VC. Signed by Judge Vince Chhabria on 12/8/2017. (knm, COURT STAFF) (Filed on 12/8/2017) (Entered: 12/08/2017)** |
| 12/14/2017 | 95 | CLERK'S NOTICE. The Court has determined that Cases 13-4679 PJH and 17-6552 VC are not related and no reassignment shall occur. (dtmS, COURT STAFF) (Filed on 12/14/2017) (Entered: 12/14/2017) |
| 03/01/2018 | 96 | USCA Memorandum, Affirmed, as to 88 Notice of Appeal, filed by Steve Kenyatta |

| | | Wilson Briggs. (cjlS, COURT STAFF) (Filed on 3/1/2018) (Entered: 03/02/2018) |
|---|---|---|
| 04/16/2018 | 97 | MANDATE of USCA as to 88 Notice of Appeal, filed by Steve Kenyatta Wilson Briggs. (cjlS, COURT STAFF) (Filed on 4/16/2018) (Entered: 04/16/2018) |
| 04/16/2018 | 98 | CLERK'S Letter Spreading Mandate to Pro Se Party. (cjlS, COURT STAFF) (Filed on 4/16/2018) (Entered: 04/16/2018) |
| 07/11/2018 | 99 | USCA Case Number 18-63 U.S. Supreme Court. (cjlS, COURT STAFF) (Filed on 7/11/2018) (Entered: 07/12/2018) |
| 10/02/2018 | 100 | ORDER of U.S. Supreme Court: DENYING petition for a writ of certiorari as to 99 USCA Case Number (cpS, COURT STAFF) (Filed on 10/2/2018) (Entered: 10/02/2018) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/29/2018 11:12:04 | | |
| **PACER Login:** | Koralfoster0116:4624215:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:13-cv-04679-PJH |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

# EXHIBIT 2

1    Steve Wilson Briggs

2    681 Edna Way

3    San Mateo, CA 94402

4    510 200 3763

5    snc.steve@hotmail.com

6    Pro Se **PLAINTIFF**

7

8            **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10    STEVE WILSON BRIGGS       )   CASE NO:

11    Plaintiff,                   )

12          vs.               )   **CV 13 4679 PJH**

13    NEILL BLOMKAMP,        )

14    SONY PICTURES ENT., INC.,   )   **COMPLAINT FOR**

15    TRISTAR PICTURES, INC.,     )   **COPYRIGHT INFRINGEMENT**

16    MEDIA RIGHTS CAPITAL,     )

17    QED INTERNATIONAL,       )

18    Defendants              )

19                **NATURE OF ACTION:**

20      1.   Pursuant to 17 U.S.C. § 101, et seq, this is an action for copyright infringement of the

21    Plaintiff's screenplay "Butterfly Driver" (originally "Uberopolis: City of Light") written in 2005;

22    W.G.A. reg. #1103287, 2005; U.S. Copyright Office reg. certificate # PAu 3-683-232, June 21st,

23    2013. **[See Exhibit C].** The infringement commensed on August, 9th, 2013, when The

24    Defendants distributed, and publically displayed, "Elysium"; a film infringing on the Plaintiff's

25    work, including the heart of his story, plot, characters, unusual settings, themes, conflict, catalyst,

26    crisis, climax-twist, his hero's unique "character-affliction", the hero's "keepsake necklace", and

27    more. The Plaintiff contends: 1) the Defendants' "Elysium" is substantially similar to his work; 2)

28    the Defendants had access to his work; 3) the Defendants tried to disguise their infringement.

<div align="center">1</div>

<div align="right">COMPLAINT</div>

FILED

OCT 08 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**JURISDICTION**

2. **Jurisdiction.** This court has subject matter jurisdiction over this complaint pursuant to 28 U.S.C. §§ 1331 & 1338(a), as this action is for copyright infringement arising under the copyright laws of the United States. This court also has subject matter jurisdiction pursuant to 28 U.S.C. 1332(a)(2) as Defendant, Neill BlomKamp, is a Canadian resident and a citizen of Canada and South Africa; not a citizen of the United States.

3. **Venue.** Venue is proper, and this court has personal jurisdiction, pursuant to 28 U.S.C. § 1391(b)(2), as the events giving rise to this complaint occured in this district. It is also the proper venue pursuant to 28 U.S.C. § 1391(d) by virtue of defendant's business transactions with this district; and under 326 US 310, as all defendants meet minimum contact rule.

4. **Intradistrict Assignment.** San Francisco is the proper division assignment as a substantial part of the events and omissions giving rise to this lawsuit occurred in this district.

**THE PARTIES**

5. **The Plaintiff,** STEVE WILSON BRIGGS, is a resident of California, currently residing in San Mateo, California. He is the writer, producer and director of the feature film, "The Amazing Mr. Excellent", several short film projects, writer of several unproduced screenplays, musician, and a teacher's aide at Sequoia High School in Redwood City, California.

6. **Defendant,** NEILL BLOMKAMP is a resident of Vancouver, Canada. He is credited with writing, directing and co-producing the screenplay in question, "Elysium".

7. **Defendant,** SONY PICTURES ENT., INC., is the American based television and film production and distribution wing of Japanese media conglomerate, Sony. It is headquartered at 10202 West Washington Blvd., Culver City, California. Sony provided Neill Blomkamp with $115,000,000 to make "Elysium".

8. **Defendant,** TRISTAR PICTURES, INC., is an American film production/ distribution studio (and a property of Sony Pictures). TriStar is located in Culver City California. TRISTAR PICTURES is the distributor of the film "Elysium".

9. **Defendant,** MEDIA RIGHTS CAPITAL, is a film studio located at 1800 Century Park E, Ste 1000, Los Angeles, CA 90067. Media Rights Capital is credited as a studio that

2

COMPLAINT

helped create "Elysium", and helped facilitate film funding.

10.     **Defendant,** QED INTERNATIONAL is a motion picture production, financing and sales distribution company, headquartered at1800 N Highland Ave, 5th Floor, Los Angeles, CA 90028. QED INTERNATIONAL is credited as a studio responsible for making Elysium.

## BACKGROUND

11.     In May, 2005, the Plaintiff completed the first draft of "Uberopolis: City of light", sending it via email to family and friends. **[See Exhibit D]**

12.     December 16th, 2005, the Plaintiff registered a revised version of "Uberopolis: City of Light" with theWriter's Guild of America (West); registration ID #: 1103287. **[See Exhibit E]**

13.     In January, 2006, the Plaintiff began a 23 month campaign to market his script.. Midway through this campaign, approximately January, 2007, the Plaitiff revised his script and renamed it "Butterfly Driver". During this marketing campaign, the Plaintiff sent dozens of query letters and emails to literary agents, managers, and film companies. **[See Exhibit F** -a few of many letters and emails]. The Plaintiff also posted loglines (short synopses) of the script on many screenwriter and filmmaking websites; entered events, like the Philadelphia Logline Festival **[See Exhibit G]**; entered the script in screenwriting competitions, such as the 2006 Slamdance Screenplay Competition **[See Exhibit H];** and posted script loglines on Inktip.com; one of the largest screenwriter to industry professional website in the world. **[See Exhibit I]**

14.     February, 2007, the Plaintiff posted the entire "Butterfly Driver"" script on Kevin Spacey's and Dana Brunetti's screenwriter's website, "TriggerStreet" (triggerstreet.com). ]**See Exhibit J]** TriggerStreet was named one of the "50 best websites of 2004" by Time Magazine; designed to connect screenwriters with other industry  professionals. TriggerStreet has (or had) tens of thousands of users. Anyone can join, then access thousands of new screenplays (anonomously, if they wish). TriggerStreet is the ONLY place the Plaintiff  released a version of his script with the inciting incident and the "keepsake necklace". This was the only website the Plaintiff ever posted his screenplay -and the only site he ever revealed his hero's secret "character affliction". **TriggerStreet is where the Defendants had access to the Plaintiff's script.** Triggerstreet.com is now "Trigger Street Labs", at: http://labs.triggerstreet.com/labs/Screenplays).

COMPLAINT

15.    From February to August of 2007, the Plaintiff posted "Butterfly Driver" on TriggerStreet three or four times. During this time the Plaintiff communicated about Butterfly Driver with Triggerstreet writers, Thomas Gilman, Jason Beck, and Bob Thielke **[Exhibit K, L, M],** all who gave the Plaintiff great guidance, which helped make his script more marketable.

**16.**    Late July, to early Augus,t 2007, the Plaintiff posted the last revised version of Butterfly Driver" **[See Exhibit A]** on TriggerSteet for a few days. During this time, there were more script downloads than usual -and a person identifying himself as a writer or producer for the TV series "The Wire" contacted the plaintiff (through the website's message board) to say he enjoyed the Plaintiff's script. During this same period, a young director (whose name the Plaintiff can't recall) contacted the Plaintiff (through the message board), to express appreciation for his script. The Plaintiff believes this director may have been Defendant, Neill Blomkamp.

17.    In December, 2007, now intent to produce his own movies, the Plaintiff stopped marketing his script; "Butterfly Driver", hoping to film it himself, someday.

18.    The Plaintiff began production of his first feature film, "The Amazing Mr. Excellent", in January, 2008; which won "Best Of Fest" at the 2010, Temecula International Film Festival.

19.    On May 27th, 2013, the Plaintiff went to see a movie with friend, and Sequoia High School teacher, Cameron Farris. Before the feature, the theater previewed a trailer for the movie, "Elysium", to be released on August, 9th, 2013. The trailer featured a plot, characters and settings seemingly misappropriated from the plaintiff's "Butterfly Driver".

20.    Later that evening, the Plaintiff, Steve Wilson Briggs, read about "Elysium" online, at Wikipedia.com; and discovered *Elysium'*s story structure closely conformed to his script.

21.    Approximately, June 6th, 2013, the Plaintiff found, and downloaded, a copy of the Defendants' script, "Elysium" (probably an unauthorized posting) at the web address: http://writetoreel.com/forum/showthread.php?1643-Elysium-Script-PDF . **[See Exhibit B]**

22.    The text of the script conformed to the trailer dialogue viewed on May 27th, 2013.

23.    On June 21st, 2013, the Plaintiff registered his screenplay, "Butterfly Driver", with the U.S. Copyright Office, as required to file an infringement complaint (Plaintiff's official copyright registration effective date: June 21st, 2013, certificate number PAu 3-683-232).

4

COMPLAINT

## STATEMENT OF FACTS COMMON TO ALL CLAIMS FOR RELIEF

24. On August 9th, 2013, the Defendants released, distributed and displayed publicly, "Elysium"in The USA and 11 other countries (http://www.imdb.com/title/tt1535108/releaseinfo) -marking the date of the commencement of infringement.

25. On August 10th, 2013, the Plaintiff viewed the Defendants' film "Elysium" at a local theater. The script the Plaintiff found online was certainly the "Elysium" script, but not the final draft.

26. Upon viewing the Defendants' film, the Plaintiff concluded: the film and screenplay, "Elysium", infringed on the Plaintiff's copyright protected story "Butterfly Driver" -as a whole, and on the parts; including the Plaintiff's five story elements (character, setting, plot, conflict, theme), his four key "plot-points" (catalyst, crisis, climax, inciting incident), his peculiar characters, his hero's "character affliction", his unusual "keepsake necklace" and much more.

## PRIMARY ACTS OF COPYRIGHT INFRINGEMENT

### 1) PLOT INFRINGEMENT:

27. The basic plot of the Defendants' "Elysium" is almost identical to the basic plot of the Plaintiff's "Butterfly Driver". Compare:

### "Butterfly Driver" Plot :

28. A poor man, living in the impoverished ruins of Earth, pays his family's emmigration out of their dangerous "zone" city by doing a dangerous mission for a disabled transporter -only to learn his seven year old daughter will die within seven days without medicine found on a satellite world for the super-rich (Uberopolis). But the hero is poor; and getting to the satellite world requires big money and special identification. Perhaps impossible, without the help of an outlaw political network. But the hero suffers the affliction of sudden, short, excrutiating headaches. The hero also carries secrets the World President (who has been genetically reprogrammed to appear much younger than he is) will kill to suppress. The President deploys a special agent to apprehend the hero. The special agent doesn't want the assignment, so he negotiates for medical aid for his son. An important woman gives the hero a special "keepsake necklace". In the climatic finish, as the hero battles the villain, just when it finally looks as if the

5

COMPLAINT

1  hero might prevail, he falls to his knees, clutches his head and screams with a terrible headache.

2  The hero somehow defeats the villain -but sustains a life threatenning injury. As the hero drifts

3  off toward death, he dreams about the "keepsake necklace". The dream saves the hero. The hero's

4  action impacts the world: allowing people to vote in an open election.

5  <u>"Elysium" Plot</u> :

6      29.   A poor man, living in the impoverished ruins of Earth has five days to get to a satellite

7  world for the super-rich (Elysium) to get medical care to save himself (and his girl-friend's sick

8  and dying six year old daughter). But the hero is poor; and getting to the satellite world requires

9  big money and special identification. Impossible without the help of an outlaw, disabled human

10  trafficker -who requires that the hero do a dangerous mission in exchange for emmigration to the

11  satellite world. While downloading information into his brain, the hero acquires the affliction of

12  sudden, short, excrutiating headaches. The hero now carries secrets a powerful Elysium official

13  (who has been genetically "re-atomized" to appear much younger than she is) will kill to possess.

14  The official deploys a special agent to apprehend the hero. The special agent doesn't want the

15  assignment, so he negotiates for restored privileges and a mansion on Elysium. The hero carries a

16  "keepsake necklace", given to him by an important woman from his past. In the climatic finish, as

17  the hero battles the special-agent villain, just when it looks as if the hero might finally prevail, the

18  hero suddenly falls to his knees, clutches his head and screams with a terrible headache. But

19  somehow the hero defeats the villain. But the hero must die to save much of the world. As he

20  prepares to die the hero takes comfort in his "keepsake necklace", in a dream-like montage.

21  The hero's action impacts the world: bringing medical aid, and perfect health, to the world.

22                  SUMMARY: Plot Infringement

23      31.   The Plaintiff's plot features: **1)** a giant satellite world for the super-rich; **2)** a hero

24  prone to excrutiating headaches (which knock him to his knees); **3)** a villain who has been

25  genetically reprogrammed to appear much younger than he/she is; **4)** advanced medicine found

26  on the satellite world; **5)** a hero who must get to the satellite world for medicine (medical care);

27  **6)** a "plight of immigrant" theme; **7)** a sick girl, who will die without the hero's action; **8)** a hero

28  who is poor and needs I.D. and transport to a satellite world; **9)** an "anguish of living without

COMPLAINT

healthcare" theme; **10)** a disabled transporter who helps the hero; **11)** an agent (sent by the villain to apprehend the hero) who accepts the assignment after negotiating; **12)** a keepsake necklace, carried by the hero, which factors into the stories conclusion; **13)** an overpopulated, impoverished Earth, ruled by a rich elite who live on the satellite world.

31.   The collection of unique plot features, in paragraph 30, outline a crafted expression, the plot of the Plaintiff's screenplay, "Butterfly Driver"; copyright of the plaintiff.

32.   The Defendants' "Elysium" uses each aspect of the Plaintiff's plot, listed in paragraph 30, and much more; infringing on the Plaintiff's copyright protect work.

33.   Further, in changing minor details about their work (e.g changing the hero's backstory; villain's gender) the Defendants made obvious effort to disguise their infringement.

## 2) CHARACTER INFRINGEMENT

34.   Several characters from the defendants' movie, "Elysium", infringe on copyright protected characters from the Plaintiff's "Butterfly Driver". Compare:

**THE HERO:** Arlo vs Max

35.   The heroes of both movies are tough, poor men, 35-45 years of age, who carry keepsake necklaces, and suffer a unique affliction:  short, sudden, excrutiating headaches, which cause the hero to stumble, grab his head and scream. Both heroes have with the same goals:

36.   THE HERO'S GOAL (**Butterfly Driver**): the hero has less than 5 days to get from Earth to an orbiting satellite world for the rich, to get medicine to save his daughter.

37.   THE HERO'S GOAL, (**Elysium**): the hero has less than 5 days to get to an orbiting satellite world for the rich, to get medical care to save himself (and inevitably, his girl-friend's daughter, too).

SUMMARY: Arlo vs Max

38.   The Plaintiff's hero, Arlo Grainer: 1) is a 35-45 year old male, living around 100 years in the future; 2) is poor, living in the overpopulated ruins of a largely impoverished Earth; 3) has less than a week to get to the satellite world for the super rich; 4) contacts underworld figures to get I.D. and transport to the satellite world; 5) suffers from rare, brief, excrutiating headaches; 6) suffers a headaches in the thick of battle in the climax; 7) must get medical aid (medicine) to save

COMPLAINT

1    his daughter; 8) carries a keepsake necklace from a special woman.

2      39.   The characteristics and conditions listed in paragraph 38 are the expression of the

3    Plaintiff's copyrighted character, Arlo Grainer; from the Plaintiff's work "Butterfly Driver".

4      40.   Alll of the characteristics and conditions, listed in paragraph 38, also apply to the

5    Defendant's character "Max". Thus, the Defendants' character "Max" infringes on the Plaintiff's

6    copyright protected character, "Arlo", and his copyright protected work, "Butterfly Driver".

7      41.   Further, the Defendants made willful, obvious efforts to disguise their infringementt

8    by changing Elysium's hero's name, job, parental status, and changing the hero's goal from

9    "needing to get to the satellite world to save his 7 year old daughter", to "needing to get to the

10    satellite world to save himself " -then attaching a female friend's 6 year old daughter to the goal.

11               **THE HERO'S "AFFLICTION"**

12      42.   The Plaintiff's hero, Arlo, suffers rare ophthalmodynia (ice picks) headaches, so

13    excrutiating they feel as if the sufferer's brain has been stabbed by an ice-pick. Thus, Arlo

14    occasionally falls to his knees, clutching his head, crying-out in pain. In the script's climax, Arlo

15    suffers a headache while fighting the villain. **[Exhibit A pp. 23, 46, 105]**

16      43.   ELYSIUM manifests the exact symptoms of the "affliction" for it's hero; even the

17    reactions to pain. Max also suffers a headache in the climax. **[Exhibit B pp. 62, 63, 77, 112]**.

18      COMPARISON of PLAINTIFF & DEFENDANTS' AFFLICTION "HEADACHES"

19      44.   Note: the script "Elysium" contains four headache, but the film shows only three.

20    The Plaintiff's "Butterfly Driver" had three events -but the early WGA reg. version "Uberopolis:

21    CIty of Light" had four. The extra event from that script [EVENT #2] was added, for comparison.

22      LEGEND:     Plaintiff's "Butterfly Driver" (BD) - **in bold print [Exhibit A]**;

23                       Defendants' "Elysium" - in regular print **[Exhibit B]**

24    45.   FIRST EVENT:

25    **(BD):   Arlo suddenly falls to his knees, grabs his head, and growls in pain, "GRRRR." His**

26    **eyes roll back as he fights his way back to his feet. [Exhibit A p. 9]**

27    (ELYSIUM):    Max tries to run, but he collapses. He clasps his head in pain... Max clasps his

28    head like a migraine. The data creating an epileptic white static in his head. **[Exhibit B p. 62,]**

46.     SECOND EVENT:

**(BD):   Arlo stands up then unexpectedly drops to his knees in pain. ARLO: "GGGRRRR! Argh!" Arlo's eyes roll back behind his head, showing only the whites of his eyes for a moment. Arlo cries out. ARLO: "AAAHHHH!"** ["Uberopolis:City of Light" p. 33]

(ELYSIUM):    Suddenly another blast of static pain grates through Max's brain. He screams, holding his head. He staggers to his feet. **[Exhibit B p. 63]**

47.     THIRD EVENT:

**(BD):   He (Arlo) suddenly falls to one knee and grabs his head, stricken by an ice-pick headache. He growls. Eyes rolled back, Arlo rises to his feet, holding his temple, as if defying the pain to stop him. [Exhibit A p. 46]**

(ELYSIUM):   Suddenly he has a mini seizure. The searing white light. The migraine. His head wants to explode. He collapses to the ground... (more)  **[Exhibit B p. 77]**

48.     FOURTH EVENT:

**(BD):   Arlo releases his grip. Drexler slowly drops to his knees, blood dripping from his face. ...As Arlo reaches for his gun a jolt of pain shoots through his head, driving him to one knee. Arlo's eyes roll in their sockets as he groans and struggles to his feet. BANG! A fist smashes Arlo in the face, knocking him to the ground. Arlo looks up to find Drexler looming over him.**

**DREXLER: "Bad time for a headache." [Exhibit A p. 109].**

(ELYSIUM):   Max starts to get the upperhand when- A white hot flash of cerebral pain... He trips and stumbles over desks and terminals, holding his head.  Manual grabs Max and pulls him back toward spider...   Kruger rises, whips out a deadly throwing knife and wings it at Manuel. Max uses every ounce of strength to will himself to his feet. **[Exhibit B p. 112]**

SUMMARY: Hero's Affliction

49.   The unusual headaches (in paragraph 45-48) and the way they manifest in the Plaintiff's character, Arlo (grabbing head, stumbling, crying-out), and the surprising way a headache occurs in the story's climax, are the Plaintiff's unique expression and copyright.

50.   In adopting the symptoms and signs of the Plaintiff's hero's affliction for the hero of

9

1   their work, "Elysium", the Defendants infringed on the Plaintiff's copyright protected character,

2   Arlo Grainer, and infringed on his copyright protected script, "Butterfly Driver".

3      51.   As seen in paragraphs 45-48, the Defendants do not call these events "headaches";

4   rather, "migraines". But "migraine" is neurological disorder characterized by recurrent <u>headaches</u>.

5   The Defendants also, twice, call the events "seizures", and an "epileptic white static". Which

6   reveal the Defendants' misinformation of a serious disability -as epilepsy and epileptic seizures

7   do not cause sufferers to fall to their knees, screaming, clutching their heads. The Defendants also

8   call the event "A white hot flash of cerebral pain." "Cerebral pain" is a "headache".

9      52.   The Defendants' willful misuse of language, as illustrated in paragraph 50, reveal an

10   obvious effort to disguise their infringement (e.g. using the terms "migraines", "seizures" and

11   "epileptic white static", to avoid the word "headache" -to appear to describe a different

12   "affliction", while describing a strikingly similar, vitually identical, reaction to the pain).

13               **THE HERO'S "KEEPSAKE NECKLACE"**

14      53.   In the Plaintiff's, "Butterfly Driver", a character, "Benni", gives the hero, Arlo, a

15   keepsake necklace-pendant . As Arlo faces death, in the end of the screenplay, he has a dream in

16   which he sees the neclace-pendant Benni gave him. The dream saves Arlo's life and adds emotion

17   to the story. The pendant also has another special story behind it, too. The writer (Plaintiff) refers

18   to the necklace as a "necklance" and a "pendant". **[Exhibit A pp. 54, 55, 65, 113]**

19      54.   In the Defendants' "Elysium" screnplay, a num gives the hero, Max, a keepsake

20   necklace-pendant. As Max faces death he looks at the necklace and remembers "Frey" (in a

21   dream-like way). The pendant also has another special story behind it. The Defendants refer to

22   the pendant as a "pendant", a "necklace", and once as a "locket". **[Exhibit B pp. 29, 117, 120]**

23      55.   SUMMARY:  In using a keepsake necklace, in "Elysium", just as the Plaintiff used a

24   keepsake necklace in "Butterfly Driver", the Defendants infringed on the Plaintiff's copyright.

25              **THE VILLAIN:** Drexler Vs Delacourt (Rhodes)

26      56.   The Villains of both works (Drexler Butterfly Driver; Delecourt/Rhodes, Elysium)

27   have been genetically reprogrammed (or "re-atomized") to appear much younger than they really

28   are **[Exhibit A p. 3; Exhibit B p. 18]**; both villains send agents to apprehend the hero due to

<div align="center">10</div>

<div align="right">COMPLAINT</div>

information he possesses; and both villains order mass killings of prisoners traveling in space shuttles (a literary strategy to reveal the depth of the character's evil) **[Exhibit A p.105; Exhibit B pp. 12, 13]**; and both are seemingly evil, but committed to the belief that they are defending their elite ilk, **[Exhibit A pp. 93-96; Exhibit B p. 18].** Additionally, The villain of Butterfly Driver, Drexler, is the World President. He used his media company to cheat himself into The Presidency. Again, following the Plaintiff's model, in the actual film, "Elysium", the villain, Delacourt, also devises an evil plan to cheat herself into The Presidency.

<div align="center">SUMMARY: Drexler vs Delacourt</div>

57.   The plaintiff's character, "Drexler": 1) has been genetically *"reprogrammed" to appear much younger than he is (*Elysium calls this medical technology "re-atomizing"); 2) is very rich; 3) lives on a giant satellite world for the super-rich; 4) orders the mass killings of people traveling in space shuttles; 5) wants the story's hero apprehended due to information the hero possesses; 6) sends a special agent to apprehend a hero; 7) is evil, but committed to the belief that his deeds serve his rich, elite ilk; 8) cheats himself into the Presidency.

58.   The characteristics, actions, wants and conditions listed in paragraph 57 are the Plaintiff's unique expression; forming his copyright protected character "Drexler", from his copyright protected work, "Butterfly Driver".

59.   By adopting all (or substantial aspects) of each of the attributes, listed in paragraph 57, for their villain, "Delacourt" ("Rhodes" in the original screenplay) the Defendants infringed on the Plaintiff's copyright protected character, and copyright protected work "Butterfly Driver".

60.   In changing minor details about their character "Deleacourt" or "Rhodes" (gender, rank, making the character intent to cheat her way into the Presidency, rather than having already commited the deed) the Defendants made obvious efforts to disguise their infringement.

**SICK CHILD:** Franny Vs Matilda

61.   In Elysium, Frey's sick 6 year old daughter, "MATILDA", dying from Leukemia, is an infringement on the character "FRANNY", from the Plaintiff's "Butterfly Driver". Compare:

62.   FRANNY. In Butterfly Driver, "Franny" is Arlo's sick 7 year old daughter. She is dying of a respiratory disease. Franny's life hangs in the balance of the hero's actions; if he fails,

<div align="center">11</div>

1 she dies. Thus, she is central to the story. Franny is finally saved by Arlo's heroic action, and is

2 seen alive and healthy in the script's final minutes.

3     63.    MATILDA. In Elysium, 6 years old, "Matilda", is dying of Leukemia. Her life hangs

4 in the balance of the hero's actions; if he fails, she dies. Thus, she is central to the sttory. Matilda

5 is finally saved by Max's heroic action, and is seen alive and healthy in the story's final moments.

6     64.    Franny's importance to the Plaintiff's work can't be overstated. She makes Arlo's

7 journey matter. She makes his goal worthy, the future relevant and the story matter.

8 <div align="center">SUMMARY: "Franny" Vs "Matilda"</div>

9     65.    The Plaintiff's character, "Franny", has these characteristics, conditions, and literary

10 duties: 1) Franny is a very sick little girl; 2) Franny will die in less than a week without hard to

11 obtain medicine or medical aid; 3) Franny's medicine or medical aid is only available on a

12 satellite world; 4) Franny is saved by the hero's heroic deeds; 5) the writer links Franny's fate to

13 the hero'success or failure -to make the hero's journey (and the future itself) meaningful; 6)

14 Franny is shown alive and well (for emotional appeal) in the closing moments of the screenplay

15 or film; 7) Franny lives in an overpopulated, polluted future Earth.

16     66.    The unique characteristics, listed in paragraph 65 are the Plaintiff's unique expression

17 of his copyright protected character, "Franny", from his work, "Butterfly Driver".

18     67.    The Defendant's, "Matilda", shares all attributes, conditions, and literary duties, listed

19 in paragraph 61. Thus, the Defendants' "Matilda" infringes on the Plaintiff's character, "Franny".

20     68.    In making nuanced changes to "Matilda" (e.g. her name, age, her relationship to the

21 hero) the Defendants made willful and obvious efforts to disguise their infringement.

22 <div align="center">3) <u>SETTING INFRINGEMENT</u>:</div>

23     69.    Perhaps the most unusual settings in film this year, the two central settings of the

24 Defendants' "Elysium" infringe on the two central settings of the Plaintiff's "Butterfly Driver".

25 <div align="center">SETTING 1: GIANT SATELLITE WORLD FOR THE RICH</div>

26     70.    The Plaintiff's satellite is 3 miles in diameter **[Exhibit A p. 26].** The Defendants' script

27 calls for a satellite 60 miles in diameter. But the film's satellite is 1 or 2 miles in diameter.

28     71.    The plaintiff's satellite world has many unusual aspects: 1) it is an enormous satellite

<div align="center">12</div>

<div align="right">COMPLAINT</div>

world, with forests and large aquatic features; 2) only the super-rich live in the satellite's pristine biosphere; 3) there are fantastic medical technologies available on the satellite; 4) entering the satllite requires special identification; 5) it is home to the story's genetically reprogrammed villain; 6) it orbits an overpopulated, impoverished Earth; 7) it is where the final battle transpires; 8) here, orange-jump-suited prisoners are seen boarding shuttles. **[Exhibit A pp.3, 33; Exhibit B p. 5];** the satellite's citizen capacity is 300,000, when complete, 150,000 at the time of the story. Elysium capacity: 251,200. **[Exhibit A p. 4; and SEE Elysium website: http://www.welcometoelysium.com/ ]**

SUMMARY: Setting 1, Giant Satellite for the Rich

72.   The list of features, in paragraph 71, are a simplification of the Plaintiff's expression of his copyright protected satellite world, Uberopolis, featured in his work, "Butterfly Driver".

73.   The Defendants, "Elysium" uses all of characteristics listed in paragraph 71 for their satelliute world. Thus, the Defendant's "Elysium" infringes on the Plaintiff's copyright.

74.   Additionally, by never referring to Elysium as a "satellite" (to avoid the Plaintiff's language), and in making superficial changes to their satellite world (size, shape), the Defendants made obvious effort to disguise their infringementas.

SETTING 2:  DYSTOPIAN EARTH

75.   The other central setting of both screenplays is the impoverished overpopulated ruin of Earth. On this setting, in both scripts:: 1) the poor have little access to medical care; 2) the hero lives in a slum, overrun by thugs and crime; 3) police and military vehicles loom in the sky and brutalize the poor **[Exhibit A pp. 7, 16, 52, 53 ; Exhibit B pp. 6, 7];** 4) Army ships, full of "undesirables"are released into the slums **[Exhibit A p. 53; Exhibit B p. 5];** 5) the poor are brutalized by the governement of the satellite world (who also do a few kind things for the poor, such as provide supplies) **[Exhibit A p. 95; Exhibit B p. 17-18];** 6) rich businesses build manufacturing plants in the slums to take advantage of the cheap labor **[Exhibit A pp. 47, 95; Exhibit B pp.15, 16, 27, 28];** 7) people commonly travel by flying shuttles and flying cars; 8) the poor live in the ruins of cities in decay. (NOTE:  Elysium's script doesn't specify "ruins", but its synopsis does, and the film illustrates this state).

13

COMPLAINT

SUMMARY: Setting 2, Dystopian Earth

76.   The characteristics listed in paragraph 75 are the Plaintiff's expression of his dystopian vision of a future Earth, and his copyright, from his copyright protected work, "Butterfly Driver".

77.   The Defendants',"Elysium", adopts (all, or significant aspects of) each of the conditions listed in paragraph 75, infringing on the Plaintiff's copyright,

78.    In making superficial changes to their vision of Earth in "Elysium" (adding robots, changing the year, etc.) the Defendants made obvious efforts to disguise their infringement.

SETTING YEAR

79.   Butterfly Driver is set in the year 2120.  Elysium's original script says the movie is set in 2109 . But the actual film and official synopsis revise that year to 2154. However, In 2010, on his website (before the Defendants had written their script) the Plaintiff changed the setting year of Butterfly Driver to 2144 -ten years from Elysium's final setting. **[See Exhibit N]** .

80.   In placing Elysium's setting year near the Plaintiff's setting year, the Defendants adhere to and expand a pattern of infringement and similarity.

4)   <u>CENTRAL CONFLICT INFRINGEMENT</u>

81.   The "conflict" is/are the thing(s) that stands between the hero and his goal. The heroes of  both, the Plaintiff's "Butterfly Driver", and the Defendants' "Elysium", have extremely similar goals. Both heroes need to get to a satellite world to access the satellite's medical technology. And both heroes must overcome identical (or extremely similar) conflicts, which are: 1) the hero is not a citizen of the satellite world; 2) the hero is poor; 3) the hero needs fake I.D. and help to get to a satellite world; 4) a  powerful, evil, official wants the hero stopped; 5) the hero suffers debiltating headaches which make reaching his goal more difficult; 6) The evil, powerful official sends a special agent to apprehend the hero.

SUMMARY: Central Conflict

82.   All of the story conflicts, enumerated in paragraph 81, together, are an expression of the Plaintiff's effort, from his screenplay, "Butterfly Driver", the Plaintiff's exclusive copyright.

83.   The Defendants infringed on the Plaintiff's copyright by adopting all of the Plaintiff's central "conflicts", listed in paragraph 81, for their screenplay and film.=, "Elysium".

14

COMPLAINT

84.    Further, the Plaintiff charges that in making three minor changes to the "conflicts" in "Elysium" (e.g. making the pursuing agent into an "evil" agent, and changing the gender and office of the evil Official), the Defendants made willful efforts to disguise their infringement.

### 5)  THEME(S) INFRINGEMENT

85.    The Plaintiff's "Butterfly Driver" has five central themes: 1) Survival without adequate healthcare is inhumane; 2) the plight of immigrants is brutal; 3) wealth corrupts and divides us; (literally -the poor on Earth, the rich on a satellite world);

4) Heroic Sacrifice (in Butterfly Driver: Arlo risks everything, taking a near fatal bullet, to save his daughter; Elysium: in the end, Max gives up his life to save Matilda and mankind.

5) Redemption comes from refusing to give up hope (the spiritual theme of both movies). BUTTERFLY DRIVER: Arlo doesn't give up hope of saving his daughter. Thus, in the end, he finds redemption and liberates the world with free, fair elections. "Butterfly Driver" uses a rabbi, a cleric, a pastor and a necklace to reinforce this theme.

ELYSIUM: Max doesn't give up his dream of getting to Elysium; thus, finds redemption -and liberates the world. "Elysium" uses a nun and a necklace to reinforce this theme.

### SUMMARY: Themes

86.    The five themes (listed in paragraph 85) are (in the context of his script "Butterfly Driver", or in any substantially similar story), the artful expression and copyright of the Plaintiff.

87.    The Defendants adopted all five of the Plaintiff's central themes for "Elysium", and thus, further infringe on the Plaintiff's copyright.

### 6)  CATALYST, CRISIS, CLIMAX (and twist) INFRINGEMENT

88.    Typically a screenplay has three imparitive "plot points": 1) catalyst, 2) crisis, 3) climax. Elysium borrows all three from the Plaintiff's, "Butterfly Driver".

89.    **CATALYST:** the event that pushes the hero into action, and gives him his goal.

90.    BUTTERFLY DRIVER:  the hero learns his daughter has only about seven days to live, unless he can get to Uberopolis to get medicine to save her. **[Exhibit A p. 35]**

91.    ELYSIUM:  the hero learns he has only five days to live, unless he can get to Elysium for medical care. **[Exhibit B p. 31]** *His girl-friend's dying daughter must get there, too.

15

COMPLAINT

92. **CRISIS:** the story's low point, when all hope seems lost.

93. Usually the crisis occurs about halfway through the story. The Plaintiff's crisis occurs near the third act, The Defendants also place their crisis near the end. Compare:

94. BUTTERFLY DRIVER: after struggling to get to Uberopolis, Arlo learns the medication his daughter needs is not on the satellite world. **[Exhibit A p. 83]**

95. ELYSIUM: Arriving to Elysium, Max learns he can't be treated without wiping out the data in his head, and Matilda can't be treated because she's not a citizen. **[Exhibit B pp. 105, 106]**

96. **CLIMAX:** where the hero confronts the villain and battles him to the end.

97. It was imparitive to the Plaintiff to set the climax on the giant satellite: the great battle on the great satellite. Conversely, the Defendants started their climax on Earth; where the battle could have ended. But Defendant, Neill Blomkamp, moved the dying child, her mother, the hero, and the villain, all to the satellite world, to conclude the battle; emulating the effect as the Plaintiff's script.

98. Both works have identical CLIMAX TWISTS: The hero battles the villain on the giant satellite. They struggle. Finally the hero gains the advantage, then suddenly, the twist: the hero has a massive headache. **[Exhibit A p. 109; Exhibit B p 112]**

SUMMARY: Catalyst, Crisis, Climax (and twist)

99. The Plaintiff's catalysts, crisis, climax (and "climax twist") are the Plaintiff's structure and expression; and are (in the Plaintiff's "Butterfly Driver" or in any similar work) the Plaintiff's copyright.

100. As shown in paragraph 88-98, the Defendants' catalyst, crisis and climax are identical, or extremely similar to the Plaintiff's work; thus, they infringe on the Plaintiff's copyright.

7) <u>INCITING INCIDENT INFRINGEMENT</u>

101. **INCITING INCIDENT:** the event that takes the hero out of his normal routine world.

102. The Plaintiff's inciting incident occurs midway through the first act. The Defendants', "Elysium", uses the Plaintiff's inciting incident as the first event of the second act.

103. BUTTERFLY DRIVER'S INCITING INCIDENT: Arlo learns bounty hunters are closing in on him. He realizes he has to get his wife and kids out of their dangerous "zone" city

16

1   and into the rich, safe "State". But he needs money to pay their transport and immigration

2   ("repatriation") fees. Arlo turns to his friend -a local underground transporter. <u>The transporter</u>

3   <u>has a disability: he is a missing arm</u>. The transporter arranges Arlo's wife and kids' transport and

4   immigration -BUT Arlo must do a VERY dangerous mission in exchange.

5       104.   ELYSIUM'S INCITING INCIDENT: Max learns he has radiation poisoning and has

6   only five days to live. His only hope is to get to the satellite city, Elysium, for medical care. With

7   no money to pay, Max asks his friend (a local underground transporter) to smuggle him to

8   Elysium. <u>The transporter has a disability: he has a paralyzed leg</u>. The transporter agrees to

9   transport Max -if Max does a VERY dangerous mission in exchange.

<div align="center">SUMMARY: Inciting Incident</div>

11      105.  The unusual structure of "paying for immigration transport by doing a very dangerous

12   mission for a disabled underworld transporter," is the Plaintiff's expression and copyright.

13      106.  As illustrated in paragraph 101-104, the Defendants "Elysium", adopts the Plaintiff's

14   inciting incident, and thus infringes on the Plaintiff's copyright.

<div align="center">8)  <u>IDIOSYNCRATIC & STYLE INFRINGEMENT</u></div>

16      107.  The Plaintiff uses two words, one word play, and an unusual omission that can be

17   considered idiosyncratic or style signature. The Defendants','"Elysium", uses these same (or, in

18   one case, very similar) idiosyncrasies :

19      108.  **(A)** BUTTERFLY DRIVER uses the very uncommon word "repatriate", in lieu of

20   the word "immigrate**". [Exhibit A pp. 12, 13, 34, 41 117].**

21      109.   ELYSIUM uses the word "repatriated" on page 5. **[Exhibit B p. 5]**

22      110.  NOTE: The word 'repatriation is extremely uncommon. It's usually used in association

23   with war. The Plaintiff chose it to reference immigration in a warlike atmosphere. In "Elysium"

24   the word is an exotic departure from Blomkamp's ordinarily simple, casual story language.

25      111.  (B)  BUTTERFLY DRIVER uses the term genetic "reprogramming" for the act of

26   reversing the effects of disease, age, and physically improving a person **[Exhibit A p. 3, 36, 90).**

27   ELYSIUM uses a similar term "reatomizing" for the act of reversing the effects of disease and

28   age, and physically improving a person. **[Exhibit B pp. 2, 4, 104)**

<div align="center">17</div>

<div align="right">COMPLAINT</div>

112.  **(C)**  BUTTERFLY DRIVER shows humans killed in space and their bodies left to fall back to Earth. The Plaintiff uses the terms "disposal" and "litter" to show the dead bodies are the new "trash" hazard. Playing with this motif, the villain, Drexler, orders a shuttle set for "disposal" -meaning: dump all aboard into space. **[Exhibit A pp. 3, 31, 107, 105, 108]**

113.  ELYSIUM: Before Rhodes orders Kruger to destroy two shuttles full of immigrants (to let their bodies to fall to Earth) she asks how many of the ships are a "debris danger" -playing on the "trash" motif. **[Exhibit B pp. 10, 11]** (the "debri danger" line was cut out of the movie).

114.  **(D)**  BUTTERFLY DRIVER omits the racial identities of the central characters, to reflect a less "racial' future. Omitting this information is unusual for a screenplay.

ELYSIUM also omits any mention of the racial identity of its central characters.

SUMMARY: Idiosyncratic and Style Infringement

115.  The Plaintiff's idiosyncratic elements, enumerated in paragraphs 107-114, are his copyright. In adopting these idiosyncrasies the Defendants infringed on the Plaintiff's copyright.

9) TECHNOLOGICAL 'VISION" INFRINGEMENT

116.  The central technologies in the Plaintiff's "Butterfly Driver" are: an advanced satellite world for the rich, and medical technologies. "Elysium" also features the central technologies of a satellite world for the rich, and medical technology (one of these medical technologies is identical to the Plaintiff's medical technology, "genetic reprogramming").

117.  SUMMARY: The Defendants' technological "vision" in "Elysium", infringes on the Plaintiff's copyright, and conforms to a pattern of similarity and infringement by the Defendants.

10) RESOLUTION SIMILARITY

118.  In both scripts, the heroes of actions have unlikely global consequences. Compare:

119.  **"BUTTERFLY DRIVER" Global Impact Resolution**: The hero's actions topple the government, bringing much of the world free, open elections -as well as a new clean energy.

120.  **"ELYSIUM" Global Impact Resolution:** because of one hero's actions, the government of Elysium is toppled, and medical aid is sent out to cure all the people of the world.

121.  SUMMARY: The Defendants' resolution mirrors the nature, style and scale of the Plaintiff's resolution, and conforms to an expanding pattern of similarity and infringement.

18

# SECONDARY INSTANCES OF COPYRIGHT INFRINGEMENT

## 1) SECONDARY SCENE INFRINGEMENT

140.   The following scenes from the Plaintiff's work, were infringed on by "Elysium".

141.   **(1)** In BUTTERFLY DRIVER, to gain access to the villain, Arlo, holds up an explosive "A-cell" and threatens to detonate it if his demand is refused. Later, in an uncertain moment with the villain, Arlo throws the A-cell out a window -initiating the climax. .**[Exhibit A pp. 88, 97]**

142.   In ELYSIUM, to get to Elysium, Max holds a grenade to his head and threatens to detonate it if his demand is refused. Later, in an uncertain moment with the villain, Max suddenly throws the grenade in a shuttle's cockpit -initiating the climax. **[Exhibit B pp. 94-95]** (*Note: in the actual film, Max does not throw the grenade).

143.   **(2)** In BUTTERFLY DRIVER, hero, Arlo, is strap-locked in a doomed shuttle, and breaks free and struggles to saves his friend from his straps. **[Exhibit A p. 31]**

144.   In ELYSIUM, hero, Max, must struggle to free his friend, Frey, who is strap-locked in the seat of a doomed shuttle. **[Exhibit B p. 96-99]**

145.   **(3)** Butterfly Driver: Jerry negotiates with insurers for his son's life. **[Exhibit A p. 22]**

146.   Elysium: Frey negotiates with hospital for her daughter's life. **[Exhibit B pp. 26, 27]**

147.   **(4)** In BUTTERFLY DRIVER, the villain, Drexler, is extremely strong because he was reprogrammed without myostatin **[Exhibit A p. 36].** Drexler also refers to himself as "immortal", suggesting he feels superior to regular humans. **[Exhibit A p. 99]**

148.   In ELYSIUM, the villain, Kruger possesses "immense strength" **[Exhibit B p. 20]**, from re-atomizing.  Kruger calls the humans on Earth "humans" and "peasants", suggesting he thinks he and Elysians are superior to regular humans.  **[Exhibit B pp. 57, 67, 91]**

149.  **(5)**  In BOTH screenplays tech programmers must forge documents to get the heroes into Uberopolis and Elysium, respectively. **[Exhibit A pp. 57-58, Exhibit B pp. 44]**

150.  **(6)**  BUTTERFLY DRIVER:   Arlo has tracker cut out of his neck. **[Exhibit A p. 33]**

151.   ELYSIUM: Kruger cuts ID & tracking chip out of his wrist. **[Exhibit B p. 57]**

152.   SUMMARY: Paragraphs 140-151 are further instances and evidence of the Defendants' "Elysium" infringing on the Plaintiff's copyright protected work, "Butterfly Driver".

## 2) SECONDARY CHARACTER INFRINGEMENT

### (1) Rianna & Benni Vs Frey :

122.    Elysium's character FREY is a hybrid character based on the characters RIANNA & BENNI from the Plaintiff's copyright protected work, "Butterfly Driver". Compare:

123.    BUTTERFLY DRIVER: Rianna lives in an uneducated slum, but is an educated, devoted mother; while Benni is beautiful, hopeful, but disappointed with the men around her. **[Exhibit A p. 52].**

124.    ELYSIUM: Frey lives in an uneducated slum, but is an educated, tough and devoted mother -also beautiful hopeful and disappointed with the men around her **[Exhibit B p. 75].**

125.    BUTTERFLY DRIVER: the writer hints at an attraction between Benni and Arlo, but no romance occurs, as it would undermine the story's urgency. **[Exhibit A p. 52]**

ELYSIUM: there is an attraction between Frey and Max, but no romance occurs. **[Exhibit B pp. 15, 75]**

### (2) Jerry Vs Kruger:

126.    Although Elysium's "KRUGER" is evil and Butterfly Driver's JERRY Matthiessen is basically good, they have a few important things in common:

127. **(A)** JERRY and KRUGER are both sent to apprehend the hero by a high ranking official.

128. **(B)** BUTTERFLY DRIVER: when superiors ask agent Jerry Matthiessen to find Arlo, Jerry bargains for health care for his son, before accepting the mission. **[Exhibit A pp. 25, 45]**

129.    ELYSIUM: when his superior asks special agent Kruger to apprehend Max, Kruger bargains for a mansion and more, before accepting the mission. **[Exhibit B pp. 56, 57]**

130. **(C)** BUTTERFLY DRIVER: Jerry works for government law enforcement, the OFI

131.    ELYSIUM: Kruger works for government law enforcement, the CCB.

### (3) Dylan Vs Spider:

132.    The Defendants' character "SPIDER" bears a striking resemblance to the Plaintiff's "Butterfly Driver" character, "DYLAN". Compare:

133.    In "Butterfly Driver" "Dylan" runs an underground base with flight path monitors on the walls. He sometimes transports immigrants. He is disabled: missing an arm. **[Exhibit A p. 7]**

20

COMPLAINT

134.   In "Elysium" "Spider" runs an underground base, with flight path monitors on the walls. He transports immigrants. <u>He is disabled with a paralyzed leg.</u>  **[Exhibit B p. 36]**

**(4) Matty Vs Matilda:**

135.   Elysium's character, "Matilda" (who infringes on Plaintiff's character, "Franny") also bears striking resemblance to the Plaintiff's character "MATTY". Compare:

136.   BUTTERFLY DRIVER: "Matty" is Jerry's sick 9 year old son. He is dying of a respiratory disease. He wants to be healthy and get out of his air chamber.  **[Exhibit A  p. 44]**

137.   ELYSIUM: "Matilda" is 6 and dying of Leukemia. She is the daughter of Frey, Max's childhood sweetheart. Matilda wants to be healthy and get out of the hospital.  **[Exhibit B p. 66]**

138.   The fact that "Matilda" is the feminine form of "Matty" is also a significant similarity.

139.   SUMMARY: Paragraphs 122-138 are further instances of the Defendants', "Elysium", infringing on the Plaintiff's copyright.

<u>MINOR SCRIPT INFRINGEMENT</u>:

153.  **(B)**  BUTTERFLY DRIVER: A character named "VAN" reflects  some current attitudes toward immigrants, when he comments about an immigrant woman's hard work, "She just repatriated. People from the state can't work like that." **[Exhibit A p. 41]**

154.   ELYSIUM: reflects some current attitudes toward immigrants when Rhodes says, "Jesus Christ. Yes, the real issue. The ungodly influx of immigrants..." **[Exhibit B p. 17]**

155.  **(C)**  BUTTERFLY DRIVER: the final battle and chase on Uberopolis, Arlo runs through doors that take the fight under the metal city floor.  **[Exhibit A p. 101]**

156.   ELYSIUM: the final battle and chase on Elysium, Max goes through a hatch that takes the fight under the metal city floor. **[Exhibit B pp. 110-112]**

157.  **(D)**   In BUTTERFLY DRIVER, Arlo's best friend is killed (by a state bounty hunter).  **[Exhibit A p. 10]**

158.   In ELYSIUM, Max's best friend is killed (by state assassin, Kruger). **[Exhibit B p. 64]**

159.  **(E)**  BUTTERFLY DRIVER uses Bush era, post 911 terms to reinforce points, such as: "I don't negotiate with State enemies," and tags like "embolden".  **[Exhibit A pp. 51, 88]**

160.   ELYSIUM borrows this stroke with "Homeland Defense" ("Homeland Security" in

21

COMPLAINT

1   the movie). [**Exhibit B p. 2, 100**]

2   161.   **(F)** BUTTERFLY DRIVER: Drexler and leaders talk politics and P.R. [**Exhibit A p.75**]

3   162.   In ELYSIUM: Delacourt, and leaders discuss politics and P.R. [**Exhibit B pp. 17-18**]

4   163.   **(G)** In BUTTERFLY DRIVER, the massive climax battle causes chaos among civilians,

5   and causes security officers to evacuate as alarms blare.  [**Exhibit A p. 105**]

6   164.   In ELYSIUM, the massive climax battle causes chaos among civilians, and causes

7   security officers to evacuate as alarms blare. [**Exhibit B p. 110**]

8   165.   **(H)** BUTTERFLY DRIVER: remote cameras track Arlo. [**Exhibit A pp. 98, 103, 107**]

9   In ELYSIUM: remote cameras track Max [**Exhibit B pp. 80, 90**]

10  166.   **( I )** BUTTERFLY DRIVER: Characters refer to Arlo as a "LEGEND". [**Exhibit A**

11  **pp. 14, 48**]

12  167.   ELYSIUM: Julio tells Max "... you used to be a "LEGEND". [**Exhibit B p. 25**]

13  168.   Paragraphs 153-167 are further evidence of infringement, by the Defendants, of the

14  Plaintiff's copyrighted work, "Butterfly Driver", and expand a pattern of similarity.

15                  INTERNET / MULTI-MEDIA INFRINGEMENT

16  169.   Through his characters, the Plaintiff, showed the science and politics history behind

17  his world, and the backstories of his primary characters. The Defendants eliminated the social

18  and political history from their screenplay and film (and most of the character's backstories). But

19  they included this information on the official Elysium website. Some on these details further

20  infringe on the Plaintiff's "Butterfly Driver" script, listed below:

21  170.   **(A)** In BUTTERFLY DRIVER, the villain, Drexler, is directly responsible for creating

22  Uberopolis. He is the richest man in the world and owner of the most profitable company ever -

23  Drexler Industries. Drexler Industries makes it's fortunes from 3 enterprises: 1) HEALTH &

24  MEDICAL; 2) REAL ESTATE (homes on Uberopolis); 3) its media company.

25  171.   In ELYSIUM the evil character Carlyle is directly responsible for creating Elysium.

26  He is the CEO of Armadyne Corp. Armadyne is the most profitable company ever. Armadyne

27  makes its fortune from 3 enterprises: 1) HEALTH & MEDICAL COMPANY;2) REAL ESTATE

28  (Elysium); 3) his robotics products. (http://www.armadyne.net/company/leadership.php )

                                    22

                                              COMPLAINT

172.  **(B)** BUTTERFLY DRIVER : When the second half of Uberopolis is completed it will support 200,000 to 300,000 citizens.  **[Exhibit A p. 4]**

173.  The offfical ELYSIUM website says Elysium has a maximum capacity of 251,200 citizens -approximating Uberopolis's capacity. (http://www.welcometoelysium.com/)

174.  **(C)** In BUTTERFLY DRIVER, immigration into the state costs tens of thousands of dollars. But only citizens who pass an intelligence test can vote.  **[Exhibit A pp. 12, 84]** On the ELYSIUM official website, it is revealed that legal immigration requires an IQ test. The website includes an IQ test site visitors can take.  http://www.itsbetteruphere.com/

175.  **(D)** In "BUTTERFLY DRIVER" the government of Uberopolis also governs Earth, from Uberopolis, and it is a corporate, business centered world government.

176.  The official ELYSIUM website establishes that the government of Elysium also governs the Earth. It is a business centered government, governed by The Elysium Corporate Authority. ( http://www.armadyne.net/#../company/about.php )

177.  Paragraphs 169-176 are further evidence of the Defendants, "Elysiun",' infringes on the Plaintiff's copyright protected work, "Butterfly Driver".

<u>MARKETING INFRINGEMENT</u>

178.  The synopsis is a filmmaker's foremost marketing tool.  In 2010, the Plaintiff updated and posted a synopsis of "Butterfly Driver" on "The Amazing Mr. Excellent" website, to attract investment for "Butterfly Driver". The Defendants synopsis is patterned after the Plaintiff's. The Plaintiff's synopsis, from Aug. 6th, 2010, can be seen, archived on the Wayback Machine, at: http://web.archive.org/web/20100807072930/http://www.mrexcellentmovie.com/future.html **[See Exhibit N].** That synopsis-logline reads:

179.  **"BUTTERFLY DRIVER:** In 2144 Earth is grossly overpopulated, with 95% of the population living in poverty, while the elite .01% live on the giant man made luxery satellite, Uberopolis. Against this backdrop, in some anonomous slum, legendary soldier -and world's most wanted fugitive, Arlo Grainer, learns the polluted atmosphere will kill his daughter unless she receives an extremely costly drug. For that medicine Arlo will go across the globe and into the heart of Uberopolis, pursued by every bounty hunter on Earth".

<div align="center">23</div>

COMPLAINT

180.     **ELYSIUM** (Synopsis-Logline): "In the year 2154, two classes of people exist: the very wealthy, who live on a pristine man-made space station called Elysium, and the rest, who live on an overpopulated, ruined planet. The people of Earth are desperate to escape the crime and poverty that is now rampant throughout the land. The only man with the chance to bring equality to these worlds is Max (Matt Damon), an ordinary guy in desperate need to get to Elysium. With his life hanging in the balance, he reluctantly takes on a dangerous mission -- one that pits him against Elysium's Secretary Delacourt (Jodie Foster) and her hard-line forces -- but if he succeeds, he could save not only his own life, but millions of people on Earth as well."

181.     The Defendants' synopsis only mentions aspects infringed on from the Plaintiff's work -no mention of robots, exoskeleton suits, or high-tech guns, as they are insubstantial, and added only to disguise the infringement.  The Defendants' synopsis follows the Plaintiff's synopsis structure. Mention, first, the year; then the class division, then the satellite world, followed by some plot details.

182.     Paragraph 178-181 establish that the Defendants' "Elysium" marketing synopsis is an infringement of the Plaintiff's copyright, and adheres to a pattern of infringement and similarity between the two works, beyond coincidence, reason or probability.

**DEFENDANTS' ATTEMPTS TO APPEAR DISSIMILAR AND HIDE INFRINGEMENT**

183.     Beyond the extensive copyright infringement, detailed in paragraphs 1-182, the Defendants also attempted to hide their infringement in obious ways -as described in the preceding paragraphs. Additionally, while making their film, "Elysium", the Defendants implemented extreme measures to keep their infringement secret. This was done to keep the Plaintiff unaware that his work was misappropriated. To keep their infringement secret, the Defendants would not permitt any cast member to take a script home -including legendary actress, Jody Foster. **[See Exhibit O]** The Defendants would not permit actors to see a script, to review their lines, before auditioning, and cast and crew members were not permitted to reveal any story details to the public.

184.     The fact that the Defendants avoid using the word "satellite" to refer to their satellite world "Elysium" in both their film and screenplay is part of their effort to appear dissimilar to the

24

1 Plaintiff's work.; done throughout "Elysium".

2    185.    Upon learning of the impending infringement of his screenplay, on May 27th, 2013,

3 the Plaintiff began contacting attorneys about the case (about 50 attorneys), during the last days

4 of May and the first week of June -including one or more attorneys who decline because of

5 "conflicts of interests". In mid June a legal advisor advised the Plaintiff that if he had contacted

6 so many attorneys it's probable the Defendants are aware of the Plaintiff's impending legal action.

7    186.    The plaintiff believes the Defendants may have been tipped about this litigation in

8 late May or early June; which gave the Defendants 2 months to re-edit the movie. Although the

9 Defendants' hero suffers three "character affliction" headaches, the Defendants removed one of

10 the headaches and may have tried to remove the other headaches, but could not, due to

11 insufficient coverage film footage. The Defendants would do this to make their film appear

12 dissimilar from the Plaintiff's story. Defendant, Neill Blomkamp is a special effects master;

13 vitually every special effect his script is executed just as described. Yet, two of the three

14 headaches that survived, into the film, are very short. And all three of the surviving headaches are

15 are missing the special effects described for them: the "eplileptic white static" and the "blast of

16 static pain grates through Max's brain", and "The searing white light", and the "white hot flash of

17 cerebral pain..."

**DEFENDANTS' PROFITS**

19    187.    As of October 8th, 2013, Elysium had earned over $272,000,000, worldwide,

20 against a cost of 115,000,000 -amounting to assumed profits of $157,000,000. The Defendants

21 may be overstating losses in anticipation of this litigation, as the budget for Elysium was listed as

22 $90,000,000, from late May to late July, 2013. Then, late July, 2013, the budget suddenly

23 skyrocketed to $115,000,000 -perhaps related to the notoriously dishonest accounting practices of

24 the film industry -often referred to as "Hollywood acounting". **[See Exhibit P]**

**PERSONAL DAMAGES AND INJURY**

26    188.    The Plaintiff's "Butterfly Drivver" is a tight, thoughtful work, cultivated from the

27 American experience of a native Californian, transplanted to an immigrant community in New

28 York City (Inwood, Washington Heights) during the events of 911 (2001); forged from first-hand

<div align="center">25</div>

1    perspective of the failures of the American healthcare system; and life-long witness experience of

2    the heart wrenching dichotomy engendered by America's immgration issues. Even "Franny", the

3    sick seven year old girl, was based of the Plaintiff's asthmatic (then) seven year old son.

4        189.     Conversely, the Defendant(s)'s "Elysium" lacked any feeling of authenticity, and

5    was marred by story flaws; such as the collision of thoughtful and absurd ideas, a lack of

6    character depth, a lack of story consistency, a lack of subtlety, and a lack of basic science

7    knowledge (such as using turbine engines for space travel, more). Adding to these failings, the

8    Defendants' film promulgated conspicuously racist views; such as their vision of a future where

9    Latinos have amassed no wealth and (in the Defendants' eyes) have no work ethic -as seemingly

10   all Latinos, in their film and script, wish to illegally enter a space world (where no jobs are

11   offered to them) so they can live in mansions, illegally, get free health care, and not work. These

12   story flaws and offensive views contribute to "Elysium" poor reviews by most respected critics.

13       190.     As a consequence of the Defendants' infringement, and their insensitive and

14   offensive social views, the Plaintiffs' reputation may be permanently damaged by the igniminious

15   association with the Defendants' infringing work. The Defendants' infringement makes it much

16   harder for the Plaintiff to approach the filmmaking establishment for support on future works, as

17   Sony Pictures Ent., Inc. also owns Columbia Pictures, and fellow Defendant, TriStar Pictures.

18       191.     The Defendant's infringement makes it impossible for the Plaintiff to market his

19   screenplay, as there is no room in the film market for two films about a poor man living in the

20   future ruins of an impoverished Earth, who needs to get to a satellite world for the super rich ,

21   etc. As affirmed by  LEWIS GALOOB TOYS, INC.v. NINTENDO OF AMERICA, INC., 964

22   F.2d 965 (9th Cir. 1992) Judge FARRIS [Cite: The Supreme Court specifically affirmed finding

23   that the motion picture adaptation "impinged on the ability to market new versions of the story."

24   Stewart, 495 U.S. at 238]

25                           **SUMMARY**

26       192.     The Defendants' "Elysium" infringes on dozens of the Plaintiff's original

27   expressions, including the Plaintiff's elaborate PLOT, his CENTRAL CHARACTERS (including

28   the Plaintiff's HERO, his VILLAIN, his essential SICK GIRL, and others); it infringing on the

<div align="center">26</div>

1    Plaintiff's SETTINGS (including the giant orbiting satellite city for the super-rich), his HERO'S

2    AFFLICTION (terrible random headache syndrome), the Plaintiff's HERO'S GOAL(getting to

3    satellite world for medical aid), all 5 of the Plaintiff's CENTRAL THEMES, the Plaintiff's 6

4    CENTRAL CONFLICTS, his CATALYST, his CRISIS, his INCITING INCIDENT (doing a

5    dangerous mission, for a disabled illegal transporter, to pay his family's immigration fees),

6    infringing on the Plaintiff's CLIMAX TWIST, his IDIOSYNCRATIC ELEMENTS, the

7    Plaintiff's GLOBAL IMPACT RESOLUTION, the Plaintiff's FUTURE TECHNOLOGY

8    (including the technology of genetic "reprogramming"), the Plaintiff's HERO'S KEEPSAKE

9    NECKLACE (which recurs in a dreamlike way in the story's final pages ), and much more.

10       193.    The Defendant's infringement is so extensive that when the Plaintiff's infringed

11    content is extracted from Elysium there is no story left to market -all that remains are robots, two

12    exoskeletons, some high-tech guns, and the hero's new backstory; all of which are simply "add-

13    ons", added to disguise infringement -not connected to the central story.

14                         **CLAIM ONE**

15       194.    The Plaintiff incorporates by reference all of the allegations of paragraphs 1

16    through 193, inclusive, as if fully set forth herein.

17       195.    The Plaintiff alleges that the Defendants' film (and screenplay) "Elysium", infringes

18    on the Plaintiff's copyright of his original screenplay, Butterfly Driver". The Defendant's willfully

19    infringed on his work for purposes of commercial advantage or private financial gain.

20       196.    The Plaintiff incorporates by reference all of the allegations of paragraphs 1

21    through 195, inclusive, and alleges that in making derivatives, reproducing, distributing and

22    displaying publicly their infringing "Elysium", the Defendants violated the Plaintiff's exclusive

23    rights as the copyright owner of his original work "Butterfly Driver", pursuant to 17 USC § 106 ".

24       197.    The Plaintiff incorporates by reference all of the allegations of paragraphs 1

25    through 196, inclusive, as if fully set forth herein. The Plaintiff further alleges the Defendendant

26    (s) made crude and obvious efforts to to give their infringing work, "Elysium", the appearance of

27    dissimilarity from the Plaintiff's "Butterfly Driver".

28       198.    The Plaintiff incorporates by reference all of the allegations of paragraphs 1

COMPLAINT

1  through 197, inclusive. The Plaintiff additionally alleges the Defendants' infringing conduct has

2  caused and is causing substantial and irreparable injury and damage to Plaintiff.

3       199     On information and belief, The Plaintiff alleges that, as a direct result of the

4  Defendants' wrongful conduct, the Defendants have realized and continue to realize profits,

5  rightfully belonging to the Plaintiff. As of October 1st, 2013, Elysium had earned over

6  $272,000,000, against a cost of 115,000,000 -profits in excess of $155,000,000, and growing.

7  **PRAYERS FOR RELIEF**

8       200.     WHEREFORE, the Plaintiff asks the Court to enter judgment in his favor, and

9  against Defendants, Neill Blomkamp, Sony Pictures Ent., Inc., TriStar Picture, Inc., Media Rights

10  Capital, and Q.E.D. International, and grant the Plaintiff the following relief:

11       201.     A.) Declare that the Defendants' unauthorized conduct violates the Plaintiff's rights

12  under the Federal Copyright Act;

13       202.     B.) Pursuant to Title 17 USC § 503(b) the Plaintiff requests The Court order the

14  end of production and distribution, and the impounding and destruction of all original recordings

15  and all copies of the Defendants' film "Elysium", in all formats (DVD, CD, film, digital, etc), and

16  order the impounding and destruction of all derivatives (such as video games, soundtracks, etc.);

17       203.     D.) As per Title 17 USC § 504(a)(b) the Plaintiff seeks Actual Damages (the

18  opportunity to make and market his film) and Lost Profits;

19       204.     E.) Such other and further relief as the Court deems just and proper;

20       205.     F.) Pursuant to Title 17 USC § 506(a)(1)(A), as the Defendants' actions were willful

21  and for purposes of commercial advantage, the Plaintiff asks the Court to hold the Defendant(s)

22  criminally accountable as provided under section 2319 of Title 18.

23       206.     G.) The Plaintiff also prays for the injunctive remedies of: ordering the stopping any

24  further and future sales and distribution of the Defendants' infringing work, "Elysium" (by that

25  name or any other name), in any form (digital, film, DVD, CD, online video, games, toys, etc.).

26       207.     The Plaintiff incorporates by reference all of the allegations of paragraphs 1 through

27  208, inclusive, as if fully set forth herein. Consistent with the guidelines for injunctive remedies

28  to establish that the Plaintiff (the moving party) will suffer irreparable harm without the

COMPLAINT

1 | injunctive measures. Consistent with the guidelines for injunctive remedies, the Plaintiff has

2 | presented a solid complaint and evidence supporting his claim that he will prevail. And,

3 | consistent with the guidelines for injunctive remedies, the Defendants will not be harmed by the

4 | injunction more than the Plaintiff will be harmed without them. And consistent with the

5 | guidelines for injunctive remedies, it is in the publics interest to be protected from being sold

6 | media and content misappropriated from other artists.

7 |    208.    H.) Pursuant to 17 U.S.C. §§ 412, the Plaintiff's "Butterfly Driver" was preregistered

8 | under section 408 (f) before the commencement of the infringement (and that has an effective

9 | date of registration not later than the earlier of 3 months after the first publication of the work or

10 | 1 month after the copyright owner has learned of the infringement). Thus, the Plaintiff prays of

11 | the Court for the remedy of reasonable fees for attorneys and disbursements, to be paid by the

12 | Defendants -as accrued, independent of, and in advance of judgement. The Plaintiff's U.S.

13 | Copyright Office registration effective date for his unpublished script, "Butterfly Driver", is June

14 | 21st, 2013, which is seven weeks before the Defendants released, distributed and displayed

15 | publicly, "Elysium", in The USA and 11 other countries, on August 9th, 2013 (SEE:

16 | http://www.imdb.com/title/tt1535108/releaseinfo); which marked the commencement of the

17 | infringement -as any infringement before that date would be presumptively fair, non-profit

18 | activity. [LEWIS GALOOB TOYS, INC. v. NINTENDO OF AMERICA, INC. (9th Cir., 1992)

19 | (964 F.2d 965) "Game Genie users are engaged in a non-profit activity. Their use of the Game

20 | Genie to create derivative works therefore is presumptively fair." The Court also ruled in this

21 | case that, "a family's use of a Game Genie for private home enjoyment must be characterized as a

22 | non-commercial, nonprofit activity."].

23 |

24 | DATED:  October 8th, 2013

25 | Respectfully submitted,

26 |

27 | By:

28 | (Signature od Steve Wilson Briggs, Plaintiff)

29

COMPLAINT

# EXHIBIT 3

ADRMOP,CLOSED,E-ProSe,ProSe,RELATE

# U.S. District Court
# California Northern District (San Francisco)
# CIVIL DOCKET FOR CASE #: 3:17-cv-06552-VC

Briggs v. Universal Pictures et al
Assigned to: Judge Vince Chhabria
Demand: $9,999,000
Relate Case Case: 3:18-cv-04952-VC
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 11/13/2017
Date Terminated: 04/25/2018
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

**Plaintiff**

**Steve Kenyatta Wilson Briggs**

represented by **Steve Kenyatta Wilson Briggs**
681 Edna Way
San Mateo, CA 94402
510-200-3763
Email: snc.steve@gmail.com
PRO SE

V.

**Defendant**

**Universal Pictures**

represented by **Rochelle L. Wilcox**
Attorney at Law
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
213-633-6800
Fax: 213-633-6899
Email: rochellewilcox@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brendan Nathaniel Charney**
Davis Wright Tremaine LLP
865 S. Figueroa Street
Suite 2400
Los Angeles, CA 90017
United Sta
213-633-6800
Fax: 213-633-6899
Email: brendancharney@dwt.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sony Pictures**

represented by **Gregory Philip Korn**
Kinsella Weitzman et al LLP
808 Wilshire Blvd 3FL
Santa Monica, CA 90401
310-566-9800
Fax: 310-566-9850

Email: gkorn@kwikalaw.com
*ATTORNEY TO BE NOTICED*

**Michael Joseph Kump**
Kinsella Weitzman et al LLP
808 Wilshire Blvd 3FL
Santa Monica, CA 90401
310-566-9855
Fax: 310-566-9850
Email: mkump@kwikalaw.com
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**NBCUniversal**                    represented by   **Rochelle L. Wilcox**
                                    (See above for address)
                                    *LEAD ATTORNEY*
                                    *ATTORNEY TO BE NOTICED*

                                    **Brendan Nathaniel Charney**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Kevin Spacey**

<u>**Defendant**</u>

**Ariel Emanuel**                   represented by   **Gregory Philip Korn**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

                                    **Michael Joseph Kump**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Matthew Damon**

<u>**Defendant**</u>

**Ben Affleck**

<u>**Defendant**</u>

**Neill Blomkamp**                  represented by   **Gregory Philip Korn**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

                                    **Michael Joseph Kump**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Mordecai Wiczyk**                 represented by   **Gregory Philip Korn**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

**Michael Joseph Kump**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

Asif Satchu                                  represented by   **Gregory Philip Korn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Joseph Kump**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bill Block**

**Defendant**

**Dana Brunetti**

**Defendant**

**Media Rights Capital**

**Defendant**

**MRC II LP**

**Defendant**

**MRC II Distribution Company LP**      represented by   **Gregory Philip Korn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Joseph Kump**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MRC II Holdings LP**                   represented by   **Gregory Philip Korn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Joseph Kump**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Asgari Inc.**

**Defendant**

**Oaktree Entertainment Inc.**           represented by   **Gregory Philip Korn**
(See above for address)
*ATTORNEY TO BE NOTICED*

Michael Joseph Kump
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MRC I Hedge Co LLC**                        represented by  Gregory Philip Korn
(See above for address)
*ATTORNEY TO BE NOTICED*

Michael Joseph Kump
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MRC SUB GP LLC**

**Defendant**

**MRC II Capital Company LP**                 represented by  Gregory Philip Korn
(See above for address)
*ATTORNEY TO BE NOTICED*

Michael Joseph Kump
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MRC I Project Company LLC**                 represented by  Gregory Philip Korn
(See above for address)
*ATTORNEY TO BE NOTICED*

Michael Joseph Kump
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |
| 11/13/2017 | 1 | COMPLAINT against Ben Affleck, Asgari Inc., Bill Block, Neill Blomkamp, Dana Brunetti, Matthew Damon, Ariel Emanuel, MRC I Hedge Co LLC, MRC I Project Company LLC, MRC II Capital Company LP, MRC II Distribution Company LP, MRC II Holdings LP, MRC II LP, MRC SUB GP LLC, Media Rights Capital, NBCUniversal, Oaktree Entertainment Inc., Asif Satchu, Sony Pictures, Kevin Spacey, Universal Pictures, Mordecai Wiczyk (Filing fee $ 400, Receipt Number 34611128977). Filed bySteve Wilson Briggs. Consent/Declination due by 11/27/2017. (Attachments: # 1 part 2, # 2 part 3, # 3 part 4, # 4 part 5, # 5 part 6, # 6 part 7, # 7 part 8, # 8 part 9, # 9 part 10, # 10 part 11, # 11 part 12, # 12 part 13, # 13 part 14, # 14 part 15, # 15 part 16, # 16 Civil Cover Sheet, # 17 receipt)(farS, COURT STAFF) (Filed on 11/13/2017) (Entered: 11/14/2017) |
| 11/13/2017 | 2 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 2/8/2018. Initial Case Management Conference set for 2/15/2018 11:00 AM in Courtroom C, 15th Floor, San Francisco. (farS, COURT STAFF) (Filed on 11/13/2017) (Entered: 11/14/2017)** |
| 11/13/2017 | 3 | Summons Issued as to Ben Affleck, Asgari Inc., Bill Block, Neill Blomkamp, Dana |

| | | |
|---|---|---|
| | | Brunetti, Matthew Damon, Ariel Emanuel, MRC I Hedge Co LLC, MRC I Project Company LLC, MRC II Capital Company LP, MRC II Distribution Company LP, MRC II Holdings LP, MRC II LP, MRC SUB GP LLC, Media Rights Capital, NBCUniversal, Oaktree Entertainment Inc., Asif Satchu, Sony Pictures, Kevin Spacey, Universal Pictures, Mordecai Wiczyk. (farS, COURT STAFF) (Filed on 11/13/2017) (Entered: 11/14/2017) |
| 11/13/2017 | 4 | NOTICE of Change of Address by Steve Wilson Briggs (farS, COURT STAFF) (Filed on 11/14/2017) Modified on 11/14/2017 (farS, COURT STAFF). (Entered: 11/14/2017) |
| 11/21/2017 | 5 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Steve Wilson Briggs.. (farS, COURT STAFF) (Filed on 11/21/2017) (Entered: 11/22/2017) |
| 11/21/2017 | 6 | MOTION for Permission for Electronic Case Filing filed by Steve Wilson Briggs. (Attachments: # 1 Proposed Order)(farS, COURT STAFF) (Filed on 11/21/2017) (Entered: 11/22/2017) |
| 11/27/2017 | 7 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge. (Attachments: # 1 Certificate/Proof of Service) (ejkS, COURT STAFF) (Filed on 11/27/2017) (Entered: 11/27/2017) |
| 11/27/2017 | 8 | **ORDER, Case reassigned to Judge Vince Chhabria. Magistrate Judge Laurel Beeler no longer assigned to the case. This case is assigned to a judge who participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and http://cand.uscourts.gov/cameras. Signed by Executive Committer on 1/27/17. (Attachments: # 1 Notice of Eligibility for Video Recording)(haS, COURT STAFF) (Filed on 11/27/2017) (Entered: 11/27/2017)** |
| 11/28/2017 | 9 | REASSIGNED CASE - NOTICE OF NEW HEARING DATE: You are notified that the Court has scheduled an Initial Case Management Conference before Judge Vince Chhabria upon reassignment. For a copy of Judge Chhabria's Standing Order and other information, please refer to the Court's website at www.cand.uscourts.gov. Case Management Statement due by 2/6/2018. Initial Case Management Conference set for 2/13/2018 01:30 PM in Courtroom 4, 17th Floor, San Francisco. The deputy clerk hereby certifies that on 11/28/2017 a copy of this order was served by sending it via first-class mail to the address of each non-CM/ECF user listed on the Notice of Electronic Filing. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Filed on 11/28/2017) (Entered: 11/28/2017) |
| 12/07/2017 | 10 | **Order by Judge Vince Chhabria granting 6 Motion for Permission for Electronic Case Filing. The deputy clerk hereby certifies that on 12/7/2017 a copy of this order was served by sending it via first-class mail to the address of each non-CM/ECF user listed on the Notice of Electronic Filing.(knm, COURT STAFF) (Filed on 12/7/2017) (Entered: 12/07/2017)** |
| 12/08/2017 | 11 | **Judicial Referral for Purpose of Determining Relationship of Cases re 13-cv-4679-PJH. Signed by Judge Vince Chhabria on 12/8/2017. The deputy clerk hereby certifies that on 12/11/2017 a copy of this order was served by sending it via first-class mail to the address of each non-CM/ECF user listed on the Notice of Electronic Filing. (knm, COURT STAFF) (Filed on 12/8/2017) Modified on 12/11/2017 (knm, COURT STAFF). (Entered: 12/08/2017)** |
| 12/14/2017 | 12 | CLERK'S NOTICE. The Court has determined that Cases 13-4679 PJH and 17-6552 VC are not related and no reassignment shall occur. (dtmS, COURT STAFF) (Filed on 12/14/2017) (Additional attachment(s) added on 12/14/2017: # 1 Certificate/Proof of Service) (dtmS, COURT STAFF). (Entered: 12/14/2017) |
| 12/19/2017 | 13 | NOTICE by Steve Kenyatta Wilson Briggs *Notice of Completion of Service* (Wilson Briggs, Steve) (Filed on 12/19/2017) (Entered: 12/19/2017) |

| 12/26/2017 | 14 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *Proof of Service for NBCUniversal (proof of service for other defendants attached)* (Attachments: # 1 Certificate/Proof of Service, # 2 Certificate/Proof of Service, # 3 Certificate/Proof of Service, # 4 Certificate/Proof of Service, # 5 Certificate/Proof of Service, # 6 Certificate/Proof of Service, # 7 Certificate/Proof of Service, # 8 Certificate/Proof of Service, # 9 Certificate/Proof of Service, # 10 Certificate/Proof of Service, # 11 Certificate/Proof of Service)(Wilson Briggs, Steve) (Filed on 12/26/2017) (Entered: 12/26/2017) |
|---|---|---|
| 12/28/2017 | 15 | MOTION to Dismiss for Lack of Jurisdiction filed by Ariel Emanuel, MRC I Hedge Co LLC, MRC I Project Company LLC, MRC II Capital Company LP, MRC II Distribution Company LP, MRC II Holdings LP, Oaktree Entertainment Inc., Asif Satchu, Sony Pictures, Mordecai Wiczyk. Motion Hearing set for 2/8/2018 10:00 AM in Courtroom 4, 17th Floor, San Francisco before Judge Vince Chhabria. Responses due by 1/11/2018. Replies due by 1/18/2018. (Kump, Michael) (Filed on 12/28/2017) (Entered: 12/28/2017) |
| 12/28/2017 | 16 | Certificate of Interested Entities by Ariel Emanuel, MRC I Hedge Co LLC, MRC I Project Company LLC, MRC II Capital Company LP, MRC II Distribution Company LP, MRC II Holdings LP, Oaktree Entertainment Inc., Asif Satchu, Sony Pictures, Mordecai Wiczyk identifying Corporate Parent Sony Corporation for Sony Pictures. (Kump, Michael) (Filed on 12/28/2017) (Entered: 12/28/2017) |
| 12/28/2017 | 17 | Joinder *by Universal City Studios LLC and NBCUniversal Media, LLC to 15 Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), or, in the Alternative, Fed. R. Civ. P. 8(a), 41(b), and/or 12(b)(6)* filed by NBCUniversal, Universal Pictures. (Wilcox, Rochelle) (Filed on 12/28/2017) Modified on 12/29/2017 (rcsS, COURT STAFF). (Entered: 12/28/2017) |
| 12/28/2017 | 18 | Certificate of Interested Entities by NBCUniversal, Universal Pictures (Wilcox, Rochelle) (Filed on 12/28/2017) (Entered: 12/28/2017) |
| 12/28/2017 | 19 | NOTICE by NBCUniversal, Universal Pictures *Defendants Universal City Studios LLC and NBCUniversal Media, LLC's Corporate Disclosure Statement (FRCP 7.1)* (Wilcox, Rochelle) (Filed on 12/28/2017) (Entered: 12/28/2017) |
| 01/02/2018 | 20 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *Brunetti proof of service* (Wilson Briggs, Steve) (Filed on 1/2/2018) (Entered: 01/02/2018) |
| 01/02/2018 | 21 | AMENDED COMPLAINT *FAC and All Exhibits* against All Defendants. Filed bySteve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit all FAC exhibits)(Wilson Briggs, Steve) (Filed on 1/2/2018) (Entered: 01/02/2018) |
| 01/03/2018 | 22 | NOTICE of Appearance by Gregory Philip Korn (Korn, Gregory) (Filed on 1/3/2018) (Entered: 01/03/2018) |
| 01/03/2018 | 23 | Response re 15 MOTION to Dismiss for Lack of Jurisdiction *Plaintiff's Opposition To Defendants' Motion To Dismiss* bySteve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 1/3/2018) (Entered: 01/03/2018) |
| 01/06/2018 | 24 | MOTION for Sanctions *Against Defense Counsel* filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 2/15/2018 10:00 AM in Courtroom 4, 17th Floor, San Francisco before Judge Vince Chhabria. Responses due by 1/22/2018. Replies due by 1/29/2018. (Wilson Briggs, Steve) (Filed on 1/6/2018) (Entered: 01/06/2018) |
| 01/07/2018 | 25 | Declaration of Declaration in Support of Plaintiff's Motion For Sanctions in Support of 24 MOTION for Sanctions *Against Defense Counsel Declaration in Support of Motion For Sanctions Against Defense Counsel* filed bySteve Kenyatta Wilson Briggs. (Related document(s) 24 ) (Wilson Briggs, Steve) (Filed on 1/7/2018) (Entered: 01/07/2018) |

| 01/16/2018 | 26 | MOTION to Dismiss *Universal City Studios LLC's and NBCUniversal Media, LLC's Notice of Motion and Motion to Dismiss First Amended Complaint; Memorandum of Points and Authorities* filed by NBCUniversal, Universal Pictures. Motion Hearing set for 2/22/2018 10:00 AM in Courtroom 4, 17th Floor, San Francisco before Judge Vince Chhabria. Responses due by 1/30/2018. Replies due by 2/6/2018. (Attachments: # 1 Proposed Order)(Wilcox, Rochelle) (Filed on 1/16/2018) (Entered: 01/16/2018) |
|---|---|---|
| 01/16/2018 | 27 | MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Neill Blomkamp, Ariel Emanuel, MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. Motion Hearing set for 2/22/2018 10:00 AM in Courtroom 4, 17th Floor, San Francisco before Judge Vince Chhabria. Responses due by 1/30/2018. Replies due by 2/6/2018. (Attachments: # 1 Declaration of Gregory Korn In Support of Defendant's Motion to Dismiss First Amended Complaint, # 2 Exhibit 1 to Gregory Korn Declaration In Support of Motion to Dismiss First Amended Complaint, # 3 Exhibit 2 to Gregory Korn Declaration In Support of Motion to Dismiss First Amended Complaint)(Kump, Michael) (Filed on 1/16/2018) (Entered: 01/16/2018) |
| 01/16/2018 | 28 | Request for Judicial Notice re 27 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed byNeill Blomkamp, Ariel Emanuel, MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. (Related document(s) 27 ) (Kump, Michael) (Filed on 1/16/2018) (Entered: 01/16/2018) |
| 01/18/2018 | 29 | REPLY (re 15 MOTION to Dismiss for Lack of Jurisdiction ) filed byNeill Blomkamp, Ariel Emanuel, MRC II Capital Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. (Korn, Gregory) (Filed on 1/18/2018) (Entered: 01/18/2018) |
| 01/19/2018 | 30 | CLERK'S NOTICE RESCHEDULING THE HEARING DATE RE 24 MOTION for Sanctions *Against Defense Counsel*, AND 15 MOTION to Dismiss for Lack of Jurisdiction SO THAT THEY MAY BE HEARD ON THE SAME DATE AND TIME AS THE MOTIONS TO DISMISS. The change in hearing date has no impact on the briefing schedule as set. Motion Hearing set for 2/22/2018 10:00 AM in San Francisco, Courtroom 02, 17th Floor before Judge Vince Chhabria. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Filed on 1/19/2018) (Entered: 01/19/2018) |
| 01/22/2018 | 31 | OPPOSITION/RESPONSE (re 24 MOTION for Sanctions *Against Defense Counsel* ) filed byNeill Blomkamp, Ariel Emanuel, MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. (Korn, Gregory) (Filed on 1/22/2018) (Entered: 01/22/2018) |
| 01/22/2018 | 32 | OPPOSITION/RESPONSE (re 24 MOTION for Sanctions *Against Defense Counsel* ) *Defendants' Universal City Studios LLCs' and NBCUiversal Media, LLC's (1) Opposition to Motion for Sanctions and (2) Request for Award of Expenses Under F.R.C.P. 11(e)(2)* filed byNBCUniversal, Universal Pictures. (Wilcox, Rochelle) (Filed on 1/22/2018) (Entered: 01/22/2018) |
| 01/22/2018 | 33 | Declaration of Brendan N. Charney in Support of 32 Opposition/Response to Motion, *Declaration of Brendan N. Charney in Support of Defendants' Univesal City Studios LLC's and NBCUiversal Media, LLC's (1) Opposition to Motion for Sanctions and (2) Request for Award of Expenses Under F.R.C.P. 11(e)(2)* filed byNBCUniversal, Universal Pictures. (Related document(s) 32 ) (Charney, Brendan) (Filed on 1/22/2018) (Entered: 01/22/2018) |
| 01/29/2018 | 34 | ADR Clerk's Notice re: Non-Compliance with Court Order (ewh, COURT STAFF) (Filed on 1/29/2018) (Entered: 01/29/2018) |
| 01/30/2018 | 35 | OPPOSITION/RESPONSE (re 26 MOTION to Dismiss *Universal City Studios LLC's and NBCUniversal Media, LLC's Notice of Motion and Motion to Dismiss First Amended Complaint; Memorandum of Points and Authorities* ) *Opposition To Defendant NBCU's* |

| | | |
|---|---|---|
| | | *Motion To Dismiss* filed bySteve Kenyatta Wilson Briggs. (Attachments: # 1 Declaration Declaration of Steve Wilson Briggs)(Wilson Briggs, Steve) (Filed on 1/30/2018) (Entered: 01/30/2018) |
| 01/30/2018 | 36 | OPPOSITION/RESPONSE (re 27 MOTION to Dismiss *Plaintiff's First Amended Complaint* ) *Plaintiff's Opposition To Defendants' Motion To Dismiss* filed bySteve Kenyatta Wilson Briggs. (Attachments: # 1 Declaration Declaration of Steve Wilson Briggs)(Wilson Briggs, Steve) (Filed on 1/30/2018) (Entered: 01/30/2018) |
| 01/30/2018 | 37 | MOTION to Continue *Notice of Motion and Motion to Continue Case Management Conference and Extend Case Management Schedule (L.R. 16-2(d)); Memorandum of Points and Authorities* filed by NBCUniversal, Universal Pictures. (Attachments: # 1 Proposed Order)(Wilcox, Rochelle) (Filed on 1/30/2018) (Entered: 01/30/2018) |
| 01/30/2018 | 38 | Declaration of Brendan N. Charney in Support of 37 MOTION to Continue *Notice of Motion and Motion to Continue Case Management Conference and Extend Case Management Schedule (L.R. 16-2(d)); Memorandum of Points and Authorities* filed byNBCUniversal, Universal Pictures. (Related document(s) 37 ) (Charney, Brendan) (Filed on 1/30/2018) (Entered: 01/30/2018) |
| 01/31/2018 | 39 | Joinder re 37 MOTION to Continue *Notice of Motion and Motion to Continue Case Management Conference and Extend Case Management Schedule (L.R. 16-2(d)); Memorandum of Points and Authorities,* 38 Declaration in Support, by Neill Blomkamp, Ariel Emanuel, MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. (Korn, Gregory) (Filed on 1/31/2018) (Entered: 01/31/2018) |
| 01/31/2018 | 40 | CLERK'S NOTICE RESCHEDULING THE INITIAL CASE MANAGEMENT CONFERENCE. Case Management Statement due by 3/6/2018. Initial Case Management Conference set for 3/13/2018 01:30 PM in San Francisco, Courtroom 04, 17th Floor. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Filed on 1/31/2018) (Entered: 01/31/2018) |
| 02/06/2018 | 41 | REPLY (re 26 MOTION to Dismiss *Universal City Studios LLC's and NBCUniversal Media, LLC's Notice of Motion and Motion to Dismiss First Amended Complaint; Memorandum of Points and Authorities* ) *Reply Memorandum of Points and Authorities in Support of Defendants Universal City Studios LLC's and NBCUniversal Media, LLC's Motion to Dismiss First Amended Complaint* filed byNBCUniversal, Universal Pictures. (Wilcox, Rochelle) (Filed on 2/6/2018) (Entered: 02/06/2018) |
| 02/06/2018 | 42 | REPLY (re 27 MOTION to Dismiss *Plaintiff's First Amended Complaint* ) filed byNeill Blomkamp, Ariel Emanuel, MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. (Korn, Gregory) (Filed on 2/6/2018) (Entered: 02/06/2018) |
| 02/08/2018 | 43 | Second MOTION for Sanctions *Against Defense Counsel* filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 3/15/2018 10:00 AM in San Francisco, Courtroom 04, 17th Floor before Judge Vince Chhabria. Responses due by 2/22/2018. Replies due by 3/1/2018. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Wilson Briggs, Steve) (Filed on 2/8/2018) (Entered: 02/08/2018) |
| 02/09/2018 | 44 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *proof of service for Ben Affleck* (Wilson Briggs, Steve) (Filed on 2/9/2018) (Entered: 02/09/2018) |
| 02/09/2018 | 45 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *Proof of service of summons, cover sheet, FAC, etc. for Defendant Bill Block* (Wilson Briggs, Steve) (Filed on 2/9/2018) (Entered: 02/09/2018) |
| 02/09/2018 | 46 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *Proof of service of summons, cover sheet, FAC, etc. for Defendant Dana Brunetti* (Wilson Briggs, Steve) |

| | | |
|---|---|---|
| | | (Filed on 2/9/2018) (Entered: 02/09/2018) |
| 02/09/2018 | 47 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *Proof of service of summons, cover sheet, FAC, etc. for Defendant Kevin Spacey* (Wilson Briggs, Steve) (Filed on 2/9/2018) (Entered: 02/09/2018) |
| 02/09/2018 | 48 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *Proof of service of summons, cover sheet, FAC, etc. for Defendant Matt Damon* (Wilson Briggs, Steve) (Filed on 2/9/2018) (Entered: 02/09/2018) |
| 02/10/2018 | 49 | Declaration of Steve Wilson Briggs in Support of 1 Complaint,,, filed bySteve Kenyatta Wilson Briggs. (Related document(s) 1 ) (Wilson Briggs, Steve) (Filed on 2/10/2018) (Entered: 02/10/2018) |
| 02/10/2018 | 50 | Declaration of Steve Wilson Briggs in Support of 43 Second MOTION for Sanctions *Against Defense Counsel in support of MOTION FOR SANCTIONS AGAINST DEFENDANTS ATTORNEYS ROCHELLE L.WILCOX, AND MICHAEL J. KUMP* filed bySteve Kenyatta Wilson Briggs. (Related document(s) 43 ) (Wilson Briggs, Steve) (Filed on 2/10/2018) (Entered: 02/10/2018) |
| 02/13/2018 | 51 | CLERK'S NOTICE vacating the motion hearing scheduled for 2/22/2018. The Court will issue a written ruling based on the motions filed and the responsive briefs to those motions. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Filed on 2/13/2018) (Entered: 02/13/2018) |
| 02/19/2018 | 52 | ERRATA re 43 Second MOTION for Sanctions *Against Defense Counsel* by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 2/19/2018) (Entered: 02/19/2018) |
| 02/21/2018 | 53 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (Wilcox, Rochelle) (Filed on 2/21/2018) (Entered: 02/21/2018) |
| 02/22/2018 | 54 | ADR Clerk's Notice Setting ADR Phone Conference on March 7, 2018 at 10:30 AM Pacific time. Please note that you must be logged into an ECF account of counsel of record in order to view this document. (cmf, COURT STAFF) (Filed on 2/22/2018) (Entered: 02/22/2018) |
| 02/22/2018 | 55 | OPPOSITION/RESPONSE (re 43 Second MOTION for Sanctions *Against Defense Counsel* ) filed byNeill Blomkamp, Ariel Emanuel, MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. (Korn, Gregory) (Filed on 2/22/2018) (Entered: 02/22/2018) |
| 02/22/2018 | 56 | OPPOSITION/RESPONSE (re 43 Second MOTION for Sanctions *Against Defense Counsel ) Defendants' Universal City Studios LLC's and NBCUniversal Media, LLC's (1) Opposition to Second Motion for Sanctions and (2) Request for Award of Expenses Under F.R.C.P. 11(c)(2)* filed byNBCUniversal, Universal Pictures. (Wilcox, Rochelle) (Filed on 2/22/2018) (Entered: 02/22/2018) |
| 02/22/2018 | 57 | DECLARATION of Brendan N. Charney in Opposition to 43 Second MOTION for Sanctions *Against Defense Counsel Declaration of Brendan N. Charney in Support of Defendants' Universal City Studios LLC's and NBCUniversal Media, LLC's Opposition to Plaintiff's Second Motion for Santions* filed byNBCUniversal, Universal Pictures. (Related document(s) 43 ) (Charney, Brendan) (Filed on 2/22/2018) (Entered: 02/22/2018) |
| 02/26/2018 | 58 | CLERK'S NOTICE RESCHEDULING THE INITIAL CASE MANAGEMENT CONFERENCE UNTIL AFTER PENDING MOTIONS HAVE BEEN ADJUDICATED. Case Management Statement due by 4/24/2018. Initial Case Management Conference set for 5/1/2018 01:30 PM in San Francisco, Courtroom 04, 17th Floor. *(This is a text-only* |

| | | |
|---|---|---|
| | | *entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Filed on 2/26/2018) (Entered: 02/26/2018) |
| 02/28/2018 | 59 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Wilcox, Rochelle) (Filed on 2/28/2018) (Entered: 02/28/2018) |
| 02/28/2018 | 60 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *with Defendant Mordecai Wiczyk* (Korn, Gregory) (Filed on 2/28/2018) (Entered: 02/28/2018) |
| 02/28/2018 | 61 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *with Defendant Ariel Emanuel* (Korn, Gregory) (Filed on 2/28/2018) (Entered: 02/28/2018) |
| 02/28/2018 | 62 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *with Defendant Sony Pictures* (Korn, Gregory) (Filed on 2/28/2018) (Entered: 02/28/2018) |
| 02/28/2018 | 63 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *with Defendant MRC II Distribution Company LP* (Korn, Gregory) (Filed on 2/28/2018) (Entered: 02/28/2018) |
| 02/28/2018 | 64 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *with Defendant Asif Satchu* (Korn, Gregory) (Filed on 2/28/2018) (Entered: 02/28/2018) |
| 02/28/2018 | 65 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *with Defendant Neill Blomkamp* (Korn, Gregory) (Filed on 2/28/2018) (Entered: 02/28/2018) |
| 03/06/2018 | 66 | Supplemental Brief re 28 Request for Judicial Notice, filed byNeill Blomkamp, Ariel Emanuel, MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk. (Related document(s) 28 ) (Korn, Gregory) (Filed on 3/6/2018) (Entered: 03/06/2018) |
| 03/07/2018 | 67 | ADR Remark: ADR Phone Conference held on 3/7/2018 by Tamara Lange. (cmf, COURT STAFF) (Filed on 3/7/2018) *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Entered: 03/07/2018) |
| 03/12/2018 | 68 | CLERK'S NOTICE vacating the Second Motion for Sanctions Against Defendants, scheduled for 3/15/2018. The Court will issue a written ruling based on the motion and responsive briefs connected to the motion. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Filed on 3/12/2018) (Entered: 03/12/2018) |
| 03/14/2018 | 69 | **ORDER DENYING MOTIONS FOR SANCTIONS AND ORDER TO SHOW CAUSE. Plaintiff's Show Cause Response due by 3/21/2018. Defendants' Responses due by 3/28/2018. Signed by Judge Vince Chhabria on 3/14/2018. (knm, COURT STAFF) (Filed on 3/14/2018) (Entered: 03/14/2018)** |
| 03/15/2018 | 70 | Request for Judicial Notice re 21 Amended Complaint filed bySteve Kenyatta Wilson Briggs. (Related document(s) 21 ) (Wilson Briggs, Steve) (Filed on 3/15/2018) (Entered: 03/15/2018) |
| 03/20/2018 | 71 | RESPONSE TO ORDER TO SHOW CAUSE by Steve Kenyatta Wilson Briggs (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E)(Wilson Briggs, Steve) (Filed on 3/20/2018) Modified on 3/20/2018 (fabS, COURT STAFF). (Entered: 03/20/2018) |
| 03/20/2018 | 72 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs re 71 Response to Order to Show Cause, (Wilson Briggs, Steve) (Filed on 3/20/2018) (Entered: 03/20/2018) |
| 03/28/2018 | 73 | RESPONSE TO ORDER TO SHOW CAUSE filed by NBCUniversal, Universal Pictures . (Wilcox, Rochelle) (Filed on 3/28/2018) (Entered: 03/28/2018) |
| 03/28/2018 | 74 | RESPONSE TO ORDER TO SHOW CAUSE filed by Neill Blomkamp, Ariel Emanuel, |

| | | MRC II Distribution Company LP, Asif Satchu, Sony Pictures, Mordecai Wiczyk . (Korn, Gregory) (Filed on 3/28/2018) (Entered: 03/28/2018) |
|---|---|---|
| 04/24/2018 | 75 | CLERK'S NOTICE RESCHEDULING THE INITIAL CASE MANAGEMENT CONFERENCE. Case Management Statement due by 5/22/2018. Initial Case Management Conference set for 5/29/2018 01:30 PM in San Francisco, Courtroom 04, 17th Floor. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (knm, COURT STAFF) (Filed on 4/24/2018) (Entered: 04/24/2018) |
| 04/25/2018 | 76 | **ORDER DISMISSING CASE. Signed by Judge Vince Chhabria on 4/25/2018. (knm, COURT STAFF) (Filed on 4/25/2018) (Entered: 04/25/2018)** |
| 04/25/2018 | 77 | **JUDGMENT. Signed by Judge Vince Chhabria on 4/25/2018. (knm, COURT STAFF) (Filed on 4/25/2018) (Entered: 04/25/2018)** |
| 08/16/2018 | 78 | **ORDER OF REFERRAL TO DETERMINE WHETHER CASES ARE RELATED. Signed by Judge Saundra Brown Armstrong on 8/16/18. (dtmS, COURT STAFF) (Filed on 8/16/2018) (Entered: 08/16/2018)** |
| 08/28/2018 | 79 | **ORDER RELATING CASES 17-cv-6552-VC, Briggs v. Universal Pictures, et al., and 18-cv-04952-SBA, Briggs v. Spacey et al. Signed by Judge Vince Chhabria on 8/28/2018. (knm, COURT STAFF) (Filed on 8/28/2018) (Entered: 08/28/2018)** |
| 10/22/2018 | 80 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs *Declartion re Defendants MRC, Satch, Wiczyk* (Wilson Briggs, Steve) (Filed on 10/22/2018) (Entered: 10/22/2018) |
| 10/25/2018 | 81 | Second MOTION for Default Judgment by the Clerk as to filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Certificate/Proof of Service certification/declaration of Cecile Lusby, # 2 Affidavit Declaration of Plaintiff, # 3 Certificate/Proof of Service copy of proof of service of summons and complaint, # 4 Proposed Order proposed entry of default) (Wilson Briggs, Steve) (Filed on 10/25/2018) (Entered: 10/25/2018) |
| 10/26/2018 | 82 | Clerk's DECLINATION OF DEFAULT. Case was dismissed and judgment entered on 4/25/18. (Related documents(s) 81 )(fabS, COURT STAFF) (Filed on 10/26/2018) (Entered: 10/26/2018) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/29/2018 13:57:56 | | |
| **PACER Login:** | Koralfoster0116:4624215:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:17-cv-06552-VC |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

# EXHIBIT 4

| | |
|---|---|
| 1 | Steve Wilson Briggs |
| 2 | 4322 Chico Ave. |
| 3 | Santa Rosa, CA 95407 |
| 4 | 510 200 3763 |
| 5 | snc.steve@gmail.com |
| 6 | PLAINTIFF In Propria Persona |
| 7 | |

FILED

NOV 1 3 2017 ③

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

LB

| | |
|---|---|
| STEVE WILSON BRIGGS | Civ No: |
| Plaintiff, | CV 17 6552 |
| vs | **COMPLAINT FOR:** |
| UNIVERSAL PICTURES; | 1. **CONSPIRACY** |
| SONY PICTURES; | 2. **OBSTRUCTION OF JUSTICE** |
| NBCUNIVERSAL; | 3. **FALSE STATEMENTS** |
| KEVIN SPACEY; | 4. **BREACH OF CONTRACT** |
| ARIEL (ARI) EMANUEL; | 5. **FRAUD AND FALSE** |
| MATTHEW (MATT) DAMON; | **STATEMENTS** |
| BEN AFFLECK; | 6. **DECEIT** |
| NEILL BLOMKAMP; | 7. **NEGLIGENCE** |
| MORDECAI (MODI) WICZYK; | 8. **GROSS NEGLIGENCE** |
| ASIF SATCHU; | 9. **VIOLATION OF CALIFORNIA** |
| BILL BLOCK; | **LABOR CODE § 1700.39** |
| DANA BRUNETTI; | 10. **VIOLATION OF UNFAIR** |
| MRC; | **BUSINESS PRACTICES ACT** |
| all MRC entities and subsidiaries: | **[CAL BUS & PROF CODE** |
| (MEDIA RIGHTS CAPITAL; MRC II LP; | **§ 17200, ET SEQ.]** |
| MRC II DISTRIBUTION COMPANY LP; | 11. **PERJURY** |
| MRC II HOLDINGS, L.P.; ASGARI INC.; | 12. **TAMPERING WITH EVIDENCE** |
| OAKTREE ENTERTAINMENT, INC.; | 13. **WITNESS TAMPERING** |
| MRC I HEDGE CO, LLC; MRC SUB GP, | 14. **SUBORNATION OF PERJURY** |
| LLC; MRC II CAPITAL COMPANY, L.P.; | |
| MRC I PROJECT COMPANY, LLC) | |
| | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

| | |
|---|---|
| 1 | **NATURE OF ACTION:** |
| 2 |    1.   Pursuant to 28 U.S. Code § 1332 (as this matter involves Defendants who are not |
| 3 | American citizens, and concerns violations that cross US state and international borders) the |
| 4 | Plaintiff brings this lawsuit against the Defendants (**Defs**) for their willful violations of US |
| 5 | and California state laws, done for their personal enrichment and/or to gain unlawful |
| 6 | competitive advantage, through their participation in such actions and violations as: |
| 7 |   1.  Obstruction Of Justice: 6 days after Plaintiff filed his Notice of Appeal (in Briggs v |
| 8 |       Blomkamp, C134679 PJH), the Defs closed their social network (TriggerStreet), to |
| 9 |       destroy evidence and records, as this was their *access* point in Briggs v Blomkamp. |
| 10 |   2.  The Defs used Def Emanuel's influence with Universal Pictures to entice, persuade |
| 11 |       or bribe the enlistment of other conspirators, and as leverage against business rivals. |
| 12 |   3.  The Defendants created a social network, "TriggerStreet.com" (**TS**) to secretly and |
| 13 |       unlawfully access, appropriate and alter unsuspecting writers' work. The |
| 14 |       Defendants financially profited from these activities, or received film acting roles |
| 15 |       for themselves, or film production or distribution benefits; |
| 16 |   4.  Without informing TS members, the Defendants installed a secret counter-security |
| 17 |       feature on TS, which erased all access records if a member deleted their work. |
| 18 |   5.  Breach: TS's "Terms of Use" stated the site was made **solely for use in the USA,** yet |
| 19 |       Def Spacey went to London for a TS launch party and interviews, and went to Spain |
| 20 |       for a TS recruitment speech, to tout TS's **"400,000 members <u>around the world."</u>** |
| 21 |   6.  Evidence will show Def Ari Emanuel, a talent agent, is also Hollywood's most |
| 21 |       powerful film producer—against California labor & business codes § 1700.39, which |
| 22 |       makes it unlawful for a talent agent to act as both agent and as an employer. |
| 23 |   7.  In a surreal move, in Briggs v Blomkamp, rather than hiring a copyright attorney, |
| 24 |       the Defs hired fixer/conman **Jeff Rovin**—a high school-educated fantasy writer—as |
| 25 |       their sole "expert" witness. Rovin provided falsified and fraudulent testimony to the |
| 26 |       court (surely on the Defs orders). Two years after Briggs v Blomkamp went to |
| 27 |       appeals, Rovin went on national TV, Fox News' "*The Sean Hannity Show*," Oct. 24, |
| 28 |       2016, to admit he was a professional "fixer" (someone hired to make problems go |

|    |    |
|----|----|
| 1  | away by producing false documents and stories) for President Bill and Hillary |
| 2  | Clinton. June 12, 2014, Plaintiff moved to exclude Rovin's report due to its gross |
| 3  | fraud. Somehow the district court denied the Plaintiff's motion. |
| 4  | 8. Defs rendered contracts relying false statements, misrepresentations and omissions. |
| 5  | 9. Defs boasted TS had "industry standard" security, when, in fact, they removed all |
| 6  | security features to allow themselves constant anonymous access to writer's works. |
| 7  | 10. Defs made wild false promises to entice new writers, such as: "Our team has been |
| 8  | extensively researching and designing TriggerStreet.com **to ensure that it** |
| 9  | **encapsulates every aspect of the user's desires and needs**". |
| 10 | 11. The Defendants conflict of interest-ridden relationships (e.g. Defs Emanuel's and |
| 11 | Bill Block's secret co-ownership of Screenbid.com with Sony Picture's CEO M. |
| 12 | Lynton, and Def Emanuel's unlawful co-ownership of MRC with Defs Satchu and |
| 13 | Wiczyk) created a culture where the Defs neglected to do basic due diligence. Thus, |
| 14 | **before they ever read a script**, Sony and MRC agreed to buy the rights to Def |
| 15 | Blomkamp's screenplay "*Elysium*," which was misappropriated from the Plaintiff. |
| 16 | <div align="center">__JURISDICTION:__</div> |
| 17 | 2. **Jurisdiction:** This court has subject matter jurisdiction per 28 USC § 1332(a)(2), as |
| 18 | one or more Defendant are foreign citizens, and (a)(2), as one is a citizen of a different State. |
| 19 | 3. **Venue:** venue is proper pursuant to 28 § 1391(b)(2) as events giving rise to this |
| 20 | complaint occurred in this district, and 28 § 1391(d), by virtue of the Defendants' business |
| 21 | transaction with this dist., and under 326 US 310 the Defs meet the minimum contact rule. |
| 21 | 4. **Intradistrict Assignment:** San Francisco is the proper intradistrict assignment as a |
| 22 | substantial part of the events and omissions, leading to this lawsuit, occurred in this district. |
| 23 | <div align="center">__THE PARTIES:__</div> |
| 24 | 5. **Plaintiff,** Steve Wilson Briggs, is a filmmaker, screenwriter, author and musician. |
| 25 | 6. **Defendant** Universal Pictures is an American film studio; NBCUniversal subsidiary. |
| 26 | 7. **Defendant** Sony Pictures is a subsidiary of the Japanese multinational Sony Corp. |
| 27 | 8. **Def** NBCUniversal is a multinational media conglomerate & Comcast subsidiary. |
| 28 | 9. **Defendant** Kevin Spacey is an American actor, and one of the men purportedly |

| | |
|---|---|
| 1 | responsible for creating the now defunct social network TriggerStreet (TS). |
| 2 |    10.  **Defendant** Ariel (Ari) Emanuel is a talent agent and co-CEO of WME-IMG. |
| 3 |    11.  **Defendant** Matt Damon is an American actor and screenwriter. |
| 4 |    12.  **Defendant** Ben Affleck is an American actor and screenwriter. |
| 5 |    13.  **Defendant** Neill Blomkamp is a South African-born film director. He is, on |
| 6 | information and belief, a Canadian or South African citizen. |
| 7 |    14.  **Defendant** Mordecai Wiczyk is the co-CEO of Media Rights Capital (MRC); |
| 8 |    15.  **Def** Asif Satchu is the co-CEO of MRC, and is believed to be a citizen of Canada. |
| 9 |    16.  **Def** Bill Block is CEO of Miramax (a subsidiary of beIN Media Group—a Qatari |
| 10 | company, owned by Al Jazeera) and a co-owner of Screenbid with Def Emanuel. |
| 11 |    17.  **Defendant** Dana Brunetti is credited with the conception of TriggerStreet. |
| 12 |    18.  **Defendant** MRC is a diversified global media company. It has many subsidiaries |
| 13 | and alternate names, including: MRC;  MRC II LP;  MRC II Distribution Company LP. |
| 14 | <div align="center">**RELATED CASES:**</div> |
| 15 |    19.  This lawsuit is related to Briggs v. Blomkamp, et al, No. C134679 PJH, a copyright |
| 16 | case, currently in appeals. No aspect of this suit is contingent on the outcome of that matter. |
| 17 | Certain new events, related to Briggs v Blomkamp, informs this matter; such as: |
| 18 |   **1.**  Six (6) days after Briggs v Blomkamp moved to appeals, the Defs destroyed |
| 19 | essential case evidence (closing and destroying the entire social network website |
| 20 | TriggerStreet, without explanation); hence, the obstruction charge. |
| 21 |   **2.**  As Plaintiff researched the Obstruction Of Justice charges against Defs, he found |
| 21 | multiple reports of Def Spacey travelling to abroad to give speeches and host parties |
| 22 | to attract foreign member to TS, in violation of the website's "Terms of Use", stating |
| 23 | TS was made solely for use in the USA; contributing to the *breach* charges, herein. |
| 24 |   **3.**  As Plaintiff prepared to draft this Complaint, **Jeff Rovin** (the Defendants "expert" |
| 25 | witness from Briggs v Blomkamp) admitted on *The Sean Hannity Show* that he was |
| 26 | a professional "fixer" (hired to produce false stories for tabloids). This revelation, |
| 27 | coupled with the fraud contained in Rovin's report (in Briggs v Blomkamp) shores a |
| 28 | portion of the Subornation Of Perjury claims against the Defendants. |

| | |
|---|---|
| 1 | **STATEMENT OF FACTS & ALLEGATIONS:** |
| 2 | **Brief Case Overview** |
| 3 | 20.  The Defendants conspired to create and operate (for 12 years) a social network for |
| 4 | screenwriters and filmmakers, known as **TriggerStreet** (referred to as **TS** in this |
| 5 | Complaint). TriggerStreet (**TS**) was located at www.triggerstreet.com from 11/2002 to |
| 6 | 07/2011, and at www.labs.triggerstreet.com from 07/2011 to 11/2014. The Defendants used |
| 7 | TS to fraudulently access and acquire original film ideas. By using TS's 400,000+ members |
| 8 | to review, judge, and rank the best work, the Defendants were able to peruse the very best |
| 9 | scripts at their leisure, alter them slightly, then produce and market them, as their own. |
| 10 | 21.   To entice the best undiscovered writers into joining TS and submitting their |
| 11 | screenplays, the Defs published and rendered a contract comprised of false claims, |
| 12 | deception and concealments. TS's "Terms of Use", "About Us" and "Security" pages |
| 13 | claimed to employ "industry standard" security, and boasted that TS "encapsulates every |
| 14 | aspect of the user's desires and needs", when, in fact, TS's security features were effectively |
| 15 | non-existent. (Said TS websites pages "Terms of Use", "About Us" and "Privacy" are |
| 16 | attached, respectively, as **Exhibit A**, **Exhibit B**, **Exhibit C**, and are incorporated by |
| 17 | reference as if fully set out herein.)  The Defs conspired to remove all security features on |
| 18 | the website. Any member could download any script, without the writer knowing the |
| 19 | downloader's ID. Only if an accessor chose to write a script review would the writer be |
| 20 | informed of the accessor's ID —but only the accessor's pseudonym (fake name) ID, while |
| 21 | others users who downloaded the script without leaving a review, left no trace at all. |
| 21 | 22.  More astounding, in 2007, the Defs added a new "counter-security" feature, **without** |
| 22 | **informing members,** whereby if a member—concerned about security—deleted his script |
| 23 | from TS, the deletion would trigger the erasure of all access records. This was done to |
| 24 | conceal the Defs accessing the Plaintiff's work (only posted in 2007). In May 2016, in an |
| 25 | Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95) a |
| 26 | former TS member recalled that this **"memory dump"** feature was added in 2007. (Said |
| 27 | forum is attached as "**Exhibit D**" and incorporated by reference as if fully set out herein; |
| 28 | see last entry, page 4.) In 2014, as Briggs v Blomkamp proceeded through discovery, the |

1  Plaintiff contacted TS to ask for their records of all the members who accessed his work.
2  (Said email is attached as "**Exhibit E**" and incorporated by reference as if fully set out
3  herein). TS replied that when his work was removed, all access records were erased. (Said
4  email is attached as "**Exhibit F**" and is incorporated by reference as if fully set out herein.)

5      23. TS falsely assured members that the site was intended solely for use in the USA.
6  But Spacey and Brunetti secretly marketed TS all around the world.

7      24. Through secret and private business co-ownerships with key CEOs, in businesses
8  like Screenbid and MRC, Def Emanuel cultivated unethical relationships with Universal
9  Pictures, Sony Pictures, MRC, QED, etc. Thus, these companies would finance and
10 distribute almost any project Emanuel asked, ignoring due diligence and best practices.

11     25. The Defendants' final illegal action occurred on Nov 6th, 2014, 6 days after
12 Plaintiff filed his Notice Of Appeal (Briggs v Blomkamp), when the Defs surreptitiously
13 closed TS, to destroy incriminating evidence —understanding the district court based its
14 MFSJ ruling on vacated law, rather than prevailing law—cited by Plaintiff. Thus, the case
15 was apt to be remanded for trial, where the Plaintiff would subpoena all site access records.

16                                         NOTE:

17     26. This Complaint reveals Def Ari Emanuel lead a conspiracy to misappropriate ideas
18 using TS and ProjectGreenlight.com (**Project Greenlight**), to market these ideas to his
19 business partners at Sony Pictures, MRC, Universal Pictures, parent NBCUniversal, etc.
20 Relevant to this, Def Emanuel has represented Defs Ben Affleck and Matt Damon for most
21 of their careers. Curiously, like Spacey, Affleck and Damon ran a screenwriter/filmmaker
21 website, Project Greenlight, from 2000-05 and 2015-16. Curiously, both sites used peculiar
22 language like *peer-to-peer*, and used *peer reviews* to weed out bad scripts. And curiously,
23 Spacey, Damon and Affleck were the only celebrities with screenwriter websites from
24 2000-2014. In 2005, writer Joel Lamontagne sued Project Greenlight and **Harvey**
25 **Weinstein's** *Miramax*, alleging the TV series *Project Runway* (2005-present) was stolen
26 from a treatment he submitted to Project Greenlight. The allegedly stolen work became the
27 property of Universal Pictures' parent, **NBCUniversal**. Def Emanuel's shadowy projects
28 eventually becoming the property of Universal is a recurring pattern in this Complaint.

**BACKGROUND FACTS:**

THE SIX (6) PRIMARY DEFENDANT ACTORS:

**ARI EMANUEL** (DEFENDANT)

27.   Defendant Ari Emanuel is the co-CEO of William Morris Endeavor (WME, aka WME-IMG). Prior to this, Def Emanuel was the CEO of Endeavor Talent Agency (1995-2009), where his aggressive manner and unethical business practices became notorious, inspiring the character *Ari Gold* in the HBO TV series "Entourage". Under Def Emanuel Endeavor was sued by Sandra Epstein for sexual harassment in 2002. (Emanuel is a close associate of many of America's most notorious sexual harassers.) Epstein suit also accused Def Emanuel of making racist remarks, and in 2014 WME was found guilty at arbitration of racial discrimination. WME-IMG seems to attract clients who share Def Emanuel's values; thus WME-IMG disproportionately represents aging white clients and *difficult* clients that other agencies avoid (Charlie Sheen, Russell Crowe), and clients who are more conservative, or politically unaware, than the rest of Hollywood.

28.   November 20th, 2016, Def Emanuel traveled to New Jersey to congratulate President-elect Trump. Emanuel is also President Trump's former talent agent. Predictably, *The Apprentice* (starring Trump) was broadcast on **NBCUniversal**. Recently, *The Hill* (and others) reported that it was Def Emanuel who helped get the accused serial sexual predator elected President, by sealing the Miss Universe tape archives, so no further tapes of candidate Trump sexually harassing beauty contestants would be released. (Said "The Hill" article is attached as **"Exhibit G"** and is incorporated by reference as if fully set out herein.)

**ASIF SATCHU (Defendant)**

29.   Defendant Asif Satchu was born in Kenya but moved to **Canada** when he was 6 years old. Satchu, like Def Blomkamp, is believed to be a Canadian citizen. (Canadian connections are a recurring feature in this matter.) Def Satchu is a co-founder of MRC, with Wiczyk. Def Satchu is the brother of **Reza Satchu**, an enormously successful Canadian businessman. Def Satchu and Reza, both graduated from Canada's **McGill** University. Def Satchu is something of a business and business-technology genius. **In 1999 Satchu co-founded SupplierMarket.com** with Jon Burgstone (Reza Satchu was also a heavily

| | |
|---|---|
| 1 | invested partner). SupplierMarket.com facilitated the **international sales and distribution** |
| 2 | of software, bolts, nuts, fasteners, rubber and glass products, corrugated packaging, and |
| 3 | probably anything else. **Only 18 months later, Aug. 2000, Satchu and his partners sold** |
| 4 | **SupplierMarket for $950,000,000.** Def Satchu graduated from Harvard (MBA) in 1999. |
| 5 | **MORDECAI (MODI) WICZYK (Defendant)** |
| 6 | 30.   Defendant Modi Wiczyk is an American born business man, co-CEO and |
| 7 | co-founder of MRC (with Defendant Satchu). Wiczyk is the **visionary** of this conspiracy. |
| 8 | 31.   Around 1995, fresh out of college, Defendant Wiczyk began working at Summit |
| 9 | Entertainment, LLC. That was the first year Summit began producing and financing films |
| 10 | (prior, Summit had exclusively sold US films abroad), surely the vision of Def Wiczyk. |
| 11 | 32.   Only four years later, in 1999, when Wiczyk was only 27, Summit Entertainment |
| 12 | made Wiczyk their Senior Vice President of Production and Acquisitions. That same year, |
| 13 | 1999, Wiczyk sent out his now famous **memo** (more about this later), **which would make** |
| 14 | **him one of the most influential and sought after men in Hollywood**. Within a year, in |
| 15 | 2000, likely on the order of Def Ari Emanuel, Def Wiczyk was **hired by Universal** |
| 16 | **Pictures** as Vice President of Productions, where Wiczyk served for 2 years, until January |
| 17 | 2002, when Def Ari Emanuel made Wiczyk a partner at Emanuel's Endeavor Talent |
| 18 | Agency. Def Wiczyk graduated from Harvard (MBA) in 1999. |
| 19 | **KEVIN SPACEY** (Defendant). |
| 20 | 33.   Defendant Kevin Spacey is an Academy Award winning actor. His career was |
| 21 | floundering and at its nadir in 2000 when the conspiracy(s) detailed herein began, and |
| 21 | when, purportedly, he and Def Brunetti conceived of TS. Def Spacey, who dropped out of |
| 22 | Juilliard School in his sophomore year, has no known web-design skills. Seemingly, |
| 23 | Spacey's only value to the TS social network was as a high-profile, semi-likeable celebrity, |
| 24 | whose promise of "industry access and exposure" would lure the best undiscovered writers |
| 25 | to the website, to unwittingly surrendering their wares to the Defendants. |
| 26 | **DANE BRUNETTI** (Defendant) |
| 27 | 34.   Defendant Brunetti has no known college education. He joined the US coast guard |
| 28 | in 1992, at 18 or 19. Brunetti met Spacey around 1998, while Brunetti was selling cell |

| | |
|---|---|
| 1 | phones in New York. Brunetti soon became Spacey's partner and personal assistant. It is |
| 2 | purported around the internet (including on Wikipedia) that Brunetti was responsible for |
| 3 | designing TriggerStreet.com. That is one operational assumptions of this complaint. |
| 4 | However, there is no evidence that Brunetti possessed any of the skills required to design a |
| 5 | social network. The Plaintiff suspects Def Asif Satchu (who founded the internet-based |
| 6 | marketplace SupplierMarket.com) may be the website's true designer and talent coordinator. |
| 7 | **MRC** |
| 8 | 35. MRC is a television and film studio, founded by its co-CEOs Defs Asif Satchu and |
| 9 | Modi Wiczyk. MRC was started in 2003 with money provided by Def Ari Emanuel |
| 10 | (although MRC often reports it was started in 2006 or 2007). Def Emanuel is a silent |
| 11 | partner in MRC. Unlike most ethical companies MRC operates under many names. Likely, |
| 12 | only Defs Emanuel, Satchu and Wiczyk know what these companies do. But such LLC |
| 13 | companies are a hallmark of money laundering networks (see Dept of Treasury's FinCEN |
| 14 | report). The Plaintiff is aware of 11 MRC companies: **MRC, Media Rights Capital; MRC** |
| 15 | **II LP; MRC II Distribution Company LP (foreign based); MRC II Holdings, LP;** |
| 16 | **Oaktree Entertainment, Inc. (a foreign stock business); MRC I Hedge Co, LLC; MRC** |
| 17 | **II Capital Company, LP; MRC Sub Gp, LLC; MRC I Project Company, LLC; Asgari** |
| 18 | **Inc.** Plaintiff believes that most of these *companies* are "shell" companies (fronts for illegal |
| 19 | activity), existing to launder money and other transactions. <u>Working in conjunction with</u> |
| 20 | <u>Def Bill Block (**Miramax** CEO) and *Al Jazeera or beIN Media Group* (Miramax's parent),</u> |
| 21 | and perhaps with Satchu's Kenyan-based family, these shells may also be responsible for: |
| 21 | a. producing and selling ideas taken from TS to foreign markets (not for US release); |
| 22 | b. financing foreign films that utilize ideas taken from TS (not for US release). |
| 23 | |
| 24 | **Def Ari Emanuel's Relationship With Defendant Spacey:** |
| 25 | 36. Defendant Ari Emanuel likely first met Defendant Kevin Spacey between 1987 and |
| 26 | 1989, when both men were at Creative Artist Agency (CAA). In 1987 Def Ari Emanuel was |
| 27 | a new CAA talent agent, working in **TV** casting. In 1987 Def Kevin Spacey, represented by |
| 28 | CAA, was working in Los Angeles, and appeared in 9 episodes of the **TV** series "Wiseguy". |

**Def Emanuel's Notorious Connection to Def Wiczyk & Satchu:**

37. Defendant Ari Emanuel is a quiet partner in MRC. Thus, by casting WME-IMG actors in MRC films, Def Emanuel profits both as an agent, and as a studio owner. This arrangement is a conflict of interest, in violation of CA Labor Code 1700.39.

38. In 2007, The New York Times published an article called *"Tilting The Balance of Power Toward Talent Agency Clients"* (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients" is attached as **"Exhibit H"** and is incorporated by reference as if fully set out herein.) The article states:

> ....representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist." According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

39. Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

> ...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.
> "For us, financing opportunities are always exciting and interesting," said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"
> Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that **no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.**

| | |
|---|---|
| 1 | **BACKGROUND FACTS** (CONTINUED) |
| 2 | THE 4 MAJOR EVENTS THAT SET UP THE CONSPIRACY(S) |
| 3 | 40.  The seeds of the Defendants unlawful actions were planted about two decades ago, |
| 4 | by **4 events:** two of these events occurring in 1995, two occurring in 1999. |
| 5 | 1.  **In 1995**  Def Ari Emanuel started Endeavor Talent Agency. |
| 6 | 2.  **In 1995** Edgar Bronfman Jr. (CEO of Seagram's) bought Universal Pictures. |
| 7 | 3.  **In   1999**,   Jerrol   LeBaron   copyrighted   a   revolutionary   screenwriter-to- |
| 8 | Hollywood-film-industry-professional   website  **Writers'   Script   Network.com**, |
| 9 | which went online in March 2000, changing its name to "**InkTip**" (inktip.com) in |
| 10 | 2003. |
| 11 | 4.  **In 1999** Defendant Modi Wiczyk wrote a revolutionary **memo**, titled "Another New |
| 12 | Ball Game", which sent Hollywood's powerhouses scrambling. Wiczyk's memo |
| 13 | would be discussed in magazines and lounges for years to come. |
| 14 | |
| 15 | 41.  These 4 events, **each** require a brief explanation to understand how they set the stage |
| 16 | for the Defendants' conspiracy(s). |
| 17 | **(1)  Def Ari Emanuel Comes To Power As CEO Of Endeavor Talent Agency, 1995** |
| 18 | 42.   In 1995, Def Ari Emanuel would start his own talent agency, Endeavor Talent |
| 19 | Agency. Endeavor would soon become the fastest growing talent agency in Hollywood. |
| 20 | **(2) Edgar Bronfman Jr. Comes To Power At Universal Pictures, 1995** |
| 21 | 43.   In 1995, Canadian based "Seagram's" (the giant beverage company) bought |
| 22 | controlling interest (80%) of Universal Pictures, and Edgar Bronfman Jr. (Seagram's heir; |
| 23 | **Canadian,** graduate of **McGill** College) became owner and CEO of Universal Pictures. |
| 24 | Bronfman remained CEO of Universal Pictures even after Vivendi bought Universal in |
| 25 | 2000.  He stepped down as chief of Universal in 2001, BUT remained Vice-Chairman of the |
| 26 | Board (likely to insure that Def Emanuel's relationship to Universal remained in place) until |
| 27 | December 2003; by then Def Emanuel's role with Universal Pictures was well established. |
| 28 | 44.  To pay for Universal Pictures, Bronfman Jr. sold Seagram's stake in Dupont (for |
| | $9-billion). Most analysts and Seagram's investors considered this a terrible business move. |

1 To make matters worse, Bronfman knew little about the film business. **NOTE:** Bronfman

2 was convicted of insider trading, in France, in 2011, receiving a 15 months suspended

3 sentence, and a €5,000,000 fine.

4      45.   In 1995, Bromfman and Def Ari Emanuel may have represented big changes in

5 Hollywood, but the biggest change in Hollywood in 1995 was the advent of the **DVD**.

6 DVDs represented huge new opportunities for producers and film companies

7 —opportunities that would make movies FAR more profitable than ever before, but more

8 profitable for producers, NOT talent agents (adding fuel to Emanuel's drive to become a

9 producer and a studio owner).

10      **(3)  The Advent Of Writers' Script Network.com (InkTip.com), 1999**

11      46.   In 1999, Jerrol LeBaron copyrighted his brilliant website *Writers' Script*

12 *Network.com*, (writersscriptnetwork.com), going online, March 2000, and changing its

13 name to **InkTip**, and its location to inktip.com, in 2003. Unlike all other screenwriter

14 websites at that time (which either just posted screenwriter agents' addresses, or just

15 allowed screenwriters to post loglines or synopses, with no ability to bring the writers to

16 the agents and filmmakers), LeBarons website promised something new. Based in Los

17 Angeles County, LeBaron went out and told Hollywood agents and filmmakers about his

18 website, and invited them to join and peruse the works of thousands of undiscovered

19 screenwriters. The site had great safeguards, designed to protect both the writers and

20 industry professionals. Writers Script Network.com required all users to use their real

21 names. Writers could not read other writers' work, as that would only reduced the writers'

21 safety. However, after registering, the **industry professionals** could freely read any logline

22 (a short description, 60 words or less) on the website. If a professional wanted to read

23 more, they could click on a link to read a synopsis—and immediately the screenwriter

24 would receive notification of who had accessed his work, when, and from where. If the

25 professional wanted to read the entire script, he/she would then need to contact the writer

26 and request a script. Writers Script Network.com kept all records of access. **LeBarons's**

27 **site was the new online industry standard** (where there had been no standard, rules,

28 safety, or security for screenwriters ); flawless in conception, safety and transparency.

### (4) **The Memo, 1999**

47.    In 1999, only 27 years old, Def Mordecai (Modi) Wiczyk, the new Senior Vice President of Production and Acquisitions at Summit Entertainment, LLC, sent out a **memo** titled "Another New Ball Game". That memo sent the unethical Hollywood's establishment scrambling after massive new profits. Wiczyk's memo would be discussed in magazines and lounges for years. Within a year, in 2000 (likely at Def Ari Emanuel's bidding) **Universal Pictures** would steal Wiczyk away from Summit, making him VP of Productions. Two years later, Def Ari Emanuel made Wiczyk his **partner** at Endeavor Talent Agency.

48.    In 2007, *Slate* remembered "the memo", in an article called "How An Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate" article is attached as "**Exhibit I**" and is incorporated by reference as if fully set out herein.). Writer Kim Masters wrote:

> ...The memo predicted the decline of the studios, with filmmaking talent as the beneficiary. He also predicted that a management company with a lot of big stars would start to produce and own films. "The most immediate and pressing challenge would be to get the studios to carry the product," he said. The likelihood of a studio boycott was remote, he said, because "whichever studio was suffering at the time would probably break ranks in the name of short-term self-preservation." Hmm.
>
> Michael Ovitz eventually tried to launch such a management company and failed. But Wiczyk's memo said the agencies could also carry out the change. **"A similar structure could be created which complies with the conflict-of-interest laws,"** Wiczyk wrote. "If [a] fund was created as a stand-alone entity and the agency had an arms-length service contract, they could avoid conflict-of-interest violations… Admittedly this is a delicate issue and a tough deal to pull off, but it's certain someone would try it." Why? The potential for enhancing agency commission was "too rich to ignore." **In fact, he said, an agency could double its annual revenues.**

49.    Wiczyk's psychopathy is on full display in those final lines of the article, as he enthusiastically implies it is reasonable to behave without ethics —if the profits are "too rich to ignore." But Wiczyk's prediction that "...it's certain someone would try it" would soon prove correct.

50.    But who would want to wander with Wyczyk into such ethically questionable water?

|   |   |
|---|---|
| 1 | **THE ENDEAVOR/UNIVERSAL/MRC DEFENDANTS:** |
| 2 | ARI EMANUEL AND  HIS SECRET RELATIONSHIP WITH UNIVERSAL |
| 3 | PICTURES; EMANUEL UNITES WITH ASIF SATCHU AND MODI WICZYK |
| 4 | 51.   In 1999, Def Ari Emanuel knew producers made the REAL money in Hollywood. |
| 5 | But, as a talent agent, he couldn't get in the action—not legally (or not with his name on the |
| 6 | product), due to California's conflict of interest laws. |
| 7 | 52.   But Def Emanuel saw an opportunity. |
| 8 | 53.   Defendant Ari Emanuel had a **distribution problem**. He represented many directors, |
| 9 | writers and actors, who sometimes decided to make independent and experimental films, |
| 10 | only to discover later that their films couldn't get national or global distribution because the |
| 11 | distributors thought the films weren't marketable. Thus, many of these films died early |
| 12 | deaths. |
| 13 | 54.   Bronfman Jr., on the other hand, had a **talent problem**. Bronfman Jr. knew the |
| 14 | importance of getting marquee names on films. Big American studios crank out about 17 |
| 15 | films a year. In this haste, sometimes the studios commit to bad screenplays that no big |
| 16 | actors will commit to, thereby dooming the film. But just one or two big names attached to |
| 17 | these *inferior* films could increase their returns by tens of millions of dollars. |
| 18 | 55.   Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it. Bronfman Jr. |
| 19 | came to power in 1995 with Universal in 4th place among the big six studios (20 Century |
| 20 | Fox, Disney, Paramount, Warner Bros., Sony Pictures, Universal Pictures). But only one |
| 21 | year later, in 1996, Universal was in last place. And last again in 1997. And in 1998, even |
| 21 | worse: last place, and Universal had one of its worst years ever, with only a 5.9% market |
| 22 | share. Stockholders were restless. (See **Exhibit J**.) |
| 23 | 56.   In this tough time, Def Ari Emanuel approached Bronfman with a proposal. |
| 24 | 57.   Def Emanuel offered to put special effort into Universal Picture films, give |
| 25 | Bronfman Jr. his best business advice, and ask his actors, writer and directors to give |
| 26 | preference to Universal Pictures films. Emanuel also likely offered to take a reduced agent's |
| 27 | fee. **In exchange** Def Ari Emanuel likely received a percentage of the films, and/or a |
| 28 | generous share of Seagram's (Universal's parent) stock, but no film credit), and an |

agreement that Universal Pictures would distribute, and/or provide production money for, any reasonably viable film Def Emanuel brought to Universal Pictures.

58.   The agreement was made late 1998.

59.   In 1999 Universal pictures would have their best year since Bronfman arrived, climbing to 3rd place, with a 12.7% market share. That was 1999 —the same year Def Modi Wiczyk wrote his memo.

60.   Def Ari Emanuel read the memo.

61.   Bronfman Jr. surely read the memo. In fact, two years after Wiczyk wrote the memo, in 2001, Bronfman's **Universal Pictures** made Def Wiczyk their vice President of Productions. (An article about Universal hiring Wiczyk is attached as "**Exhibit K**" and is incorporated by reference as if fully set out herein.)

62.   And a year after that, in 2002, Def Emanuel would hire Def Wiczyk away from Bronfman Jr., to make Wiczyk a **partner** at Endeavor Talent Agency.

- 63.   But Wiczyk had been Vice President of **productions** at Summit Entertainment, AND Vice President of **productions** at  Universal Pictures. Wiczyk was a  **producer**. Why would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel was secretly going into the production business, with MRC and Universal Pictures.

64.   When Def Ari Emanuel stole Wiczyk away from Universal Pictures there were no hard feelings between Def Emanuel, Bronfman and Universal Pictures, and nothing changed in their arrangement. Def Ari Emanuel continued to provide the same talent and producorial services for both MRC and Universal Pictures. And although Bronfman left Universal a year later (2003), Def Emanuel continues to do favors for Bronfman and his Universal "family" to this very day (e.g. Def Emanuel and WME-IMG represent Bronfman Jr's daughter, Hannah).

### Wiczyk's Memo Inspires A Conspiracy

65.   The driving force behind Defs Emanuel's, Wiczyk's and Satchu's involvement in this conspiracy was to create the film production system outlined in Wiczyk's **memo**, to increase—maybe even **double**—profits. The conspiracy required maybe 4 players, with the right talents. Def Emanuel had connections to all the studios, and access to huge stars; Asif

Satchu was a creative business force who specialized in distribution and networking; Modi Wiczyk was a proven business, financing, and film production prodigy. They had almost everything they needed—except good screenplays. But as a new "questionable" company, established writers were not inclined to work with this unscrupulous band.

66. A film production start with acquiring a screenplay, a "property". The Defendants knew that. They also knew good screenplays are hard to find, cost good money, and are a risky investment. A bad director could ruin a great script, and even the best writers sometimes wrote bad scripts. In 2000 Def Wiczyk helped sell his brother's (Roee Wiczyk) screenplay to his former employer (Summit Ent.). But the script was weak, thus never developed, and Roee Wiczyk never sold another script. "Variety" reported on this script sale in 2000. (Said article is attached as "**Exhibit L**" and is incorporated by reference as if fully set out herein.) As a business man, Wiczyk could sell anything —he sold his brother's script idea without even having a script name. But now, operating as film producers and a *studio*, without an **actual** *good* script, or some good ideas, they couldn't get any project started.

67. The Defendants needed scripts, but they wanted to reduce their risks.

68. Defs Emanuel, Satchu and Wiczyk knew ideas are not copyrightable; only unique arrangements of ideas are copyrightable. If the Defendants had a method to access good writers' work, they could extract the best of those ideas, then pay their own writers to turn them into "new" screenplays, then produce and market those derivatives, as their own.

69. The L.A. based Defendants were aware of WritersScriptNetwork.com. As prominent "industry" insiders, they had likely even received a call or email from Jerrol LeBaron. They wanted something like WritersScriptNetwork.com, but **without** the good security features.

## THE TRIGGERSTREET DEFENDANTS

SPACEY'S CAREER SPUTTERS; SPACEY MEETS BRUNETTI; CONCEPTION OF THE TIGGERSTREET SOCIAL NETWORK; TRIGGERSTREET CONSPIRES W/ MRC

70. In 1994 Def Spacey learned Warner Bros intended to make a movie about the life of Bobby Darin (eventually called "Beyond The Sea"). This was Spacey's secret dream role. He offered to play the leading role, but the producers refused, believing Spacey was too old.

71.  In 1995, Def Spacey's career soared with *Usual Suspects* and *Seven*. But in 1996 and 1997 Def Spacey was back to NOT getting solid leading-man roles.

72.  This likely inspired Def Spacey to form his production company, "Trigger Street Productions", to make quality films with himself cast as the lead.  But for the next 7 years his production company floundered. The problem was getting a good screenplay.

73.  It is reported that around 1998 Def Spacey met Def Dana Brunetti, who soon became Spacey's personal assistant.

74.  Although in 1999 Def Spacey won an **Academy Award** for Best Actor (American Beauty), 1999 would mark the beginning of a very difficult period of Def Spacey's career (1999-2003). His production company would go 3 years without making a film (Jan 2000 to Jan 2003). And worse, for some reason Hollywood would not invest much money in any movie with **Kevin Spacey** in a leading role, **his films budgets were far below the Hollywood average** (the average Hollywood budget in 2000 was about $60 million): 1. American Beauty, 1999, **$15 million**; 2. The Big Kahuna, 1999, **$7 million**; 3. Ordinary Decent Criminal, 2000, **$12 million**; 4. Pay It Forward, 2000, **$40 million**.

75.  Def Spacey's difficulty consistently getting good roles, then, was likely due to his terrible reputation around Hollywood as something of a hustler. In 1999, actor Val Kilmer explained in a "Mr Showbiz" interview that in the 1970s Kevin Spacey, who was then a young college student, tricked Kilmer's father out of $18,000 for college tuition —but Spacey, according to Kilmer, kept the money, dropped out of school, and never repaid Kilmer's father. (Said "Mr. Showbiz" article is attached as "**Exhibit M**" and is incorporated by reference as if fully set out herein.)  Stories like Kilmer's, and a tabloid photo journal of Def Spacey participating in a public indiscretion, contributed to Def Spacey's trouble.

76.  But amid all of these struggles, somehow in 2000, Spacey was able to secure the film rights to his dream project -**Bobby Darin's** life story. But since Def Spacey had no production funding, he would have to wait almost 4 more years to make his movie.

77.  It's possible that during these tough times, Spacey and Brunetti looked around online for affordable scripts for Spacey's production company to film. And maybe then they stumbled upon *Writers Script Network.com*, which inspired them to create TS… Then, this

1    unlikely pair—a college dropout actor whose career was on life support, and a cellphone

2    salesman—teamed up to create a massive social network for screenwriters and filmmakers.

3    And soon Ari Emanuel learned about the site and asked Spacey to make some

4    modifications: relaxing security, and making access private and untraceable. That could be

5    how TS was created. It makes little difference to the conspiracy that followed.

6        78.    However, the Plaintiff believes TS was formed in a conspiracy conceived by Def

7    Ari Emanuel, to enrich himself and his conspirators. Elysium, alone, earned $286,000,000

8    worldwide theatrically, and should have earn another $570,000,000 in home entertainment

9    and TV, (typically, movies earn twice their theatrical total in home ent., TV, and auxiliary

10   sales), for a total of **$856,000,000** —almost a billion dollars. **This is why setting up TS**

11   **and Project Greenlight were so important to Def Ari Emanuel. One good script can**

12   **easily earn a billion dollars, and one big TV show can earn far more than that.**

13

14                  **THE DEFENDANTS' CONSPIRACY BEGINS:**

15

16       79.    In 2000, shortly after Def Emanuel discovered Writers Script Network.com, Def

17   Emanuel planned his own screenwriter/filmmaker website, with minimal or no security

18   features. He would use his clients, Def Matt Damon and Ben Affleck, as website spokesmen

19   and alleged *conceivers*. In August 2000 Project Greenlight was born. (An Internet Archives

20   screenshot of projectgreenlight.com, showing the origin time of Project Greenlight, is

21   attached as **Exhibit N** and incorporated by reference as if fully set out herein.)

21       80.    Then misfortune struck Universal Pictures in 2000, and  Def Ari Emanuel seized

22   the occasion to launch a **second** website, allegedly conceived by Defs Spacey and Brunetti.

23       81.    In 2000, Universal Pictures was in a bind. They were just a few months away from

24   beginning to film "K-PAX" but they didn't have a leading actor (after Will Smith and others

25   dropped out). Smith, and other actors and directors (with integrity) were perhaps dropping

26   out due to rumours that Argentinian film director and screenwriter, Eliseo Subiela, learned

27   about writer Gene Brewer's 1995 book "K-PAX" and planned to sue Brewer and Universal

28   Pictures for copyright infringement of Subiela's 1986 film "Man Facing Southeast".

82.   But Universal Pictures, not worried about a small director from Argentina suing, decided to push forward, film, release, make a fortune, and fight Subiela in court later.

83.   By mid 2000, with little time to find a leading man, Universal Pictures was desperate enough to consider casting Def Kevin Spacey in the leading role.

84.   Def Ari Emanuel could have just asked Spacey to take the leading role. Spacey would have leaped at the chance. But Spacey wasn't an Endeavor client, so Def Emanuel wouldn't receive his casting fee.   Def Ari Emanuel was a businessman. As such, even though he needed a favor from Spacey, he wasn't going to just give Spacey a leading role, he wanted something in return. Def Ari Emanuel knew Def Spacey's career was in trouble.

85.   Def Ari Emanuel approached Def Spacey to ask him about starting or endorsing, a screenwriter/filmmaker social network; a social network with little or no security features. The conversation likely started with Def Ari Emanuel asking how Spacey's career was going.   Def Spacey likely explained his recent career setbacks, and his hope to one day film Bobby Darin's life story. He may have explained that he had recently secured the rights to his Bobby Darin film (Beyond the Sea), but had no funding to shoot his dream film.

**Quid Pro Quo**

86.   Upon hearing about Spacey's career troubles, Def Emanuel made Def Spacey and Brunetti an offer: (1) he asked Defs Spacey and Brunetti to design a social network so that ALL user could access ALL screenplays, anonymously, with few security safeguards (it is possible/probable that Def Asif Satchu facilitated the website design); (2) Def Emanuel also may have asked Spacey and Brunetti to include a counter-security feature whereby if a screenplay was removed from the website all access history would also be erased (**although the Defs seem to have added this second features in 2007, shortly before accessing the Plaintiff's work**). The Plaintiff believes that in exchange for agreeing to operate such a social network, Def Ari Emanuel promised Defs Spacey and Brunetti a few things in return:

1.   Spacey would star in K-PAX, a film with a solid $68 million budget;

2.   Def Ari Emanuel would finance Spacey's production company to make Def Spacey's dream film, Beyond the Sea;

3.   Def Emanuel would help Spacey's production company arrange financing and

distribution (as needed) for the life of the social network;

4. Def Emanuel would introduce Spacey and Brunetti to the financial and distribution partners necessary for their production company to succeed;

5. Def Emanuel would try to find Spacey a very meaningful—maybe even a career defining—role.

87.  The agreement was made.

88.  Thus, September 2000, only <u>one month after the birth of Project Greenlight</u>, **TriggerStreet.com (<u>TS</u>) was born.** (Internet Archives screenshot of projectgreenlight.com, showing the origin time of Project Greenlight is attached as "**Exhibit O**" and incorporated by reference as if fully set out herein.)

89.  But TS would remain a closed, private, and inactive site for 2 years, not having its official "launch" party until 2002. This was done to keep TriggerSteet from competing with Project Greenlight. This wait also allowed TS to learn from Project Greenlight's mistakes.

90.  In November 2000, as agreed, Spacey began filming KPAX. When the film was released it would be the first smoking gun in this conspiracy:

- 91.  KPAX was released Oct 2001. It would be the first time **Universal Pictures EVER** cast Kevin Spacey in a leading role (in fact, Universal had only ever cast Spacey in **one [1]** film, a **supporting** role, ten years prior, in 1990, in "Henry & June"). (*Spacey was most commonly cast in **Warner Bros** films and independent films.) <u>Casting Spacey to star in K-PAX, a $68 million film, at such a low point in Spacey's career, was almost inconceivable.</u> **Def Spacey wouldn't star in a film with a budget over $40 million for 5 more years** (Superman Returns). Spacey would only appear in one other Universal Pictures film, 2 years later, *The Life of David Gale*—originally a Warner Bros (Spacey's stable) property that Universal Pictures optioned. Spacey just came with the deal.

- 92.  A month after K-PAX was released, in November 2001, director/writer **Eliseo Subiela (via Jason Laskay) sued Universal Pictures**, Gene Brewer, et al, for plagiarizing his film *Man Facing Southeast*. The suit was eventually withdrawn when Subiela and Laskay could no longer afford to litigate against a giant corporation like Universal Pictures.

COMPLAINT

| | |
|---|---|
| 1 | **TS LAUNCHES, NOVEMBER 2002** |
| 2 | 93.  After giving Project Greenlight two years to gain traction, November 2002, the |
| 3 | Defendants prepared to launch TS. To attract the best undiscovered writers, the Defendants |
| 4 | planned to generate "buzz" by throwing 3 huge TS "launch parties": one in New York, one |
| 5 | in Los Angeles, and one in **London**. (A photo of Kevin Spacey at the TS London Launch |
| 6 | party is attached as "**Exhibit P**" and is incorporated by reference as if fully set out herein.) |
| 7 | While in Britain, Def Spacey did many interviews about TS. The Guardian featured a piece |
| 8 | called "Cyber Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's |
| 9 | well-rehearsed lines. (Said Guardian article in which Def Spacey went to London to discuss |
| 10 | TS is attached as "**Exhibit Q**" and incorporated by reference as if fully set out herein.) |
| 11 | Writer Sean Clarke wrote: |
| 12 | Spacey tells an anecdote about the original idea for the site, |
| 13 | which is essentially Brunetti's brainchild. He says they "came up with a sketchy plan, which at the time..." and chuckles |
| 14 | wryly, on which cue Brunetti take up the story "... which at the time, we thought was great." They both shake their heads |
| 15 | ruefully. Later, I watch as the pair address a press conference, |
| 16 | they repeat the story, with exactly the same pauses, the same chuckle, the same interruptions. It's beat-perfect, like a |
| 17 | Mamet script. |
| 18 | |
| 19 | 94.  And to generate even more buzz, before the website was launched, Budweiser |
| 20 | announced their corporate sponsorship of the TS social network. |
| 21 | 95.  Along with the sponsors, parties and interviews, to help repair Def Spacey's |
| 21 | damaged reputation, the TS website posted a heartwarming story that Spacey started his |
| 22 | new social network "to help undiscovered writers and filmmakers get industry access and |
| 23 | exposure." |
| 24 | 96.  **TriggerStreet.com was "launched", and went online, November 2002** |
| 25 | •  97.  Def Spacey held a New York TriggerStreet **launch party** on Nov 11th, 2002. |
| 26 | •  98.  Def Spacey held a Los Angeles TS **launch party** on Nov 18th, 2002. |
| 27 | •  99.  Def Spacey held a London TS **launch party** on Nov 26th, 2002. |
| 28 | |

| | |
|---|---|
| 1 | **After Triggerstreet Officially Launched, Nov 11th, 2002,** |
| 2 | **The Following Events (Connecting The Defendants) Occurred:** |
| 3 | 100. Shortly after TS's official launch (November 2002), Def Spacey would receive |
| 4 | three (3) huge payments from Defendants Ari Emanuel and Universal Pictures (Def Spacey |
| 5 | would receive many other unlikely benefits—payments—during the subsequent 12 year |
| 6 | lifespan of TS). |
| 7 | • 101. In **<u>February</u> 2003**, 3 months after TS launched, **<u>Universal Pictures</u>** |
| 8 | distributed Spacey's film "**The Life of David Gale**" (again, originally a property of |
| 9 | Spacey's home studio, Warner Bros). This would be the last time Universal Pictures would |
| 10 | be involved in a Spacey film (to the date of the filing of this Complaint). Thus, the only two |
| 11 | Universal Pictures films featuring Spacey as a lead are *K-PAX*, and *The Life of David Gale*. |
| 12 | • 102. That same month, **<u>February of 2003</u>**, Spacey's production company would |
| 13 | magically get money to release and distribute its first movie in 3 years: "United States of |
| 14 | Leland". The film would only be released in 14 theaters, losing millions, and bringing in |
| 15 | only $344,000. Likely, Universal Pictures wouldn't put their name on the film, because |
| 16 | after two bad years, Universal was back in 5th place (second to last place), and they didn't |
| 17 | want *United States of Leland* to move them into last place. |
| 18 | • 103. That same month, again, **<u>February</u> 2003**, it was announced that Production |
| 19 | for ***Beyond the Sea*** (<u>Spacey's</u> <u>dream</u> <u>film</u> <u>about</u> <u>Bobby</u> <u>Darin</u>) was being fast-tracked with |
| 20 | Spacey as lead actor. |
| 21 | 104. Suddenly, in the nadir of Defendant Spacey's career, inexplicably Hollywood was |
| 21 | showing Def Spacey tremendous love and support—when 4 of his previous 5 films were |
| 22 | major money losers. |
| 23 | Footnotes: |
| 24 | 105. Shortly after TS launched, in **2003**, Ari Emanuel gave Asif Satchu and Mordecai |
| 25 | Wiczyk financing to start MRC. |
| 26 | 106. **December 17th, 2004**, *Beyond the Sea* was released. It would be Spacey's **greatest** |
| 27 | **failure**; costing $25 million, but only earning $8.4 million; losing over $16,000,000. |
| 28 | |

| | |
|---|---|
| 1 | **Additional Facts Regarding TS And The Defendants** |
| 2 | • 107.   Spacey's production company made no films for 3 years, January 2000 to |
| 3 | January 2003: Ordinary Decent Criminal (Jan 2000, direct to DVD in USA), and United |
| 4 | States of Leland (Jan 2003, released in only 14 theaters). |
| 5 | • 108.   Since TS launched, Def Spacey's production company has made 22 films. |
| 6 | • 109.   May 2005, 2.5 years after TS launched, Project Greenlight was effectively |
| 7 | dead (no new contests for filmmakers or screenwriters). Killed by the success of TS. |
| 8 | Although, oddly, the Project Greenlight website remained open, but inactive —no new |
| 9 | contests, no new submissions accepted; just an open, inactive website, until 2015. |
| 10 | • 110.   In 2006 Spacey held a TriggerStreet "RE-launch" party in Los Angeles. |
| 11 | • 111.   2007, Plaintiff's screenplay, Butterfly Driver, was posted and accessed on TS. |
| 12 | • 112.   2007-2009 TS secretly joined Bud.TV (Budweiser TV), without informing |
| 13 | members or revising its Term of Use page. In a 2007 Anheuser-Busch announced it was |
| 14 | launching Bud.TV with TriggerStreet.com providing programming. (Said Bud.TV news |
| 15 | release is attached as "**Exhibit R**" and incorporated by reference as if fully set out herein.) |
| 16 | Curiously, Bud.TV's Wikipedia page shows Defs Matt Damon and Ben Affleck (Project |
| 17 | Greenlight), and Kevin Spacey (TS) all provided Bud.TV programming. (Said Wikipedia |
| 18 | article is attached as "**Exhibit S**" and incorporated by reference as if fully set out herein.) |
| 19 | • 113.   Feb 2009, the BBC reported Def Spacey hosted the Mofilm Film Festival, in |
| 20 | Spain, where he boasted of TS's "**400,000 members around the world.**" (Said BBC article |
| 21 | is attached as "**Exhibit T**" and is incorporated by reference as if fully set out herein.) |
| 21 | • 114.   On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency (ETA) |
| 22 | merged with the William Morris Agency (WMA), creating William Morris Endeavor. |
| 23 | **17 days later**, May 14th 2009, **after about 20 years <u>with the William Morris Agency</u>**, |
| 24 | Def Spacey signed with CAA (Creative Artist Agency). Def Spacey did so to keep TS |
| 25 | members (and any observing regulatory authorities) from becoming suspicious of his link to |
| 26 | Def Ari Emanuel through TS. (A New York Times article about the April 2009 merger of |
| 27 | WMA and Endeavor is attached as "**Exhibit U**" and is incorporated by reference as if fully |
| 28 | set out herein.)  (A May 2009 Variety article about Def Spacey leaving WME is attached as |

1    "**Exhibit V**" and is incorporated by reference as if fully set out herein.)

2    • 115.   May 2010, "Deadline Hollywood" reported Defendant **Universal Pictures**

3    and Defendant Media Rights Capital (MRC) announced a 20 picture, 5-year production and

4    distribution deal. (Said "Deadline Hollywood" article is attached as "**Exhibit W**" and is

5    incorporated by reference as if fully set out herein.)  Thus, MRC's (a company co-owned by

6    Defendant Ari Emanuel) first mega-deal would be with **Universal Pictures**.

7    • 116.   On March 15th, 2011, **Netflix** and Def **MRC** (owned by Defs Emanuel,

8    Wiczyk and Satchu) announced their mega $100 million dollar 2-season deal to produce the

9    new series *House of Cards*, starring Def Kevin Spacey, in his career defining role. Quietly, a

10   few months later, in July 2011, with the role of a lifetime secured, Def Spacey would move

11   his social network, TS, to http//www.labs.triggerstreet.com, and begin to use the web

12   address TriggerStreet.com as his production company's site.

13   • 117.   August 2013, the film Elysium (an infringement on the Plaintiff's work) was

14   released internationally. The Plaintiff then filed his copyright infringement suit against the

15   Defendants, October 2013.

16   • 118.   November 6th, 2014, 6 days after the Plaintiff filed his Notice Of Motion of

17   appeal, Defs Spacey and Brunetti closed and destroyed the TS social network.

18   • 119.   In 2015, almost immediately after TS closed, Project Greenlight (which had

19   been **dead for 10 years**, came back to life, with a new HBO TV show, airing fall of 2015.

20   • 120.   July 2016, HBO announced the Project Greenlight TV show was cancelled.

21   • 121.   In 2016, with the cancellation of the TV show *Project Greenlight*, and with

21   the closing of TS—with no way to gain access to original screenplays to misappropriate—

22   ProjectGreenlight**.com** went active, again. **After 10 years of online inactivity**, Def Matt

23   Damon, Ben Affleck and ProjectGreenlight.com began seeking new screenplays again.

24   • 122.   In 2015, Def Dana Brunetti (former cellphone salesman and Spacey's personal

25   assistant) produced his **first** solo film, without Kevin Spacey, *50 Shades of Grey* —payment

26   for his involvement in the TS conspiracy. *50 Shades of Grey* was **Distributed** **by** **Universal**

27   **Pictures**. (A Wikipedia article showing the producers and distributors of 50 Shades of Grey

28   is attached as "**Exhibit X**" and is incorporated by reference as if fully set out herein.)

**SONY PICTURES EMAIL LEAK EXPOSE DEF ARI EMANUEL'S SECRET UNIVERSAL PICTURES TIES, HIS UNLAWFUL RELATIONSHIPS WITH SONY PICTURES' CEO (M. LYNTON), & HIS BULLYING, THUGGISH METHODS**

123.　Further confirming all allegation herein, in 2015 Wikileaks released thousands of Sony Pictures emails, which had been previously released in 2014, when North Korea hacked and published thousands of Sony's emails. Within days hundreds of respected news agencies carried the story —The NYTimes, LATimes, Hollywood Reporter, all reported the juicy details—and the juiciest story was the story of how Sony Pictures lost -or passed on- "Steve Jobs", the movie.

124.　All of the reports are similar: the emails provide an inside view of bunch of super-rich Hollywood producers, writers, and directors negotiating the production budget of the film "Steve Jobs", until the deal went bad and Sony gave up on the film. And right in the eye of the storm is Def Ari Emanuel. (An articles from "Mashable.com" about said "Steve Jobs" film emails is attached as **"Exhibit Y"**and is incorporated by reference as if fully set out herein.)

125.　A few of the celebrities captured on Sony Pictures email/text leak, at times, behaved poorly, but no one behaved worse than, Def Emanuel. Brazen and thuggish, we see Def Ari Emanuel berate Sony Pictures' Chairman Amy Pascal, with impunity. And when the other Sony execs learned of this, they only called Def Emanuel a *bully*—behind his back. No one dared to confront Def Emanuel. But more surprisingly, through a tiny sliver of Def Ari Emanuel's emails (just those going into, or out of, Sony Pictures) we learn:

1. Def Ari Emanuel is a major film producer —in conflict with his role as a talent agent, and in violating California labor law which forbids employers (a producer) from charging employees (his actors) fees to be hired—perhaps an even more significant conflict of interest than Def Emanuel's partnership in MRC II LP.

2. Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures CEO and Chairman) are secretly business partners: co-owners in the company *Screenbid*.

3. Ari Emanuel is also a film financier, or executive producer (a person who provides or finds money to make films).

4. Def Ari Emanuel also arranges peripheral services for Sony Pictures (and others), like making deals with Hasbro Toy Co. for Sony Pictures (for Spider-Man 2 & Minions action figures?).

5. Whenever necessary, **Universal Pictures** will distribute ANY film for Ari Emanuel.

"STEVE JOBS" EMAILS CONFIRM DEF ARI EMANUEL
IS SECRETLY A MAJOR FILM PRODUCER, AND THE TRUE
PRODUCER OF "STEVE JOBS" —NOT SCOTT RUDIN

126. Through the Sony "Steve Jobs" email trail we see the "Steve Jobs" negotiation go on for about 8 months, then it begins to fall apart on October 16th, 2014, after Sony Pictures' President of Business Affairs, Andrew Gumpert, sends Sony Pictures Chairperson Amy Pascal, film producer Scott Rudin, Def Ari Emanuel, and WME co-CEO Patrick Whitesell a financing offer, which the filmmakers felt was too low. October 18th, 2014, two days after Gumpert's low offer, Scott Rudin, angrily responds:

> 2014-10-18 16:09:38  Re: wwbo bumps/jobs From: Scott Rudin
> <sr@scottrudinproductions.com> To: pascal, amy
> gumpert, andrew  aemanuel@wmeentertainment.com
> pwhitesell@wmeentertainment.com

**SCOTT RUDIN:**
> "You have NO risk in the movie but WE should have risk? You lay off every cent except what you choose to keep and WE should then also fund you --- that's how this should work?
> I cannot believe you're serious. What idiot would make this deal? The presumption that five Oscar winners would be desperate enough to give up all value for their services and then also risk the baseline bargain-basement fees on top of it is beyond comprehension.
> Every single movie like this that we have made for you has worked. And you think this is fair?"

127. At Rudin's words, Def Ari Emanuel, who purports to the world that he is just a talent agent, would then take over the email exchange —seemingly eager to bully a woman.

> On Oct 18, 2014, at 9:15 AM,  From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com> To: pascal, amy

| | |
|---|---|
| 1 | sr@scottrudinproductions.com  gumpert, andrew |
| 2 | pwhitesell@wmeentertainment.com |
| | **ARI EMANUEL:** |
| 3 | "This offer is fucking bull shit. Give us the movie back. You you guys |
| 4 | in the business. No other studio would even ask for this. Pass" |

128.  Def Ari Emanuel immediately establishes and retains dominance and control of the matter for the remainder of the negotiation, and Scott Rudin would remain quiet and subordinate to Def Emanuel. But the key detail in this email is that Def Emanuel has the authority to say "Pass", meaning: we choose NOT to do business with you, we will find another partner. No mere talent agent can usurp that power from the producer.  Scott Rudin put Ari Emanuel on that email chain because Ari Emanuel is the true producer.

129.   The exchange goes on. Amy Pascal writes:

On Oct 18, 2014, at 10:18 AM From: Amy_Pascal@spe.sony.com
To: aemanuel@wmeentertainment.com
sr@scottrudinproductions.com gumpert, Andrew
pwhitesell@wmeentertainment.com
**AMY PASCAL:**
"Can we please deal with this Monday
Maybe we all get in a room and close it up"

130.   But Def Ari Emanuel will not be silenced by Ms Pascal's request to wait until Monday. He replies five minutes later::

On Oct 18, 2014, at 10:23 AM,  From: Ariel Emanuel
<AEmanuel@wmeentertainment.com>  To: pascal,
amy  sr@scottrudinproductions.com  gumpert,
andrew pwhitesell@wmeentertainment.com
**ARI EMANUEL:**
"Whatever
**You guys ask us to find financing. Scott, Patrick and myself get
<u>Modi</u>** and we still get no respect. Amy, this is not what you want to
hear - but this NEVER happens and any other studio. In fact they
then would go out of their way to make a proper deal.
Even Harvey.
Monday is fine."

131.   With that statement **Def Ari Emanuel admitted he found film financiers for "Steve Jobs", which is a strictly a producer's, or an executive producer's job.** Def Ari

COMPLAINT

27

Emanuel also generously (and falsely) shares credit with Rudin and Whitsell for getting Modi Wiczyk to help with financing, to make Rudin and Whitsell appear more significant to the process. Again, Defs Modi Wiczyk and Ari Emanuel had been a business partners since 2002 (at Endeavor, as well as in MRC). Getting Def Modi Wiczyk involved was entirely Def Ari Emanuel's doing. Amy Pascal responds to Def Emanuel's provocation:

> On Oct 18, 2014, at 10:51 AM, From: Amy_Pascal@spe.sony.com
> To: aemanuel@wmeentertainment.com
> sr@scottrudinproductions.com gumpert,Andrew
> pwhitesell@wmeentertainment.com

**AMY PASCAL:**
> "arithat is totally unnecessary we are in a negotiationwe have all
> been doing this a long timewe want to make moneyyou want to
> make money for yourselves andyour clientsthis has nothing to do
> with respect and to be fair and its a credit to the movie that scott
> put together there are more financing partners  than we know
> what todo with here....thats not the issue...we are the only major
> studio that even tries to make thesekind of movesdont make it
> harder than it isthe tone is really uncalled for  and unfairand
> doesnt help get things doneamy"

132.    Through all of this, Scott Rudin never commented or told Def Ari Emanuel to disengaged. That is not his place. Ari runs the show. Def Ari Emanuel replies:

> 2014-10-18 10:58:41  Re: wwbo bumps/jobs From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com> To: pascal, amy
> sr@scottrudinproductions.com   gumpert,
> andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
> "Ok not true. Other studios make these movies"

133.    Def Ari Emanuel was eluding to Universal Pictures, who would produce any film Def Emanuel suggested. Texting stopped for 7 or 8 hours, until Def Ari Emanuel resumed.

> 2014-10-18 16:20:47 From: aemanuel@wmeentertainment.com
> To: gumpert, andrew sr@scottrudinproductions.com,
> pwhitesell@wmeentertainment.com,  pascal, amy

**ARI EMANUEL:**
> "In the real world when some one either risks something or gives something
> up they get something in return. You guys seem to think we should be
> honored just to be in business with you based on your offer. Why?"

COMPLAINT
28

134.   After this, the negotiation disintegrated over the next 4 weeks. The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:

> 2014-11-14 22:57:02 From: aemanuel@wmeentertainment.com
> To: pascal, amy
>
> **ARI EMANUEL:**
>
> > "Is business affairs calling me so I can take this to Fox Searchlight officially?"

135.   <u>With that statement Def Emanuel showed that, in addition to producing, **he even arranges distribution**</u>. Def Emanuel is asking Amy Pascal if Sony Pictures' President of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants "Steve Jobs". Def Emanuel is bluffing that Fox Searchlight has agreed to take the film. He never had a deal with Fox Searchlight. He was just playing hardball; trying to get a better offer out of Sony, AND keep them in the dark about his distribution relationship with **Universal Pictures.**

136.   As this deal dragged on over 8 months, 3 weeks before the previous exchange, Sony Pictures' Andrew Dumpert, spotted Def Emanuel's chicanery and bad motives. In an email to Sony execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

> 2014-10-18 16:59:16 From: Andrew Gumpert
> To: lynton, michael; pascal, amy; belgrad, doug
>
> **Andrew Gumpert:**
>
> > "The fact is there is only so much in the kitty. Unless the movie massively breaks out they can never make real money, nor can we and our investors.They have a 50pt pool with the best definition and 5m of box office bonuses. **Do they want to make MORE than the equity? I think they do.** There is a huge philosophical gap (given the rude and insolent responses from Ari and **Scott**)..."

137.   Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott Rudin weren't adhering to established guidelines.

138.   Although there have surely been occasions when Sony Pictures did cave-in to Def Emanuel's arm-twisting, this would not be one of those occasion. But oddly, Michael Lynton, CEO of Sony Pictures, responds to Gumpert only with silence—because Def Ari Emanuel is his close friend and secret business partner in Screenbid.

| | |
|---|---|
| 1 | **"Steve Jobs" Film's Not-So Surprising *Twist* Ending:** |
| 2 | 139. Fox Searchlight never touched "Steve Jobs". |
| 3 | 140. Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the |
| 4 | price of the film above market value, to increase his profit margin. He didn't need Sony |
| 5 | Pictures to give him standard market value for "Steve Jobs", he could get standard value |
| 6 | from Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari |
| 7 | Emanuel took the film to the Studio that has distributed all of his films, since around 1999. |
| 8 | 141. On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs", |
| 9 | after so much posturing and tumult, <u>"Steve Jobs" was distributed by **Universal Pictures**</u>. |
| 10 | |
| 11 | <u>SONY PICTURES EMAILS SHOW DEFS EMANUEL & BILL BLOCK & SONY</u> |
| 12 | <u>PICTURES' CEO (M. LYNTON) MAINTAIN UNETHICAL RELATIONSHIPS,</u> |
| 13 | <u>AS THEY CO-OWN "SCREENBID" TOGETHER (CONFLICT OF INTERESTS)</u> |
| 14 | 142. The "Steve Jobs" emails reveal Defs Emanuel and Bill Block are in a co-ownership |
| 15 | business with Sony Pictures' then-CEO Michael Lynton. As we see Def Ari Emanuel write |
| 16 | Michael Lynton to ask Lynton to check on their co-owned business, *Screenbid.* |
| 17 | On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com |
| 18 | To: lynton, michael; |
| | **ARI EMANUEL:** |
| 19 | Michael - |
| 20 | What are we doing on Screenbid? We had success on our early tests, nothing since. You guys own a piece of this company, we've had |
| 21 | nothing since our early success. We have to keep the engines going. |
| 21 | 143. In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of |
| 22 | Screenbid is confirmed by the repeated use of pronoun"we". Def Ari Emanuel asks "What |
| 23 | are <u>we</u> doing..." Then he states "<u>**We**</u> had success on our early tests..." Then he reminds |
| 24 | Lynton that he (and some unknown party, or parties) also own shares of this company. Then, |
| 25 | implying Lynton has a responsibility, Def Emanuel says, "**You guys own a piece of this** |
| 26 | **company...**" Then Def Emanuel exhorts CEO Michael Lynton to take action, saying: "<u>**We**</u> |
| 27 | <u>**have to keep the engines going**</u>." |
| 28 | 144. These are not the messages of quiet stockholders. These men are owners. |

145. Sony Picture's CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his business partners a business report, pasted below his reply text. (<u>Bill</u> <u>Block</u> <u>was</u> <u>the</u> <u>CEO</u> <u>of</u> <u>QED</u> <u>International,</u> <u>a</u> <u>Defendant</u> <u>in</u> <u>Briggs</u> <u>v</u> <u>Blomkamp</u>.) Def Bill Block's reply email reads:

> 2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
> From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
> michael_lynton@spe.sony.com
>
> **BILL BLOCK:**
> Going well gentlemen.
> Bill
> From: Jeffrey A. Dash [mailto:jdash@screenbid.com]
> Sent: Monday, October 27, 2014 10:13 AM
> To: Bill Block
> Subject: SCREENBID AUCTION UPDATE
> AUCTION UPDATE:
>
> TRUE BLOOD: (HBO) We are winding down aftermarket sales and
> fulfillment and are on schedule to present audited reports to HBO
> accounting within 14 days.
>
> SONS OF ANARCHY: (FOX) We visited the set on Friday
> 10/24/14 and met with the department heads for props, wardrobe,
> transportation and set decoration. They are scheduled to wrap next
> week and we will take delivery by 11/5/14, immediately inventory
> and shoot. Writing began about 2 weeks ago The auction is
> scheduled to go live on 12/01/14 and bidding will end on 12/10/14.
> Fulfillment time will be tight. In order to get everything shipped
> prior to XMAS we will have extra staff in place to facilitate…"

146. In this unethical relationship, Sony Pictures' CEO Lynton, personally profited as Screenbid's owner, in such ways as directing Sony Pictures to give Screenbid millions in set furnishings to auction on Screenbid, where he and Def Emanuel profited as owners. Lynton's secret relationship with Def Emanuel is why Sony Pictures did not do due diligence to vet Def Blomkamp's Elysium script.

SONY EMAILS SHOW DEF EMANUEL PERFORMS

PRODUCORIAL SERVICES:  CALLING SONY'S CEO & CHAIRMAN

TO ARRANGE A DEAL WITH HASBRO

147.   On March 28, 2014, Def Ari Emanuel emailed/texted Sony's Pictures' CEO and Chairman to close an animation co-financing deal with Hasbro. Def Emanuel's email read:

> 2014-03-28  re: HASBRO Animation deal
> From: aemanuel@wmeentertainment.com
> To:amy_pascal@spe.sony.com;  michael_lynton@spe.sony.com
> **ARI EMANUEL:**
> "HASBRO Animation deal
> Amy & Michael -
> We have sent Ronni our proposal for the animation co-financing deal. Please take a look when you get a chance and lets lock this down.
> Ari

148.   Talent Agents don't arrange animation co-financing deals with Hasbro, producers and studios do. Curiously, after Billionaire Def Ari Emanuel recently purchased the UFC he arranged a UFC Hasbro deal. (An article where Def Emanuel discusses UFC and Hasbro is attached as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.)

**SONY EMAILS SHOW DEFENDANTS COMMITTED PERJURY REGARDING**

**THEIR EFFORTS TO HIDE INFRINGEMENT IN BRIGGS V BLOMKAMP**

149.   The Defendants' fraud, conspiracy and routine deceit included committing perjury by lying on documents signed under oath.

150.   During the discovery phase of Briggs v Blomkamp, et al (C13 4679 PJH) the Plaintiff informed the district court that he suspected that writer/producer Simon Kinberg was hired to rewrite Def Blomkamp's poorly written screenplay. In response to Plaintiff's interrogatories to MRC II LP, the Defendants  made false statement, under oath, regarding a substantial matter in that case, which may impact the Plaintiff's ability to prevail in that lawsuit (currently in appeals). (Said Def MRC II LP's Interrogatory Responses from Briggs v Blomkamp are attached as "**Exhibit AA**"  and is incorporated by reference as if fully set out herein.)

151.   That deceit occurred when the Defs responded to interrogatory #17; believing Simon Kinberg helped disguise Def Blomkamp's infringement, the Plaintiff asked:

**Plaintiff's Interrogatory:**
INTERROGATORY #17:
"Simon Kinberg is a writer and "script doctor" (a writer who fixes scripts that have serious problems). Simon Kinberg is listed as a producer of Elysium. Exactly what duties did Simon Kinberg play in the production and script doctoring of the screenplay and film "Elysium"?"

**Defendants' Answer:**
"Defendant incorporates by reference the preliminary statement and general objections... Subject to and without waiving the foregoing objections, Defendant responds as follows:
     Simon Kinberg <u>produced</u> the <u>Film</u>. As producer, Mr. Kinberg also **assisted with a <u>polish</u> of the Film's screenplay** during the later stages of writing."

### But The Leaked Sony Emails Reveal The Truth About Said Perjury:

152.   The Defendants admitted that Simon Kinberg helped improve the weak screenplay, BUT suggested that his help was just a "polish", which suggests merely dotting I's and crossing T's, and maybe a dialogue suggestion here and there. But, in fact, Simon Kinberg had to do exhaustive work to try to salvage Elysium's terrible screenplay.

153.   The gross underestimation and misrepresentation of all the work Simon Kinberg had to do to repair Def Blomkamp's Elysium script is revealed in the 2015 Wikileaks're-posting of the Sony Pictures' hacked emails, in five (5) key email exchanges between Defs **Modi Wiczyk**, **Simon Kinberg**, and Sony Pictures Chairperson **Amy Pascal**. In the first email, Def Wiczyk explains Kinberg's role:

     2014-10-27 13:36:12 <u>Fwd: CHAPPIE NOTES</u>
     From: mwiczyk@mrcstudios.com To: pascal, amy
**MODI WICZYK:,**
   "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying. great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then.</u> dont know why, dont care. its our turn now.i told doug that we should

leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

154.   Def Wiczyk, Simon Kinberg, and Amy Pascal continued to discuss the endless and unimaginable problems Kinberg was having helping director Def Blomkamp's save his film, *Chappie*; the executives discuss reshoots,  dialogue rewrites, other huge changes, and how to protect Def Blomkamp's insecure ego. Yet, amid these massive problems, Kinberg comments that Def Blomkamp was handling Kinberg's executive ordered changes much better than he handled them on Elysium, where Kinberg explains Blomkamp **"shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once."** In this email to Amy Pascal, Simon Kinberg wrote:

2014-08-07 07:02:55  Re: Chappie  from:
sdkinberg@aol.com  to: pascal, amy

**SIMON KINBERG:**

"cool! neill has been really open throughout this process, and wants to get the audience all the way there. i think we're all feeling the same things now, so we can put it together and deliver to him, and he'll take it as an assignment not a judgement, and stay creative. **i saw him shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once. so i don't think he will now…**"

155.   In fact, the text/emails reveal Def Wiczyk and Amy Pascal were forced to hide from Def Blomkamp the fact that Simon Kinberg had to take over the film to finish it. This is revealed when Def Wiczyk wrote to Sony's Chairperson, Amy Pascal:

2014-10-27 13:42:22  Re: To discuss
From: mwiczyk@mrcstudios.com; To: pascal, amy

**MODI WICZYK:**

"not to oversimplify but i know simon has been biting his tongue for a month and all the sloppy stuff has been making him crazy. when i speak to him he seems to have a very clear view of what he wants to do. it lines up w what ur saying. i hink if we make them do it we will have a much much much better film that works. we just cant literally tell neill si is taking over....so its "our" notes"

156.  Additional evidence of the extreme measures that Defendants Simon Kinberg, Sony Pictures, MRC and Modi Wiczyk resorted to salvage Chappie. Can be seen in such

emails/texts as when Def Modi Wiczyk explains director Def Neill Blomkamp's inability to even write or direct "basics". In an email text to Amy Pascal, Wiczyk wrote:

<div align="center">2014-10-27 13:52:57  Re: To discuss<br>From: mwiczyk@mrcstudios.com, To: pascal, amy</div>

**MODI WICZYK:**

"yes thats what i meanthe right version of this could be iconic and do 300 and have a huge sequel<u>what</u> <u>bugs</u> <u>me</u> <u>is</u> <u>how</u> <u>obvious</u> <u>and</u> <u>unpolished the problems areall the hard stuff is great but all the basics are killing us</u>"

157.    A week later, Def Modi Wiczyk emailed Amy Pascal to discuss BlomKamp's insecurities, and how they were impacting production.

<div align="center">2014-11-03 04:31:07  <u>Re:</u>  From:<br>mwiczyk@mrcstudios.com  To: pascal, amy</div>

**MODI WICZYK:**

"dunno re simon. <u>maybe</u> <u>insecure,</u> <u>maybe</u> <u>thinks</u> <u>simon</u> <u>is</u> <u>on</u> <u>"studio"</u> <u>side,</u> <u>which</u> <u>is</u> <u>juvenile.</u> <u>hes</u> <u>always</u> <u>mad</u> <u>at</u> <u>somebody.</u> vacillates btwn targets. i ignore it until it stops forward progress.
re edgar i actually initiallygot nervous the music was too old to be cool,but all my assistants say lots of these songs are in the collective consciousness, played in bars and clubs. shows what i know....i dug the reel he did. and i loved the app w script and music."

158.   There are many more such emails that further reveal how inept and difficult Def Blomkamp is. But from these select emails, we see that to revise Blomkamp's *Chappie*, Kinberg took extraordinary measures, and that Blomkamp's inept, "insecure" and "juvenile" conduct made Kinberg "crazy", forcing the executives to takeover the edit. Yet, Kinberg implied these problems were mild compared to what he endured with Blomkamp revising *Elysium*, where the problems were so extreme that Blomkamp **"shut down"** and **"didn't have the answers"**. Clearly, the script work Kinberg did on Elysium was **exhaustive**, and not a mere "polish" as Def MRC II LP stated under oath. <u>This was a clear act of perjury</u>.

### SONY EMAILS CONFIRM DEFS RULE 37 VIOLATION IN BRIGGS V BLOMKAMP, SHOWING DEFS OMITTED TESTIMONY & EVIDENCE

159.   On page 28 of the Plaintiff's First Amended Complaint in Briggs v Blomkamp, et al, the Plaintiff made a bold prediction: that sometime after May of 2013 (when Blomkamp

<div align="center">COMPLAINT<br>35</div>

learned the details of Plaintiff's impending copyright lawsuit) Defendant Neill Blomkamp went back into the editing room and tried to edit-out key headache scenes, which were identical to the Plaintiff's work. The Plaintiff explained that Blomkamp did this to try to cover-up his theft of the Plaintiff's intellectual property.

160.   Supporting this prediction, during the discovery phase of Briggs v Blomkamp, the Plaintiff found a report on TheProvince.com (titled: "Elysium's ready as director Blomkamp looks forward to next project" from February 2013) in which Def Blomkamp stated the film was finished back in February 2013. (Said article from "The Province" is attached as **"Exhibit BB"** and is incorporated by reference as if fully set out herein.) Then, proving the Plaintiff's prediction, in sworn responses to Plaintiff's interrogatories, during discovery in Briggs v Blomkamp, Def Blomkamp admitted film editing was finished "Sometime in or about June 2013." (Said Defendant Blomkamp's Interrogatory Responses from Briggs v Blomkamp are attached as **"Exhibit CC"** and are incorporated by reference, as if fully set out herein.)

161.   The Plaintiff then filed a motion to compel documents, asking for all texts and emails between Def Blomkamp and both *Elysium* film editors: Julian Clarke and Lee Smith (Smith was the final editor—the editor who would have made these headache changes). The Plaintiff made this motion to prove that Def Blomkamp resumed film editing after February 2013, to try to remove or alter the "headache" scenes. However, **the Defendants would not provide a response from Lee Smith**, only from Clarke (Clarke stated that editing ended well before June 2013—contradicting Blomkamp, who said editing ended June 2013). But Lee Smith returned to the editing room to fix the headache scenes in May and June 2013.

162.   As well as doing the final edit of Elysium, the 2014 Sony email leak show that Lee Smith also did the final edits for Blomkamp's next film, *Chappie* (although Smith isn't credited on IMDB or Wikipedia).

163.   Lee Smith's final edit of Chappie is revealed in the Sony email leaks as Def Modi Wiczyk writes to Amy Pascal:

<div align="center">

2014-08-12 00:13:30  saw it.   From:
mwiczyk@mrcstudios.com   To:

</div>

<div align="center">

COMPLAINT

36

</div>

amy_pascal@spe.sony.com

**MODI WICZYK:**

"we are going to get there and have a big success with this one. **lee smith** will be huge, **nb** is in GREAT frame of mind."

164.  Def Wiczyk knew Smith would be "huge" because of how Smith helped salvage Elysium. A few months later Def Wiczyk told Amy Pascal about all the work Lee Smith had left to do on the film, and the continued problems between Blomkamp and Kinberg.

2014-11-03 02:03:10 <u>Re:</u> From: mwiczyk@mrcstudios.com
To; pascal, amy

**MODI WICZYK:**

"Hi!
in terms of neill, totally ur call but...
i feel like <u>this</u> <u>coming</u> <u>week</u> <u>is</u> <u>critical</u> <u>bc</u> <u>neill</u> <u>has</u> <u>to</u> <u>really</u> <u>really</u> <u>let</u> <u>lee</u> <u>in</u> <u>to</u> **polish,** <u>refine,</u> etc. alot of little indulgences are gonna have to go. so--- i was trying to be positive but also let him know theres real real work yet to do. and in a short period of time.... i talked to lee for a while today who says neills been very open so thats good...but hes been a dick to simon for whatever reason. so a long way of saying i want to keep the pressure on him. because i agree it can be special. make sense?"

165.  The Plaintiff filed his Motion to Compel (seeking a statement from Lee Smith) three (3) weeks before the deadline for dispositive motions (liability), July 9th, 2013. But the district court set the motion hearing for more than a week AFTER the deadline for dispositive motions (Aug 7th, 2013).   Thus, the Plaintiff had to file his Motion For Summary Judgment (**MFSJ**), without being able to inform the court of the Defendants' **violation of Rule 37** (failure to cooperate to compel a discovery response); a violation that, in this case, resulted in the omission of evidence of a cover-up (that cover-up being: Neill Blomkamp returned to the editing room with Lee Smith, in June 2013, to ask Smith to try to erase edit and remove the headaches from Elysium). Thus, during the teleconference hearing with Magistrate Judge Laurel Beeler, the Plaintiff explained that the matter was unresolved but was effectively "moot" because both parties' MFSJs had been filed, and the Plaintiff had less than a week to file his Reply Brief (Magistrate Beeler thus ruled the issue moot). (Note: the Defs also refused ALL of the Plaintiff's discovery requests for texts or emails regarding ANY Elysium matters; expanding the Defendants' **Rule 37 violations**).

**MRC & SONY PICTURES NEGLECTED TO DO BASIC**

**DUE DILIGENCE, BUYING THE RIGHTS TO ELYSIUM**

**WITHOUT EVEN READING A SCREENPLAY**

166.   In 2008, Def Neill Blomkamp filmed *District 9* without a screenplay.  District 9's star, Sharlto Copley, has given many interviews discussing the fact that he improvised every line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article with Sharlto Copley is attached as "**Exhibit DD**" and is incorporated by reference as if fully set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO Michael Lynton and Def Bill Block (of QED Int.), Emanuel was able to get QED and Sony Pictures' subsidiary *TriStar* to produce and distribute District 9, without a screenplay —using only Def Blomkamp's notes, which they referred to as a "script". Countless writers in online forums, have tried to find a copy of a District 9 script. All have failed.

167.   Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures bought the film and distribution rights to Elysium from Def Blomkamp, without ever reading a screenplay. Sony Pictures bought the rights to Elysium in a hasty meeting in 2008. In this well documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures agreed to buy the rights, immediately, never bothering to read the script. HollywoodReporter.com reported the details of the stunningly hasty meeting between Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011. MRC scheduled meetings with several other distributors that same day, but Sony Pictures was so rushed and eager to buy the film that MRC canceled all other distribution meetings scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that secured this deal, but never mentions a "screenplay" or a "script".  (Said Hollywood Reporter article about Blomkamp, MRC closing the deal with Sony Pictures is attached as "**Exhibit EE**" and is incorporated by reference as if fully set out herein.)  This same meeting and concept art were also recounted in the book "Elysium: The Art of the Film" —a book primarily made up of underlined interviews with Def Blomkamp, himself. On August 6th, 2013, Deep Focus Review (deepfocusreview.com) reviewed the book "Elysium: The Art of

the Film", reflecting on this meeting. (Said Deep Focus Review article is attached as **"Exhibit FF"** and and is incorporated by reference as if fully set out herein.) Upon interviewing Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and MRC staged 50-60 concept art paintings "and set them against the screenplay", explaining:

> "On the strength of these images—not to mention the strength of his first film, *District 9*—he garnered himself a $100 million budget and signed stars Matt Damon and Jodie Foster."

168. The Defendants used the amazing artwork to strategically distract attention from the flawed screenplay. Sony Pictures took the bait. Within an hour or so, a deal for about $115 million was made, and no executive from Sony Pictures ever read a script. MRC didn't do due diligence because Defendant Ari Emanuel was a co-owner of MRC and Def Blomkamp's personal agent; thus, they stood to make millions from the deal. Sony Pictures failed to do due diligence because CEO Michael Lynton had an improper, secret business partnership with Def Emanuel (Screenbid.com), and wanted to maintain good relations with Defs Emanuel and MRC—and make millions without regard for whose work they pirated.

169. Def Blomkamp's script was so poorly executed and riddled with evidence of misappropriation of the Plaintiff's work, that Defs Blomkamp, MRC and Sony Pictures took extreme measures to protect the script during film production. The website Games Radar (gamesradar.com) interviewed one of Elysium's stars, film icon **Jodie Foster**, who revealed the producer's paranoia as she explained she wasn't allowed to possess a script. (Said Games Radar interview with Jodie Foster is attached as **"Exhibit GG"** and is incorporated by reference as if fully set out herein.) Foster said:

> **"They won't even give me a screenplay. I've read it, but they won't give me one to physically keep in my home 'cause they're so worried about everybody."**

170. How Sony Pictures and MRC committed $115 million to a movie without reading a screenplay, but invested millions to keep the screenplay secret defies reason. This was done to keep the Plaintiff from learning details of the film's plot before it was released, to prevent the Plaintiff from getting an injunction to stop production.

171.    Had Sony Pictures behaved ethically, AND done their due diligence, they would have read Blomkamp's screenplay, then they would have seen Def Blomkamp's unfocused ideas, vast story weakness, and his poor literary skills. These shortcomings, juxtaposing concepts that were beyond such limited literary skills, should have raised red flags that Blomkamp's story may have been misappropriate, thus killing the deal. Hence, the Plaintiff would have filed no claims, including all claims herein.

172.    When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal. Wiczyk wrote:

> 2014-10-27 13:36:12  Fwd: CHAPPIE NOTES
> From: mwiczyk@mrcstudios.com To: pascal, amy
> **MODI WICZYK:**
> "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then</u>. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

173.    A company has a responsibility to do basic due diligence, to make sure their products are what they allege: original works. Having a CEO who is secret business partners with the CEO of a talent agency subcontractor, undermines due diligence. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" to hide evidence of misappropriation is not doing due diligence. Rather, these are the methods of corrupt, mob-like conspirators.

174.    Further, during discovery in Briggs v Blomkamp et al, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants failed to produced any such documentation.

**Defendant Blomkamp Gets Caught Lying To The World About**

**His "Aliens" Script (Which Also Did Not Exist) , in 2017:**

175.   Just as Def Blomkamp (with Def Wiczyk's help) sold Elysium to Sony and MRC without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" film without a script—but this time he did it openly, online, for the world to see. Unfortunately, in the process he ensnared several other Hollywood notables in his' strange world of lies.

176.   On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his Twitter account, expressing hope of one day shooting the film. Soon dozens of Blomkamp fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, including in an article on Nerdist.com. (Said article from Nerdist.com is attached as "**Exhibit HH**" and is incorporated by reference as if fully set out herein.)

177.   By July **2016**, websites like ScreenRant.com were reporting Def Blomkamp had recruited actress Sigourney Weaver and director James Cameron to tell the world how great Blomkamp's script was. (Said ScreenRant article is attached as "**Exhibit II**" and is incorporated by reference as if fully set out herein.)  In ScreenRant Sigourney Weaver said:

> **"There is an incredible script by Neill. I didn't want to do a fifth one. I thought going to earth wouldn't be fun. I got this script that was amazing and gives fans everything they're looking for..."**

178.   And James Cameron also praised the script in the ScreenRant article:

> **Director James Cameron (*Avatar*) then went on to throw in his two cents, saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"**

179.   "Gangbusters."

180.   Then, in April 2017, ScreenCrush.com reported that director Ridley Scott, owner of the Aliens franchise, had announced there would be no *Aliens 5* movie.  Mr. Scott explained Defendant Blomkamp **never even had a script**. (Said Screen Crush article is attached as "**Exhibit JJ**" and incorporated by reference as if fully set out herein.)  Ridley Scott stated:

> **"I don't think it will ever see the light of day. There was never a script. Just an idea that evolved from a dozen or so pages."**

181.   This all caused the article writer to wonder who was lying: "We seem to find

COMPLAINT

41

1    ourselves in a bit of a '*he said, she and he said*' situation here," Monagle wrote.

2       182.   Remember, in 2000 Def Wiczyk helped sell his brother's script to Summit without

3    so much as a script name, and Sony Pictures was right there, negotiating for the rights to

4    that unwritten, nameless script—eager to please any good friend of Ari Emanuel's.

5    By 2016, with *Aliens 5*, the Defendants had grown so brazen that they let Def Blomkamp go

6    out and lie to the world for himself, believing they could throw a script together after the

7    contract was signed. Rubbing their hands in anticipation of all that money, none of them

8    expected Ridley Scott to do due diligence and insist on seeing a script, ruining their scheme.

9

10      **IN BRIGGS V BLOMKAMP THE DEFS  HIRED A CONMAN, JEFF ROVIN**

11      **(WHO COMMITTED FRAUD UPON THE COURT & WENT ON FOX NEWS**

12      **TO ADMIT HE WAS A"FIXER" FOR BILL CLINTON) AS THEIR "EXPERT"**

13      183.   Not only does this case reveal how effortlessly seemingly everyone in Hollywood

14   lies, it reveals that when they get caught lying and stealing other people's work, they call on

15   world-class liars.

16      184.   In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of

17   thousands of California intellectual property attorneys as an expert witness, the Defs hired

18   Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the

19   same Jeff Rovin who confessed (two years <u>after</u> Briggs v Blomkamp went to MFSJ) to the

20   *National ENQUIRER (*October 19th, 2016), and confessed on **Fox News'** live telecast of

21   *The Sean Hannity Show* (Oct 24, 2016), that he was a professional "fixer" who

21   orchestrated false "smear" reports on people who disparaged President Bill and Hillary

22   Clinton—while Bill Clinton was President. Rovin claimed he then published these smear

23   articles in tabloid newspapers. Rovin's interview with Hannity can be seen at

24   https://www.youtube.com/watch?v=L3mzoKuFN5o. The story carried in countless other

25   publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit**

26   **KK**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER

27   article is attached as as "**Exhibit LL**" and is incorporated by reference as if fully set out

28   herein.)

185. **Rovin made these self-incriminating admissions on camera, in his own words.** Rovin admitted that he also bribed the victims of his smears to stay quiet. Shockingly, Rovin says the bribes were so effective that they <u>rarely</u> <u>needed</u> <u>to</u> <u>resort</u> <u>to</u> **<u>other</u> <u>measures</u>**. In Rovin's words, "**Most of the time** it was just money, it never had to be any threats." Witlessly, Rovin admitted threats, violence—or worse—might ensue if the money wasn't accepted.

186. Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

187. Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort."

188. Rovin went on to explain he had worked as a "fixer" many times in the past.

189. In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.

190. In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff moved the the court to exclude Rovin's "expert" report, as Rovin had falsified dozens of citations and fabricated evidence to substantiate his own claims, including a lengthy "quote" in which he fraudulently omitted 42 words—that wholly countered what Rovin reported. (Said Motion to Exclude is attached as "**Exhibit MM**" and is incorporated by reference as if fully set out herein.) Oddly, the court took no interest in the fraud contained in Rovin's report—which became the base of the district court's summary judgment opinion—and denied the motion.

191. How the Defendants knew such a devious man's "expert" report would go unchallenged is a mystery. How the Defendants knew such a sinister man existed—at all—is stunning. Rovin explained that he worked for President Clinton when Bill Clinton was in office (1991-2001). When asked how he came to be involved with the Clintons, Rovin explained that the Clintons became aware of Rovin because, in Rovin's words, he was **"fixing something for an actor who was in their** (the Clinton's) **inner circle."** Rovin does not identify who this cabinet member is, but during the time Rovin was involved with the Clintons (1991-1998), **Rahm Emanuel** worked as the senior adviser to President Clinton (1993-1998). Rahm Emanuel is Defendant Ari Emanuel's brother.

| 1 | **Defendants May Use Campaign Donation To Avoid Prosecution** |
|---|---|
| 2 | 192. July 17, 2017, Observer.com reported that when Senator **Kamala Harris** was |
| 3 | California's Attorney General she ignored corporate lawbreakers who made max donations |
| 4 | to her campaign. (Said Observer article is attached as "**Exhibit NN**" and is incorporated by |
| 5 | reference, as if fully set out herein). CampaignMoney.com reported **Def Emanuel** made max |
| 6 | donations to Harris's campaign. (Said Campaign Money report is attached as "**Exhibit OO**" |
| 7 | and is incorporated by reference as if fully set out herein.) The L.A. Times also reported Def |
| 8 | Emanuel hosted a fundraiser for California's Lieutenant Governor Gavin Newsom. (Said LA |
| 9 | Times article is attached as "**Exhibit PP**" and incorporated by reference, as if fully set out |
| 10 | herein.) Emanuel likely made said donations to keep Harris, Newsom, and the Dept of Bus |
| 11 | Oversight from investigating his improper ties with Universal, MRC, Screenbid, Sony, etc. |
| 12 | **9TH CIRCUIT FILM RULING IRREGULARITIES & CONFLICTS** |
| 13 | 193. The district court's Briggs v Blomkamp summary ruling applied reversed law, |
| 14 | rather than the prevailing law (cited by the Plaintiff). Such irregularities seem common in |
| 15 | film industry cases in the 9th. In 2014, the L.A. Times asked Chief Justice **Alex Kozinski** |
| 16 | about this and the 9th's relationship with the film industry. (Said article is attached as |
| 17 | "**Exhibit QQ**" and incorporated by reference as if fully set out herein.) Kozinsky explained: |
| 18 19 20 21 | "He holds movie nights at the 9th Circuit courthouses in Pasadena, San Francisco and occasionally Seattle, where judges and lawyers pitch in for pizza and beer, **watch films and hear from scriptwriters and other industry insiders about the movies. Director** George Lucas **used to provide the court with films before they came out on DVDs**…" |
| 21 | 194. Many readers were stunned to learn that The Studios had such access to the very |
| 22 | judges trying their cases. The article quotes attorney Steven T. Lowe, who, implying bias in |
| 23 | the Ninth, said, "The studios and networks always win." In 2010, *The Los Angeles Lawyer* |
| 24 | published Lowe's article "Death of Copyright". (Said article is attached as "**Exhibit RR**" |
| 25 | and is incorporated by reference as if fully set out herein.) In the article Lowe explains: |
| 26 27 28 | "Of the **48** copyright infringement cases against studios or networks that resulted in a final judgment within the Second and **Ninth Circuits** (and the district courts within those circuits) **in the last two decades, the studios and networks prevailed in all of them** and nearly always on motions for summary judgment." |

| | |
|---|---|
| 1 | **SUMMARY** |
| 2 | **Review Of Facts  Regarding Defendants' Actions,** |
| 3 | **Resulting In Injury To  Plaintiff:** |
| 4 | 195.   The Defendants are accountable for taking the following actions, which resulted in |
| 5 | injury to the Plaintiff: |
| 6 | **(1)** |
| 7 | 196.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 8 | Defendants, create a social network website, called Trigger Street, or TriggerStreet ("TS" |
| 9 | herein), located at triggerstreet.com from 2002 until 2011, and at labs.triggerstreet.com |
| 10 | from 2011 until 2014. |
| 11 | **(2)** |
| 12 | 197.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 13 | Defendants, published and rendered the TS "Terms of Use" contract page, which stated: |
| 14 | Unless otherwise specified, the materials on the Site and in the Services |
| 15 | are presented **solely for** the purpose of promoting the entertainment, information, and community resources and services available in, and other |
| 16 | uses in, **the United States of America.** We control and operate the Site and the Services from within the United States. We make no representation |
| 17 | that materials on the Site or the Services are appropriate or available for |
| 18 | use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose |
| 19 | to access the Site from other locations do so on their own initiative and are |
| 20 | responsible for compliance with local laws. |
| 21 | 198.   The previous statement from the TS "Terms of Use" page was deliberately false |
| 21 | and/or misleading, and intended to inform members (or suggest, imply or insinuate) that |
| 22 | TS was intended for use by and for, users in the USA. This was false, and WAS FRAUD, |
| 23 | A MISREPRESENTATION, A FALSE STATEMENT, AND A DECEIT. These false |
| 24 | statements were made to falsely assure informed, savvy writers that the website was safe |
| 25 | from foreign "bad actors', as there are many nations that do not, or cannot enforce the |
| 26 | Universal Copyright Convention, and often American copyright holders never learn that |
| 27 | their works were misappropriated by foreign infringers, because the stolen works are only |
| 28 | displayed in the infringers' nation. (TS also may have stated it was intended for US use to |

avoid paying taxes on the international earnings from its Budweiser endorsement deal.)

199.   In truth, unbeknownst to American users, from the outset TS was intended for international use.

200.   The Defendants' action were also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to make any materially false, fictitious, or fraudulent statement or representation.

**(3)**

201.   Defendant Kevin Spacey made numerous trips abroad, to London, Spain, etc., to give speeches and interviews, and throw parties, intent to recruit new TS members. While in Spain, in 2009, Spacey stated,  "I started the website about six years ago, and we now have close to 400,000 members around the world."

202.   This was **BREACH OF CONTRACT**, as most (perhaps all) members in the USA believed the website was solely for use in the USA.

**(4)**

203.   TS and the Defendants provided content and programming from TS to Bud.TV from 2007 to 2009. Bud.TV also ran an international advertising campaign about this. This international ad campaign advertised TS all around the world, as well as Bud.TV. Both, advertising TS in Bud.TV promotions, AND advertising TS on Bud.TV itself, were **BREACHES OF CONTRACT** of TS's Terms of Use contract page.

**(5)**

204.   The Defendant(s) made the TS website with effectively no security features, as ALL members were allowed to ANONYMOUSLY read ALL screenplays. This, while TS claimed to be industry standard, encapsulating all of the desires and needs of its users, and touted its state of the art security. This was a violation of state and federal conspiracy, negligence, gross negligence, fraud, deceit, misrepresentations, and false statements laws.

**(6)**

205.   Unlike a truly "industry standard" site like WritersScriptNetwork.com, all TS members/users were encouraged and deceived into using and navigating the website with false identities (even for writing reviews). Intent to protect the identities of misappropriating

COMPLAINT

46

1 conspirators, the Privacy page was written and designed to scare user/members into using

2 false identities. The TS Privacy page stated:

> User Names and User Disclosure
> The user name you select or are provided with upon registration with the
> Site is deemed non-personally identifiable information. Your user name
> may be published on the Site and may be disclosed to others, including,
> without limitation, to the public, and to any third parties with whom we
> elect to share such information. In addition, **if you include <u>your name</u>
> or any other personally identifying information** in any material
> transmitted or posted on public areas of the Site or the Services
> (including, without limitation, message boards, **reviews** and chat rooms),
> **such information will become public information and will be
> published on the Site and will be disclosed to other users of the Site
> and to other third parties who may have access to or otherwise see a
> display of such information**.

13   206.   These statements were made to encourage users to take risks they ordinarily would

14 not take, and should not take, as part of the Defendants efforts to persuade users/members to

15 make their wares accessible to the Defendants. This was CONSPIRACY and DECEIT.

<center>(7)</center>

17   207.   The TS Privacy page suggested that the website had a method to reveal the true

18 identity of all "accessors", if necessary.

> Information Disclosure
> We reserve the right to disclose information submitted by or concerning
> any user as we feel is necessary to protect our systems or business.
> Specifically, but without limitation, we reserve the right to disclose such
> information when a visitor or member is in violation of our Terms of Use
> or any other agreement with us, or engages (or is suspected of engaging)
> in any harmful, infringing or illegal activity....

23   208.   However, there is no evidence to support that TS ever, truly, had any method of

24 retrieving any access records, or the accessor's true identity, etc. Nor is there any reason to

25 believe such a system ever existed on TS. Thus, the Defendants' action were in violation of

26 <u>18 U.S. Code § 1001</u> – <u>Statements or entries generally</u>, which makes it illegal to make any

27 materially false, fictitious, or fraudulent statement or representation.

**(8)**

209.   The Defendant(s) made extraordinary and fraudulent claims about website security; doing so to lure in the best undiscovered writers, and eliminate any doubts or suspicions users might otherwise reasonably have. Such false and exceptional claims as:

a.   The TS "About Us" page stated:

> "Our team has been extensively researching and designing TriggerStreet.com to ensure that it **encapsulates <u>every</u> aspect of the user's <u>desires</u> and <u>needs</u>**."

210.   THIS WAS FRAUD. All reasonable screenwriter members would expect (from a website assuring that the website "**encapsulates <u>every</u> aspect of the user's <u>desires</u> and <u>needs</u>**") that records be preserved of all access of writers' work, identifying which members accessed which works, AND recorded by the accessor's true name —AND NOT erase all access history if the member removes his/her work because he/she worries his work may be unsafe on the website. Members would reasonably expect and *desire* this (from a site claiming to be industry standard) because other websites were already doing this (InkTip.com, perhaps others). Further, all reasonable members would **desire** and **need** a website to use accurate language, and behave in accordance with the implicit language of the Website's Terms of Use". And if the "Terms of Use" stated, suggested, implied—or used language that implied—that the website was solely for use in the USA, members should expect that site operators would act in accordance with that agreement, and not advertise or recruit abroad. This false claim was made to lure writers to an unsafe website.

211.   This was deceit. The Defendants' action were also in violation of <u>18 U.S. Code §</u> <u>1001 – Statements or entries generally</u>, which makes it illegal to make any materially false, fictitious, or fraudulent statement or representation.

a.   On the TS Privacy page, the "Security" message stated:

> "Security
> When you <u>submit</u> <u>information</u> via the Site, your information is protected using secure data networks protected by **industry standard firewall and password protection systems**. Our security practices and policies are <u>periodically reviewed and updated</u> as necessary, and only authorized individuals have access to the information provided by our users."

212.   THIS WAS FRAUD. There was nothing "industry standard" about the TS screenwriter website. The standard was set by Writers Script Network.com (InkTip.com). InkTip kept all records of all access, even after members left. On Inktip.com, there was no feature erasing all access records upon script removal. By implying all information was protected and secure and industry standard, reasonable members would assume all members' access activity would be recorded, stored, and protected —not erased.

213.   The Defendants' action were also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to make any materially false, fictitious, or fraudulent statement or representation.

   b.   The Defendant(s) and TS used Def Spacey's stardom to lure in writers, then writers were **promised** "industry access and exposure"; using Spacey's fame and Academy Award winning laurels to leverage a false promise. TS's statement from its "About Us" page promised that:

      "Based on the principles of creative excellence, it (the TS website) provides **industry access and exposure** to help build the careers of notable new filmmakers and screenwriters."

214.   THIS FALSE PROMISE, bolstered by the other fraudulent statements on the "Terms of Use", "About Us", and "Privacy" pages, expanded a pattern of false statements, misrepresentations, fraud and deceit. The Plaintiff did NOT expect to be *discovered*. But he also did NOT expect to be cheated by these industry insiders.

**(9)**

215.   The Defendants added a new counter security feature, whereby if a member removed his/her screenplays from the TS website because he/she worried that it might be unsafe or the target of infringers or pirates, the moment the writer removed his script ALL access records would be erased. The Plaintiff believes the Defs added this feature in 2007 to access and steal the Plaintiff's work. But whether this extra hidden layer of counter-security was added when the website was made, in 2002, or if it was added in 2007, the Defendant(s) and TS did not inform members about this feature, and it was never mentioned on the TS website. The Defendants' failure to inform members of this counter-security

feature, and the risks it posed, was a deliberate omission of imperative information. The Defendants actions were in violation of California Civ. Code § 1572, fraud by omission, and constitute DECEIT in violation of Califonia Civ. Code § 1709, and these actions and inactions were in violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to conceal or cover up such facts.

**(10)**

216.    Corporations are expected to do due diligence in all substantial purchases, transactions and deals (such as investing $120 million in a film). Due diligence means doing **"a complete and appropriate review of documentation and facts by a potential buyer or its agents before purchasing an asset or engaging in business with a prospect"** (from the Law Offices of Stimmel, Stimmel & Smith); this definition goes on to require a "...complete review using lawyers and CPAs to assist so that when one is done, one knows all that one needs to know before engaging in business with or buying a company or other asset or piece of property." The Defendants did not do due diligence —not even reading the screenplay before buying its rights; thus, the Defendants engaged in **gross negligence.**

**(11)**

217.    The Defendants engaged in conflicts of interests that violated **CALIFORNIA LABOR CODE SECTION 1700.39**, which states, "No talent agency shall divide fees with an employer, an agent or other employee of an employer." Defendant Ari Emanuel was the central talent agent in making the film Elysium, representing Elysium's star Def Matt Damon, and its writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an owner of MRC (the employer of Def Neill Blomkamp for the making of Elysium, and the buyer of Elysium's film rights). Thus, Def Ari Emanuel divided fees as a talent agent and employer. The Plaintiff was injured by this violation of California law.

**(12)**

218.    The Defendants engaged in VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, ET SEQ., UNFAIR BUSINESS PRACTICES ACT. Sony Pictures' (a publicly traded company), and its CEO Michael Lynton, violated California Business & Professions Code  § 17200, ET SEQ., by engaging in improper and unethical

business relationship, whereby Michael Lynton, acting as an officer of Sony Pictures, hired a subcontract, Screenbid, to sell numerous items of substantial value for Sony Pictures. Thus, Def Lynton profited as Sony Pictures' CEO, and he and Def Ari Emanuel profited as the owners of Screenbid, the subcontracted auction service. This was a conflict of interest.

219.    This improper relationship caused CEO Michael Lynton to encourage his subordinates and peers NOT to scrutinize projects, clients or business entities associated with his secret business partner Def Ari Emanuel. Thus, Sony Pictures agreed to distribute Elysium without doing due diligence to read a screenplay to see to it that it was reasonably executed. Had Sony Pictures employed a reasonable standard of due diligence, Elysium would not have been made; thus, no injury would have come to the Plaintiff.

**(13)**

220.    The Defendants engaged in Obstruction Of Justice by closing and destroying the TS website 6 days after the Plaintiff filed his Notice of Appeal to the Ninth Circuit Court of Appeals. The Defendants did this to destroy incriminating evidence, because the district court based its MFSJ ruling on reversed law, cited by the Defendants, rather than the prevailing law, cited by Plaintiff. Thus, Briggs v Blomkamp, et al, is/was apt to be returned to the lower court, where the Plaintiff will/would subpoena all website access records, to confirm the Defendants used TS to access the Plaintiff's work, and confirm that TS misrepresented its security and ID protection features, and had no such records or oversight at all.

**(14)**

221.    By conspiring to hire an admitted "fixer", Jeff Rovin (who spent years of his life preparing false smear stories for tabloid news), to prepare and submit a falsified "expert" report to the court, the Defendants engaged in SUBORNATION OF PERJURY. This was also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to knowingly and willfully: (1) falsify, conceal, or cover up by any trick, scheme, or device a material fact; (2) make any materially false, fictitious, or fraudulent statement or representation; or (3) make or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

COMPLAINT

**(15)**

222.   By stating, in their answers to the Plaintiff's interrogatories, that Simon Kinberg only provided a "polish" to the Defendants script, "Elysium", when, in fact, he did exhaustive work to salvage the screenplay, the Defendant(s) committed **Perjury.** This was also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to conceal or cover up such facts.

**(16)**

223.   In Briggs v Blomkamp, the Plaintiff stated that the Elysium film editor(s) would confirm that the Film's editing resumed in June, 2013 (after wrapping up originally in February 2013), after the Defendants learned of the Plaintiff's immanent lawsuit. The Plaintiff stated the editor(s) would also confirm that this final film editing was done to try to remove the the hero's headaches. But the Defendants refused to provide Plaintiff any access to Elysium's final editor, Lee Clarke. In doing so the Defendants **VIOLATED RULE 37** —a violation that may have changed the outcome of the case**.** In doing so, the Defendants endeavored to **conceal and cover** up their misappropriation of the Plaintiff's work; a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1).

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
CONSPIRACY
Violating California Penal Code 182(a)(3),(4), and/or (5)
**(Against All Defendants)**

224.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 223, as if fully set out herein.

California Penal Code 182 (a)(3)(4)(5) makes it unlawful:

(a) If two or more persons conspire:
(3) Falsely to move or maintain any suit, action, or proceeding.
(4) To cheat and defraud any person of any property, by any means which
   are in themselves criminal, or to obtain money or property by false pretenses
   or by false promises with fraudulent intent not to perform those promises.
(5) To commit any act injurious to the public health, to public morals, or to
   pervert or obstruct justice, or the due administration of the laws.

COMPLAINT
52

| | |
|---|---|
| 1 | 225.    The Defendants engaged in three (3) conspiracies, in violation of California Penal |
| 2 | Code 182(a) (3)(4) and/or (5).  California Penal Code requires that one of the conspirators |
| 3 | commit an **overt act** in the process. The Defendants committed many overt actions: |
| 4 | **First Conspiracy** |
| 5 | 226.    To unlawfully enrich themselves, the Defendants conspired to create a social |
| 6 | network for screenwriters and filmmakers, with little or no security features. The |
| 7 | Defendants would then mislead screenwriters that the website was safe, then the Defendants |
| 8 | could access and misappropriate these screenwriter's work. |
| 9 | 227.  **Overt Act #1:** The Defendants conspired to create a social network website. |
| 10 | 228.    **Overt Act #2:** The Defendants conspired to design the website with effectively no |
| 11 | security features. |
| 12 | 229.    **Overt Act #3:**The Defendants conspired to commit fraud and mislead website |
| 13 | member/users that the website had reasonable security features, when it had none. |
| 14 | 230.    **Overt Act #4:** The Defendants conspired to add a counter security feature that |
| 15 | erased all access information if members removed their screenplays. |
| 16 | 231.    **Overt Act #5:**The Defendants apparently conspired to add this feature (described |
| 17 | in the previous paragraph) in 2007, to erase evidence of their access of the Plaintiff's script. |
| 18 | 232.    **Overt Act #6:** The Defendants conspired to make the film Elysium (which may |
| 19 | still be legally proven to be derived from the Plaintiff's work), careful not to leak any |
| 20 | information about the project. |
| 21 | 233.    **Overt Act #7:** The Defendants conspired to create website *Terms of Use* page that |
| 21 | stated the website was intended solely for use in America, but the Defendants repeatedly |
| 22 | sent Def Spacey around the globe to recruit members. The Defendants ALSO secretly |
| 23 | advertised TS on international websites (like Bud.TV) and in other international |
| 24 | publications. The Defendants knew what the Terms of Use rules stated, and they agreed |
| 25 | amongst themselves that it was important to violate said rules, to get international members. |
| 26 | 234.    **Overt Act #8:** While producing the film Elysium, the Defendants conspired to |
| 27 | keep the Elysium script an absolute secret, not even allowing Hollywood giants like Jody |
| 28 | Foster to take her script home. |

235. **Overt Act #9:** The Defendants (particularly Ari Emanuel, who profited the most from these acts and arrangements) also had Def Matt Damon and Ben Affleck start a screenwriter/filmmaker website, similar to TriggerStreet, called Project Greenlight. Affleck and Damon have been Def Emanuel's clients (through Endeavor and WME-IMG) for most of their careers. Both websites (TS and Project Greenlight) have been accused of being the place of access in major film and TV copyright infringement suits. Both "stolen" film or TV projects were eventually sold to companies with questionable relationships to Def Emanuel (MRC and Universal Pictures -or their parents or subsidiaries). Both websites (TS and Project Greenlight) used suspiciously similar language: "peer reviews," "peer-to-peer," etc.

<div align="center">

**Second Conspiracy**

</div>

236. Once the Plaintiff realized the Defendants misappropriated his work, he sued.

237. In response, the Defendants designed a second conspiracy, to prevent the Plaintiff from duly prevailing in his copyright lawsuit. This would require cheating the Plaintiff, and cheating the US and California civil justice systems.

238. **Overt Act #10:** Rather than hiring any one of of perhaps ten-thousand well qualified California intellectual property attorneys for their expert witness in Briggs v Blomkamp, et al, the Defendants opted to hire a New York conman named Jeff Rovin, who admitted on Fox News "The Sean Hannity Show" that he was a professional "fixer" who worked for President Bill Clinton's administration, and used his literary skill to create "smear" stories for junk tabloid newspapers to attack Clinton critics. Rovin said he came to work for Bill and Hillary Clinton because he was working for another "actor" in the Clinton White House. The Plaintiff is certain that other actor is Rahm Emanuel, who was Senior Advisor to the President (Clinton). Rahm Emanuel is Defendant Ari Emanuel's brother. Rahm likely referred Def Ari Emanuel to hire Jeff Rovin to "fix" the expert report. Def Ari Emanuel is a co-owner of MRC, Defs Blomkamp's agent, and business partner of Bill Block (CEO of QED Int.), all of whom were named in Briggs v Blomkamp, et al.

239. **Overt Act #11:** Defendants conspired to prevent the Plaintiff from speaking to editor Lee Smith in Briggs v Blomkamp.

240. **Overt Act #12:** The Defendants conspired to commit perjury, stating that Simon

1   Kinberg merely "polished" Def Blomkamp's script.

2   241.   **Overt Act #13:** The Defendants conspired to shut-down and destroy the TS social

3   network 6 days after the Plaintiff filed his Notice Of Appeal, also obstructing justice.

4   <div align="center">**Third Conspiracy**</div>

5   242.   To greatly increase and accelerate their rate of personal enrichment, the Defendants

6   conspired to break California business, labor and ethics codes. Breaking these business

7   labor and ethics codes caused a disintegration in the Defendants' business practices, causing

8   them to act recklessly, and negligently.

9   243.   **Overt Act #14:** The Defendants conspired to commit to invest over $100,000,000

10   to make the film Elysium, without reading a script.

11   244.   **Overt Act #15:** The Defendants conspired to create an arrangement where

12   Universal Pictures or its parent or its subsidiaries, will finance and/or distribute any project

13   Def Ari Emanuel brings Universal Pictures—even unlawfully acquired projects.

14   245.   **Overt Act #16:** The Defendants conspired to engage in inappropriate business

15   relationships, such as Def Emanuel and Sony Pictures CEO Michael Lynton co-owning

16   Screenbid, and Defendant Emanuel co-owning MRC (violating Cal Labor Code 1700.39).

17   246.   In the aforementioned actions, and others detailed in this Complaint, and perhaps

18   others to be revealed at trial, the Defendants willfully, maliciously, fraudulently, with

19   wrongful intent to harm the Plaintiff, with disregard for the Plaintiff's rights and welfare,

20   and with disregard for ethics and for the law, engaged in one or more conspiracies.

21   247.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

21   Defendants' actions, in an amount to be determined at trial.

22   <div align="center">**SECOND CLAIM FOR RELIEF**</div>

23   <div align="center">OBSTRUCTION OF JUSTICE & ANTICIPATORY OBSTRUCTION OF JUSTICE
**Violating 18 U.S. Code § 1519**</div>

24   <div align="center">Destruction, Alteration, Or Falsification Of Records In A Federal Investigation
**(Against All Defendants)**</div>

25

26   248.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

27   247, as if fully set out herein.

28   249.   18 U.S. Code § 1519 makes it unlawful to destroy evidence, etc., in anticipation or

| 1 | contemplation of a legal action; stating: |
|---|---|
| 2 | Whoever knowingly alters, destroys, mutilates, conceals, covers up, |
| 3 | falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper |
| 4 | administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation |
| 5 | to or **contemplation** of any such matter or case, shall be fined under this |
| 6 | title, imprisoned not more than 20 years, or both. |

250. The Defendants engaged in obstruction of justice (and/or anticipatory obstruction of justice), violating 18 U.S. Code § 1519, by endeavoring to close and destroy their social network TriggerStreet.com, as detailed throughout this Complaint. Although the Defendants knew the website was the central access point of an ongoing legal case, they closed the site 6 days after the Plaintiff filed his Notice Of Appeal; doing so while the site was still growing, without giving the website's perhaps 700,000 members an explanation.

251. In these actions, detailed in this Complaint, and perhaps others to be revealed at trial, the Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff, and with disregard for the law, acted to violate the law and obstruct justice.

252. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial, in addition to any other remedies deemed necessary and appropriate by the court.

### THIRD CLAIM FOR RELIEF
FRAUD AND FALSE STATEMENTS
**Violating 18 U.S. Code § 1001** (Statements or entries generally)
**(Against All Defendants)**

253. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 252, as if fully set out herein.

254. In their actions, detailed in this Complaint, the Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff and perhaps others, with disregard for the law, committed numerous acts of fraud, misrepresentations, deceit, fraudulent omissions, false statements, etc., in violation of 18 U.S. Code § 1001.

255. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
<u>BREACH OF CONTRACT</u>
Violating California Code, Civil Code § 3294
**(Against All Defendants)**

256.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 255, as if fully set out herein.

257.   In their actions detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully and with disregard for ethics and law, committed numerous acts of Breach Of Contract, in violation of California Civil Code § 3294.

258.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
<u>FRAUD</u>
Violating California Civ. Code § 1572
**(Against All Defendants)**

259.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 258, as if fully set out herein.

260.   In their actions detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully, maliciously, and with wrongful intent to harm the Plaintiff and perhaps others, and with disregard for the law, committed numerous acts of fraud, misrepresentation, deceit, fraudulent omissions, false statements, etc., in violation of California Civ. Code § 1572.

261.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
<u>DECEIT</u>
Violating California Civ. Code § 1709
**(Against All Defendants)**

262.   The Plaintiff Hereby realleges and incorporates by reference paragraphs 1 through 261, as if fully set out herein.

263.   In their actions detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully, maliciously, and with wrongful intent to harm the Plaintiff

COMPLAINT
57

1  (and perhaps others), and with disregard for the law, committed numerous acts of deceit, in

2  violation of California Civ. Code § 1709.

3  264.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

4  Defendants' actions, in an amount to be determined at trial.

5  **SEVENTH CLAIM FOR RELIEF**

6  <u>NEGLIGENCE</u>
   Violating 19 U.S. Code § 1592 (Penalties for fraud, gross negligence, and negligence)

7  **(Against All Defendants)**

8  265.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

9  264, as if fully set out herein.

10  266.   In their actions, detailed in this Complaint, and perhaps other actions to be revealed

11  at trial, the Defendants, with wrongful intent to harm the Plaintiff (and perhaps others), with

12  disregard for ethics and the law, acted with negligence, in violation of 19 U.S. Code § 1592.

13  267.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

14  Defendants' actions, in an amount to be determined at trial.

15  **EIGHTH CLAIM FOR RELIEF**

16  <u>GROSS NEGLIGENCE</u>
   **Violating 19 U.S. Code § 1592** (Penalties for fraud, gross negligence, and negligence)

17  **(Against All Defendants)**

18  268.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

19  267, as if fully set out herein.

20  269.    In their actions, detailed in this Complaint, and perhaps other actions to be

21  revealed at trial, the Defendants willfully, maliciously, with wrongful intent to harm the

21  Plaintiff (and perhaps others), with disregard for the Plaintiff, ethics, and the law, acted

22  with gross negligence, in violation of 19 U.S. Code § 1592.

23  270.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

24  Defendants' actions, in an amount to be determined at trial.

25  **NINTH CLAIM FOR RELIEF**

26  <u>VIOLATING CALIFORNIA LABOR CODE § 1700.39</u>
   **(Against All Defendants)**

27

28  271.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

1   270, as if fully set out herein.

2     272.   In their actions, detailed in this Complaint, and perhaps other actions to be

3   revealed at trial, the Defendants willfully, with wrongful intent, and disregard for others,

4   ethics and the law, violated California Labor Code 1700.39.

5     273.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of

6   the Defendants' actions, in an amount to be determined at trial.

7                   **TENTH CLAIM FOR RELIEF**
VIOLATION OF UNFAIR BUSINESS PRACTICES ACT

8                 [CAL BUS & PROF CODE§ 17200, ET SEQ.]

9                   **(Against All Defendants)**

10     274.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

11   273, as if fully set out herein.

12     275.   In their actions, detailed in this Complaint, and perhaps others to be revealed at

13   trial, the Defendants willfully, with wrongful intent, motivated to unlawfully enrich

14   themselves, with negligent disregard for the Plaintiff, others, ethics and the law, violated

15   the Unfair Business Practices Act [Cal Bus & Prof Code§ 17200, Et Seq., namely: officers

16   of separate but cooperating businesses, willfully entered a conflict of interest, by going into

17   a secret, private business partnership as co-owners of Screenbid, which the Defendants

18   used as a subcontractor for their separate businesses. These conflicts of interests eroded the

19   Defendants business standards and practices; creating the circumstances whereby the

20   Defendants were able to misappropriate the Plaintiff's intellectual property.

21     276.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

21   Defendants' actions, in an amount to be determined at trial.

22                   **ELEVENTH CLAIM FOR RELIEF**
PERJURY

23          **Violating 18 U.S. Code § 1621 (**Perjury generally**)**

24                 **(Against All Defendants)**

25     277.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

26   276, as if fully set out herein.

27     278.   In their actions, detailed in this Complaint, and perhaps other actions to be

28   revealed at trial, the Defendants willfully, maliciously, with disregard for the law,

1    committed perjury, in violation of 18 U.S. Code § 1621.

2    279. The Plaintiff was injured as a direct, foreseeable and proximate consequence of

3    the Defendants' actions, in an amount to be determined at trial.

**TWELFTH CLAIM FOR RELIEF**
<u>TAMPERING WITH EVIDENCE</u>
**Violating 18 U.S. Code § 1512(c)(1) (Tampering with a witness, victim, or informant)**
**(Against All Defendants)**

7    280. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

8    279, as if fully set out herein.

9    281. In their actions, detailed in this Complaint, and perhaps other actions to be

10   revealed at trial, the Defendants willfully, maliciously, and with disregard for the law,

11   engaged in tampering with evidence, in violation of 18 U.S. Code § 1512(c)(1).

12   282. The Plaintiff was injured as a direct, foreseeable and proximate consequence of

13   the Defendants' actions, in an amount to be determined at trial.

**THIRTEENTH CLAIM FOR RELIEF**
<u>WITNESS TAMPERING</u>
**Violating 18 U.S. Code § 1512(c)(2) (Tampering with a witness, victim, or informant)**
**(Against All Defendants)**

17   283. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

18   282, as if fully set out herein.

19   284. In their actions, detailed in this Complaint, and perhaps other actions to be

20   revealed at trial, the Defendants willfully, and with disregard for the law, justice, and the

21   Plaintiff's rights, engaged in tampering with evidence, in violation of 18 U.S. Code §

21   1512(c)(1).

22   285. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

23   Defendants' actions, in an amount to be determined at trial.

**FOURTEENTH CLAIM FOR RELIEF**
<u>SUBORNATION OF PERJURY</u>
**Violating 18 U.S. Code § 1622**
**(Against All Defendants Except The California Dept. Of Business Oversight)**

27   286. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1

28   through 285, as if fully set out herein.

COMPLAINT
60

287. In their actions, detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully and maliciously violated the Plaintiff's rights and the law, to engage in subornation of perjury, in violation of 18 U.S. Code § 1622.

288. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

## **PRAYER FOR RELIEF:**

WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

1. For general damages in an amount according to proof at the time of trial;

2. For exemplary damages;

3. For special damages in an amount according to proof at trial;

4. For restitution and disgorgement of all profits (estimated at $850,000,000—which represents the total projected profits that the Defendants will realize from the misappropriation of the Plaintiff's work, see page 18, para 2) in favor of the Plaintiff, consistent with US copyright remedies (plus any exemplary damages for deceiving the district court);

5. For Plaintiff's cost of this lawsuit and reasonable attorney's fees;

6. For such injunctions and additional relief the Court may deem proper..

DATED: November 13th, 2017

Respectfully Submitted

By: _____

Steve Wilson Briggs, Plaintiff

COMPLAINT

61

# EXHIBIT 5

| | |
|---|---|
| 1 | Steve Wilson Briggs |
| 2 | 681 Edna Way, |
| 3 | San Mateo, CA 94402 |
| 4 | 510 200 3763 |
| 5 | snc.steve@gmail.com |
| 6 | PLAINTIFF In Propria Persona |
| 7 | |
| 8 | **UNITED STATES DISTRICT COURT** |
| 9 | **NORTHERN DISTRICT OF CALIFORNIA** |

| | | |
|---|---|---|
| 10 | | |
| 11 | STEVE WILSON BRIGGS | Civ No: CV 17 6552 |
| 12 | Plaintiff, | **FIRST AMENDED COMPLAINT** |
| 13 | vs | **FOR:** |
| 14 | UNIVERSAL CITY STUDIOS LLC; | 1. CIVIL CONSPIRACY |
| 15 | NBCUNIVERSAL MEDIA, LLC; | 2. SPOLIATION OF EVIDENCE |
| | SONY PICTURES ENT INC.; | 3. BREACH OF CONTRACT |
| 16 | KEVIN SPACEY; | 4. FRAUD / INTENTIONAL |
| 17 | ARI (ARIEL) EMANUEL; | MISREPRESENTATIONS |
| | MATT DAMON; | 5. DECEIT |
| 18 | BEN AFFLECK; | 6. CONCEALMENT |
| 19 | NEILL BLOMKAMP; | 7. NEGLIGENCE |
| | MORDECAI (MODI) WICZYK; | 8. GROSS NEGLIGENCE |
| 20 | ASIF SATCHU; | 9. VIOLATION OF CALIFORNIA |
| 21 | BILL BLOCK; | LABOR CODE § 1700.39 |
| | DANA BRUNETTI; | 10. VIOLATION OF UNFAIR |
| 21 | MRC II DISTRIBUTION COMPANY LP | BUSINESS PRACTICES ACT [CAL |
| 22 | (AKA MRC, Media Rights Capital, and | BUS & PROF CODE |
| | all other MRC entities and subsidiaries) | § 17200, ET SEQ.] |
| 23 | | 11. WITNESS TAMPERING |
| 24 | Defendants. | 12. INFRINGING EXPORTATION |
| | | (17 USC § 602, under 17 USC § 501) |
| 25 | | 13. COPYRIGHT INFRINGEMENT |
| 26 | | (17 U.S.C § 501) |
| 27 | | **DEMAND FOR JURY TRIAL** |
| 28 | | |

COMPLAINT

1

| | |
|---|---|
| 1 | **NATURE OF ACTION:** |
| 2 |    **1.**    Pursuant to 28 U.S. Code § 1331 (as this matter involves violations of US federal |
| 3 | law) and 28 U.S. Code § 1367(a) (as this matter is substantially related to the prior action, |
| 4 | Briggs v Blomkamp, currently in appeals), Plaintiff brings this action against the Defendants |
| 5 | (**Defs**) for their violations of federal and state law.  In pursuit of personal enrichment and/or |
| 6 | to gain unlawful competitive advantage, the Defendants engaged in such violations as: |
| 7 |   1.  Spoliation: 6 days after Plaintiff filed Notice of Appeal (in Briggs v Blomkamp, |
| 8 |       C134679), the Defs closed their social network *TriggerStreet.com* **(TS)** to destroy |
| 9 |       evidence and records, as this was their *access* point in Briggs v Blomkamp; Plaintiff |
| 10 |       would subpoena these records if the 9th Circuit remands the matter for trial. |
| 11 |   2.  Defs Spacey and Brunetti (likely acting at Def Emanuel's behest) created the social |
| 12 |       network, TS, to secretly and unlawfully access, appropriate and alter the original |
| 13 |       works of undiscovered writers. The Defs financially profited from these activities, |
| 14 |       or received film acting roles, or film production or distribution benefits. |
| 15 |   3.  **Breach:** TS's *Terms Of Use* stated the site was **solely for use in the USA,** yet |
| 16 |       secretly the site operated around the world. Further, secretly and without consent |
| 17 |       from US members, Spacey and Brunetti went to London (2002) and Spain (2009) to |
| 18 |       recruit new members, touting TS's **"400,000 members <u>around the world</u>."** |
| 19 |   4.  By making Plaintiff's work available in foreign markets, without Plaintiff's consent, |
| 20 |       the Defs committed Infringing Exportation, infringing on the Plaintiff's copyright. |
| 21 |   5.  Without informing TS members, the Defendants installed an anti-security feature on |
| 21 |       TS, which erased all access records if a member deleted their work. |
| 22 |   6.  In *Briggs v Blomkamp*, the Defs hired 'fixer" **Jeff Rovin** (a high school-educated |
| 23 |       fantasy writer) as their sole "expert" witness. Rovin provided a falsified report to the |
| 24 |       court. Two years after Briggs v Blomkamp went to appeals, on Oct. 24, 2016, Rovin |
| 25 |       went on national TV, Fox News' *The Sean Hannity Show*, to admit he was a |
| 26 |       professional "fixer" (someone who makes problems go away by producing false |
| 27 |       stories and documents) for President Bill Clinton's administration. Clearly, the Defs |
| 28 |       hired Rovin to "fix" his expert report, and violate the judicial process. In June 2014, |

the Plaintiff moved to exclude Rovin's report due to its gross fraud: Motion denied.

7.  Evidence will show Def Ari Emanuel, a talent agent, is also Hollywood's most powerful film producer—against California labor & business codes § 1700.39, which makes it unlawful for a talent agent to act as both agent and as an employer.

8.  Defs boasted TS had "industry standard" security, when, in fact, they removed all security features to allow themselves constant anonymous access to writer's works.

9.  Defs made wild false promises to entice new writers to TS, such as: "Our team has been extensively researching and designing TriggerStreet.com **to ensure that it encapsulates every aspect of the user's desires and needs**".

10. The Defs used Def Emanuel's influence with Universal Pictures to entice, persuade or bribe the enlistment of other conspirators and as leverage against business rivals.

11. The Defs unlawful relationships (e.g. Defs Emanuel's and Block's co-ownership of Screenbid.com with Sony Picture's CEO M. Lynton; Emanuel's co-ownership of MRC with Defs Satchu and Wiczyk) created a culture where the Defs neglected to do due diligence. Thus, **before they ever read a script**, Sony Pictures and MRC bought the rights to the film *Elysium* (which was misappropriated from the Plaintiff).

## JURISDICTION:

2.  **Jurisdiction:** This court has subject matter jurisdiction per 28 USC **§** 1331, as this action involves violation of federal law; per 28 U.S. Code § 1367(a), as this matter is substantially related to Plaintiff's prior federal action, Briggs v Blomkamp; and perhaps partially under 28 USC **§** 1332(a)(2), as one or more Defendant is/are foreign citizens.

3.  **Venue:** venue is proper pursuant to 28 § 1391(b)(2) as events giving rise to this complaint occurred in this district, and 28 § 1391(d), by virtue of the Defendants' business transaction with this dist., and under 326 US 310 the Defs meet the minimum contact rule.

4.  **Intradistrict Assignment:** San Francisco is the proper intradistrict assignment as a substantial part of the events and omissions, leading to this lawsuit, occurred in this district.

## THE PARTIES:

5.  **Plaintiff,** Steve Wilson Briggs, is a filmmaker, screenwriter, author, musician and a makerspace tinkerer/teacher at Cesar Chavez & Green Oaks Academy.

6. **Defendant** Universal Pictures is an American film studio; NBCUniversal subsidiary.

7. **Defendant** Sony Pictures is a subsidiary of the Japanese multinational Sony Corp.

8. **Def** NBCUniversal is a multinational media conglomerate & Comcast subsidiary.

9. **Defendant** Kevin Spacey is an American actor, and one of the men purportedly responsible for creating the now defunct social network TriggerStreet (TS).

10. **Defendant** Ariel (Ari) Emanuel is a talent agent and co-CEO of WME-IMG.

11. **Defendant** Matt Damon is an American actor and screenwriter.

12. **Defendant** Ben Affleck is an American actor and screenwriter.

13. **Defendant** Neill Blomkamp is a South African-born film director. He is, on information and belief, a Canadian or South African citizen.

14. **Defendant** Mordecai Wiczyk is the co-CEO of Media Rights Capital (MRC);

15. **Def** Asif Satchu is the co-CEO of MRC, and is believed to be a citizen of Canada.

16. **Def** Bill Block is CEO of Miramax (a subsidiary of Qatari's beIN Media & Al Jazeera).

17. **Defendant** Dana Brunetti is credited with the conception of TriggerStreet.

18. **Defendant** MRC is a diversified global media company, with many subsidiaries and/or aliases, including: Media Rights Capital, MRC II LP; MRC II Distribution Company LP; ; MRC II Holdings, L.P.; AsgarI Inc.; Oaktree Entertainment, Inc., and more.

NOTE:

19. Some of the issues in this Complaint concern false statements made during discovery and a falsified witness report submitted in Briggs v Blomkamp, C134679 PJH. Some of the issues concern certain the Defendants destroying property/evidence related to Briggs v Blomkamp, as that matter moved into appeals—actions which were unknown to the Plaintiff until February 2016. Some of the issues involve the Defendants creating a business culture that encouraged deceit and neglect, creating the conditions under which the Plaintiff's property was violated. Some of the issues involve the Defendants writing and entering into falsified contracts and/or breaching these contracts, which bound the Defendants and Plaintiff until the contract terminated when TriggerStreet.com (or labs.triggerstreet.com) went out of business, November 6th, 2016.

| 1 | **STATEMENT OF FACTS & ALLEGATIONS:** |
|---|---|
| 2 | **Brief Case Overview** |

3    20.  The Defendants conspired to create and operate (for 12 years) a social network for

4  screenwriters and filmmakers, known as **TriggerStreet** (referred to as **TS** in this

5  Complaint). TriggerStreet (**TS**) was located at www.triggerstreet.com from 11/2002 to

6  07/2011, and at www.labs.triggerstreet.com from 07/2011 to 11/2014. The Defendants used

7  TS to fraudulently access and acquire original film ideas. By using TS's 400,000+ members

8  to review, judge, and rank the best work, the Defendants were able to peruse the very best

9  scripts at their leisure, alter them slightly, then produce and market them, as their own.

10    21.  To entice the best undiscovered writers into joining TS and submitting their

11  screenplays, the Defs published and rendered a contract comprised of false claims,

12  deception and concealments. TS's "Terms of Use", "About Us" and "Security" pages

13  claimed to employ "industry standard" security, and boasted that TS "encapsulates every

14  aspect of the user's desires and needs", when, in fact, TS's security features were effectively

15  non-existent. (Said TS websites pages "Terms of Use", "About Us" and "Privacy" are

16  attached, respectively, as **Exhibit A**, **Exhibit B**, **Exhibit C**, and are incorporated by

17  reference as if fully set out herein.)  The Defs conspired to remove all security features on

18  the website. Any member could download any script, without the writer knowing the

19  downloader's ID. Only if an accessor chose to write a script review would the writer be

20  informed of the accessor's ID —but only the accessor's pseudonym (fake name) ID, while

21  others users who downloaded the script without leaving a review, left no trace at all.

21    22.  More astounding, in 2007, the Defs added a new **anti**-security feature, **without**

22  **informing members,** whereby if a member—concerned about security—deleted his script

23  from TS, the deletion would trigger the erasure of all access records. This was done to

24  conceal the Defs accessing the Plaintiff's work (only posted in 2007). In May 2016, in an

25  Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95) a

26  former TS member recalled that this **"memory dump"** feature was added in 2007. (Said

27  forum is attached as "**Exhibit D**" and incorporated by reference as if fully set out herein;

28  see last entry, page 4.) In 2014, as Briggs v Blomkamp proceeded through discovery, the

1   Plaintiff contacted TS to ask for their records of all the members who accessed his work.

2   (Said email is attached as "**Exhibit E**" and incorporated by reference as if fully set out

3   herein). TS replied that when his work was removed, all access records were erased. (Said

4   email is attached as "**Exhibit F**" and is incorporated by reference as if fully set out herein.)

5       23.  TS falsely assured members that the site was intended <u>solely for use in the USA</u>.

6   But Spacey and Brunetti secretly marketed TS all around the world.

7       24.  Through secret and private business co-ownerships with key CEOs, in businesses

8   like Screenbid and MRC, Def Emanuel cultivated unethical relationships with Universal

9   Pictures, Sony Pictures, MRC, QED, etc. Thus, these companies would finance and

10  distribute almost any project Emanuel asked, ignoring due diligence and best practices.

11      25.  The Defendants' final illegal action occurred on Nov 6th, 2014, 6 days after

12  Plaintiff filed his Notice Of Appeal (Briggs v Blomkamp), when the Defs surreptitiously

13  closed TS, to destroy incriminating evidence —understanding the district court based its

14  MFSJ ruling on vacated law, rather than prevailing law (cited by Plaintiff). Thus, the case

15  was apt to be remanded for trial, where the Plaintiff would subpoena all site access records.

16                                      NOTE:

17  26.  This Complaint reveals Def Ari Emanuel lead a conspiracy to misappropriate ideas

18  using TS and ProjectGreenlight.com (**Project Greenlight**), to market these ideas to his

19  business partners at Sony Pictures, MRC, Universal Pictures, NBCUniversal, etc.  Relevant

20  to this, Def Emanuel or WME has represented Defs Ben Affleck and Matt Damon for most

21  of their careers. Curiously, like Spacey, Affleck and Damon ran a screenwriter/filmmaker

21  website, *Project Greenlight,* from 2000-05 and 2015-16**.** Curiously, both sites used peculiar

22  language like *peer-to-peer,* and used *peer reviews* to weed out bad scripts. And curiously,

23  Spacey, Damon and Affleck were the only celebrities with screenwriter websites from

24  2000-2014.   In 2005, writer Joel Lamontagne sued Project Greenlight and **Harvey**

25  **Weinstein's *Miramax*,** alleging the TV series *Project Runway* (2005-present) was stolen

26  from a treatment he submitted to Project Greenlight. The allegedly stolen work became the

27  property of Universal Pictures' parent, **NBCUniversal**. Def Emanuel's shadowy projects

28  eventually becoming the property of Universal is a recurring pattern in this Complaint.

| | |
|---|---|
| 1 | **BACKGROUND FACTS:** |
| 2 | **(Understanding This Case Requires Knowledge Of Key Background Facts & Actors;** |
| 3 | **A Review Of Facts Directly Pertaining To The Defs Violations Begins On Page 18)** |
| 4 | THE SIX (6) PRIMARY DEFENDANT ACTORS: |
| 5 | **ARI EMANUEL** (DEFENDANT) |
| 6 | 27.   Defendant Ari Emanuel is the co-CEO of William Morris Endeavor (WME, aka |
| 7 | WME-IMG). Prior Emanuel was CEO of Endeavor Talent Agency (1995-2009), where his |
| 8 | aggressive, unethical business practices inspired the character *Ari Gold*, in the HBO TV |
| 9 | series *Entourage*. In 2002, Def Emanuel's *Endeavor* was sued for sexual harassment by |
| 10 | Sandra Epstein. Epstein also accused Def Emanuel of making racist remarks. In 2014 WME |
| 11 | was found guilty at arbitration of racial discrimination. Logically, WME-IMG attracts |
| 12 | clients who share Def Emanuel's values; thus, WME-IMG disproportionately represents |
| 13 | aging white clients and *difficult* clients that other agencies avoid (Charlie Sheen, Russell |
| 14 | Crowe), and clients who are politically conservative, or politically unaware or inactive. |
| 15 | 28.    November 20th, 2016, Def Emanuel traveled to New Jersey to congratulate |
| 16 | President-elect Trump. Emanuel is also President Trump's former talent agent. Predictably, |
| 17 | *The Apprentice* (starring Trump) was broadcast on **NBCUniversal**. Recently, *The Hill* (and |
| 18 | others) reported that it was Def Emanuel who helped seal the Miss Universe tape archives, |
| 19 | so no further tapes of candidate Trump sexually harassing beauty contestants would be |
| 20 | released. (Said "The Hill" article is attached as **"Exhibit G"** and is incorporated by |
| 21 | reference as if fully set out herein.) |
| 21 | **ASIF SATCHU (Defendant)** |
| 22 | 29.   Defendant Asif Satchu was born in Kenya but moved to **Canada** when he was 6 |
| 23 | years old. Satchu, like Def Blomkamp, is believed to be a Canadian citizen. (Canadian |
| 24 | connections are a recurring feature in this matter.) Def Satchu is a co-founder of MRC, with |
| 25 | Wiczyk. Def Satchu is the brother of **Reza Satchu**, an enormously successful Canadian |
| 26 | businessman. Def Satchu and Reza, both graduated from Canada's **McGill** University. Def |
| 27 | Satchu is something of a business and business-technology genius.  **In 1999 Satchu** |
| 28 | **co-founded SupplierMarket.com** with Jon Burgstone (Reza Satchu was also a heavily |

1  invested partner). SupplierMarket.com facilitated the **international sales and distribution**
2  of software, bolts, nuts, fasteners, rubber and glass products, corrugated packaging, and
3  probably anything else. **Only 18 months later, Aug. 2000, Satchu and his partners sold**
4  **SupplierMarket for $950,000,000.** Def Satchu graduated from Harvard (MBA) in 1999.

5      **MORDECAI (MODI) WICZYK (Defendant)**

6  30. Defendant Modi Wiczyk is an American born businessman, co-CEO and co-founder
7  of MRC (with Defendant Satchu). Wiczyk is the **visionary** of this conspiracy.

8    31. Around 1995, fresh out of college, Defendant Wiczyk began working at Summit
9  Entertainment, LLC. That was the first year Summit began producing and financing films
10  (prior, Summit had exclusively sold US films abroad); surely the vision of Def Wiczyk.

11    32. Only four years later, in 1999, when Wiczyk was only 27, Summit Entertainment
12  made Wiczyk their Senior Vice President of Production and Acquisitions. That same year,
13  1999, Wiczyk sent out his now famous <u>**memo**</u>, **which would make him one of the most**
14  **influential and sought after men in Hollywood**. Within a year, in 2000, likely on the order
15  of Def Ari Emanuel, Def Wiczyk was **hired by <u>Universal Pictures</u>** as Vice President of
16  Productions, where Wiczyk served for 2 years, until January 2002, when Def Ari Emanuel
17  made Wiczyk a partner at Emanuel's Endeavor Talent Agency. Def Wiczyk graduated from
18  Harvard (MBA) in 1999.

19      **KEVIN SPACEY** (Defendant).

20    33. Defendant Kevin Spacey is an Academy Award winning actor. His career was
21  floundering and at its nadir in 2000 when the conspiracy(s) detailed herein began, and when,
21  purportedly, he and Def Brunetti conceived of TS. Def Spacey, who dropped out of Juilliard
22  School in his sophomore year, has no known web-design skills. Seemingly, Spacey's only
23  value to the TS social network was as a high-profile, semi-likeable celebrity whose promise
24  of "industry access and exposure" would lure the best undiscovered writers to the website,
25  to unwittingly surrendering their wares to the Defendants.

26      **DANE BRUNETTI** (Defendant)

27    34. Defendant Brunetti has no known college education. He joined the US coast guard in
28  1992, at 18 or 19. Brunetti met Spacey around 1998, while Brunetti was selling cell phones

1 in New York. Brunetti soon became Spacey's partner and personal assistant. It is purported
2 around the internet (including on Wikipedia) that Brunetti was responsible for designing
3 TriggerStreet.com. That is possible. However, there is no evidence that Brunetti possessed
4 any of the skills required to design a social network. The Plaintiff suspects Def Asif Satchu
5 (who founded the internet-based marketplace SupplierMarket.com) may be the website's
6 true designer and talent coordinator.

7 **MRC**

8 35. MRC is a television and film studio, founded by its co-CEOs Defs Asif Satchu and
9 Modi Wiczyk. MRC was started in 2003 with money provided by Def Ari Emanuel
10 (although MRC often reports it was started in 2006 or 2007). Def Emanuel is a silent
11 partner in MRC. Unlike most ethical companies MRC operates under many names. Likely,
12 only Defs Emanuel, Satchu and Wiczyk know what these companies do. But such LLC
13 companies are a hallmark of money laundering networks (see Dept of Treasury's FinCEN
14 report). The Plaintiff is aware of 11 MRC companies: **MRC, Media Rights Capital; MRC**
15 **II LP; MRC II Distribution Company LP (foreign based); MRC II Holdings, LP;**
16 **Oaktree Entertainment, Inc. (a foreign stock business); MRC I Hedge Co, LLC; MRC**
17 **II Capital Company, LP; MRC Sub Gp, LLC; MRC I Project Company, LLC; Asgari**
18 **Inc.** Plaintiff believes that most of these *companies* are "shell" companies (fronts for illegal
19 activity), existing to launder money and other transactions. Working in conjunction with
20 Def Bill Block (**Miramax** CEO) and *Al Jazeera or beIN Media Group* (Miramax's parent),
21 and perhaps with Satchu's Kenyan-based family, these shells may also be responsible for:

21    a. producing and selling ideas taken from TS to foreign markets (not for US release);
22    b. financing foreign films that utilize ideas taken from TS (not for US release).

23

24 **Def Ari Emanuel's Relationship With Defendant Spacey:**

25 36. Defendant Ari Emanuel likely first met Defendant Kevin Spacey between 1987 and
26 1989, when both men were at Creative Artist Agency (CAA). In 1987 Def Ari Emanuel was
27 a new CAA talent agent, working in **TV** casting. In 1987 Def Kevin Spacey, represented by
28 CAA, was working in Los Angeles and appeared in 9 episodes of the **TV** series "Wiseguy".

**Def Emanuel's Notorious Connection to Def Wiczyk & Satchu:**

37. Defendant Ari Emanuel is a quiet partner in MRC. Thus, by casting WME-IMG actors in MRC films, Def Emanuel profits both as an agent and as a studio owner. This arrangement is a conflict of interest, in violation of CA Labor Code 1700.39.

38. In 2007, The New York Times published an article called *"Tilting The Balance of Power Toward Talent Agency Clients"* (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients" is attached as "**Exhibit H**" and is incorporated by reference as if fully set out herein.) The article states:

> ….representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist." According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

39. Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

> ...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.
>
> "For us, financing opportunities are always exciting and interesting," said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"
>
> Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that **no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.**

| | |
|---|---|
| 1 | **BACKGROUND FACTS** (CONTINUED) |
| 2 | THE 4 MAJOR EVENTS THAT SET UP THE CONSPIRACY(S) |
| 3 | **40.** The seeds of the Defendants unlawful actions were planted about two decades ago, |
| 4 | by **4 events:** two of these events occurring in 1995, two occurring in 1999. |
| 5 | 1. **In 1995** Def Ari Emanuel started Endeavor Talent Agency. |
| 6 | 2. **In 1995** Edgar Bronfman Jr. (CEO of Seagram's) bought Universal Pictures. |
| 7 | 3. **In 1999**, Jerrol LeBaron copyrighted a revolutionary screenwriter-to- |
| 8 | Hollywood-film-industry-professional website **Writers' Script Network.com**, |
| 9 | which went online in March 2000, changing its name to "**InkTip**" (inktip.com) in |
| 10 | 2003. |
| 11 | 4. **In 1999** Defendant Modi Wiczyk wrote a revolutionary **memo**, titled "Another New |
| 12 | Ball Game", which sent Hollywood's powerhouses scrambling. Wiczyk's memo |
| 13 | would be discussed in magazines and lounges for years to come. |
| 14 | |
| 15 | **41.** These 4 events, **each** require a brief explanation to understand how they set the stage |
| 16 | for the Defendants' conspiracy(s). |
| 17 | **(1) Def Ari Emanuel Comes To Power As CEO Of Endeavor Talent Agency, 1995** |
| 18 | **42.** In 1995 Def Ari Emanuel started Endeavor Talent Agency. Soon, his aggressive, |
| 19 | unethical practices would make Endeavor the fastest growing talent agency in Hollywood. |
| 20 | **(2) Edgar Bronfman Jr. Comes To Power At Universal Pictures, 1995** |
| 21 | **43.** In 1995, Canadian based "Seagram's" (the giant beverage company) bought |
| 21 | controlling interest (80%) of Universal Pictures, and Edgar Bronfman Jr. (Seagram's heir; |
| 22 | **Canadian**, graduate of **McGill** College) became owner and CEO of Universal Pictures. |
| 23 | Bronfman remained CEO of Universal Pictures even after Vivendi bought Universal in |
| 24 | 2000. He stepped down as chief of Universal in 2001, BUT remained Vice-Chairman of the |
| 25 | Board (likely to insure that Def Emanuel's relationship to Universal remained in place) until |
| 26 | December 2003; by then Def Emanuel's role with Universal Pictures was well established. |
| 27 | **44.** To pay for Universal Pictures, Bronfman Jr. sold Seagram's stake in Dupont (for |
| 28 | $9-billion). Most analysts and Seagram's investors considered this a terrible business move. |

To make matters worse, Bronfman knew little about the film business. **NOTE:** Bronfman was convicted of insider trading, in France, in 2011, receiving a 15 months suspended sentence, and a €5,000,000 fine.

45. In 1995, Bromfman and Def Ari Emanuel represented big changes in Hollywood, but <u>the biggest change in Hollywood in 1995 was the advent of the **DVD**</u>. DVDs represented huge new opportunities for producers and film companies —opportunities that would make movies FAR more profitable than ever before; but more profitable for producers, NOT talent agents—adding fuel to Emanuel's drive to become a producer and a studio owner.

**(3) <u>The Advent Of Writers' Script Network.com (InkTip.com), 1999</u>**

46. In 1999, Jerrol LeBaron copyrighted his brilliant website **Writers' Script Network.com**, (writersscriptnetwork.com), going online March 2000; changing its name to **InkTip** and its location to inktip.com in 2003. Unlike all other screenwriter websites at that time (which either just posted screenwriter agents' addresses, or just allowed screenwriters to post loglines or synopses, with no ability to bring the writers to the agents and filmmakers), LeBarons website promised something new. Based in Los Angeles County, LeBaron went out and told Hollywood agents and filmmakers about his website, and invited them to join and peruse the works of thousands of undiscovered screenwriters. The site had great safeguards, designed to protect both the writers and industry professionals. Writers' Script Network.com required all users to use their real names. Writers could not read other writers' work, as that would only reduced the writers' safety. However, after registering, the **industry professionals** could freely read any logline (a short description, 60 words or less) on the website. If a professional wanted to read more, they could click on a link to read a synopsis—and immediately the screenwriter would receive notification of who had accessed his work, when, and from where. If the professional wanted to read the entire script, he/she would then need to contact the writer and request a script. Writers' Script Network.com kept all records of access. **LeBarons's site was the new online industry <u>standard</u>** (where there had been no standard, rules, safety, or security for screenwriters ); flawless in conception, safety and transparency.

| 1 | **(4) The Memo, 1999** |

47.   In 1999, only 27 years old, Def Mordecai (Modi) Wiczyk, the new Senior Vice President of Production and Acquisitions at Summit Entertainment, LLC, sent out a **memo** titled "Another New Ball Game". That memo sent Hollywood's unethical establishment scrambling after massive new profits. Wiczyk's memo would be discussed in magazines and lounges for years. Within a year, in 2000 (likely at Def Ari Emanuel's bidding) **Universal Pictures** would steal Wiczyk away from Summit, making him VP of Productions. Two years later, Def Ari Emanuel made Wiczyk his **partner** at Endeavor Talent Agency.

48.   In 2007, *Slate* remembered "the memo" in an article called "How An Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate" article is attached as "**Exhibit I**" and is incorporated by reference as if fully set out herein.). Writer Kim Masters wrote:

> ...The memo predicted the decline of the studios, with filmmaking talent as the beneficiary. He also predicted that a management company with a lot of big stars would start to produce and own films. "The most immediate and pressing challenge would be to get the studios to carry the product," he said. The likelihood of a studio boycott was remote, he said, because "whichever studio was suffering at the time would probably break ranks in the name of short-term self-preservation." Hmm.
>
> Michael Ovitz eventually tried to launch such a management company and failed. But Wiczyk's memo said the agencies could also carry out the change. **"A similar structure could be created which complies with the conflict-of-interest laws,"** Wiczyk wrote. "If [a] fund was created as a stand-alone entity and the agency had an arms-length service contract, they could avoid conflict-of-interest violations… Admittedly this is a delicate issue and a tough deal to pull off, but it's certain someone would **try it**." Why? The potential for enhancing agency commission was "too rich to ignore." **In fact, he said, an agency could double its annual revenues.**

49.   Wiczyk's psychopathy is on full display in those final lines of the article, as he enthusiastically implies it is reasonable to behave without ethics —if the profits are "too rich to ignore." But Wiczyk's prediction that "...it's certain someone would try it" would soon prove correct.

50.  But who would want to wander with Wyczyk into such ethically questionable water?

| | |
|---|---|
| 1 | **THE ENDEAVOR/UNIVERSAL/MRC DEFENDANTS:** |
| 2 | <u>ARI EMANUEL AND  HIS SECRET RELATIONSHIP WITH UNIVERSAL</u> |
| 3 | <u>PICTURES; EMANUEL UNITES WITH ASIF SATCHU AND MODI WICZYK</u> |
| 4 | 51.   In 1999, Def Ari Emanuel knew producers made the REAL money in Hollywood. |
| 5 | But, as a talent agent, he couldn't get in the action—not legally (or not with his name on the |
| 6 | product), due to California's conflict of interest laws. |
| 7 | 52.   But Def Emanuel saw an opportunity. |
| 8 | 53.   Defendant Ari Emanuel had a **distribution problem**. His talent agency (Endeavor) |
| 9 | represented many directors, writers and actors, who sometimes decided to make |
| 10 | independent and experimental films, only to discover, later, that their films couldn't get |
| 11 | national or global distribution because the distributors thought the films weren't marketable. |
| 12 | Thus, many of these films died early deaths. |
| 13 | 54.   Bronfman Jr., on the other hand, had a **talent problem**. Bronfman Jr. knew the |
| 14 | importance of getting marquee names on films. Big American studios crank out about 17 |
| 15 | films a year. In this haste, sometimes the studios commit to bad screenplays that no big |
| 16 | actors will commit to, thereby dooming the films. But just one or two big names attached to |
| 17 | these *inferior* films could increase their returns by tens of millions of dollars. |
| 18 | 55.   Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it. Bronfman Jr. |
| 19 | came to power in 1995 with Universal in 4th place among the big six studios (20 Century |
| 20 | Fox, Disney, Paramount, Warner Bros., Sony Pictures, Universal Pictures). But only one |
| 21 | year later, in 1996, Universal was in last place. And last again in 1997. And in 1998, even |
| 21 | worse: last place, and Universal had one of its worst years ever, with only a 5.9% market |
| 22 | share. Stockholders were restless. (See **Exhibit J**.) |
| 23 | 56.   In this tough time, Def Ari Emanuel approached Bronfman with a proposal. |
| 24 | 57.   Def Emanuel offered to put special effort into Universal Picture films, and ask his |
| 25 | actors, writers and directors to give preference to Universal Pictures films. Emanuel also |
| 26 | likely offered to take a reduced agent's fee. **In exchange** Def Ari Emanuel likely received a |
| 27 | percentage of the films, and/or a generous share of Seagram's (Universal's parent) stock, but |
| 28 | no film credit), and an agreement that Universal Pictures would distribute, and/or provide |

<div align="center">COMPLAINT</div>
<div align="center">14</div>

1   production money for, any reasonably viable film Def Emanuel brought to Universal
2   Pictures.

3       58.   The agreement was made late 1998.

4       59.   The next year, 1999, Universal pictures would have its best year since Bronfman
5   arrived, climbing to 3rd place, with a 12.7% market share. That was 1999 —the same year
6   Def Modi Wiczyk wrote his memo.

7       60.   Def Ari Emanuel read the memo.

8       61.   Bronfman Jr. surely read the memo. In fact, two years after Wiczyk wrote the memo,
9   in 2001, Bronfman's **Universal Pictures** made Def Wiczyk their vice President of
10  Productions. (An article about Universal hiring Wiczyk is attached as "**Exhibit K**" and is
11  incorporated by reference as if fully set out herein.)

12      62.   And a year after that, in 2002, Def Emanuel would hire Def Wiczyk away from
13  Bronfman Jr., to make Wiczyk a **partner** at Endeavor Talent Agency.

14  ●   63.   But Wiczyk had been Vice President of **productions** at Summit Entertainment,
15  AND Vice President of **productions** at  Universal Pictures. Wiczyk was a  **producer**. Why
16  would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel
17  was secretly going into the production business with MRC and Universal Pictures.

18      64.   When Def Ari Emanuel stole Wiczyk away from Universal Pictures there were no
19  hard feelings between Def Emanuel, Bronfman and Universal Pictures, and nothing changed
20  in their arrangement. Def Ari Emanuel continued to provide the same talent and producorial
21  services for both MRC and Universal Pictures. And although Bronfman left Universal a
21  year later (2003), Def Emanuel continues to do favors for Bronfman and his Universal
22  "family" to this very day (e.g. Def Emanuel and WME-IMG represent Bronfman Jr's
23  daughter, Hannah).

24                  **Wiczyk's Memo Inspires A Conspiracy**

25      65.   The driving force behind Defs Emanuel's, Wiczyk's and Satchu's involvement in
26  this conspiracy was to create the film production system outlined in Wiczyk's **memo**, to
27  increase—maybe even **double—**profits. The conspiracy required only 3 or 4 players, with
28  the right talents. Def Emanuel had connections to all the studios, and access to huge stars;

Asif Satchu was a creative business force who specialized in distribution and networking; Modi Wiczyk was a proven business, financing, and film production prodigy. They had almost everything they needed—except good screenplays. But as a new "questionable" company, established writers were not inclined to work with this unscrupulous band.

66. A film production starts with acquiring a screenplay, a "property". The Defendants knew that. They also knew good screenplays are hard to find, cost good money and are a risky investment. A bad director could ruin a great script, and even the best writers sometimes wrote bad scripts. In 2000 Def Wiczyk helped sell his brother's (Roee Wiczyk) screenplay to his former employer (Summit Ent.). But the script was weak, thus never developed, and Roee Wiczyk never sold another script. "Variety" reported on this script sale in 2000. (Said article is attached as "**Exhibit L**" and is incorporated by reference as if fully set out herein.) As a business man, Wiczyk could sell anything —he sold his brother's script idea without even having a script name. But now, operating as film producers and a *studio*, without an **actual** *good* script, or some good ideas, they couldn't get any project started.

67. The Defendants needed scripts, but they wanted to reduce their risks.

68. Defs Emanuel, Satchu and Wiczyk knew ideas are not copyrightable; only unique arrangements of ideas are copyrightable. If the Defendants had a method to access good writers' work, they could extract the best of those ideas, then pay their own writers to turn them into "new" screenplays, then produce and market those derivatives as their own.

69. The L.A. based Defendants were aware of Writers Script Network.com. As "industry insiders" they had likely even received a call or email from Jerrol LeBaron. They wanted something like Writers Script Network.com—but **without** the good security features.


### THE TRIGGERSTREET DEFENDANTS
SPACEY'S CAREER SPUTTERS; SPACEY MEETS BRUNETTI;
THE CONCEPTION OF THE TRIGGERSTREET SOCIAL NETWORK

70. In 1994 Def Spacey learned Warner Bros intended to make a movie about the life of Bobby Darin (eventually called "Beyond The Sea"). This was Spacey's secret dream role. He offered to play the leading role, but the producers refused, believing Spacey was too old.

71.  In 1995, Def Spacey's career soared with *Usual Suspects* and *Seven*. But in 1996 and 1997 Def Spacey was back to NOT getting solid leading-man roles.

72.  This likely inspired Def Spacey to form his production company, "Trigger Street Productions", to make quality films with himself cast as the lead.  But for the next 7 years his production company floundered. The problem was getting a good screenplay.

73.  It is reported that around 1998 Def Spacey met Def Dana Brunetti, who soon became Spacey's personal assistant.

74.  Although in 1999 Def Spacey won an **Academy Award** for Best Actor (American Beauty), 1999 would mark the beginning of a very difficult period of Def Spacey's career (1999-2003). His production company would go 3 years without making a film (Jan 2000 to Jan 2003). And worse, for some reason Hollywood would not invest much money in any movie with **Kevin Spacey** in a leading role, **his films budgets were far below the Hollywood average** (the average Hollywood budget in 2000 was about $60 million): 1. American Beauty, 1999, **$15 million**; 2. The Big Kahuna, 1999, **$7 million**; 3. Ordinary Decent Criminal, 2000, **$12 million**; 4. Pay It Forward, 2000, **$40 million**.

75.  Def Spacey's difficulty consistently getting good roles, then, was likely due to his terrible reputation around Hollywood as something of a hustler. In 1999, actor Val Kilmer explained in a "Mr Showbiz" interview that in the 1970s Kevin Spacey, who was then a young college student, tricked Kilmer's father out of $18,000 for college tuition —but Spacey, according to Kilmer, kept the money, dropped out of school, and never repaid Kilmer's father. (Said "Mr. Showbiz" article is attached as "**Exhibit M**" and is incorporated by reference as if fully set out herein.)  Stories like Kilmer's, and a tabloid photo journal of Def Spacey participating in a public indiscretion, contributed to Def Spacey's trouble.

76.  But amid all of these struggles, somehow in 2000, Spacey was able to secure the film rights to his dream project -**Bobby Darin's life story**. But since Def Spacey had no production funding, he would have to wait almost 4 more years to make his movie.

77.  It's possible that during these tough times, Spacey and Brunetti looked around online for affordable scripts for Spacey's production company to film. And maybe then they stumbled upon *Writers Script Network.com*, which inspired them to create TS… Then, this

1   unlikely pair—a college dropout actor whose career was on life support, and a cellphone
2   salesman—teamed up to create a massive social network for screenwriters and filmmakers.
3   And soon Ari Emanuel learned about the site and asked Spacey to make some
4   modifications: relaxing security, and making access private and untraceable. That could be
5   how TS was created. It makes little difference to the conspiracy that followed.

6       78.   However, the Plaintiff believes TS was formed in a conspiracy conceived by Def
7   Ari Emanuel, to enrich himself and his conspirators. Elysium, alone, earned $286,000,000
8   worldwide theatrically, and should have earn another $570,000,000 in home entertainment
9   and TV, (typically, movies earn twice their theatrical total in home ent., TV, and auxiliary
10   sales), for a total of **$856,000,000** —almost a billion dollars. **This is why setting up TS and**
11   **Project Greenlight were so important to Def Ari Emanuel. One good script can easily**
12   **earn a billion dollars, and one big TV show can earn far more than that.**

13

14                 **THE DEFENDANTS' CONSPIRACY BEGINS:**

15

16       79.   In 2000, shortly after Def Emanuel discovered Writers Script Network.com, Def
17   Emanuel planned his own screenwriter/filmmaker website, with minimal or no security
18   features. He would use his clients, Def Matt Damon and Ben Affleck, as the website's
19   spokesmen and its alleged *conceivers*. In August 2000 Project Greenlight was born. (An
20   Internet Archives screenshot of projectgreenlight.com—showing its origin time—is
21   attached as "**Exhibit N**" and is incorporated by reference as if fully set out herein.)

21       80.   Then misfortune struck Universal Pictures in 2000, and Def Ari Emanuel seized the
22   occasion to launch a **second** website, allegedly conceived by Defs Spacey and Brunetti.

23       81.   In 2000, Universal Pictures was in a bind. They were just a few months away from
24   beginning to film "K-PAX" but they didn't have a leading actor (after Will Smith and others
25   dropped out). Smith, and other actors and directors (with integrity) were perhaps dropping
26   out due to rumours that Argentinian film director and screenwriter, Eliseo Subiela, learned
27   about writer Gene Brewer's 1995 book "K-PAX" and planned to sue Brewer and Universal
28   Pictures for copyright infringement of Subiela's 1986 film "Man Facing Southeast".

82.   But Universal Pictures, not worried about a small director from Argentina suing, decided to push forward, film, release, make a fortune, and fight Subiela in court later.

83.   By mid 2000, with little time to find a leading man, Universal Pictures was desperate enough to consider casting Def Kevin Spacey in the leading role.

84.   Def Ari Emanuel could have just asked Spacey to take the leading role. Spacey would have leaped at the chance. But Spacey wasn't an Endeavor client, so Def Emanuel wouldn't receive his casting fee.  Def Ari Emanuel was a businessman. As such, even though he needed a favor from Spacey, he wasn't going to just give Spacey a leading role, he wanted something in return. Def Ari Emanuel knew Def Spacey's career was in trouble.

85.   Def Ari Emanuel approached Def Spacey to ask him about starting or endorsing, a screenwriter/filmmaker social network; a social network with little or no security features. The conversation likely started with Def Ari Emanuel asking how Spacey's career was going.  Def Spacey likely explained his recent career setbacks, and his hope to one day film Bobby Darin's life story. He may have explained that he had recently secured the rights to his Bobby Darin film (Beyond the Sea), but had no funding to shoot his dream film.

**Quid Pro Quo**

86.   Upon hearing about Spacey's career troubles, Def Emanuel made Def Spacey and Brunetti an offer: (1) he asked Defs Spacey and Brunetti to design a social network so that ALL user could access ALL screenplays, anonymously, with few security safeguards (it is possible/probable that Def Asif Satchu facilitated the website design); (2) Def Emanuel also may have asked Spacey and Brunetti to include a counter-security feature whereby if a screenplay was removed from the website all access history would also be erased (**although the Defs seem to have added this second features in 2007, shortly before accessing the Plaintiff's work**). The Plaintiff believes that in exchange for agreeing to operate such a social network, Def Ari Emanuel promised Defs Spacey and Brunetti a few things in return:

**1.** Spacey would star in K-PAX, a film with a solid $68 million budget;

**2.** Def Ari Emanuel would finance Spacey's production company to make Def Spacey's dream film, Beyond the Sea;

**3.** Def Emanuel would help Spacey's production company arrange financing and

COMPLAINT

19

distribution (as needed) for the life of the social network;

**4.** Def Emanuel would introduce Spacey and Brunetti to the financial and distribution partners necessary for their production company to succeed;

**5.** Emanuel would try to find Spacey a meaningful, perhaps "career defining," role.

87. The agreement was made.

88. Thus, September 2000, only <u>one</u> <u>month</u> <u>after</u> <u>the</u> <u>birth</u> <u>of</u> <u>Project</u> <u>Greenlight</u>, **TriggerStreet.com (<u>TS</u>) was born.** (Internet Archives screenshot of projectgreenlight.com, showing the origin time of Project Greenlight is attached as "**Exhibit O**" and incorporated by reference as if fully set out herein.) The probability that both of the world's only screenwriter/filmmaker social websites (both of which also happened to be prominently celebrity-endorsed) coincidentally starting only a month apart is infinitesimal.

89. But TS would remain a closed and inactive site for 2 years, not having its official "launch" party until 2002. This helped avert suspicion, kept TriggerSteet from competing with Project Greenlight, and allowed TS to learn from Project Greenlight's mistakes.

90. In November 2000, as agreed, Spacey began filming KPAX. When the film was released it would be the first smoking gun in this conspiracy:

● 91. KPAX was released Oct 2001. It would be the first time **Universal Pictures EVER** cast Kevin Spacey in a leading role (in fact, Universal had only ever cast Spacey in **one [1]** film, a **supporting** role, ten years prior, in 1990, in "Henry & June"). (*Spacey was most commonly cast in **Warner Bros** films and independent films.) <u>Casting</u> <u>Spacey</u> <u>to</u> <u>star</u> <u>in</u> <u>K-PAX,</u> <u>a</u> <u>$68</u> <u>million</u> <u>film,</u> <u>at</u> <u>such</u> <u>a</u> <u>low</u> <u>point</u> <u>in</u> <u>Spacey's</u> <u>career,</u> <u>was</u> <u>almost</u> <u>inconceivable</u>. **Def Spacey wouldn't star in a film with a budget over $40 million for 5 more years** (Superman Returns). Spacey would only appear in one other Universal Pictures film, 2 years later, *The Life of David Gale*—originally a Warner Bros (Spacey's stable) property that Universal Pictures optioned. Spacey just came with the deal.

● 92. A month after K-PAX was released, in November 2001, director/writer **Eliseo Subiela (via Jason Laskay) sued Universal Pictures**, Gene Brewer, et al, for plagiarizing his film *Man Facing Southeast*. The suit was eventually withdrawn when Subiela and Laskay could no longer afford to litigate against a giant corporation like Universal Pictures.

| | **TS LAUNCHES, NOVEMBER 2002** |
|---|---|
| 1 | |
| 2 | 93. After giving Project Greenlight two years to gain traction, November 2002, the |
| 3 | Defendants prepared to launch TS. To attract the best undiscovered writers, the Defendants |
| 4 | planned to generate "buzz" by throwing 3 huge TS "launch parties": one in New York, one |
| 5 | in Los Angeles, and one in **London**. (A photo of Kevin Spacey at the TS London Launch |
| 6 | party is attached as "**Exhibit P**" and is incorporated by reference as if fully set out herein.) |
| 7 | While in Britain, Def Spacey did many interviews about TS. The Guardian featured a piece |
| 8 | called "Cyber Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's |
| 9 | well-rehearsed lines. (Said Guardian article in which Def Spacey went to London to discuss |
| 10 | TS is attached as "**Exhibit Q**" and incorporated by reference as if fully set out herein.) |
| 11 | Writer Sean Clarke wrote: |
| 12 | |
| 13 | Spacey tells an anecdote about the original idea for the site, which is essentially Brunetti's brainchild. He says they "came up with a sketchy plan, which at the time..." and chuckles |
| 14 | wryly, on which cue Brunetti take up the story "... which at the time, we thought was great." They both shake their heads |
| 15 | ruefully. Later, I watch as the pair address a press conference, they repeat the story, with exactly the same pauses, the same |
| 16 | chuckle, the same interruptions. It's beat-perfect, like a Mamet script. |
| 17 | |
| 18 | |
| 19 | 94. And to generate even more buzz, before the website was launched, Budweiser |
| 20 | announced their corporate sponsorship of the TS social network. |
| 21 | 95. Along with the sponsors, parties and interviews, to help repair Def Spacey's |
| 21 | damaged reputation, the TS website posted a heartwarming story that Spacey started his |
| 22 | new social network "to help undiscovered writers and filmmakers get industry access and |
| 23 | exposure." |
| 24 | 96. **TriggerStreet.com was "launched", and went online, November 2002** |
| 25 | ● 97. Def Spacey held a New York TriggerStreet **launch party** on Nov 11th, 2002. |
| 26 | ● 98. Def Spacey held a Los Angeles TS **launch party** on Nov 18th, 2002. |
| 27 | ● 99. Def Spacey held a London TS **launch party** on Nov 26th, 2002. |
| 28 | |

| | |
|---|---|
| 1 | **After TriggerStreet Officially Launched, Nov 11th, 2002,** |
| 2 | **The Following Events (Connecting The Defendants) Occurred:** |
| 3 | 100.  Within just a few months of TS's official launch (Nov 2002), Def Spacey would |
| 4 | receive **3** huge payments from Defs Ari Emanuel and Universal Pictures (although Spacey |
| 5 | would receive many other "benefits" during the 12 year lifespan of TS): **1)** Universal |
| 6 | Pictures would distribute "The Life of David Gale"; **2)** Spacey's production company |
| 7 | would receive distribution money for "United States of Leland"; **3)** after 3 long years, |
| 8 | Spacey's production company would receive **$25,000,000** to produce "Beyond the Sea". |
| 9 | ● 101.  In **<u>February</u> 2003**, 3 months after TS launched, **<u>Universal Pictures</u>** |
| 10 | distributed Spacey's film "**The Life of David Gale**" (again, originally a property of |
| 11 | Spacey's home studio, Warner Bros). This would be the last time Universal Pictures would |
| 12 | be involved in a Spacey film (to the date of the filing of this Complaint). Thus, the only two |
| 13 | Universal Pictures films featuring Spacey as a lead are *K-PAX*, and *The Life of David Gale*. |
| 14 | ● 102. That same month, **<u>February</u> of 2003**, Spacey's production company would |
| 15 | magically get money to release and distribute its first movie in 3 years: "United States of |
| 16 | Leland". The film would only be released in 14 theaters, losing millions, and bringing in |
| 17 | only $344,000. Likely, Universal Pictures wouldn't put their name on the film, because |
| 18 | after two bad years, Universal was back in 5th place (second to last place), and they didn't |
| 19 | want *United States of Leland* to move them into last place. |
| 20 | ● 103.  That same month, again, **<u>February</u> 2003**, it was announced that production |
| 21 | of Spacey's Dream film, "Beyond the Sea," was being fast-tracked—directed by and |
| 21 | starring Spacey and produced by Spacey's production company, with a $25,000,000 budget. |
| 22 | 104.  Suddenly, in the nadir of Spacey's career, inexplicably Hollywood was showing |
| 23 | him tremendous support—when 4 of Spacey's previous 5 films were major money losers. |
| 24 | Footnotes: |
| 25 | 105.  Shortly after TS launched, in **2003**, Ari Emanuel gave Asif Satchu and Mordecai |
| 26 | Wiczyk financing to start MRC. |
| 27 | 106. **December 17th, 2004**, *Beyond the Sea* was released. It would be Spacey's **greatest** |
| 28 | **failure**; costing $25 million, but only earning $8.4 million; losing over $16,000,000. |

| | |
|---|---|
| 1 | **Additional Facts Regarding TS And The Defendants** |
| 2 | ● 107. Spacey's production company made no films for 3 years, January 2000 to |
| 3 | January 2003: Ordinary Decent Criminal (Jan 2000, direct to DVD in USA), and United |
| 4 | States of Leland (Jan 2003, released in only 14 theaters). |
| 5 | ● 108. Since TS launched, Def Spacey's production company has made 22 films. |
| 6 | ● 109. May 2005, 2.5 years after TS launched, Project Greenlight was effectively |
| 7 | dead (no new contests for filmmakers or screenwriters); killed by the success of TS. |
| 8 | Although, oddly, the Project Greenlight website remained open, but inactive —no new |
| 9 | contests, no new submissions accepted; just an open, inactive website (until 2015). |
| 10 | ● 110. In 2006 Spacey held a TriggerStreet "RE-launch" party in Los Angeles. |
| 11 | ● 111. 2007, Plaintiff's screenplay, Butterfly Driver, was posted and accessed on TS. |
| 12 | ● 112. 2007-2009 TS secretly joined Bud.TV (Budweiser TV), without informing |
| 13 | members or revising its Term of Use page. In a 2007 Anheuser-Busch announced it was |
| 14 | launching Bud.TV with TriggerStreet.com providing programming. (Said Bud.TV news |
| 15 | release is attached as "**Exhibit R**" and incorporated by reference as if fully set out herein.) |
| 16 | Curiously, Bud.TV's Wikipedia page shows Defs Matt Damon and Ben Affleck (Project |
| 17 | Greenlight), and Kevin Spacey (TS) all provided Bud.TV programming. (Said Wikipedia |
| 18 | article is attached as "**Exhibit S**" and incorporated by reference as if fully set out herein.) |
| 19 | ● 113. Feb 2009, the BBC reported Def Spacey hosted the Mofilm Film Festival, in |
| 20 | Spain, where he boasted of TS's **"400,000 members around the world."** (Said BBC article |
| 21 | is attached as "**Exhibit T**" and is incorporated by reference as if fully set out herein.) |
| 21 | Willfully marketing TS outside of the USA violated the Plaintiff's copyrights. |
| 22 | ● 114. On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency (ETA) |
| 23 | merged with the William Morris Agency (WMA), creating William Morris Endeavor. |
| 24 | **17 days later**, May 14th 2009, **after about 20 years <u>with the William Morris Agency</u>**, |
| 25 | Def Spacey signed with CAA (Creative Artist Agency). Def Spacey did so to keep TS |
| 26 | members (and any observing regulatory authorities) from becoming suspicious of his link to |
| 27 | Def Ari Emanuel through TS. (A New York Times article about the April 2009 merger of |
| 28 | WMA and Endeavor is attached as **"Exhibit U"** and is incorporated by reference as if fully |

set out herein.)  (A May 2009 Variety article about Def Spacey leaving WME is attached as "**Exhibit V**" and is incorporated by reference as if fully set out herein.)

● 115.  May 2010, "Deadline Hollywood" reported Defendant **Universal Pictures** and Defendant Media Rights Capital (MRC) announced a 20 picture, 5-year production and distribution deal. (Said "Deadline Hollywood" article is attached as "**Exhibit W**" and is incorporated by reference as if fully set out herein.)  Thus, MRC's (a company co-owned by Defendant Ari Emanuel) first mega-deal would be with **Universal Pictures**.

● 116.  March 15th, 2011, **Netflix** and Def **MRC** (owned by Defs Emanuel, Wiczyk and Satchu) announced their mega $100 million dollar 2-season deal to produce the new series *House of Cards*, starring Def Kevin Spacey. Quietly, a few months later, July 2011, **with the role of a lifetime secured**, Spacey moved TS to http//www.labs.triggerstreet.com, and begin to use the web address triggerstreet.com as his production company's site.

● 117.  August 2013, the film ***Elysium*** (infringing on the Plaintiff's work) was released. The Plaintiff then sued for copyright infringement, October 2013.

● 118.  November 6th, 2014, 6 days after the Plaintiff filed his Notice Of Motion of appeal, Defs Spacey and Brunetti closed and destroyed the TS social network.

● 119.  In 2015, almost immediately after TS closed, Project Greenlight (which had been **dead for 10 years**, came back to life, with a new HBO TV show, airing fall of 2015.

● 120.  July 2016, HBO announced the Project Greenlight TV show was cancelled.

● 121.  In 2016, with the cancellation of the TV show *Project Greenlight*, and with the closing of TS—with no way to gain access to original screenplays to misappropriate— ProjectGreenlight**.com** went active, again. **After 10 years of online inactivity**, Def Matt Damon, Ben Affleck and ProjectGreenlight.com began seeking new screenplays again.

● 122.  In 2015, Def Dana Brunetti produced his **first** solo effort (without Kevin Spacey or their *Trigger Street Production* company), ***50 Shades of Grey***. *50 Shades of Grey* was, of course, <u>distributed</u> by **Universal** **Pictures,** apparently the only major distributor that will touch a Brunetti film (without Def Spacey or their *Trigger Street Productions* company attached). (A Wikipedia article showing the producers and distributors of 50 Shades of Grey is attached as "**Exhibit X**" and is incorporated by reference as if fully set out herein.)

COMPLAINT

24

**SONY PICTURES EMAIL LEAK EXPOSE DEF ARI EMANUEL'S SECRET UNIVERSAL PICTURES TIES,  HIS UNLAWFUL RELATIONSHIPS WITH SONY PICTURES' CEO (M. LYNTON), & HIS BULLYING, THUGGISH METHODS**

123.   Further confirming all allegation herein, in 2015 Wikileaks released thousands of Sony Pictures emails, which had been previously released in 2014, when North Korea hacked and published thousands of Sony's emails. Within days hundreds of respected news agencies carried the story —The NYTimes, LATimes, Hollywood Reporter, all reported the juicy details—and the juiciest story was the story of how Sony Pictures lost -or passed on- "Steve Jobs", the movie.

124.   All of the reports are similar: the emails provide an inside view of bunch of super-rich Hollywood producers, writers, and directors negotiating the production budget of the film "Steve Jobs", until the deal went bad and Sony gave up on the film. And right in the eye of the storm is Def Ari Emanuel. (An articles from "Mashable.com" about said "Steve Jobs" film emails is attached as "**Exhibit Y**"and is incorporated by reference as if fully set out herein.)

125.   A few of the celebrities captured on Sony Pictures email/text leak, at times, behaved poorly, but no one behaved worse than, Def Emanuel. Brazen and thuggish, we see Def Ari Emanuel berate Sony Pictures' Chairman Amy Pascal, with impunity. And when the other Sony execs learned of this, they only called Def Emanuel a *bully*—behind his back. No one dared to confront Def Emanuel. But more surprisingly, through a tiny sliver of Def Ari Emanuel's emails (just those going into, or out of, Sony Pictures) we learn:

1.  Def Ari Emanuel is a major film producer —in conflict with his role as a talent agent, and in violating California labor law which forbids employers (a producer) from charging employees (his actors) fees to be hired—perhaps an even more significant conflict of interest than Def Emanuel's partnership in MRC II LP.

2.  Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures CEO and Chairman) are secretly business partners: co-owners in the company *Screenbid*.

3.  Ari Emanuel is also a film financier, or executive producer (a person who provides or finds money to make films).

COMPLAINT
25

4.  Def Ari Emanuel also arranges peripheral services for Sony Pictures (and others), like making deals with Hasbro Toy Co. for Sony Pictures  (for Spider-Man 2 & Minions  action figures?).

5.  <u>Whenever necessary, **Universal Pictures** will distribute ANY film for Ari Emanuel</u>.

<div align="center">

<u>"STEVE JOBS" EMAILS CONFIRM DEF ARI EMANUEL</u>

<u>IS SECRETLY A MAJOR FILM PRODUCER, AND THE TRUE</u>

<u>PRODUCER OF "STEVE JOBS" —NOT SCOTT RUDIN</u>

</div>

126.   Through the Sony "Steve Jobs" email trail we see the "Steve Jobs" negotiation go on for about 8 months, then it begins to fall apart on October 16th, 2014, after Sony Pictures' President of Business Affairs, Andrew Gumpert, sends Sony Pictures Chairperson Amy Pascal, film producer Scott Rudin, Def Ari Emanuel, and WME co-CEO Patrick Whitesell a financing offer, which the filmmakers felt was too low.  October 18th, 2014, two days after Gumpert's low offer, Scott Rudin, angrily responds:

> 2014-10-18 16:09:38  Re: wwbo bumps/jobs From: Scott Rudin
> <sr@scottrudinproductions.com> To: pascal, amy
> gumpert, andrew  aemanuel@wmeentertainment.com
> pwhitesell@wmeentertainment.com

**SCOTT RUDIN:**
> "You have NO risk in the movie but WE should have risk? You lay off every cent except what you choose to keep and WE should then also fund you --- that's how this should work?
>         I cannot believe you're serious. What idiot would make this deal? The presumption that five Oscar winners would be desperate enough to give up all value for their services and then also risk the baseline bargain-basement fees on top of it is beyond comprehension.
>         Every single movie like this that we have made for you has worked. And you think this is fair?"

127.   At Rudin's words, Def Ari Emanuel, who purports to the world that he is just a talent agent, would then take over the email exchange —seemingly eager to bully a woman.

> On Oct 18, 2014, at 9:15 AM,  From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com> To: pascal, amy

<div align="center">

COMPLAINT

26

</div>

sr@scottrudinproductions.com  gumpert, andrew
pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
"This offer is fucking bull shit. Give us the movie back. You you guys
in the business. No other studio would even ask for this. Pass"

128.  Def Ari Emanuel immediately establishes and retains dominance and control of the matter for the remainder of the negotiation, and Scott Rudin would remain quiet and subordinate to Def Emanuel. But the key detail in this email is that Def Emanuel has the authority to say "Pass", meaning: we choose NOT to do business with you, we will find another partner. No mere talent agent can usurp that power from the producer.  Scott Rudin put Ari Emanuel on that email chain because Ari Emanuel is the true producer.

129.  The exchange goes on. Amy Pascal writes:

On Oct 18, 2014, at 10:18 AM From: Amy_Pascal@spe.sony.com
To: aemanuel@wmeentertainment.com
sr@scottrudinproductions.com gumpert, Andrew
pwhitesell@wmeentertainment.com

**AMY PASCAL:**
"Can we please deal with this Monday
Maybe we all get in a room and close it up"

130.  But Def Ari Emanuel will not be silenced by Ms Pascal's request to wait until Monday. He replies five minutes later::

On Oct 18, 2014, at 10:23 AM,  From: Ariel Emanuel
<AEmanuel@wmeentertainment.com>  To: pascal,
amy  sr@scottrudinproductions.com  gumpert,
andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
"Whatever
**You guys ask us to find financing. Scott, Patrick and myself get
Modi** and we still get no respect. Amy, this is not what you want to
hear - but this NEVER happens and any other studio. In fact they
then would go out of their way to make a proper deal.
Even Harvey.
Monday is fine."

131.  With that statement **Def Ari Emanuel admitted he found film financiers for "Steve Jobs", which is a strictly a producer's, or an executive producer's job.** Def Ari

| | |
|---|---|
| 1 | Emanuel also generously (and falsely) shares credit with Rudin and Whitsell for getting |
| 2 | Modi Wiczyk to help with financing, to make Rudin and Whitsell appear more significant to |
| 3 | the process. Again, Defs Modi Wiczyk and Ari Emanuel had been a business partners since |
| 4 | 2002 (at Endeavor, as well as in MRC). Getting Def Modi Wiczyk involved was entirely |
| 5 | Def Ari Emanuel's doing. Amy Pascal responds to Def Emanuel's provocation: |

On Oct 18, 2014, at 10:51 AM, From: Amy_Pascal@spe.sony.com
To: aemanuel@wmeentertainment.com
sr@scottrudinproductions.com gumpert,Andrew
pwhitesell@wmeentertainment.com

**AMY PASCAL:**
"arithat is totally unnecessary we are in a negotiationwe have all
been doing this a long timewe want to make moneyyou want to
make money for yourselves andyour clientsthis has nothing to do
with respect and to be fair and its a credit to the movie that scott
put together there are more financing partners  than we know
what todo with here....thats not the issue...we are the only major
studio  that  even tries  to make  thesekind  of movesdont  make  it
harder than it isthe tone is really uncalled for  and unfairand
doesnt help get things doneamy"

132. Through all of this, Scott Rudin never commented or told Def Ari Emanuel to
disengaged. That is not his place. Ari runs the show. Def Ari Emanuel replies:

2014-10-18 10:58:41  Re: wwbo bumps/jobs From: Ariel Emanuel
<AEmanuel@wmeentertainment.com>  To: pascal, amy
sr@scottrudinproductions.com   gumpert,
andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
"Ok not true. Other studios make these movies"

133. Def Ari Emanuel was alluding to Universal Pictures, who would produce any film
Def Emanuel suggested. Texting stopped for 7 or 8 hours, until Def Ari Emanuel resumed.

2014-10-18 16:20:47 From: aemanuel@wmeentertainment.com
To: gumpert, andrew sr@scottrudinproductions.com,
pwhitesell@wmeentertainment.com,  pascal, amy

**ARI EMANUEL:**
"In the real world when some one either risks something or gives something
up they get something in return. You guys seem to think we should be
honored just to be in business with you based on your offer. Why?"

134.   After this, the negotiation disintegrated over the next 4 weeks. The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:

> 2014-11-14 22:57:02 From: aemanuel@wmeentertainment.com
> To: pascal, amy
>
> **ARI EMANUEL:**
> "Is business affairs calling me so I can take this to Fox Searchlight officially?"

135.   <u>With that statement Def Emanuel showed that, in addition to producing, **he even arranges distribution**</u>. Def Emanuel is asking Amy Pascal if Sony Pictures' President of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants "Steve Jobs". Def Emanuel is bluffing that Fox Searchlight has agreed to take the film. He  never had a deal with Fox Searchlight. He was just playing hardball; trying to get a better offer out of Sony, AND keep them in the dark about his distribution relationship with **Universal Pictures.**

136.   As this deal dragged on over 8 months, 3 weeks before the previous exchange, Sony Pictures' Andrew Dumpert, spotted Def Emanuel's chicanery and bad motives. In an email to Sony execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

> 2014-10-18 16:59:16 From: Andrew Gumpert
> To: lynton, michael; pascal, amy; belgrad, doug
>
> **Andrew Gumpert:**
> "The fact is there is only so much in the kitty. Unless the movie massively breaks out they can never make real money, nor can we and our investors.They have a 50pt pool with the best definition and 5m of box office bonuses. **<u>Do they want to make MORE than the equity? I think they do.</u>** There is a huge philosophical gap (given the rude and insolent responses from Ari and **Scott**)..."

137.   Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott Rudin weren't adhering to established guidelines.

138.   Although there have surely been occasions when Sony Pictures did cave-in to Def Emanuel's arm-twisting, this would not be one of those occasion. But oddly, Michael Lynton, CEO of Sony Pictures, responds to Gumpert only with silence—because Def Ari Emanuel is his close friend and secret business partner in Screenbid.

| | |
|---|---|
| 1 | **"Steve Jobs" Film's Not-So Surprising *Twist* Ending:** |
| 2 | 139.    Fox Searchlight never touched "Steve Jobs". |
| 3 | 140.    Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the |
| 4 | price of the film above market value, to increase his profit margin. He didn't need Sony |
| 5 | Pictures to give him standard market value for "Steve Jobs", he could get standard value |
| 6 | from Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari |
| 7 | Emanuel took the film to the Studio that has distributed all of his films, since around 1999. |
| 8 | 141.    On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs", |
| 9 | after so much posturing and tumult, <u>"Steve Jobs" was distributed by **Universal Pictures.**</u> |
| 10 | |
| 11 | <u>SONY PICTURES EMAILS SHOW DEFS EMANUEL & BILL BLOCK & SONY</u> |
| 12 | <u>PICTURES' CEO (M. LYNTON) MAINTAIN UNETHICAL RELATIONSHIPS,</u> |
| 13 | <u>AS THEY CO-OWN "SCREENBID" TOGETHER (CONFLICT OF INTERESTS)</u> |
| 14 | 142.    The "Steve Jobs" emails reveal Defs Emanuel and Bill Block are in a co-ownership |
| 15 | business with Sony Pictures' then-CEO Michael Lynton. As we see Def Ari Emanuel write |
| 16 | Michael Lynton to ask Lynton to check on their co-owned business, *Screenbid.* |
| 17 | On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com |
| 18 | To: lynton, michael; <br> **ARI EMANUEL:** |
| 19 | Michael - |
| 20 | What are we doing on Screenbid? We had success on our early tests, <br> nothing since. You guys own a piece of this company, we've had |
| 21 | nothing since our early success. We have to keep the engines going. |
| 21 | 143.    In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of |
| 22 | Screenbid is confirmed by the repeated use of pronoun"we". Def Ari Emanuel asks "What |
| 23 | are **we** doing..." Then he states "**We** had success on our early tests…" Then he reminds |
| 24 | Lynton that he (and some unknown party, or parties) also own shares of this company. Then, |
| 25 | implying Lynton has a responsibility, Def Emanuel says, "**You guys own a piece of this** |
| 26 | **company…"** Then Def Emanuel exhorts CEO Michael Lynton to take action, saying: "<u>We</u> |
| 27 | <u>have to keep the engines going</u>." |
| 28 | 144.    These are not the messages of quiet stockholders. These men are owners. |

145.   Sony Picture's CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his business partners a business report, pasted below his reply text. (Bill Block was the CEO of QED International, a Defendant in Briggs v Blomkamp.) Def Bill Block's reply email reads:

> 2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
> From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
> michael_lynton@spe.sony.com
>
> **BILL BLOCK:**
>    Going well gentlemen.
>    Bill
>    From: Jeffrey A. Dash [mailto:jdash@screenbid.com]
>    Sent: Monday, October 27, 2014 10:13 AM
>    To: Bill Block
>    Subject: SCREENBID AUCTION UPDATE
>    AUCTION UPDATE:
>
>    TRUE BLOOD: (HBO) We are winding down aftermarket sales and
>    fulfillment and are on schedule to present audited reports to HBO
>    accounting within 14 days.
>
>    SONS OF ANARCHY: (FOX) We visited the set on Friday
>    10/24/14 and met with the department heads for props, wardrobe,
>    transportation and set decoration. They are scheduled to wrap next
>    week and we will take delivery by 11/5/14, immediately inventory
>    and shoot. Writing began about 2 weeks ago The auction is
>    scheduled to go live on 12/01/14 and bidding will end on 12/10/14.
>    Fulfillment time will be tight. In order to get everything shipped
>    prior to XMAS  we will have extra staff in place to facilitate…"

146.   In this unethical relationship, Sony Pictures' CEO Lynton, personally profited as Screenbid's owner, in such ways as directing Sony Pictures to give Screenbid millions in set furnishings to auction on Screenbid, where he and Def Emanuel profited as owners. Lynton's secret relationship with Def Emanuel is why Sony Pictures did not do due diligence to vet Def Blomkamp's Elysium script.

| | |
|---|---|
| 1 | <div align="center">SONY EMAILS SHOW DEF EMANUEL PERFORMS</div> |
| 2 | <div align="center">PRODUCORIAL SERVICES:  CALLING SONY'S CEO & CHAIRMAN</div> |
| 3 | <div align="center">TO ARRANGE A DEAL WITH HASBRO</div> |
| 4 | 147.   On March 28, 2014, Def Ari Emanuel emailed/texted Sony's Pictures' CEO and |
| 5 | Chairman to close an animation co-financing deal with Hasbro. Def Emanuel's email read: |
| 6 | 2014-03-28   re: HASBRO Animation deal |
| 7 | From: aemanuel@wmeentertainment.com<br>To:amy_pascal@spe.sony.com;  michael_lynton@spe.sony.com |
| 8 | **ARI EMANUEL:** |
| 9 | "HASBRO Animation deal<br>Amy & Michael - |
| 10 | We have sent Ronni our proposal for the animation co-financing |
| 11 | deal. Please take a look when you get a chance and lets lock this<br>down. |
| 12 | Ari |
| 13 | 148.   Talent Agents don't arrange animation co-financing deals with Hasbro—producers |
| 14 | and studios do. Curiously, after Billionaire Def Ari Emanuel recently purchased the UFC he |
| 15 | arranged a UFC Hasbro deal. (An article where Def Emanuel discusses UFC and Hasbro is |
| 16 | attached as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.) |
| 17 | |
| 18 | **SONY EMAILS SHOW DEFENDANTS COMMITTED PERJURY REGARDING** |
| 19 | **THEIR EFFORTS TO HIDE INFRINGEMENT IN BRIGGS V BLOMKAMP** |
| 20 | 149.   The Defendants' fraud, conspiracy and routine deceit included committing perjury |
| 21 | by lying on documents signed under oath. |
| 21 | 150.   During the discovery phase of Briggs v Blomkamp, et al (C13 4679 PJH) the |
| 22 | Plaintiff informed the district court that he suspected that writer/producer Simon Kinberg |
| 23 | was hired to rewrite Def Blomkamp's poorly written screenplay. In response to Plaintiff's |
| 24 | interrogatories to MRC II LP, the Defendants  made false statement, under oath, regarding a |
| 25 | substantial matter in that case, which may impact the Plaintiff's ability to prevail in that |
| 26 | lawsuit (currently in appeals). (Said Def MRC II LP's Interrogatory Responses from Briggs |
| 27 | v Blomkamp are attached as "**Exhibit AA**"  and is incorporated by reference as if fully set |
| 28 | out herein.) |

<div align="center">COMPLAINT</div>

151.   That deceit occurred when the Defs responded to interrogatory #17; believing Simon Kinberg helped disguise Def Blomkamp's infringement, the Plaintiff asked:

**Plaintiff's Interrogatory:**
INTERROGATORY #17:
"Simon Kinberg is a writer and "script doctor" (a writer who fixes scripts that have serious problems). Simon Kinberg is listed as a producer of Elysium. Exactly what duties did Simon Kinberg play in the production and script doctoring of the screenplay and film "Elysium"?"

**Defendants' Answer:**
"Defendant incorporates by reference the preliminary statement and general objections... Subject to and without waiving the foregoing objections, Defendant responds as follows:
       Simon Kinberg produced the Film. As producer, Mr. Kinberg also **assisted with a polish of the Film's screenplay** during the later stages of writing."

**But The Leaked Sony Emails Reveal The Truth About Said Perjury:**

152.   The Defendants admitted that Simon Kinberg helped improve the weak screenplay, BUT suggested that his help was just a "polish", which suggests merely dotting I's and crossing T's, and maybe a dialogue suggestion here and there. But, in fact, Simon Kinberg had to do exhaustive work to try to salvage Elysium's terrible screenplay.

153.   The gross underestimation and misrepresentation of all the work Simon Kinberg had to do to repair Def Blomkamp's Elysium script is revealed in the 2015 Wikileaks're-posting of the Sony Pictures' hacked emails, in five (5) key email exchanges between Defs **Modi Wiczyk**, **Simon Kinberg**, and Sony Pictures Chairperson **Amy Pascal**. In the first email, Def Wiczyk explains Kinberg's role:

2014-10-27 13:36:12  Fwd: CHAPPIE NOTES
From: mwiczyk@mrcstudios.com To: pascal, amy
**MODI WICZYK:,**
"hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying. great detail and very specific.he also included rachels document and merged it.**simon is a fixer and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  nb has been ignoring him the past few weeks after listening to him up until then. dont know why, dont care. its our turn now.i told doug that we should

COMPLAINT
33

leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

154.   Def Wiczyk, Simon Kinberg, and Amy Pascal continued to discuss the endless and unimaginable problems Kinberg was having helping director Def Blomkamp's save his film, *Chappie*; the executives discuss reshoots,  dialogue rewrites, other huge changes, and how to protect Def Blomkamp's insecure ego. Yet, amid these massive problems, Kinberg comments that Def Blomkamp was handling Kinberg's executive ordered changes much better than he handled them on Elysium, where Kinberg explains Blomkamp **"shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once.**" In this email to Amy Pascal, Simon Kinberg wrote:

2014-08-07 07:02:55  Re: Chappie   from:
sdkinberg@aol.com   to: pascal, amy
**SIMON KINBERG:**
"cool! neill has been really open throughout this process, and wants to get the audience all the way there. i think we're all feeling the same things now, so we can put it together and deliver to him, and he'll take it as an assignment not a judgement, and stay creative. **i saw him shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once. so i don't think he will now…**"

155.   In fact, the text/emails reveal Def Wiczyk and Amy Pascal were forced to hide from Def Blomkamp the fact that Simon Kinberg had to take over the film to finish it. This is revealed when Def Wiczyk wrote to Sony's Chairperson, Amy Pascal:

2014-10-27 13:42:22  Re: To discuss
From: mwiczyk@mrcstudios.com; To: pascal, amy
**MODI WICZYK:**
"not to oversimplify but i know simon has been biting his tongue for a month and all the sloppy stuff has been making him **crazy.** when i speak to him he seems to have a very clear view of what he wants to do. it lines up w what ur saying. i hink if we make them do it we will have a much much much better film that works. we just cant literally tell neill **si is taking over....**so its "our" notes"

156.   Additional evidence of the extreme measures that Defendants Simon Kinberg, Sony Pictures, MRC and Modi Wiczyk resorted to salvage Chappie. Can be seen in such

COMPLAINT

34

emails/texts as when Def Modi Wiczyk explains director Def Neill Blomkamp's inability to even write or direct "basics". In an email text to Amy Pascal, Wiczyk wrote:

2014-10-27 13:52:57  Re: To discuss
From: mwiczyk@mrcstudios.com, To: pascal, amy
**MODI WICZYK:**
        "yes thats what i meanthe right version of this could be iconic and do 300
        and have a huge sequel what bugs me is how obvious and unpolished the
        problems areall the hard stuff is great but all the basics are killing us"

157.    A week later, Def Modi Wiczyk emailed Amy Pascal to discuss BlomKamp's insecurities, and how they were impacting production.

2014-11-03 04:31:07  Re:  From:
mwiczyk@mrcstudios.com  To: pascal, amy
**MODI WICZYK:**
        "dunno re simon. maybe insecure, maybe thinks simon is on "studio"
        side, which is juvenile. hes always mad at somebody. vacillates btwn
        targets. i ignore it until it stops forward progress.
        re edgar i actually initiallygot nervous the music was too old to be
        cool,but all my assistants say lots of these songs are in the collective
        consciousness, played in bars and clubs. shows what i know....i dug the
        reel he did. and i loved the app w script and music."

158.   There are many more such emails that further reveal how inept and difficult Def Blomkamp is. But from these select emails, we see that to revise Blomkamp's *Chappie*, Kinberg took extraordinary measures, and that Blomkamp's inept, "insecure" and "juvenile" conduct made Kinberg "crazy", forcing the executives to takeover the edit. Yet, Kinberg implied these problems were mild compared to what he endured with Blomkamp revising *Elysium*, where the problems were so extreme that Blomkamp **"shut down"** and **"didn't have the answers".** Thus, clearly the script work Kinberg did on Elysium was **exhaustive**, and not a mere "polish" as Def MRC II LP stated under oath. This was a clear act of perjury.


**SONY EMAILS CONFIRM DEFS RULE 37 VIOLATION IN BRIGGS V**
**BLOMKAMP, SHOWING DEFS OMITTED TESTIMONY & EVIDENCE**

159.   On page 28 of the Plaintiff's First Amended Complaint in Briggs v Blomkamp, et al, the Plaintiff made a bold prediction: that sometime after May of 2013 (when Blomkamp

learned the details of Plaintiff's impending copyright lawsuit) Defendant Neill Blomkamp went back into the editing room and tried to edit-out key headache scenes, which were identical to the Plaintiff's work. The Plaintiff explained that Blomkamp did this <u>to try to cover-up his theft of the Plaintiff's intellectual property</u>.

160.   Supporting this prediction, during the discovery phase of Briggs v Blomkamp, the Plaintiff found a report on TheProvince.com (titled: "Elysium's ready as director Blomkamp looks forward to next project" from February 2013) in which Def Blomkamp stated the film was finished back in February 2013. (Said article from "The Province" is attached as "**Exhibit BB**" and is incorporated by reference as if fully set out herein.) Then, proving the Plaintiff's prediction, in sworn responses to Plaintiff's interrogatories, during discovery in Briggs v Blomkamp, Def Blomkamp admitted film editing was finished "Sometime in or about June 2013." (Said Defendant Blomkamp's Interrogatory Responses from Briggs v Blomkamp are attached as "**Exhibit CC**" and are incorporated by reference, as if fully set out herein.)

161.   The Plaintiff then filed a motion to compel documents, asking for all texts and emails between Def Blomkamp and both *Elysium* film editors: Julian Clarke and Lee Smith (Smith was the final editor—the editor who would have made these headache changes). The Plaintiff made this motion to prove that Def Blomkamp resumed film editing after February 2013, to try to remove or alter the "headache" scenes. However, **the Defendants would not provide a response from Lee Smith**, only from Clarke (Clarke stated that editing ended well before June 2013—contradicting Blomkamp, who said editing ended June 2013). But Lee Smith returned to the editing room to fix the headache scenes in May and June 2013.

162.   As well as doing the final edit of Elysium, the 2014 Sony email leak show that Lee Smith also did the final edits for Blomkamp's next film, *Chappie* (although Smith isn't credited on IMDB or Wikipedia).

163.   Lee Smith's final edit of Chappie is revealed in the Sony email leaks as Def Modi Wiczyk writes to Amy Pascal:

2014-08-12 00:13:30  <u>saw it.</u>  From: mwiczyk@mrcstudios.com  To:

amy_pascal@spe.sony.com

**MODI WICZYK:**

"we are going to get there and have a big success with this one. **lee
smith** will be huge, **nb** is in GREAT frame of mind."

164.  Def Wiczyk knew Smith would be "huge" because of how Smith helped salvage
Elysium. A few months later Def Wiczyk told Amy Pascal about all the work Lee Smith had
left to do on the film, and the continued problems between Blomkamp and Kinberg.

2014-11-03 02:03:10 <u>Re:</u>  From: mwiczyk@mrcstudios.com
To; pascal, amy

**MODI WICZYK:**

"Hi!
in terms of neill, totally ur call but...
i feel like <u>this</u> <u>coming</u> <u>week</u> <u>is</u> <u>critical</u> <u>bc</u> <u>neill</u> <u>has</u> <u>to</u> <u>really</u> <u>really</u> <u>let</u> <u>lee</u>
<u>in</u> <u>to</u> **polish,** <u>refine,</u> etc. alot of little indulgences are gonna have to go.
so--- i was trying to be positive but also let him know theres real real
work  yet  to  do.  and  in  a  short  period  of  time....  i  talked  to  lee  for  a
while today who says neills been very open so thats good...but hes been
a dick to simon for whatever reason. so a long way of saying i want to
keep the pressure on him. because i agree it can be special.
make sense?"

165.  The Plaintiff filed his Motion to Compel (seeking a statement from Lee Smith)
three (3) weeks before the deadline for dispositive motions (liability), July 9th, 2013. But
the district court set the motion hearing for more than a week AFTER the deadline for
dispositive motions (Aug 7th, 2013).   Thus, the Plaintiff had to file his Motion For
Summary Judgment (**MFSJ**), without being able to inform the court of the Defendants'
**violation of Rule 37** (failure to cooperate to compel a discovery response); a violation that,
in this case, resulted in the omission of evidence of a cover-up (that cover-up being: Neill
Blomkamp returned to the editing room with Lee Smith, in June 2013, to ask Smith to try to
erase edit and remove the headaches from Elysium). Thus, during the teleconference
hearing with Magistrate Judge Laurel Beeler, the Plaintiff explained that the matter was
unresolved but was effectively "moot" because both parties' MFSJs had been filed, and the
Plaintiff had less than a week to file his Reply Brief (Magistrate Beeler thus ruled the issue
moot). (Note: the Defs also refused ALL of the Plaintiff's discovery requests for texts or
emails regarding ANY Elysium matters; expanding the Defendants' **Rule 37 violations**).

**MRC & SONY PICTURES NEGLECTED TO DO BASIC**

**DUE DILIGENCE, BUYING THE RIGHTS TO ELYSIUM**

**WITHOUT EVEN READING A SCREENPLAY**

166.    In 2008, Def Neill Blomkamp filmed *District 9* without a screenplay.  District 9's star, Sharlto Copley, has given many interviews discussing the fact that he improvised every line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article with Sharlto Copley is attached as "**Exhibit DD**" and is incorporated by reference as if fully set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO Michael Lynton and Def Bill Block (of QED Int.), Emanuel was able to get QED and Sony Pictures' subsidiary *TriStar* to produce and distribute District 9, without a screenplay—using only Def Blomkamp's notes, which they referred to as a "script". Countless writers and fans, in online forums, have tried to find a copy of a District 9 script. All have failed.

167.    Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures bought the film and distribution rights to Elysium from Def Blomkamp, without ever reading a screenplay. Sony Pictures bought the rights to Elysium in a hasty meeting in 2008. In this well documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures agreed to buy the rights, immediately, never bothering to read the script. HollywoodReporter.com reported the details of the stunningly hasty meeting between Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011. MRC scheduled meetings with several other distributors that same day, but Sony Pictures was so rushed and eager to buy the film that MRC canceled all other distribution meetings scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that secured this deal, but never mentions a "screenplay" or a "script".  (Said Hollywood Reporter article about Blomkamp, MRC closing the deal with Sony Pictures is attached as "**Exhibit EE**" and is incorporated by reference as if fully set out herein.)  This same meeting and concept art were also recounted in the book "Elysium: The Art of the Film" —a book primarily made up of interviews with Def Blomkamp, himself. On August 6th, 2013, Deep Focus Review (deepfocusreview.com) reviewed the book "Elysium: The Art of

the Film", reflecting on this meeting. (Said Deep Focus Review article is attached as "**Exhibit FF**" and and is incorporated by reference as if fully set out herein.)  Upon interviewing Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and MRC staged 50-60 concept art paintings "and set them against the screenplay", explaining:

> "On the strength of these images—not to mention the strength of his first film, *District 9*—he garnered himself a $100 million budget and signed stars Matt Damon and Jodie Foster."

168.  The Defendants used the amazing artwork to strategically distract attention from the flawed screenplay. Sony Pictures took the bait. Within an hour or so, a deal for about $115 million was made, and no executive from Sony Pictures ever read a script. MRC didn't do due diligence because Defendant Ari Emanuel was a co-owner of MRC and Def Blomkamp's personal agent; thus, they stood to make millions from the deal. Sony Pictures failed to do due diligence because CEO Michael Lynton had an improper, secret business partnership with Def Emanuel (Screenbid.com), and wanted to maintain good relations with Defs Emanuel and MRC—and make millions without regard for whose work they pirated.

169.  Def Blomkamp's script was so poorly executed and riddled with evidence of misappropriation of the Plaintiff's work, that Defs Blomkamp, MRC and Sony Pictures took extreme measures to protect the script during film production. The website Games Radar (gamesradar.com) interviewed one of Elysium's stars, film icon **Jodie Foster**, who revealed the producer's paranoia as she explained she wasn't allowed to possess a script.  (Said Games Radar interview with Jodie Foster is attached as "**Exhibit GG**" and is incorporated by reference as if fully set out herein.)  Foster said:

> **"They won't even give me a screenplay. I've read it, but they won't give me one to physically keep in my home 'cause they're so worried about everybody."**

170.  How Sony Pictures and MRC committed $115 million to a movie without reading a screenplay, but invested millions to keep the screenplay secret defies reason. This was done to keep the Plaintiff from learning details of the film's plot before it was released, to prevent the Plaintiff from getting an injunction to stop  production.

171.   Had Sony Pictures behaved ethically, AND done their due diligence, they would have read Blomkamp's screenplay, then they would have seen Def Blomkamp's unfocused ideas, vast story weakness, and his poor literary skills. These shortcomings, juxtaposing concepts that were beyond such limited literary skills, should have raised red flags that Blomkamp's story may have been misappropriate, thus killing the deal. Hence, the Plaintiff would have filed no claims, including all claims herein.

172.   When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal.  Wiczyk wrote:

> 2014-10-27 13:36:12  Fwd: CHAPPIE NOTES
> From: mwiczyk@mrcstudios.com To: pascal, amy
> **MODI WICZYK:**
> "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then</u>. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

173.   A company has a responsibility to do basic due diligence, to make sure their products are what they allege: original works. Having a CEO who is secret business partners with the CEO of a talent agency subcontractor, undermines due diligence. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" to hide evidence of misappropriation is not doing due diligence. Rather, these are the methods of corrupt, mob-like conspirators.

174.   Further, during discovery in Briggs v Blomkamp et al, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants failed to produced any such documentation.

COMPLAINT
40

**Defendant Blomkamp Gets Caught Lying To The World About**

**His "Aliens" Script (Which Also Did Not Exist) , in 2017:**

175. Just as Def Blomkamp (with Def Wiczyk's help) sold Elysium to Sony and MRC without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" film without a script—but this time he did it openly, online, for the world to see. Unfortunately, in the process he ensnared several other Hollywood notables in his' strange world of lies.

176. On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his Twitter account, expressing hope of one day shooting the film. Soon dozens of Blomkamp fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, including in an article on Nerdist.com. (Said article from Nerdist.com is attached as "**Exhibit HH**" and is incorporated by reference as if fully set out herein.)

177. By July **2016,** websites like ScreenRant.com were reporting Def Blomkamp had recruited actress Sigourney Weaver and director James Cameron to tell the world how great Blomkamp's script was. (Said ScreenRant article is attached as "**Exhibit II**" and is incorporated by reference as if fully set out herein.) In ScreenRant Sigourney Weaver said:

> **"There is an incredible script by Neill. I didn't want to do a fifth one. I thought going to earth wouldn't be fun. I got this script that was amazing and gives fans everything they're looking for..."**

178. And James Cameron also praised the script in the ScreenRant article:

> **Director James Cameron (*Avatar*) then went on to throw in his two cents, saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"**

179. "Gangbusters."

180. Then, in April 2017, ScreenCrush.com reported that director Ridley Scott, owner of the Aliens franchise, had announced there would be no *Aliens 5* movie. Mr. Scott explained Defendant Blomkamp **never even had a script.** (Said Screen Crush article is attached as "**Exhibit JJ**" and incorporated by reference as if fully set out herein.) Ridley Scott stated:

> **"I don't think it will ever see the light of day. There was never a script. Just an idea that evolved from a dozen or so pages."**

181. This all caused the article writer to wonder who was lying: "We seem to find

1    ourselves in a bit of a '*he said, she and he said*' situation here," Monagle wrote.

2       182.   Remember, in 2000 Def Wiczyk helped sell his brother's script to Summit without

3    so much as a script name, and Sony Pictures was right there, negotiating for the rights to

4    that unwritten, nameless script—eager to please any good friend of Ari Emanuel's.        By

5    2016, with *Aliens 5*, the Defendants had grown so brazen that they let Def Blomkamp go out

6    and lie to the world for himself, believing they could throw a script together after the

7    contract was signed. Rubbing their hands in anticipation of all that money —none of them

8    expected Ridley Scott to do due diligence and insist on seeing a script, ruining their scheme.

9

10      **IN BRIGGS V BLOMKAMP THE DEFS  HIRED A CONMAN, JEFF ROVIN**

11      **(WHO COMMITTED FRAUD UPON THE COURT & WENT ON FOX NEWS**

12      **TO ADMIT HE WAS A "FIXER" FOR BILL CLINTON) AS THEIR "EXPERT"**

13      183.   Not only does this case reveal how effortlessly seemingly everyone in Hollywood

14   lies, it reveals that when they get caught lying and stealing other people's work, they call on

15   world-class liars.

16      184.   In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of

17   thousands of California intellectual property attorneys as an expert witness, the Defs hired

18   Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the

19   same Jeff Rovin who confessed (two years <u>after</u> Briggs v Blomkamp went to MFSJ) to the

20   *National ENQUIRER (*October 19th, 2016), and confessed on **Fox News'** live telecast of

21   ***The Sean Hannity Show*** (Oct 24, 2016), that he was a professional "fixer" who

21   orchestrated false "smear" reports on people who disparaged President Bill and Hillary

22   Clinton—while Bill Clinton was President. Rovin claimed he then published these smear

23   articles in tabloid newspapers. Rovin's interview with Hannity can be seen at

24   https://www.youtube.com/watch?v=L3mzoKuFN5o. The story carried in countless other

25   publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit**

26   **KK**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER

27   article is attached as as **"Exhibit LL"** and is incorporated by reference as if fully set out

28   herein.)

185.  **Rovin made these self-incriminating admissions on camera, in his own words.** Rovin admitted that he also bribed the victims of his smears to stay quiet. Shockingly, Rovin says the bribes were so effective that they rarely needed to resort to **other measures**. In Rovin's words, "**Most of the time** it was just money, it never had to be any threats." Witlessly, Rovin admitted threats, violence—or worse—might ensue if the money wasn't accepted.

186.  Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

187.  Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort."

188.  Rovin went on to explain he had worked as a "fixer" many times in the past.

189.  In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.

190.  In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff moved the the court to exclude Rovin's "expert" report, as Rovin had falsified dozens of citations and fabricated evidence to substantiate his own claims, including a lengthy "quote" in which he fraudulently omitted 42 words—that wholly countered what Rovin reported. (Said Motion to Exclude is attached as "**Exhibit MM**" and is incorporated by reference as if fully set out herein.)  Oddly, the court took no interest in the fraud contained in Rovin's report—which became the base of the district court's summary judgment opinion—and denied the motion.

191.  How the Defendants knew such a devious man's "expert" report would meet no skepticism by the court is a mystery. How the Defendants knew such a sinister man existed—at all—is stunning.  Rovin explained that he worked for President Clinton when Bill Clinton was in office (1991-2001). When asked how he came to be involved with the Clintons, Rovin explained that the Clintons became aware of Rovin because, in Rovin's words, he was **"fixing something for an actor who was in their** (the Clinton's) **inner circle."** Rovin does not identify who this cabinet member is, but during the time Rovin was involved with the Clintons (1991-1998), **Rahm Emanuel** worked as the senior adviser to President Clinton (1993-1998). Rahm Emanuel is Defendant Ari Emanuel's brother.

# SUMMARY OF THE DEFENDANTS'

## UNLAWFUL ACTIONS

### Act 1

192.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other Defendants, created a social network website called Trigger Street, or TriggerStreet ("TS" herein), located at triggerstreet.com from 2002 until 2011, and at labs.triggerstreet.com from 2011 until 2014.

193.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other Defendants, published and rendered the TS "Terms of Use" contract page, which stated:

> Unless otherwise specified, the materials on the Site and in the Services are presented **solely for** the purpose of promoting the entertainment, information, and community resources and services available in, and other uses in, **the United States of America.** We control and operate the Site and the Services from within the United States. We make no representation that materials on the Site or the Services are appropriate or available for use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose to access the Site from other locations do so on their own initiative and are responsible for compliance with local laws.

194.   The previous statement from the TS "Terms of Use" page was deliberately false and/or misleading, and intended to inform members (or suggest, imply or insinuate) that TS was intended for use by and for users in the USA. This was Fraud, Intentional Misrepresentation, False Statements, and Deceit. These false statements were made to falsely assure informed, savvy writers that the website was safe from foreign "bad actors', as there are many nations that do not, or cannot enforce the Universal Copyright Convention, and often American copyright holders never learn that their works were misappropriated by foreign infringers, because the stolen works are only displayed in the infringers' nation. (TS also may have stated it was intended for UAS use to avoid paying taxes on the international earnings from its Budweiser endorsement deal.)

195.  In truth, unbeknownst to American users who had been deceived by the Defendants, from the outset TS was intended for international use.

196.   The Defendants' action were also a violation of Cal Civ 1572, 3294, and 1709.

**Act 2**

197.   Defendant Kevin Spacey made numerous trips abroad, to London, Spain, etc., to give speeches and interviews, and throw parties, intent to recruit new TS members. While in Spain, in 2009, Spacey stated,  "I started the website about six years ago, and we now have close to 400,000 members around the world."

198.   This was **BREACH OF CONTRACT**, as the Plaintiff—like most  members in the USA (perhaps all US members)—believed the website was solely for use in the USA.

**Act 3**

199.   TS and the Defendants provided content and programming from TS to Bud.TV from 2007 to 2009.  Bud.TV also ran an international advertising campaign about TS. This international ad campaign advertised TS (as well as Bud.TV) all around the world. In both, advertising TS in Bud.TV promotions, AND advertising TS on Bud.TV itself, the Defendants **breached** the terms of TS's *Terms Of Use* contract page.

**Act 4**

200.   The Defendant(s) made the TS website with effectively no security features, as ALL members were allowed to ANONYMOUSLY read ALL screenplays. This, while TS claimed to be industry standard, encapsulating all of the desires and needs of its users, and touted its state of the art security. This was a violation of state and federal conspiracy, negligence, gross negligence, fraud, deceit, misrepresentations, and false statements laws.

**Act 5**

201.   Unlike a truly "industry standard" site like Writers Script Network.com, all TS members/users were encouraged and deceived into using and navigating the website with false identities (even for writing reviews). The Defendants' intent was to protect the identities of their misappropriating conspirators, the Privacy page was written and designed to scare user/members into using false identities. The TS Privacy page stated:

> User Names and User Disclosure
> The user name you select or are provided with upon registration with the Site is deemed non-personally identifiable information. Your user name may be published on the Site and may be disclosed to others, including, without limitation, to the public, and to any third parties with whom we

elect to share such information. In addition, **if you include your name or any other personally identifying information** in any material transmitted or posted on public areas of the Site or the Services (including, without limitation, message boards, **reviews** and chat rooms), **such information will become public information and will be published on the Site and will be disclosed to other users of the Site and to other third parties who may have access to or otherwise see a display of such information**.

202.  These statements were made to encourage users to take risks they ordinarily would not take and should not take, as part of the Defendants efforts to persuade users/members to make their wares accessible to the Defendants. This was CONSPIRACY and DECEIT.

### Act 6

203.  The TS Privacy page suggested that the website had a method to reveal the true identity of all "accessors", if necessary.

> Information Disclosure
> We reserve the right to disclose information submitted by or concerning any user as we feel is necessary to protect our systems or business. Specifically, but without limitation, we reserve the right to disclose such information when a visitor or member is in violation of our Terms of Use or any other agreement with us, or engages (or is suspected of engaging) in any harmful, infringing or illegal activity....

204.  However, there is no evidence to support that TS ever, truly, had any method of retrieving any access records, or the accessor's true identity, etc. Nor is there any reason to believe such a system ever existed on TS. Thus, the Defendants' action were in violation of California Civ. Code § 1572, which makes it unlawful to make materially false, fictitious, deceitful, or fraudulent statement or representation.

### Act 7

205.  The Defendant(s) made extraordinary and fraudulent claims about website security; doing so to lure in the best undiscovered writers, and eliminate any doubts or suspicions users might otherwise reasonably have. TS made such false and exceptional claims as:

a.  The TS "About Us" page stated:

> "Our team has been extensively researching and designing TriggerStreet.com to ensure that it **encapsulates every aspect of the user's desires and needs**."

206.   This was Fraud. All reasonable screenwriter members would expect (from a website assuring that the website "**encapsulates _every_ aspect of the user's _desires and needs_**") that records be preserved of all access of writers' work, identifying which members accessed which works, AND recorded by the accessor's true name —AND NOT erase all access history if the member removes his/her work because he/she worried his work may be unsafe on the website. Members would reasonably expect and _desire_ this from a site claiming to be industry standard, because websites like InkTip.com were already doing this. Further, all reasonable members would **desire** and **need** a website to use accurate language, and behave in accordance with the implicit language of the website's _Terms Of Use_. And if these "Terms of Use" stated, suggested, implied that the website was solely for use in the USA, members should expect that site operators would act in accordance with that agreement, and not advertise or recruit abroad. This false claim was made to fraudulently lure writers to an unsafe website.

207.   This was deceit. The Defendants' actions were also in violation of California Civ. Code § 1572 - Statements or entries generally, which makes it unlawful to make any materially false, fictitious, or fraudulent statement or representation. On the TS "_Privacy_" page, the "Security" message stated:

> "Security
> When you submit information via the Site, your information is protected using secure data networks protected by **industry standard firewall and password protection systems**. Our security practices and policies are periodically reviewed and updated as necessary, and only authorized individuals have access to the information provided by our users."

208.   This was also Fraud. There was nothing "industry standard" about the TS screenwriter website. The standard was set by Writers Script Network.com (InkTip.com). InkTip kept all records of all access, even after members left. On Inktip.com, there was no feature erasing all access records upon script removal. By implying all information was protected and secure and industry standard, reasonable members would assume all members' access activity would be recorded, stored, and protected —not erased.

209.   The Defendant(s) and TS used Def Spacey's stardom to lure in writers. Then

writers were **promised** "industry access and exposure"—using Spacey's fame and Academy Award winning laurels to leverage this false promise. TS's statement from its "About Us" page promised that:

> "Based on the principles of creative excellence, it (the TS website) provides **industry access and exposure** to help build the careers of notable new filmmakers and screenwriters."

210. This false promise, bolstered by the other fraudulent statements on the "Terms of Use", "About Us", and "Privacy" pages, expanded a pattern of fraud, false statements, false promises, concealment, intentional misrepresentations, and deceit.

## Act 8

211. The Defendants added a new anti-security feature, whereby if a member removed his/her screenplays from the TS website because he/she worried that his/her work might be unsafe or the target of infringers or pirates, the moment that writer removed his script from the site ALL access records would be erased. The Plaintiff believes the Defs added this feature in 2007 to access and steal the Plaintiff's work. Whether this extra hidden layer of counter-security was added when the website was made, in 2002, or if it was added in 2007, the Defendant(s) and TS did not inform members about this feature, and it was never mentioned on the TS website. The Defendants' failure to inform members of this anti-security feature, and the risks it posed, was a deliberate omission of imperative information. The Defendants actions were in violation of California Civ. Code § 1572, fraud by omission, and constitute DECEIT in violation of California Civ. Code § 1709.

## Act 9

212. Corporations are expected to do due diligence in all substantial purchases, transactions and deals (such as investing $120 million in a film). Due diligence means doing **"a complete and appropriate review of documentation and facts by a potential buyer or its agents before purchasing an asset or engaging in business with a prospect"** (from the Law Offices of Stimmel, Stimmel & Smith) This definition goes on to require a "...complete review using lawyers and CPAs to assist so that when one is done, one knows all that one needs to know before engaging in business with or buying a company or other

asset or piece of property." The Defendants did not do due diligence —failing to even read the screenplay before buying its rights. Thus, the Defendants engaged in **gross negligence.**

**Act 10**

213.   The Defendants engaged in conflicts of interests that violated **CALIFORNIA LABOR CODE SECTION 1700.39**, which states, "No talent agency shall divide fees with an employer, an agent or other employee of an employer." Defendant Ari Emanuel was the central talent agent in making the film Elysium, representing Elysium's star Def Matt Damon and its writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an owner of MRC (the employer of Def Neill Blomkamp for the making of Elysium, and the buyer of Elysium's film rights). Thus, Def Ari Emanuel divided fees as a talent agent and employer. The Plaintiff was injured by this violation of California law.

**Act 11**

214.   The Defendants engaged in **Violations Of California Business & Professions Code § 17200, Et Seq., Unfair Business Practices Act.** Sony Pictures' (a publicly traded company), and its CEO Michael Lynton, violated California Business & Professions Code § 17200, ET SEQ., by engaging in improper and unethical business relationship, whereby Michael Lynton, acting as an officer of Sony Pictures, hired a subcontractor (Screenbid) to sell numerous items of substantial value for Sony Pictures. Thus, Def Lynton profited as Sony Pictures' CEO, and he and Defs Ari Emanuel and Bill Block profited as the owners of Screenbid, the subcontracted auction service. This was a conflict of interest.

215.   This improper relationship caused CEO Michael Lynton to encourage his subordinates and peers NOT to scrutinize projects, clients or business entities associated with his secret business partner Def Ari Emanuel. Thus, Sony Pictures agreed to distribute Elysium without doing due diligence to read a screenplay to see to it that it was reasonably executed. Had Sony Pictures employed a reasonable standard of due diligence, Elysium would not have been made; thus, no injury would have come to the Plaintiff.

**Act 12**

216.   The Defendants engaged in Spoliation Of Evidence by closing and destroying the TS website  6 days after the Plaintiff filed his Notice of Appeal to the Ninth Circuit Court of

1   Appeals. The Defendants did this to destroy unfavorable evidence, because the district court

2   based its MFSJ ruling on reversed law (cited by the Defendants), rather than the prevailing

3   law (cited by Plaintiff). Thus, Briggs v Blomkamp, et al, is/was apt to be returned to the

4   lower court, where the Plaintiff will/would subpoena all website access records, to confirm

5   the Defendants used TS to access the Plaintiff's work, and/or confirm that TS

6   misrepresented its security and ID protection features, and had no such records or oversight.

7   **Act 13**

8   217.   By conspiring to hire "fixer" Jeff Rovin (who spent years of his life writing false

9   "smear" stories for tabloid news) to submit a falsified "expert" report to the court, the

10  Defendants engaged in civil conspiracy, as well as fraud and deceit in violation of California

11  Civ. Code §§ 1572 and 1709. In these actions may also constitute Subornation Of Perjury

12  **Act 14**

13  218.   By stating, in their answers to the Plaintiff's interrogatories, that Simon Kinberg

14  only provided a "polish" to the Defendants script *Elysium* (when, in fact, Kinberg did

15  exhaustive work to salvage the screenplay) the Defendants engaged a conspiracy to commit

16  fraud and deceit, violating California Civ. Code §§ 1572 and 1709. Beyond these civil

17  infractions, the Defendants may have committed **Perjury,** violating 18 U.S. Code § 1001.

18  **Act 15**

19  219.   In the Briggs v Blomkamp Complaint, the Plaintiff stated that the *Elysium* film

20  editor(s) would confirm that Film editing resumed in June, 2013 (after initially wrapping up

21  in February 2013) —after the Defendants learned of the Plaintiff's impending lawsuit. The

21  Plaintiff predicted the editor(s) would confirm that this final editing was done to remove the

22  hero's headaches. But during discovery, the Defs gave Plaintiff only a statement from Julian

23  Clarke, refusing to provide a statement from final editor, Lee Clarke. Thus, the Defendants

24  **violated RULE 37** —a violation that may have changed the outcome of the case**. The**

25  **Defendants' actions violated Cal Civ 1572 and 1709** —and perhaps 18 U.S. Code § 1001.

26  **Act 16**

27  220.   Using the TS website, Defendants Spacey and Brunetti marketed the Plaintiff's

28  original screenplay in foreign markets all around the world, without informing the Plaintiff.

The TS social network website made representations that the website was solely for use in the USA. The plaintiff relied on these claims. Unbeknownst to the Plaintiff, the Defendants repeatedly travelled to foreign markets to invite foreign citizens to join TS, where they could freely access the Plaintiff's screenplay ("Butterfly Driver", posted on TS in 2007). In engaging in these actions, **the Defendant committed INFRINGING EXPORTATION of the Plaintiff's copyright protected property,** under 17 USC § 602(a)(2), which makes it unlawful to export copyrighted property from the USA, without the authority of the owner of copyright, as this would infringe of the copyright owner's exclusive right to distribute, under 17 USC § 106; actionable under sections 17 USC § 501.

221.    The Plaintiff was unaware of  Defendants Spacey's and Brunetti's infringing exportation of his work until February of  2016, when the Plaintiff discovered a BBC article, written in 2009, about Kevin Spacey travelling to Barcelona, Spain to tout TS's "400,000 members around the world." (See Exhibit T). **Immediately, upon discovering the article, the Plaintiff notified the 9th Circuit Court of Appeals, via a court filing on February 29th, 2016.** Shortly after discovering the article, the Plaintiff discovered other articles about Spacey travelling abroad to market TS, dating back to 2002. (See **Exhibit P and Q.**) American users were never informed that TS was being marketed around the world.

222.    The 3 year statute of limitations to take legal action on this infringement started to run in February 2016, when the Plaintiff learned of the Defendants' infringement.

### Act 17

223.    Defendants Spacey's and Brunetti's actions (detailed in the 3 preceding paragraphs under the heading "Act 16") infringed on the Plaintiff's exclusive copyrights of his screenplay *Butterfly Driver*, posted on the TS website in 2007, as the Defendants' actions violated the Plaintiff's exclusive right to distribute his work, under section 17 USC § 106.


### STATEMENT OF INJURY

224.  Among the injuries caused by the Defendants' actions were (1) the misappropriation of Plaintiff's work; (2) the infringement of the Plaintiff's copyright —by a foreign actor (Blomkamp); (3) a judgement against the Plaintiff in his effort to protect his copyright.

| | |
|---|---|
| 1 | **CLAIMS FOR RELIEF** |
| 2 | **FIRST CLAIM FOR RELIEF** |
| 3 | CIVIL CONSPIRACY<br>(**Against All Defendants**) |
| 4 | 225.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through |
| 5 | 224, as if fully set out herein. |
| 6 | 226.   Judicial Council of California Civil Jury Instructions states that "A conspiracy is an |
| 7 | agreement by two or more persons to commit a wrongful act. **Such an agreement may be** |
| 8 | **made orally or in writing _or_ _may_ _be_ _implied_ _by_ _the_ _conduct_ _of_ _the_ _parties_**." Keeping |
| 9 | with standard, the Defendants engaged in three (3) conspiracies. While engaged in these |
| 10 | conspiracies, the Defendants committed many clear, overt acts. |
| 11 | **First Conspiracy** |
| 12 | 227.   To unlawfully enrich themselves, the Defendants conspired to create a social |
| 13 | network for screenwriters and filmmakers, with little or no security features. The |
| 14 | Defendants would then mislead screenwriters that the website was safe, then the Defendants |
| 15 | could access and misappropriate the screenwriters' work. In the execution of this conspiracy |
| 16 | the Defendants took the following overt actions: |
| 17 | 1.   The Defendants conspired to create a social network website (TS) for screenwriters |
| 18 | and filmmakers, a website with effectively no security features. |
| 19 | 2.   The Defendants conspired to commit fraud and mislead TS member/users that the |
| 20 | website had reasonable security features, when it had none. |
| 21 | 3.   The Defendants conspired to add a anti-security feature that erased all access |
| 21 | information if members removed their screenplays. |
| 22 | 4.   The Defendants conspired to add the anti-security feature in 2007, to erase evidence |
| 23 | of their access of the Plaintiff's script. |
| 24 | 5.   The Defendants conspired to make the film Elysium, careful not to leak any |
| 25 | information about the project . |
| 26 | 6.   The Defendants conspired to create a _Terms of Use_ page that stated the website was |
| 27 | intended solely for use in America, but the Defendants repeatedly sent Def Spacey |
| 28 | around the globe to recruit members, in violation of the _Terms of Use_ agreement. |

7.  Also in violation of the Terms of Use agreement the Defendants secretly advertised TS on international websites like Bud.TV, and other international media outlets.

8.  While producing *Elysium*, the Defendants conspired to keep the script an absolute secret, not even allowing Hollywood giants like Jody Foster to take the script home.

9.  The Defendants (particularly Ari Emanuel, who profited the most from these acts and arrangements) had actors Def Damon and Affleck start a screenwriter/filmmaker website, similar to TS, called Project Greenlight. Not coincidentally, these two websites were created only a month apart; both websites used celebrity endorsers; both websites have been accused of being the *access* point in major film and TV copyright infringement suits; both of these "stolen" projects were eventually sold to companies with deep connections to Def Emanuel (MRC and Universal Pictures).

**Second Conspiracy**

228.   Once the Plaintiff realized the Defendants misappropriated his work, he sued.

229.    In response, the Defendants devised a second conspiracy to prevent the Plaintiff from prevailing in his copyright lawsuit. Their plan involved cheating the Plaintiff and the US federal justice systems. In the execution of this second conspiracy the Defendants took the following actions:

1.  Rather than hiring an intellectual property attorneys as their expert witness in Briggs v Blomkamp, the Defendants opted to hire a con man named Jeff Rovin; who, two years later, admitted on Fox News' "The Sean Hannity Show" that he was a "fixer" who worked for President Bill Clinton, where he used his literary skill to create "smear" stories, to attack Clinton critics in tabloid newspapers. Rovin said he came to work for Bill and Hillary Clinton because he was working for another "actor" in the Clinton White House. This *actor* wss surely Rahm Emanuel, the Senior Advisor to the President (Clinton), who is also Defendant Ari Emanuel's brother;

2.  During discovery in Briggs v Blomkamp, the Defendants conspired to prevent editor Lee Smith from answering the Plaintiff's interrogatories;

3.  The Defendants made false statements in their interrogatory answers, as Simon Kinberg stated that he merely "polished" Def Blomkamp's script;

4. The Defendants conspired to shut-down and destroy the TS social network 6 days after the Plaintiff filed his Notice Of Appeal;

**Third Conspiracy**

230. To greatly increase their rate of personal enrichment, the Defendants conspired to break California business, labor and ethics codes. Breaking these codes caused an erosion in the Defendants' business practices, causing them to act recklessly and negligently. In the execution of this second conspiracy the Defendants took the following negligent actions:

1. The Defendants conspired to commit to invest over $100,000,000 to make the film Elysium, without reading a script.

2. The Defendants conspired to create an arrangement where Universal Pictures, or its parent or its subsidiaries, would finance and/or distribute any project Def Ari Emanuel brought to Universal Pictures—even unlawfully acquired projects.

3. The Defendants conspired to engage in inappropriate business relationships, such as Def Emanuel and Sony Pictures CEO Michael Lynton co-owning Screenbid, and Defendant Emanuel co-owning MRC (violating Cal Labor Code 1700.39).

231. In these actions the Defendants willfully, with disregard for the Plaintiff's rights, and with disregard for the law, engaged in one or more conspiracies.

232. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
<u>SPOLIATION OF EVIDENCE</u>
**(Against All Defendants)**

233. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 232, as if fully set out herein.

234. California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression or destruction of evidence unlawful, stating: **"You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."** Similarly, 18 U.S. Code § 1519 makes it unlawful to destroy evidence —even in **anticipation or contemplation** of a legal action.

235. The Defendants engaged in spoliation of evidence by closing and destroying their

1  social network, TS (TriggerStreet.com). Although the Defendants knew the website was the

2  central access point of an ongoing legal case, they closed the site 6 days after the Plaintiff

3  filed his Notice Of Appeal.

4     236.   The Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff,

5  and with disregard for the law, acted to violate the law and conceal and destroy evidence.

6     237.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

7  amount to be determined at trial, in accordance with prevailing compensatory and/or

8  punitive damages guideline.

9                    **THIRD CLAIM FOR RELIEF**
                   <u>BREACH OF CONTRACT</u>

10            Violating California Code, Civil Code § 3294

11        **(Against Defendants Kevin Spacey and  Dana Brunetti)**

12     238.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

13  237, as if fully set out herein.

14     239.   In joining the TS (TriggerStreet) social network, the plaintiff entered into a contract

15  with Defendant Spacey and Brunetti. By repeatedly travelling abroad to places like London

16  and Barcelona to market TS, the Defendants breached the TS "Terms of Use" contract,

17  which stated the site was made **solely for use in the USA**. The Defendants furthered

18  breached this contract by secretly advertising the TS social network on various media

19  outlets, like Bud.TV.  In these actions the Defendants committed numerous contractual

20  breaches, in violation of California Civil Code § 3294.

21     240.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

21  amount to be determined at trial.

22                  **FOURTH CLAIM FOR RELIEF**
        <u>FRAUD / INTENTIONAL MISREPRESENTATIONS</u>

23             Violating California Civ. Code § 1572

24    **(Against Defs Satchu, Wiczyk, MRC II Dist Co LP, Blomkamp, Spacey, Brunetti)**

25     241.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

26  240, as if fully set out herein.

27     242.   The Defendants produced contracts in which the Defendants made claims that they

28  purported as true. The Defendants knew these claims were false. The Defendants intended

| | |
|---|---|
| 1 | for the Plaintiff, and others, to rely on their representations. The Plaintiff relied on the |
| 2 | Defendants' claims. The Plaintiff was harmed by the Defendants' false representations. The |
| 3 | Plaintiff's reliance on the Defendants' false representation was a substantial factor in the |
| 4 | Plaintiff's harm. In these actions, the Defendants committed fraud, intentional |
| 5 | misrepresentation, and fraudulent omission, in violation of Cal Civ. § 1572. |
| 6 | 243.  The Plaintiff was injured as a consequence of the Defendants' actions, in an |
| 7 | amount to be determined at trial. |

<center>

**FIFTH CLAIM FOR RELIEF**

<u>DECEIT</u>

Violating California Civ. Code §§ 1709 & 1710

**(Against Defs MRC II Dist Co LP, Blomkamp, Spacey, Brunetti, Wiczyk, and Satchu)**

</center>

| | |
|---|---|
| 11 | 244.  The Plaintiff hereby realleges and incorporates by reference paragraphs 1 through |
| 12 | 243, as if fully set out herein. |
| 13 | 245.  In their numerous acts of Deceit, detailed herein, the Defendants (1) suggested as |
| 14 | fact things that were not true and that they did not believe to be true; (2) asserted as fact, |
| 15 | that which was not true, which they had no reasonable ground for believing to be true; (3) |
| 16 | suppressed facts which they were bound to disclose it, and gave information of other facts |
| 17 | which were likely to mislead. In these actions the Defendants engaged in Deceit, in |
| 18 | violation of California Civ. Code §§ 1709 and 1710. |
| 19 | 246.  The Plaintiff was injured as a consequence of the Defendants' actions, in an |
| 20 | amount to be determined at trial. |

<center>

**SIXTH CLAIM FOR RELIEF**

<u>CONCEALMENT</u>

Violating California Civ. Code § 1709

**(Against Defendants MRC II Distribution Company LP, Blomkamp, Spacey, Brunetti)**

</center>

| | |
|---|---|
| 23 | 247.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through |
| 24 | 246, as if fully set out herein. |
| 25 | 248.  The Defendants engaged in numerous acts of Concealment (e.g. during discovery in |
| 26 | Briggs v Blomkamp, witnesses and agents for the Defendants intentionally failed to disclose |
| 27 | certain facts that were known only to them, which the Plaintiff could not have discovered), |
| 28 | in violation of California Civ. Code § 1709. |

<center>

COMPLAINT

56

</center>

249. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
NEGLIGENCE
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

250. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 249, as if fully set out herein.

251. The Defendants engaged in a variety of negligent business practices, in violation of Cal. Civ. Code § 1714(a). The Plaintiff was harmed by the Defendants' negligence. The Defendants' negligence was a substantial factor in causing the Plaintiff's harm.

252. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
GROSS NEGLIGENCE
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

253. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 252, as if fully set out herein.

254. Through their actions as engaging in prohibited business relationships, and failing to read the screenplay before buying its rights, the Defendants engaged in grossly negligent business practices. The Plaintiff was harmed by the Defendants' gross negligence. The Defendants' gross negligence was a substantial factor in causing the Plaintiff's harm. The Defendants actions were in violation of Cal. Civ. Code § 1714(a).

255. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
VIOLATING CALIFORNIA LABOR CODE § 1700.39
(Against Emanuel, Block, MRC II Dist Co lp, Universal City Stu llc, Sony Pictures Ent Inc)

256. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 255, as if fully set out herein.

257. The Defendants violated **CALIFORNIA LABOR CODE SECTION 1700.39**,

which states, "No talent agency shall divide fees with an employer, an agent or other employee of an employer." Defendant Ari Emanuel represented *Elysium*'s star Def Matt Damon, and represented writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an owner of MRC (the employer of Defs Blomkamp and Damon for the making of *Elysium*). Thus, Emanuel divided fees as an agent and employer. In so doing the Defendants violated California Labor Code 1700.39.

258.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### TENTH CLAIM FOR RELIEF
### <u>VIOLATION OF UNFAIR BUSINESS PRACTICES ACT</u>
[CAL BUS & PROF CODE§ 17200, ET SEQ.]
**(Against Defendants Emanuel, Block, MRC II Dist Co LP, Sony Pictures Ent Inc)**

259.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 258, as if fully set out herein.

260.    Def Emanuel and Def Block, while acting as the CEOs of WME and Miramax, respectively, secretly entered into  a private business partnership with Sony Pictures Entertainment's CEO Michael Lynton, as co-owners of Screenbid, a business that said Defendants then used as a subcontractor for WME, Miramax, and Sony Picture Ent. In these actions the Defendants violated the California's Unfair Business Practices Act [Cal Bus & Prof Code§ 17200, Et Seq.]. Further, these arrangements contributed to the negligent culture that lead to the Defendants' misappropriation of the Plaintiff's work.

261.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF
### <u>WITNESS TAMPERING</u>
**(Against Defs Emanuel, Block, Blomkamp, MRC II Dist Co lp,, Sony Pictures Ent Inc)**

262.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 261, as if fully set out herein.

263.   California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression of of evidence unlawful; stating: **"You may consider whether one party intentionally <u>concealed</u> or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have**

been unfavorable to that party." In such actions as (1) hiring a professional "fixer" to provide a falsified expert witness report, and (2) proffering a discovery statement from writer Simon Kinberg stating that he merely "polished" Def Blomkamp's screenplay—when the online film communication records show Kinberg performed a massive reworking of the screenplay— the Defendants willfully engaged in witness tampering.

264. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

<div align="center">

**TWELFTH CLAIM FOR RELIEF**
INFRINGING EXPORTATION
Violating  17 USC § 602(a)(2)
**(Against Defendants Spacey and Brunetti)**

</div>

265.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 264, as if fully set out herein.

266.   By marketing and making the Plaintiff's work available around the world on the TS social network website, without the Plaintiff's consent, Defendants Spacey and Brunetti committed Infringing Exportation of the Plaintiff's copyrighted work, under 17 USC § 602(a)(2); thereby violating the Plaintiff's exclusive right to distribute his copyrighted work under 17 USC 106(3), enforceable under 17 USC § 501(a): Copyright Infringement.

267. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

<div align="center">

**THIRTEENTH CLAIM FOR RELIEF**
COPYRIGHT INFRINGEMENT
Under 17 USC § 501(a)
**(Against Defendants Spacey and Brunetti)**

</div>

268.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 267, as if fully set out herein.

269.   By marketing and making the Plaintiff's work available around the world on the TS social network website, without the Plaintiff's consent, Defs Spacey and Brunetti infringed on the Plaintiff's exclusive right to distribute his work, violating 17 USC § 501(a).

270. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

<div align="center">

COMPLAINT
59

</div>

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

1. For general damages in an amount according to proof at the time of trial;
2. For exemplary damages;
3. For special damages in an amount according to proof at trial;
4. For restitution and disgorgement of all profits (estimated at $850,000,000—which represents all projected profits the Defendants will realize from the misappropriation of the Plaintiff's work; see p19, para 2) for the Plaintiff, consistent with US copyright remedies;
5. For Plaintiff's cost of this lawsuit and reasonable attorney's fees;
6. For such injunctions and additional relief the Court may deem proper.

DATED: January 2st, 2018

Respectfully Submitted,

By: __/s/ Steve Wilson Briggs_____

Steve Wilson Briggs

Plaintiff In Propria Persona

# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVE KENYATTA WILSON BRIGGS,

Plaintiff,

v.

UNIVERSAL PICTURES, et al.,

Defendants.

Case No. 17-cv-06552-VC

**ORDER DISMISSING CASE**

Re: Dkt. No. 69

Steve Wilson Briggs has not met his burden of establishing that he properly served either Dana Brunetti or Kevin Spacey. He has provided no information to suggest that the purported agents he served – or at least attempted to serve – were in fact authorized either "by appointment or by law to receive service of process" for Spacey and Brunetti. Fed. R. Civ. P. 4(e)(2)(C). The fact that Todd Rubenstein of Morris Yorn Barnes Levine Krintzman Rubenstein Kohner & Gellman has represented Spacey in other actions is not evidence Rubenstein or Morris Yorn is authorized to accept service for Spacey. Likewise, the fact that Matt DelPiano of Creative Artists Agency is Dana Brunetti's talent agent does not suggest that DelPiano or Creative Artists Agency is authorized to accept service for Brunetti.

Moreover, even if Todd Rubenstein or Matt DelPiano were agents to Spacey or Brunetti, Briggs has not provided evidence to suggest that process was personally delivered to either DelPiano or Rubenstein, as would be required under either Federal Rule of Civil Procedure 4(e)(2)(C) or California law. *See* Dkt. Nos. 46-47. Nor has he provided evidence that Morris Yorn or Creative Artists Agency were properly served under either Federal Rule of Civil Procedure 4(h)(1)(B) or California law. *Id.*

Briggs has not shown good cause for his failure to properly serve Spacey and Brunetti. *See* Fed. R. Civ. P. 4(m). Inadvertent failure to comply with Rule 4 does not constitute good cause. *See Townsel v. Contra Costa County*, 820 F.2d 319, 320 (9th Cir. 1987). Moreover, there is no indication that Spacey or Brunetti have actually learned of this suit. *See Boudette v. Barnette*, 923 F.2d 754, 756 (9th Cir. 1991). The Court declines to otherwise extend the time for service of process. Thus, all counts against Brunetti and Spacey are dismissed without prejudice.

There are no federal claims asserted against any of the remaining defendants, and the Court declines to exercise supplemental jurisdiction on the state-law claims. *See* 28 U.S.C. § 1367(c)(3). Thus, these remaining claims are also dismissed without prejudice.

**IT IS SO ORDERED.**

Dated: April 25, 2018

_____

VINCE CHHABRIA
United States District Judge