1  KELLI L. SAGER (State Bar No. 120162)
      kellisager@dwt.com
2  ROCHELLE L. WILCOX (State Bar No. 197790)
      rochellewilcox@dwt.com
3  BRENDAN N. CHARNEY (State Bar No. 293378)
      brendancharney@dwt.com
4  DAVIS WRIGHT TREMAINE LLP
   865 South Figueroa Street, Suite 2400
5  Los Angeles, California 90017
   Telephone:    (213) 633-6800
6  Facsimile:    (213) 633-6899

7  Attorneys for Defendant
   NBCUNIVERSAL MEDIA, LLC
8

9               IN THE UNITED STATES DISTRICT COURT

10             THE NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12

13  STEVE WILSON BRIGGS,                Case No. 18-cv-4952

14           Plaintiff,                 [Hon. Vince Chhabria]

15       v.                            **NBCUNIVERSAL MEDIA, LLC'S
                                        REQUEST FOR JUDICIAL NOTICE**
16  KEVIN SPACEY; ARI (ARIEL) EMANUEL;
    MATT DAMON; BEN AFFLECK;            (Motion to Dismiss; Proposed Order Filed
17  NBCUNIVERSAL MEDIA, LLC; SONY       Concurrently)
    PICTURES ENT. INC.; TRIGGER STREET
18  PRODUCTIONS; NEILL BLOMKAMP; ASIF   Date:      December 20, 2018
    SATCHU; MORDECAI (MODI) WICZYK;     Time:      10:00 a.m.
19  WILLIAM (BILL) BLOCK; DANA          Crtrm:     4
    BRUNETTI; SOUND POINT CAPITAL
20  MANAGEMENT, LC; MRC (and all MRC
    entities and subs.),
21
22
23           Defendants.

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

# I.   INTRODUCTION

In connection with its concurrently-filed Motion to Dismiss the Complaint, NBCUniversal Media, LLC ("NBCU") hereby respectfully request that the Court take judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of documents from the court file in prior actions filed by Plaintiff: Briggs v. Blomkamp, N.D. Cal. No 13-cv-04679, 9th Cir. No. 14-17175, Supreme Ct. No. 18-63; and Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552. Specifically, NBCU requests judicial notice of the following:

**Ex. A:**   Judgment, Briggs v. Blomkamp, N.D. Cal. No 13-cv-04679 (October 3, 2014) (ECF No. 87);

**Ex. B:**   Memorandum Opinion, Briggs v. Sony Pictures Ent., 9th Cir. No. 14-17175 (ECF No. 32-1) (filed March 1, 2018);

**Ex. C:**   Order, Briggs v. Sony Pictures Ent., 9th Cir. No. 14-17175 (ECF No. 34) (filed April 6, 2018);

**Ex. D:**   Order Denying Writ of Certiorari, Briggs v. Sony Pictures Ent., Supreme Ct. No. 18-63 (filed Oct 1, 2018);

**Ex. E:**   Complaint, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 1) (without exhibits);

**Ex. F:**   First Amended Complaint, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 21) (without exhibits);

**Ex. G:**   Motion to Dismiss First Amended Complaint, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 26);

**Ex. H:**   Response to Order to Show Cause, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 73); and,

**Ex. I:**   Order Dismissing Case, Briggs v. Universal Pictures, N.D. Cal. No. 17-cv-6552 (ECF No. 76).

# II.   MEMORANDUM OF POINTS AND AUTHORITIES

Federal Rule of Evidence 201 gives the Court the power to take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonably be questioned." Fed. R. Evid. 201(b)(2).  The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).  Judicial notice may be taken at any stage of the proceedings.  Fed. R. Evid. 201(d).

Rule 201 allows the court to "take judicial notice of court filings and other matters of public record."  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); see also Harris v. Cty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012) (taking judicial notice of documents on file in related action for purposes of evaluating claim preclusion); MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986) (taking judicial notice of a motion to dismiss together with a supporting memorandum filed in a separate matter).  "[T]he court may take judicial notice of and consider matters of public record without converting a Rule 12(b)(6) motion to dismiss into a motion for summary judgment."  Fountain v. JP Morgan Chase Bank, N.A., 2017 WL 2272072, at *2 (D. Haw. May 24, 2017) (citing Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)).

Here, each of the documents as to which Defendants request judicial notice appears in the public record as part of court files in prior lawsuits filed by Plaintiff Steven Briggs.  These documents can be judicially noticed because they are public records, issued by or submitted to a court, and their authenticity cannot be contested.  The Court therefore should take judicial notice of the requested documents.

### III. CONCLUSION

For the reasons set forth in this Request for Judicial Notice, NBCU respectfully requests that this Court take judicial notice of the documents listed above and attached hereto.

DATED: November 9, 2018

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ROCHELLE L. WILCOX
BRENDAN N. CHARNEY


By: */s/ Rochelle L. Wilcox*
    Rochelle L. Wilcox

Attorneys for Defendants
NBCUNIVERSAL MEDIA, LLC

DAVIS WRIGHT TREMAINE LLP

REQUEST FOR JUDICIAL NOTICE
Case No. 18-cv-04952
4844-8173-5034v.2 0020040-000144

Exhibit A

**United States District Court**

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVE WILSON BRIGGS,

        Plaintiff,                No. C 13-4679 PJH

        v.                      **JUDGMENT**

NEILL BLOMKAMP, et al.,

        Defendants.

_____/

      The court having granted defendants' motion for summary judgment and denied plaintiff's motion for summary judgment,

      It is Ordered and Adjudged

      that plaintiff Steve Wilson Briggs take nothing, and that the action be dismissed.

Dated:  October 3, 2014

                                             _____

                                           PHYLLIS J. HAMILTON
                                         United States District Judge

# Exhibit B

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAR 1 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STEVE K. WILSON BRIGGS, | No.  14-17175 |
| Plaintiff-Appellant, | D.C. No. 4:13-cv-04679-PJH |
| v. | |
| SONY PICTURES ENTERTAINMENT, INC.; TRISTAR PICTURES, INC.; MEDIA RIGHTS CAPITAL; QED INTERNATIONAL; NEILL BLOMKAMP, | MEMORANDUM[*] |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief Judge, Presiding

Submitted February 28, 2018[**]

Before:     Thomas, Chief Judge, Trott and Silverman, Circuit Judges.

Steve K. Wilson Briggs appeals pro se from the district court's summary

judgment in his copyright action.  We have jurisdiction under 28 U.S.C. § 1291.

We review de novo, *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir.

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]     The panel unanimously concludes that this case is suitable for decision without oral argument.  *See* Fed. R. App. P. 34(a)(2).

2002), and we affirm.

The district court properly granted summary judgment on Briggs's copyright infringement claim because Briggs failed to raise a genuine dispute of material fact as to whether defendants accessed his screenplay *Butterfly Driver*, or whether Briggs's screenplay and defendants' film *Elysium* are either strikingly or substantially similar. *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012) (setting forth ways a plaintiff may prove access); *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987) ("Absent evidence of access, a 'striking similarity' between the works may give rise to a permissible inference of copying."); *see also Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624-25 (9th Cir. 2010) (setting forth the extrinsic test to assess substantial similarity between specific expressive elements of copyrighted works at issue, such as plot, sequence of events, theme, dialogue, mood, setting, pace, and characters).

We reject Briggs's unsupported contention that the district court applied the wrong standard for deciding whether the defendant has accessed the plaintiff's work. *L.A. Printex* did not overrule *Art Attacks Ink, LLC v. MGA Entertainment, Inc.*, 581 F.3d 1138 (9th Cir. 2009), or *Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000), by not expressly reiterating that speculation or conjecture fails to establish a reasonable probability of access. *See L.A. Printex,* 676 F.3d at 846 (""To prove access, a plaintiff must show a reasonable possibility, not merely a

bare possibility, that an alleged infringer had the chance to view the protected work.""") (quoting *Art Attacks Ink*, 581 F.3d at 1143); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."). This court in *Loomis v. Cornish* reaffirmed that access can be proved with circumstantial evidence either by a chain of events linking the plaintiff's work and the defendant's access, or by showing that the plaintiff's work has been widely disseminated. *See Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). Summary judgment was proper because Briggs's speculations about access did not raise a triable dispute.

The district court did not abuse its discretion by denying Briggs's motion to amend his complaint after the deadline set forth in the pretrial scheduling order because Briggs failed to show "good cause." *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-09 (9th Cir. 1992) (setting forth standard of review and the "good cause" requirement to modify a scheduling order).

The district court did not abuse its discretion by granting Briggs a shorter discovery continuance than he had requested. *See Martel v. Cnty. of Los Angeles*, 56 F.3d 993, 995 (9th Cir. 1995) (en banc) ("[A] district court's decision to deny a continuance sought for the purposes of obtaining discovery will be disturbed only upon the clearest showing that denial of discovery results in actual and substantial

prejudice to the complaining litigant.") (citation and internal quotation marks omitted).

**AFFIRMED.**

14-17175

Exhibit C

FILED

UNITED STATES COURT OF APPEALS

APR 06 2018

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STEVE K. WILSON BRIGGS,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>SONY PICTURES ENTERTAINMENT,<br>INC.; et al.,<br><br>    Defendants-Appellees. | No.   14-17175<br><br>D.C. No. 4:13-cv-04679-PJH<br>Northern District of California,<br>Oakland<br><br><br>ORDER |

Before:  THOMAS, Chief Judge, and TROTT and SILVERMAN, Circuit Judges.

The panel has voted to deny Appellant's petition for rehearing and Chief

Judge Thomas has voted to reject the petition for rehearing en banc and Judges

Trott and Silverman so recommend.

The full court has been advised of the petition for rehearing en banc and no

active judge has requested a vote on whether to rehear the matter en banc.  Fed. R.

App. P. 35.

The petition for rehearing and the petition for rehearing en banc are

DENIED.

Exhibit D

Oct. 1, 2018.

2018 WL 3391694
Only the Westlaw citation is currently available.
Supreme Court of the United States

BRIGGS, STEVE K. W. V. SONY PICTURES, ET AL.

No. 18-63.
|

**Opinion**

**\*1**  The petition for writ of certiorari is denied.

**All Citations**

--- S.Ct. ----, 2018 WL 3391694 (Mem)

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit E

CHAMBERS

1  Steve Wilson Briggs

2  4322 Chico Ave.

3  Santa Rosa, CA 95407

4  510 200 3763

5  snc.steve@gmail.com

6  PLAINTIFF In Propria Persona

**ORIGINAL FILED**

NOV 13 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

8              UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

*LB*

10

11  STEVE WILSON BRIGGS

12              Plaintiff,

13                  vs

14  UNIVERSAL PICTURES;
    SONY PICTURES;
15  NBCUNIVERSAL;
    KEVIN SPACEY;
16  ARIEL (ARI) EMANUEL;
17  MATTHEW (MATT) DAMON;
    BEN AFFLECK;
18  NEILL BLOMKAMP;
    MORDECAI (MODI) WICZYK;
19  ASIF SATCHU;
20  BILL BLOCK;
    DANA BRUNETTI;
21  MRC;
     all MRC entities and subsidiaries:
22  (MEDIA RIGHTS CAPITAL; MRC II LP;
23   MRC II DISTRIBUTION COMPANY LP;
     MRC II HOLDINGS, L.P.; ASGARI INC.;
24  OAKTREE ENTERTAINMENT, INC.;
    MRC I HEDGE CO, LLC; MRC SUB GP,
25  LLC; MRC II CAPITAL COMPANY, L.P.;
26  MRC I PROJECT COMPANY, LLC)

27              Defendants.

28

Civ No:

**CV 17 6552**

**COMPLAINT FOR:**

1.  **CONSPIRACY**
2.  **OBSTRUCTION OF JUSTICE**
3.  **FALSE STATEMENTS**
4.  **BREACH OF CONTRACT**
5.  **FRAUD AND FALSE STATEMENTS**
6.  **DECEIT**
7.  **NEGLIGENCE**
8.  **GROSS NEGLIGENCE**
9.  **VIOLATION OF CALIFORNIA LABOR CODE § 1700.39**
10. **VIOLATION OF UNFAIR BUSINESS PRACTICES ACT [CAL BUS & PROF CODE § 17200, ET SEQ.]**
11. **PERJURY**
12. **TAMPERING WITH EVIDENCE**
13. **WITNESS TAMPERING**
14. **SUBORNATION OF PERJURY**

**DEMAND FOR JURY TRIAL**

COMPLAINT

1

## NATURE OF ACTION:

1. Pursuant to 28 U.S. Code § 1332 (as this matter involves Defendants who are not American citizens, and concerns violations that cross US state and international borders) the Plaintiff brings this lawsuit against the Defendants (**Defs**) for their willful violations of US and California state laws, done for their personal enrichment and/or to gain unlawful competitive advantage, through their participation in such actions and violations as:

1. Obstruction Of Justice: 6 days after Plaintiff filed his Notice of Appeal (in Briggs v Blomkamp, C134679 PJH), the Defs closed their social network (TriggerStreet), to destroy evidence and records, as this was their *access* point in Briggs v Blomkamp.

2. The Defs used Def Emanuel's influence with Universal Pictures to entice, persuade or bribe the enlistment of other conspirators, and as leverage against business rivals.

3. The Defendants created a social network, "TriggerStreet.com" (**TS**) to secretly and unlawfully access, appropriate and alter unsuspecting writers' work. The Defendants financially profited from these activities, or received film acting roles for themselves, or film production or distribution benefits;

4. Without informing TS members, the Defendants installed a secret counter-security feature on TS, which erased all access records if a member deleted their work.

5. Breach: TS's "Terms of Use" stated the site was made **solely for use in the USA**, yet Def Spacey went to London for a TS launch party and interviews, and went to Spain for a TS recruitment speech, to tout TS's **"400,000 members <u>around the world."</u>**

6. Evidence will show Def Ari Emanuel, a talent agent, is also Hollywood's most powerful film producer—against California labor & business codes § 1700.39, which makes it unlawful for a talent agent to act as both agent and as an employer.

7. In a surreal move, in Briggs v Blomkamp, rather than hiring a copyright attorney, the Defs hired fixer/conman **Jeff Rovin**—a high school-educated fantasy writer—as their sole "expert" witness. Rovin provided falsified and fraudulent testimony to the court (surely on the Defs orders). Two years after Briggs v Blomkamp went to appeals, Rovin went on national TV, Fox News' *"The Sean Hannity Show,"* Oct. 24, 2016, to admit he was a professional "fixer" (someone hired to make problems go

1  away by producing false documents and stories) for President Bill and Hillary
2  Clinton. June 12, 2014, Plaintiff moved to exclude Rovin's report due to its gross
3  fraud. Somehow the district court denied the Plaintiff's motion.

4  8. Defs rendered contracts relying false statements, misrepresentations and omissions.

5  9. Defs boasted TS had "industry standard" security, when, in fact, they removed all
6  security features to allow themselves constant anonymous access to writer's works.

7  10. Defs made wild false promises to entice new writers, such as: "Our team has been
8  extensively researching and designing TriggerStreet.com **to ensure that it**
9  **encapsulates every aspect of the user's desires and needs**".

10  11. The Defendants conflict of interest-ridden relationships (e.g. Defs Emanuel's and
11  Bill Block's secret co-ownership of Screenbid.com with Sony Picture's CEO M.
12  Lynton, and Def Emanuel's unlawful co-ownership of MRC with Defs Satchu and
13  Wiczyk) created a culture where the Defs neglected to do basic due diligence. Thus,
14  **before they ever read a script**, Sony and MRC agreed to buy the rights to Def
15  Blomkamp's screenplay "*Elysium*," which was misappropriated from the Plaintiff.

16  **JURISDICTION:**

17  2.  **Jurisdiction:** This court has subject matter jurisdiction per 28 USC § 1332(a)(2), as
18  one or more Defendant are foreign citizens, and (a)(2), as one is a citizen of a different State.

19  3.  **Venue:** venue is proper pursuant to 28 § 1391(b)(2) as events giving rise to this
20  complaint occurred in this district, and 28 § 1391(d), by virtue of the Defendants' business
21  transaction with this dist., and under 326 US 310 the Defs meet the minimum contact rule.

21  4.  **Intradistrict Assignment:** San Francisco is the proper intradistrict assignment as a
22  substantial part of the events and omissions, leading to this lawsuit, occurred in this district.

23  **THE PARTIES:**

24  5.  **Plaintiff,** Steve Wilson Briggs, is a filmmaker, screenwriter, author and musician.

25  6.  **Defendant** Universal Pictures is an American film studio; NBCUniversal subsidiary.

26  7.  **Defendant** Sony Pictures is a subsidiary of the Japanese multinational Sony Corp.

27  8.  **Def** NBCUniversal is a multinational media conglomerate & Comcast subsidiary.

28  9.  **Defendant** Kevin Spacey is an American actor, and one of the men purportedly

1   responsible for creating the now defunct social network TriggerStreet (TS).

2      10. **Defendant** Ariel (Ari) Emanuel is a talent agent and co-CEO of WME-IMG.

3      11. **Defendant** Matt Damon is an American actor and screenwriter.

4      12. **Defendant** Ben Affleck is an American actor and screenwriter.

5      13. **Defendant** Neill Blomkamp is a South African-born film director. He is, on

6   information and belief, a Canadian or South African citizen.

7      14. **Defendant** Mordecai Wiczyk is the co-CEO of Media Rights Capital (MRC);

8      15. **Def** Asif Satchu is the co-CEO of MRC, and is believed to be a citizen of Canada.

9      16. **Def** Bill Block is CEO of Miramax (a subsidiary of beIN Media Group—a Qatari

10  company, owned by Al Jazeera) and a co-owner of Screenbid with Def Emanuel.

11     17. **Defendant** Dana Brunetti is credited with the conception of TriggerStreet.

12     18. **Defendant** MRC is a diversified global media company. It has many subsidiaries

13  and alternate names, including: MRC; MRC II LP; MRC II Distribution Company LP.

14                       **RELATED CASES:**

15    19. This lawsuit is related to Briggs v. Blomkamp, et al, No. C134679 PJH, a copyright

16  case, currently in appeals. No aspect of this suit is contingent on the outcome of that matter.

17  Certain new events, related to Briggs v Blomkamp, informs this matter; such as:

18    **1.** Six (6) days after Briggs v Blomkamp moved to appeals, the Defs destroyed

19        essential case evidence (closing and destroying the entire social network website

20        TriggerStreet, without explanation); hence, the obstruction charge.

21    **2.** As Plaintiff researched the Obstruction Of Justice charges against Defs, he found

21        multiple reports of Def Spacey travelling to abroad to give speeches and host parties

22        to attract foreign member to TS, in violation of the website's "Terms of Use", stating

23        TS was made solely for use in the USA; contributing to the *breach* charges, herein.

24    **3.** As Plaintiff prepared to draft this Complaint, **Jeff Rovin** (the Defendants "expert"

25        witness from Briggs v Blomkamp) admitted on *The Sean Hannity Show* that he was

26        a professional "fixer" (hired to produce false stories for tabloids). This revelation,

27        coupled with the fraud contained in Rovin's report (in Briggs v Blomkamp) shores a

28        portion of the Subornation Of Perjury claims against the Defendants.

## STATEMENT OF FACTS & ALLEGATIONS:

### Brief Case Overview

20.  The Defendants conspired to create and operate (for 12 years) a social network for screenwriters and filmmakers, known as **TriggerStreet** (referred to as **TS** in this Complaint). TriggerStreet (**TS**) was located at www.triggerstreet.com from 11/2002 to 07/2011, and at www.labs.triggerstreet.com from 07/2011 to 11/2014. The Defendants used TS to fraudulently access and acquire original film ideas. By using TS's 400,000+ members to review, judge, and rank the best work, the Defendants were able to peruse the very best scripts at their leisure, alter them slightly, then produce and market them, as their own.

21.  To entice the best undiscovered writers into joining TS and submitting their screenplays, the Defs published and rendered a contract comprised of false claims, deception and concealments. TS's "Terms of Use", "About Us" and "Security" pages claimed to employ "industry standard" security, and boasted that TS "encapsulates every aspect of the user's desires and needs", when, in fact, TS's security features were effectively non-existent. (Said TS websites pages "Terms of Use", "About Us" and "Privacy" are attached, respectively, as **Exhibit A, Exhibit B, Exhibit C**, and are incorporated by reference as if fully set out herein.)  The Defs conspired to remove all security features on the website. Any member could download any script, without the writer knowing the downloader's ID. Only if an accessor chose to write a script review would the writer be informed of the accessor's ID —but only the accessor's pseudonym (fake name) ID, while others users who downloaded the script without leaving a review, left no trace at all.

22. More astounding, in 2007, the Defs added a new "counter-security" feature, **without informing members,** whereby if a member—concerned about security—deleted his script from TS, the deletion would trigger the erasure of all access records. This was done to conceal the Defs accessing the Plaintiff's work (only posted in 2007). In May 2016, in an Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95) a former TS member recalled that this **"memory dump"** feature was added in 2007. (Said forum is attached as **"Exhibit D"** and incorporated by reference as if fully set out herein; see last entry, page 4.) In 2014, as Briggs v Blomkamp proceeded through discovery, the

1   Plaintiff contacted TS to ask for their records of all the members who accessed his work.
2   (Said email is attached as "**Exhibit E**" and  incorporated by reference as if fully set out
3   herein). TS replied that when his work was removed, all access records were erased. (Said
4   email is attached as "**Exhibit F**" and is incorporated by reference as if fully set out herein.)

5       23.  TS falsely assured members that the site was intended solely for use in the USA.
6   But Spacey and Brunetti secretly marketed TS all around the world.

7       24.  Through secret and private business co-ownerships with key CEOs, in businesses
8   like Screenbid and MRC, Def Emanuel cultivated unethical relationships with Universal
9   Pictures, Sony Pictures, MRC, QED, etc. Thus, these companies would finance and
10  distribute almost any project Emanuel asked, ignoring due diligence and best practices.

11      25.  The Defendants' final illegal action occurred on Nov 6th, 2014, 6 days after
12  Plaintiff filed his Notice Of Appeal (Briggs v Blomkamp), when the Defs surreptitiously
13  closed TS, to destroy incriminating evidence —understanding the district court based its
14  MFSJ ruling on vacated law, rather than prevailing law—cited by Plaintiff. Thus, the case
15  was apt to be remanded for trial, where the Plaintiff would subpoena all site access records.

16                                          NOTE:

17      26.  This Complaint reveals Def Ari Emanuel lead a conspiracy to misappropriate ideas
18  using TS and ProjectGreenlight.com (**Project Greenlight**), to market these ideas to his
19  business partners at Sony Pictures, MRC, Universal Pictures, parent NBCUniversal, etc.
20  Relevant to this, Def Emanuel has represented Defs Ben Affleck and Matt Damon for most
21  of their careers. Curiously, like Spacey, Affleck and Damon ran a screenwriter/filmmaker
21  website, Project Greenlight, from 2000-05 and 2015-16. Curiously, both sites used peculiar
22  language like *peer-to-peer,* and used *peer reviews* to weed out bad scripts. And curiously,
23  Spacey, Damon and Affleck were the only celebrities with screenwriter websites from
24  2000-2014.   In 2005, writer Joel Lamontagne sued Project Greenlight and **Harvey**
25  **Weinstein's *Miramax*,** alleging the TV series *Project Runway* (2005-present) was stolen
26  from a treatment he submitted to Project Greenlight. The allegedly stolen work became the
27  property of Universal Pictures' parent, **NBCUniversal**. Def Emanuel's shadowy projects
28  eventually becoming the property of Universal is a recurring pattern in this Complaint.

**BACKGROUND FACTS:**

THE SIX (6) PRIMARY DEFENDANT ACTORS:

**ARI EMANUEL** (DEFENDANT)

27. Defendant Ari Emanuel is the co-CEO of William Morris Endeavor (WME, aka WME-IMG). Prior to this, Def Emanuel was the CEO of Endeavor Talent Agency (1995-2009), where his aggressive manner and unethical business practices became notorious, inspiring the character *Ari Gold* in the HBO TV series "Entourage". Under Def Emanuel Endeavor was sued by Sandra Epstein for sexual harassment in 2002. (Emanuel is a close associate of many of America's most notorious sexual harassers.) Epstein suit also accused Def Emanuel of making racist remarks, and in 2014 WME was found guilty at arbitration of racial discrimination. WME-IMG seems to attract clients who share Def Emanuel's values; thus WME-IMG disproportionately represents aging white clients and *difficult* clients that other agencies avoid (Charlie Sheen, Russell Crowe), and clients who are more conservative, or politically unaware, than the rest of Hollywood.

28. November 20th, 2016, Def Emanuel traveled to New Jersey to congratulate President-elect Trump. Emanuel is also President Trump's former talent agent. Predictably, *The Apprentice* (starring Trump) was broadcast on **NBCUniversal**. Recently, *The Hill* (and others) reported that it was Def Emanuel who helped get the accused serial sexual predator elected President, by sealing the Miss Universe tape archives, so no further tapes of candidate Trump sexually harassing beauty contestants would be released. (Said "The Hill" article is attached as **"Exhibit G"** and is incorporated by reference as if fully set out herein.)

**ASIF SATCHU (Defendant)**

29. Defendant Asif Satchu was born in Kenya but moved to **Canada** when he was 6 years old. Satchu, like Def Blomkamp, is believed to be a Canadian citizen. (Canadian connections are a recurring feature in this matter.) Def Satchu is a co-founder of MRC, with Wiczyk. Def Satchu is the brother of **Reza Satchu**, an enormously successful Canadian businessman. Def Satchu and Reza, both graduated from Canada's **McGill** University. Def Satchu is something of a business and business-technology genius. **In 1999 Satchu co-founded SupplierMarket.com** with Jon Burgstone (Reza Satchu was also a heavily

1  invested partner). SupplierMarket.com facilitated the **international sales and distribution**

2  of software, bolts, nuts, fasteners, rubber and glass products, corrugated packaging, and

3  probably anything else. **Only 18 months later, Aug. 2000, Satchu and his partners sold**

4  **SupplierMarket for $950,000,000.** Def Satchu graduated from Harvard (MBA) in 1999.

5        **MORDECAI (MODI) WICZYK (Defendant)**

6      30.    Defendant Modi Wiczyk is an American born business man, co-CEO and

7  co-founder of MRC (with Defendant Satchu). Wiczyk is the **visionary** of this conspiracy.

8      31.  Around 1995, fresh out of college, Defendant Wiczyk began working at Summit

9  Entertainment, LLC. That was the first year Summit began producing and financing films

10  (prior, Summit had exclusively sold US films abroad), surely the vision of Def Wiczyk.

11      32.  Only four years later, in 1999, when Wiczyk was only 27, Summit Entertainment

12  made Wiczyk their Senior Vice President of Production and Acquisitions. That same year,

13  1999, Wiczyk sent out his now famous **memo** (more about this later), **which would make**

14  **him one of the most influential and sought after men in Hollywood**. Within a year, in

15  2000, likely on the order of Def Ari Emanuel, Def Wiczyk was **hired by** **Universal**

16  **Pictures** as Vice President of Productions, where Wiczyk served for 2 years, until January

17  2002, when Def Ari Emanuel made Wiczyk a partner at Emanuel's Endeavor Talent

18  Agency. Def Wiczyk graduated from Harvard (MBA) in 1999.

19        **KEVIN SPACEY** (Defendant).

20      33.  Defendant Kevin Spacey is an Academy Award winning actor. His career was

21  floundering and at its nadir in 2000 when the conspiracy(s) detailed herein began, and

21  when, purportedly, he and Def Brunetti conceived of TS. Def Spacey, who dropped out of

22  Juilliard School in his sophomore year, has no known web-design skills. Seemingly,

23  Spacey's only value to the TS social network was as a high-profile, semi-likeable celebrity,

24  whose promise of "industry access and exposure" would lure the best undiscovered writers

25  to the website, to unwittingly surrendering their wares to the Defendants.

26        **DANE BRUNETTI** (Defendant)

27      34.  Defendant Brunetti has no known college education. He joined the US coast guard

28  in 1992, at 18 or 19. Brunetti met Spacey around 1998, while Brunetti was selling cell

1    phones in New York. Brunetti soon became Spacey's partner and personal assistant. It is
2    purported around the internet (including on Wikipedia) that Brunetti was responsible for
3    designing TriggerStreet.com. That is one operational assumptions of this complaint.
4    However, there is no evidence that Brunetti possessed any of the skills required to design a
5    social network. The Plaintiff suspects Def Asif Satchu (who founded the internet-based
6    marketplace SupplierMarket.com) may be the website's true designer and talent coordinator.

7    **MRC**

8    35. MRC is a television and film studio, founded by its co-CEOs Defs Asif Satchu and
9    Modi Wiczyk. MRC was started in 2003 with money provided by Def Ari Emanuel
10    (although MRC often reports it was started in 2006 or 2007). Def Emanuel is a silent
11    partner in MRC. Unlike most ethical companies MRC operates under many names. Likely,
12    only Defs Emanuel, Satchu and Wiczyk know what these companies do. But such LLC
13    companies are a hallmark of money laundering networks (see Dept of Treasury's FinCEN
14    report). The Plaintiff is aware of 11 MRC companies: **MRC, Media Rights Capital; MRC**
15    **II LP; MRC II Distribution Company LP (foreign based); MRC II Holdings, LP;**
16    **Oaktree Entertainment, Inc. (a foreign stock business); MRC I Hedge Co, LLC; MRC**
17    **II Capital Company, LP; MRC Sub Gp, LLC; MRC I Project Company, LLC; Asgari**
18    **Inc.** Plaintiff believes that most of these *companies* are "shell" companies (fronts for illegal
19    activity), existing to launder money and other transactions. <u>Working in conjunction with</u>
20    <u>Def Bill Block (**Miramax** CEO) and *Al Jazeera or beIN Media Group* (Miramax's parent),</u>
21    and perhaps with Satchu's Kenyan-based family, these shells may also be responsible for:

21      a.  producing and selling ideas taken from TS to foreign markets (not for US release);
22      b.  financing foreign films that utilize ideas taken from TS (not for US release).

23

24    **Def Ari Emanuel's Relationship With Defendant Spacey:**

25    36. Defendant Ari Emanuel likely first met Defendant Kevin Spacey between 1987 and
26    1989, when both men were at Creative Artist Agency (CAA). In 1987 Def Ari Emanuel was
27    a new CAA talent agent, working in **TV** casting. In 1987 Def Kevin Spacey, represented by
28    CAA, was working in Los Angeles, and appeared in 9 episodes of the **TV** series "Wiseguy".

**Def Emanuel's Notorious Connection to Def Wiczyk & Satchu:**

37.   Defendant Ari Emanuel is a quiet partner in MRC. Thus, by casting WME-IMG actors in MRC films, Def Emanuel profits both as an agent, and as a studio owner. This arrangement is a conflict of interest, in violation of CA Labor Code 1700.39.

38.   In 2007, The New York Times published an article called *"Tilting The Balance of Power Toward Talent Agency Clients"* (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients" is attached as **"Exhibit H"** and is incorporated by reference as if fully set out herein.) The article states:

> ....representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist."According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

39.   Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

> ...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.
> "For us, financing opportunities are always exciting and interesting,"said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"
> Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that **no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.**

## BACKGROUND FACTS (CONTINUED)

## THE 4 MAJOR EVENTS THAT SET UP THE CONSPIRACY(S)

40.  The seeds of the Defendants unlawful actions were planted about two decades ago, by **4 events:** two of these events occurring in 1995, two occurring in 1999.

1. **In 1995** Def Ari Emanuel started Endeavor Talent Agency.

2. **In 1995** Edgar Bronfman Jr. (CEO of Seagram's) bought Universal Pictures.

3. **In 1999,** Jerrol LeBaron copyrighted a revolutionary screenwriter-to-Hollywood-film-industry-professional website **Writers' Script Network.com,** which went online in March 2000, changing its name to "**InkTip**" (inktip.com) in 2003.

4. **In 1999** Defendant Modi Wiczyk wrote a revolutionary **memo**, titled "Another New Ball Game", which sent Hollywood's powerhouses scrambling. Wiczyk's memo would be discussed in magazines and lounges for years to come.

41.  These 4 events, **each** require a brief explanation to understand how they set the stage for the Defendants' conspiracy(s).

**(1)  Def Ari Emanuel Comes To Power As CEO Of Endeavor Talent Agency, 1995**

42.  In 1995, Def Ari Emanuel would start his own talent agency, Endeavor Talent Agency. Endeavor would soon become the fastest growing talent agency in Hollywood.

**(2)  Edgar Bronfman Jr. Comes To Power At Universal Pictures, 1995**

43.  In 1995, Canadian based "Seagram's" (the giant beverage company) bought controlling interest (80%) of Universal Pictures, and Edgar Bronfman Jr. (Seagram's heir; **Canadian**, graduate of **McGill** College) became owner and CEO of Universal Pictures. Bronfman remained CEO of Universal Pictures even after Vivendi bought Universal in 2000. He stepped down as chief of Universal in 2001, BUT remained Vice-Chairman of the Board (likely to insure that Def Emanuel's relationship to Universal remained in place) until December 2003; by then Def Emanuel's role with Universal Pictures was well established.

44.  To pay for Universal Pictures, Bronfman Jr. sold Seagram's stake in Dupont (for $9-billion). Most analysts and Seagram's investors considered this a terrible business move.

1  To make matters worse, Bronfman knew little about the film business. **NOTE:** Bronfman

2  was convicted of insider trading, in France, in 2011, receiving a 15 months suspended

3  sentence, and a €5,000,000 fine.

4      45.  In 1995, Bromfman and Def Ari Emanuel may have represented big changes in

5  Hollywood, but the biggest change in Hollywood in 1995 was the advent of the **DVD**.

6  DVDs represented huge new opportunities for producers and film companies

7  —opportunities that would make movies FAR more profitable than ever before, but more

8  profitable for producers, NOT talent agents (adding fuel to Emanuel's drive to become a

9  producer and a studio owner).

10         **(3)  The Advent Of Writers' Script Network.com (InkTip.com), 1999**

11      46.  In 1999, Jerrol LeBaron copyrighted his brilliant website *Writers' Script*

12  *Network.com*, (writersscriptnetwork.com), going online, March 2000, and changing its

13  name to **InkTip**, and its location to inktip.com, in 2003. Unlike all other screenwriter

14  websites at that time (which either just posted screenwriter agents' addresses, or just

15  allowed screenwriters to post loglines or synopses, with no ability to bring the writers to

16  the agents and filmmakers), LeBarons website promised something new. Based in Los

17  Angeles County, LeBaron went out and told Hollywood agents and filmmakers about his

18  website, and invited them to join and peruse the works of thousands of undiscovered

19  screenwriters. The site had great safeguards, designed to protect both the writers and

20  industry professionals. Writers Script Network.com required all users to use their real

21  names. Writers could not read other writers' work, as that would only reduced the writers'

21  safety. However, after registering, the **industry professionals** could freely read any logline

22  (a short description, 60 words or less) on the website. If a professional wanted to read

23  more, they could click on a link to read a synopsis—and immediately the screenwriter

24  would receive notification of who had accessed his work, when, and from where. If the

25  professional wanted to read the entire script, he/she would then need to contact the writer

26  and request a script. Writers Script Network.com kept all records of access. **LeBarons's**

27  **site was the new online industry standard** (where there had been no standard, rules,

28  safety, or security for screenwriters ); flawless in conception, safety and transparency.

#### (4) The Memo, 1999

47.   In 1999, only 27 years old, Def Mordecai (Modi) Wiczyk, the new Senior Vice President of Production and Acquisitions at Summit Entertainment, LLC, sent out a **memo** titled "Another New Ball Game". That memo sent the unethical Hollywood's establishment scrambling after massive new profits. Wiczyk's memo would be discussed in magazines and lounges for years. Within a year, in 2000 (likely at Def Ari Emanuel's bidding) **Universal Pictures** would steal Wiczyk away from Summit, making him VP of Productions. Two years later, Def Ari Emanuel made Wiczyk his **partner** at Endeavor Talent Agency.

48.   In 2007, *Slate* remembered "the memo", in an article called "How An Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate" article is attached as "**Exhibit I**" and is incorporated by reference as if fully set out herein.). Writer Kim Masters wrote:

> ...The memo predicted the decline of the studios, with filmmaking talent as the beneficiary. He also predicted that a management company with a lot of big stars would start to produce and own films. "The most immediate and pressing challenge would be to get the studios to carry the product," he said. The likelihood of a studio boycott was remote, he said, because "whichever studio was suffering at the time would probably break ranks in the name of short-term self-preservation." Hmm.
>
> Michael Ovitz eventually tried to launch such a management company and failed. But Wiczyk's memo said the agencies could also carry out the change. **"A similar structure could be created which complies with the conflict-of-interest laws,"** Wiczyk wrote. "If [a] fund was created as a stand-alone entity and the agency had an arms-length service contract, they could avoid conflict-of-interest violations... Admittedly this is a delicate issue and a tough deal to pull off, but it's certain someone would try it." Why? The potential for enhancing agency commission was "too rich to ignore." **In fact, he said, an agency could double its annual revenues.**

49.   Wiczyk's psychopathy is on full display in those final lines of the article, as he enthusiastically implies it is reasonable to behave without ethics —if the profits are "too rich to ignore." But Wiczyk's prediction that "...it's certain someone would try it" would soon prove correct.

50.   But who would want to wander with Wyczyk into such ethically questionable water?

**THE ENDEAVOR/UNIVERSAL/MRC DEFENDANTS:**

<u>ARI EMANUEL AND HIS SECRET RELATIONSHIP WITH UNIVERSAL</u>

<u>PICTURES; EMANUEL UNITES WITH ASIF SATCHU AND MODI WICZYK</u>

51.   In 1999, Def Ari Emanuel knew producers made the REAL money in Hollywood. But, as a talent agent, he couldn't get in the action—not legally (or not with his name on the product), due to California's conflict of interest laws.

52.   But Def Emanuel saw an opportunity.

53.   Defendant Ari Emanuel had a **distribution problem**. He represented many directors, writers and actors, who sometimes decided to make independent and experimental films, only to discover later that their films couldn't get national or global distribution because the distributors thought the films weren't marketable. Thus, many of these films died early deaths.

54.   Bronfman Jr., on the other hand, had a **talent problem**. Bronfman Jr. knew the importance of getting marquee names on films. Big American studios crank out about 17 films a year. In this haste, sometimes the studios commit to bad screenplays that no big actors will commit to, thereby dooming the film. But just one or two big names attached to these *inferior* films could increase their returns by tens of millions of dollars.

55.   Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it. Bronfman Jr. came to power in 1995 with Universal in 4th place among the big six studios (20 Century Fox, Disney, Paramount, Warner Bros., Sony Pictures, Universal Pictures). But only one year later, in 1996, Universal was in last place. And last again in 1997. And in 1998, even worse: last place, and Universal had one of its worst years ever, with only a 5.9% market share. Stockholders were restless. (See **Exhibit J**.)

56.   In this tough time, Def Ari Emanuel approached Bronfman with a proposal.

57.   Def Emanuel offered to put special effort into Universal Picture films, give Bronfman Jr. his best business advice, and ask his actors, writer and directors to give preference to Universal Pictures films. Emanuel also likely offered to take a reduced agent's fee. **In exchange** Def Ari Emanuel likely received a percentage of the films, and/or a generous share of Seagram's (Universal's parent) stock, but no film credit), and an

1  agreement that Universal Pictures would distribute, and/or provide production money for,
2  any reasonably viable film Def Emanuel brought to Universal Pictures.

3     58.  The agreement was made late 1998.

4     59.  In 1999 Universal pictures would have their best year since Bronfman arrived,
5  climbing to 3rd place, with a 12.7% market share. That was 1999 —the same year Def
6  Modi Wiczyk wrote his memo.

7     60.  Def Ari Emanuel read the memo.

8     61.  Bronfman Jr. surely read the memo. In fact, two years after Wiczyk wrote the memo,
9  in 2001, Bronfman's **Universal Pictures** made Def Wiczyk their vice President of
10 Productions. (An article about Universal hiring Wiczyk is attached as "**Exhibit K**" and is
11 incorporated by reference as if fully set out herein.)

12    62.  And a year after that, in 2002, Def Emanuel would hire Def Wiczyk away from
13 Bronfman Jr., to make Wiczyk a **partner** at Endeavor Talent Agency.

14 •  63.  But Wiczyk had been Vice President of **productions** at Summit Entertainment,
15 AND Vice President of **productions** at  Universal Pictures. Wiczyk was a  **producer**. Why
16 would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel
17 was secretly going into the production business, with MRC and Universal Pictures.

18    64.  When Def Ari Emanuel stole Wiczyk away from Universal Pictures there were no
19 hard feelings between Def Emanuel, Bronfman and Universal Pictures, and nothing
20 changed in their arrangement. Def Ari Emanuel continued to provide the same talent and
21 producorial services for both MRC and Universal Pictures. And although Bronfman left
21 Universal a year later (2003), Def Emanuel continues to do favors for Bronfman and his
22 Universal "family" to this very day (e.g. Def Emanuel and WME-IMG represent Bronfman
23 Jr's daughter, Hannah).

**Wiczyk's Memo Inspires A Conspiracy**

25    65.  The driving force behind Defs Emanuel's, Wiczyk's and Satchu's involvement in
26 this conspiracy was to create the film production system outlined in Wiczyk's **memo**, to
27 increase—maybe even **double**—profits. The conspiracy required maybe 4 players, with the
28 right talents. Def Emanuel had connections to all the studios, and access to huge stars; Asif

1   Satchu was a creative business force who specialized in distribution and networking; Modi
2   Wiczyk was a proven business, financing, and film production prodigy. They had almost
3   everything they needed—except good screenplays. But as a new "questionable" company,
4   established writers were not inclined to work with this unscrupulous band.

5       66.   A film production start with acquiring a screenplay, a "property". The Defendants
6   knew that. They also knew good screenplays are hard to find, cost good money, and are a
7   risky investment. A bad director could ruin a great script, and even the best writers
8   sometimes wrote bad scripts. In 2000 Def Wiczyk helped sell his brother's (Roee Wiczyk)
9   screenplay to his former employer (Summit Ent.). But the script was weak, thus never
10  developed, and Roee Wiczyk never sold another script. "Variety" reported on this script sale
11  in 2000. (Said article is attached as "**Exhibit L**" and is incorporated by reference as if fully
12  set out herein.) As a business man, Wiczyk could sell anything —he sold his brother's script
13  idea without even having a script name. But now, operating as film producers and a *studio*,
14  without an **actual** *good* script, or some good ideas, they couldn't get any project started.

15      67.   The Defendants needed scripts, but they wanted  to reduce their risks.

16      68.   Defs Emanuel, Satchu and Wiczyk knew ideas are not copyrightable; only unique
17  arrangements of ideas are copyrightable. If the Defendants had a method to access good
18  writers' work, they could extract the best of those ideas, then pay their own writers to turn
19  them into "new" screenplays, then produce and market those derivatives, as their own.

20      69.   The L.A. based Defendants were aware of WritersScriptNetwork.com. As prominent
21  "industry" insiders, they had likely even received a call or email from Jerrol LeBaron. They
21  wanted something like WritersScriptNetwork.com, but **without** the good security features.

22

23                          **THE TRIGGERSTREET DEFENDANTS**
24  SPACEY'S CAREER SPUTTERS; SPACEY MEETS BRUNETTI; CONCEPTION OF
25  THE TIGGERSTREET SOCIAL NETWORK; TRIGGERSTREET CONSPIRES W/ MRC

26      70.   In 1994 Def Spacey learned Warner Bros intended to make a movie  about the life of
27  Bobby Darin (eventually called "Beyond The Sea"). This was Spacey's secret dream role.
28  He offered to play the leading role, but the producers refused, believing Spacey was too old.

71. In 1995, Def Spacey's career soared with *Usual Suspects* and *Seven*. But in 1996 and 1997 Def Spacey was back to NOT getting solid leading-man roles.

72. This likely inspired Def Spacey to form his production company, "Trigger Street Productions", to make quality films with himself cast as the lead. But for the next 7 years his production company floundered. The problem was getting a good screenplay.

73. It is reported that around 1998 Def Spacey met Def Dana Brunetti, who soon became Spacey's personal assistant.

74. Although in 1999 Def Spacey won an **Academy Award** for Best Actor (American Beauty), 1999 would mark the beginning of a very difficult period of Def Spacey's career (1999-2003). His production company would go 3 years without making a film (Jan 2000 to Jan 2003). And worse, for some reason Hollywood would not invest much money in any movie with **Kevin Spacey** in a leading role, **his films budgets were far below the Hollywood average** (the average Hollywood budget in 2000 was about $60 million): 1. American Beauty, 1999, **$15 million**; 2. The Big Kahuna, 1999, **$7 million**; 3. Ordinary Decent Criminal, 2000, **$12 million**; 4. Pay It Forward, 2000, **$40 million**.

75. Def Spacey's difficulty consistently getting good roles, then, was likely due to his terrible reputation around Hollywood as something of a hustler. In 1999, actor Val Kilmer explained in a "Mr Showbiz" interview that in the 1970s Kevin Spacey, who was then a young college student, tricked Kilmer's father out of $18,000 for college tuition —but Spacey, according to Kilmer, kept the money, dropped out of school, and never repaid Kilmer's father. (Said "Mr. Showbiz" article is attached as "**Exhibit M**" and is incorporated by reference as if fully set out herein.) Stories like Kilmer's, and a tabloid photo journal of Def Spacey participating in a public indiscretion, contributed to Def Spacey's trouble.

76. But amid all of these struggles, somehow in 2000, Spacey was able to secure the film rights to his dream project -**Bobby Darin's life story**. But since Def Spacey had no production funding, he would have to wait almost 4 more years to make his movie.

77. It's possible that during these tough times, Spacey and Brunetti looked around online for affordable scripts for Spacey's production company to film. And maybe then they stumbled upon *Writers Script Network.com*, which inspired them to create TS... Then, this

1  unlikely pair—a college dropout actor whose career was on life support, and a cellphone
2  salesman—teamed up to create a massive social network for screenwriters and filmmakers.
3  And soon Ari Emanuel learned about the site and asked Spacey to make some
4  modifications: relaxing security, and making access private and untraceable. That could be
5  how TS was created. It makes little difference to the conspiracy that followed.

6      78.   However, the Plaintiff believes TS was formed in a conspiracy conceived by Def
7  Ari Emanuel, to enrich himself and his conspirators. Elysium, alone, earned $286,000,000
8  worldwide theatrically, and should have earn another $570,000,000 in home entertainment
9  and TV, (typically, movies earn twice their theatrical total in home ent., TV, and auxiliary
10  sales), for a total of **$856,000,000** —almost a billion dollars. **This is why setting up TS**
11  **and Project Greenlight were so important to Def Ari Emanuel. One good script can**
12  **easily earn a billion dollars, and one big TV show can earn far more than that.**

13
14                          **THE DEFENDANTS' CONSPIRACY BEGINS:**
15

16      79.   In 2000, shortly after Def Emanuel discovered Writers Script Network.com, Def
17  Emanuel planned his own screenwriter/filmmaker website, with minimal or no security
18  features. He would use his clients, Def Matt Damon and Ben Affleck, as website spokesmen
19  and alleged *conceivers*. In August 2000 Project Greenlight was born. (An Internet Archives
20  screenshot of projectgreenlight.com, showing the origin time of Project Greenlight, is
21  attached as "**Exhibit N**" and incorporated by reference as if fully set out herein.)

21      80.   Then misfortune struck Universal Pictures in 2000, and  Def Ari Emanuel seized
22  the occasion to launch a **second** website, allegedly conceived by Defs Spacey and Brunetti.

23      81.   In 2000, Universal Pictures was in a bind. They were just a few months away from
24  beginning to film "K-PAX" but they didn't have a leading actor (after Will Smith and others
25  dropped out). Smith, and other actors and directors (with integrity) were perhaps dropping
26  out due to rumours that Argentinian film director and screenwriter, Eliseo Subiela, learned
27  about writer Gene Brewer's 1995 book "K-PAX" and planned to sue Brewer and Universal
28  Pictures for copyright infringement of Subiela's 1986 film "Man Facing Southeast".

82.    But Universal Pictures, not worried about a small director from Argentina suing, decided to push forward, film, release, make a fortune, and fight Subiela in court later.

83.    By mid 2000, with little time to find a leading man, Universal Pictures was desperate enough to consider casting Def Kevin Spacey in the leading role.

84.    Def Ari Emanuel could have just asked Spacey to take the leading role. Spacey would have leaped at the chance. But Spacey wasn't an Endeavor client, so Def Emanuel wouldn't receive his casting fee.  Def Ari Emanuel was a businessman. As such, even though he needed a favor from Spacey, he wasn't going to just give Spacey a leading role, he wanted something in return. Def Ari Emanuel knew Def Spacey's career was in trouble.

85.    Def Ari Emanuel approached Def Spacey to ask him about starting or endorsing, a screenwriter/filmmaker social network; a social network with little or no security features. The conversation likely started with Def Ari Emanuel asking how Spacey's career was going. Def Spacey likely explained his recent career setbacks, and his hope to one day film Bobby Darin's life story. He may have explained that he had recently secured the rights to his Bobby Darin film (Beyond the Sea), but had no funding to shoot his dream film.

### Quid Pro Quo

86.    Upon hearing about Spacey's career troubles, Def Emanuel made Def Spacey and Brunetti an offer: (1) he asked Defs Spacey and Brunetti to design a social network so that ALL user could access ALL screenplays, anonymously, with few security safeguards (it is possible/probable that Def Asif Satchu facilitated the website design); (2) Def Emanuel also may have asked Spacey and Brunetti to include a counter-security feature whereby if a screenplay was removed from the website all access history would also be erased (**although the Defs seem to have added this second features in 2007, shortly before accessing the Plaintiff's work**). The Plaintiff believes that in exchange for agreeing to operate such a social network, Def Ari Emanuel promised Defs Spacey and Brunetti a few things in return:

1.  Spacey would star in K-PAX, a film with a solid $68 million budget;

2.  Def Ari Emanuel would finance Spacey's production company to make Def Spacey's dream film, Beyond the Sea;

3.  Def Emanuel would help Spacey's production company arrange financing and

1     distribution (as needed) for the life of the social network;

2     4.  Def Emanuel would introduce Spacey and Brunetti to the financial and distribution

3         partners necessary for their production company to succeed;

4     5.  Def Emanuel would try to find Spacey a very meaningful—maybe even a career

5         defining—role.

6

7     87.  The agreement was made.

8     88.  Thus, September 2000, only <u>one month after the birth of Project Greenlight</u>,

9 **TriggerStreet.com (TS) was born.** (Internet Archives screenshot of projectgreenlight.com,

10 showing the origin time of Project Greenlight is attached as **"Exhibit O"** and incorporated

11 by reference as if fully set out herein.)

12     89.  But TS would remain a closed, private, and inactive site for 2 years, not having its

13 official "launch" party until 2002. This was done to keep TriggerSteet from competing with

14 Project Greenlight. This wait also allowed TS to learn from Project Greenlight's mistakes.

15     90.  In November 2000, as agreed, Spacey began filming KPAX. When the film was

16 released it would be the first smoking gun in this conspiracy:

17   •  91.  KPAX was released Oct 2001. It would be the first time **Universal Pictures**

18 **EVER** cast Kevin Spacey in a leading role (in fact, Universal had only ever cast Spacey in

19 **one [1]** film, a **supporting** role, ten years prior, in 1990, in "Henry & June"). (*Spacey was

20 most commonly cast in **Warner Bros** films and independent films.) <u>Casting Spacey to star</u>

21 <u>in K-PAX, a $68 million film, at such a low point in Spacey's career, was almost</u>

21 <u>inconceivable.</u> **Def Spacey wouldn't star in a film with a budget over $40 million for 5**

22 **more years** (Superman Returns). Spacey would only appear in one other Universal Pictures

23 film, 2 years later, *The Life of David Gale*—originally a Warner Bros (Spacey's stable)

24 property that Universal Pictures optioned. Spacey just came with the deal.

25   •  92.  A month after K-PAX was released, in November 2001, director/writer **Eliseo**

26 **Subiela (via Jason Laskay) sued Universal Pictures**, Gene Brewer, et al, for plagiarizing

27 his film *Man Facing Southeast*. The suit was eventually withdrawn when Subiela and

28 Laskay could no longer afford to litigate against a giant corporation like Universal Pictures.

## TS LAUNCHES, NOVEMBER 2002

93. After giving Project Greenlight two years to gain traction, November 2002, the Defendants prepared to launch TS. To attract the best undiscovered writers, the Defendants planned to generate "buzz" by throwing 3 huge TS "launch parties": one in New York, one in Los Angeles, and one in **London**. (A photo of Kevin Spacey at the TS London Launch party is attached as "**Exhibit P**" and is incorporated by reference as if fully set out herein.) While in Britain, Def Spacey did many interviews about TS. The Guardian featured a piece called "Cyber Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's well-rehearsed lines. (Said Guardian article in which Def Spacey went to London to discuss TS is attached as "**Exhibit Q**" and incorporated by reference as if fully set out herein.) Writer Sean Clarke wrote:

> Spacey tells an anecdote about the original idea for the site, which is essentially Brunetti's brainchild. He says they "came up with a sketchy plan, which at the time..." and chuckles wryly, on which cue Brunetti take up the story "... which at the time, we thought was great." They both shake their heads ruefully. Later, I watch as the pair address a press conference, they repeat the story, with exactly the same pauses, the same chuckle, the same interruptions. It's beat-perfect, like a Mamet script.

94. And to generate even more buzz, before the website was launched, Budweiser announced their corporate sponsorship of the TS social network.

95. Along with the sponsors, parties and interviews, to help repair Def Spacey's damaged reputation, the TS website posted a heartwarming story that Spacey started his new social network "to help undiscovered writers and filmmakers get industry access and exposure."

96. **TriggerStreet.com was "launched", and went online, November 2002**

- 97. Def Spacey held a New York TriggerStreet **launch party** on Nov 11th, 2002.
- 98. Def Spacey held a Los Angeles TS **launch party** on Nov 18th, 2002.
- 99. Def Spacey held a London TS **launch party** on Nov 26th, 2002.

**After Triggerstreet Officially Launched, Nov 11th, 2002,**

**The Following Events (Connecting The Defendants) Occurred:**

100.   Shortly after TS's official launch (November 2002), Def Spacey would receive three (3) huge payments from Defendants Ari Emanuel and Universal Pictures (Def Spacey would receive many other unlikely benefits—payments—during the subsequent 12 year lifespan of TS).

• 101.   In **February** 2003, 3 months after TS launched, **Universal Pictures** distributed Spacey's film **"The Life of David Gale"** (again, originally a property of Spacey's home studio, Warner Bros). This would be the last time Universal Pictures would be involved in a Spacey film (to the date of the filing of this Complaint). Thus, the only two Universal Pictures films featuring Spacey as a lead are *K-PAX*, and *The Life of David Gale.*

• 102. That same month, **February** of 2003, Spacey's production company would magically get money to release and distribute its first movie in 3 years: "United States of Leland". The film would only be released in 14 theaters, losing millions, and bringing in only $344,000. Likely, Universal Pictures wouldn't put their name on the film, because after two bad years, Universal was back in 5th place (second to last place), and they didn't want *United States of Leland* to move them into last place.

• 103.   That same month, again, **February** 2003, it was announced that Production for ***Beyond the Sea*** (Spacey's dream film about Bobby Darin) was being fast-tracked with Spacey as lead actor.

104.   Suddenly, in the nadir of Defendant Spacey's career, inexplicably Hollywood was showing Def Spacey tremendous love and support—when 4 of his previous 5 films were major money losers.

Footnotes:

105.   Shortly after TS launched, in **2003**, Ari Emanuel gave Asif Satchu and Mordecai Wiczyk financing to start MRC.

106. **December 17th, 2004,** *Beyond the Sea* was released. It would be Spacey's **greatest failure**; costing $25 million, but only earning $8.4 million; losing over $16,000,000.

**Additional Facts Regarding TS And The Defendants**

- 107.  Spacey's production company made no films for 3 years, January 2000 to January 2003: Ordinary Decent Criminal (Jan 2000, direct to DVD in USA), and United States of Leland (Jan 2003, released in only 14 theaters).

- 108.  Since TS launched, Def Spacey's production company has made 22 films.

- 109.  May 2005, 2.5 years after TS launched, Project Greenlight was effectively dead (no new contests for filmmakers or screenwriters). Killed by the success of TS. Although, oddly, the Project Greenlight website remained open, but inactive —no new contests, no new submissions accepted; just an open, inactive website, until 2015.

- 110.  In 2006 Spacey held a TriggerStreet "RE-launch" party in Los Angeles.

- 111.  2007, Plaintiff's screenplay, Butterfly Driver, was posted and accessed on TS.

- 112.  2007-2009 TS secretly joined Bud.TV (Budweiser TV), without informing members or revising its Term of Use page. In a 2007 Anheuser-Busch announced it was launching Bud.TV with TriggerStreet.com providing programming. (Said Bud.TV news release is attached as "**Exhibit R**" and incorporated by reference as if fully set out herein.) Curiously, Bud.TV's Wikipedia page shows Defs Matt Damon and Ben Affleck (Project Greenlight), and Kevin Spacey (TS) all provided Bud.TV programming. (Said Wikipedia article is attached as "**Exhibit S**" and incorporated by reference as if fully set out herein.)

- 113.   Feb 2009, the BBC reported Def Spacey hosted the Mofilm Film Festival, in Spain, where he boasted of TS's "**400,000 members around the world.**" (Said BBC article is attached as "**Exhibit T**" and is incorporated by reference as if fully set out herein.)

- 114.  On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency (ETA) merged with the William Morris Agency (WMA), creating William Morris Endeavor. **17 days later**, May 14th 2009, **after about 20 years <u>with</u> the <u>William Morris Agency</u>**, Def Spacey signed with CAA (Creative Artist Agency). Def Spacey did so to keep TS members (and any observing regulatory authorities) from becoming suspicious of his link to Def Ari Emanuel through TS. (A New York Times article about the April 2009 merger of WMA and Endeavor is attached as "**Exhibit U**" and is incorporated by reference as if fully set out herein.) (A May 2009 Variety article about Def Spacey leaving WME is attached as

"**Exhibit V**" and is incorporated by reference as if fully set out herein.)

- 115.   May 2010, "Deadline Hollywood" reported Defendant **Universal Pictures** and Defendant Media Rights Capital (MRC) announced a 20 picture, 5-year production and distribution deal. (Said "Deadline Hollywood" article is attached as "**Exhibit W**" and is incorporated by reference as if fully set out herein.) Thus, MRC's (a company co-owned by Defendant Ari Emanuel) first mega-deal would be with **Universal Pictures**.

- 116.   On March 15th, 2011, **Netflix** and Def **MRC** (owned by Defs Emanuel, Wiczyk and Satchu) announced their mega $100 million dollar 2-season deal to produce the new series *House of Cards*, starring Def Kevin Spacey, in his career defining role. Quietly, a few months later, in July 2011, with the role of a lifetime secured, Def Spacey would move his social network, TS, to http//www.labs.triggerstreet.com, and begin to use the web address TriggerStreet.com as his production company's site.

- 117.   August 2013, the film Elysium (an infringement on the Plaintiff's work) was released internationally. The Plaintiff then filed his copyright infringement suit against the Defendants, October 2013.

- 118.   November 6th, 2014, 6 days after the Plaintiff filed his Notice Of Motion of appeal, Defs Spacey and Brunetti closed and destroyed the TS social network.

- 119.   In 2015, almost immediately after TS closed, Project Greenlight (which had been **dead for 10 years**, came back to life, with a new HBO TV show, airing fall of 2015.

- 120.   July 2016, HBO announced the Project Greenlight TV show was cancelled.

- 121.   In 2016, with the cancellation of the TV show *Project Greenlight*, and with the closing of TS—with no way to gain access to original screenplays to misappropriate—ProjectGreenlight.**com** went active, again. **After 10 years of online inactivity**, Def Matt Damon, Ben Affleck and ProjectGreenlight.com began seeking new screenplays again.

- 122.   In 2015, Def Dana Brunetti (former cellphone salesman and Spacey's personal assistant) produced his **first** solo film, without Kevin Spacey, *50 Shades of Grey* —payment for his involvement in the TS conspiracy. *50 Shades of Grey* was **Distributed by Universal Pictures**. (A Wikipedia article showing the producers and distributors of 50 Shades of Grey is attached as "**Exhibit X**" and is incorporated by reference as if fully set out herein.)

**SONY PICTURES EMAIL LEAK EXPOSE DEF ARI EMANUEL'S SECRET UNIVERSAL PICTURES TIES, HIS UNLAWFUL RELATIONSHIPS WITH SONY PICTURES' CEO (M. LYNTON), & HIS BULLYING, THUGGISH METHODS**

123.   Further confirming all allegation herein, in 2015 Wikileaks released thousands of Sony Pictures emails, which had been previously released in 2014, when North Korea hacked and published thousands of Sony's emails. Within days hundreds of respected news agencies carried the story —The NYTimes, LATimes, Hollywood Reporter, all reported the juicy details—and the juiciest story was the story of how Sony Pictures lost -or passed on- "Steve Jobs", the movie.

124.   All of the reports are similar: the emails provide an inside view of bunch of super-rich Hollywood producers, writers, and directors negotiating the production budget of the film "Steve Jobs", until the deal went bad and Sony gave up on the film. And right in the eye of the storm is Def Ari Emanuel. (An articles from "Mashable.com" about said "Steve Jobs" film emails is attached as **Exhibit Y**"and is incorporated by reference as if fully set out herein.)

125.   A few of the celebrities captured on Sony Pictures email/text leak, at times, behaved poorly, but no one behaved worse than, Def Emanuel. Brazen and thuggish, we see Def Ari Emanuel berate Sony Pictures' Chairman Amy Pascal, with impunity. And when the other Sony execs learned of this, they only called Def Emanuel a *bully*—behind his back. No one dared to confront Def Emanuel. But more surprisingly, through a tiny sliver of Def Ari Emanuel's emails (just those going into, or out of, Sony Pictures) we learn:

1. Def Ari Emanuel is a major film producer —in conflict with his role as a talent agent, and in violating California labor law which forbids employers (a producer) from charging employees (his actors) fees to be hired—perhaps an even more significant conflict of interest than Def Emanuel's partnership in MRC II LP.

2. Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures CEO and Chairman) are secretly business partners: co-owners in the company *Screenbid*.

3. Ari Emanuel is also a film financier, or executive producer (a person who provides or finds money to make films).

4.  Def Ari Emanuel also arranges peripheral services for Sony Pictures (and others), like making deals with Hasbro Toy Co. for Sony Pictures (for Spider-Man 2 & Minions action figures?).

5.  Whenever necessary, **Universal Pictures** will distribute ANY film for Ari Emanuel.

### "STEVE JOBS" EMAILS CONFIRM DEF ARI EMANUEL
### IS SECRETLY A MAJOR FILM PRODUCER, AND THE TRUE
### PRODUCER OF "STEVE JOBS" —NOT SCOTT RUDIN

126.  Through the Sony "Steve Jobs" email trail we see the "Steve Jobs" negotiation go on for about 8 months, then it begins to fall apart on October 16th, 2014, after Sony Pictures' President of Business Affairs, Andrew Gumpert, sends Sony Pictures Chairperson Amy Pascal, film producer Scott Rudin, Def Ari Emanuel, and WME co-CEO Patrick Whitesell a financing offer, which the filmmakers felt was too low.  October 18th, 2014, two days after Gumpert's low offer, Scott Rudin, angrily responds:

> 2014-10-18 16:09:38  Re: wwbo bumps/jobs From: Scott Rudin
> <sr@scottrudinproductions.com> To: pascal, amy
> gumpert, andrew  aemanuel@wmeentertainment.com
> pwhitesell@wmeentertainment.com

**SCOTT RUDIN:**
> "You have NO risk in the movie but WE should have risk? You lay off every cent except what you choose to keep and WE should then also fund you --- that's how this should work?
> I cannot believe you're serious. What idiot would make this deal? The presumption that five Oscar winners would be desperate enough to give up all value for their services and then also risk the baseline bargain-basement fees on top of it is beyond comprehension.
> Every single movie like this that we have made for you has worked. And you think this is fair?"

127.  At Rudin's words, Def Ari Emanuel, who purports to the world that he is just a talent agent, would then take over the email exchange —seemingly eager to bully a woman.

> On Oct 18, 2014, at 9:15 AM, From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com> To: pascal, amy

1   sr@scottrudinproductions.com  gumpert, andrew
2   pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
3   "This offer is fucking bull shit. Give us the movie back. You you guys
    in the business. No other studio would even ask for this. Pass"
4

5   128.  Def Ari Emanuel immediately establishes and retains dominance and control of the

6   matter for the remainder of the negotiation, and Scott Rudin would remain quiet and

7   subordinate to Def Emanuel. But the key detail in this email is that Def Emanuel has the

8   authority to say "Pass", meaning: we choose NOT to do business with you, we will find

9   another partner. No mere talent agent can usurp that power from the producer. Scott Rudin

10  put Ari Emanuel on that email chain because Ari Emanuel is the true producer.

11  129.  The exchange goes on. Amy Pascal writes:

12  On Oct 18, 2014, at 10:18 AM From: Amy_Pascal@spe.sony.com
    To: aemanuel@wmeentertainment.com
13  sr@scottrudinproductions.com gumpert, Andrew
14  pwhitesell@wmeentertainment.com

**AMY PASCAL:**
15  "Can we please deal with this Monday
16  Maybe we all get in a room and close it up"

17  130.  But Def Ari Emanuel will not be silenced by Ms Pascal's request to wait until

18  Monday. He replies five minutes later::

19  On Oct 18, 2014, at 10:23 AM, From: Ariel Emanuel
    <AEmanuel@wmeentertainment.com> To: pascal,
20  amy sr@scottrudinproductions.com  gumpert,
21  andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**
21  "Whatever
22  **You guys ask us to find financing. Scott, Patrick and myself get
    Modi** and we still get no respect. Amy, this is not what you want to
23  hear - but this NEVER happens and any other studio. In fact they
    then would go out of their way to make a proper deal.
24  Even Harvey.
25  Monday is fine."

26

27  131.  With that statement **Def Ari Emanuel admitted he found film financiers for**

28  **"Steve Jobs", which is a strictly a producer's, or an executive producer's job.** Def Ari

COMPLAINT
27

1  Emanuel also generously (and falsely) shares credit with Rudin and Whitsell for getting

2  Modi Wiczyk to help with financing, to make Rudin and Whitsell appear more significant to

3  the process. Again, Defs Modi Wiczyk and Ari Emanuel had been a business partners since

4  2002 (at Endeavor, as well as in MRC). Getting Def Modi Wiczyk involved was entirely

5  Def Ari Emanuel's doing. Amy Pascal responds to Def Emanuel's provocation:

6      On Oct 18, 2014, at 10:51 AM, From: Amy_Pascal@spe.sony.com
                  To: aemanuel@wmeentertainment.com

7            sr@scottrudinproductions.com gumpert,Andrew

8              pwhitesell@wmeentertainment.com

  **AMY PASCAL:**

9      "arithat is totally unnecessary we are in a negotiationwe have all

10     been doing this a long timewe want to make moneyyou want to
       make money for yourselves andyour clientsthis has nothing to do

11     with respect and to be fair and its a credit to the movie that scott

12     put together there are more financing partners than we know
       what todo with here....thats not the issue...we are the only major

13     studio that even tries to make thesekind of movesdont make it

14     harder than it isthe tone is really uncalled for and unfairand
       doesnt help get things doneamy"

15

16   132.   Through all of this, Scott Rudin never commented or told Def Ari Emanuel to

17 disengaged. That is not his place. Ari runs the show. Def Ari Emanuel replies:

18     2014-10-18 10:58:41  Re: wwbo bumps/jobs From: Ariel Emanuel
           <AEmanuel@wmeentertainment.com> To: pascal, amy

19         sr@scottrudinproductions.com  gumpert,

20        andrew pwhitesell@wmeentertainment.com

  **ARI EMANUEL:**

21     "Ok not true. Other studios make these movies"

21

22   133.   Def Ari Emanuel was eluding to Universal Pictures, who would produce any film

23 Def Emanuel suggested. Texting stopped for 7 or 8 hours, until Def Ari Emanuel resumed.

24     2014-10-18 16:20:47 From: aemanuel@wmeentertainment.com
          To: gumpert, andrew sr@scottrudinproductions.com,

25          pwhitesell@wmeentertainment.com,  pascal, amy

26   **ARI EMANUEL:**

27     "In the real world when some one either risks something or gives something
       up they get something in return. You guys seem to think we should be

28     honored just to be in business with you based on your offer. Why?"

134.   After this, the negotiation disintegrated over the next 4 weeks. The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:

> 2014-11-14 22:57:02 From: aemanuel@wmeentertainment.com
> To: pascal, amy
> **ARI EMANUEL:**
> "Is business affairs calling me so I can take this to Fox Searchlight officially?"

135.   With that statement Def Emanuel showed that, in addition to producing, he even arranges distribution. Def Emanuel is asking Amy Pascal if Sony Pictures' President of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants "Steve Jobs". Def Emanuel is bluffing that Fox Searchlight has agreed to take the film. He never had a deal with Fox Searchlight. He was just playing hardball; trying to get a better offer out of Sony, AND keep them in the dark about his distribution relationship with **Universal Pictures.**

136.   As this deal dragged on over 8 months, 3 weeks before the previous exchange, Sony Pictures' Andrew Dumpert, spotted Def Emanuel's chicanery and bad motives. In an email to Sony execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

> 2014-10-18 16:59:16 From: Andrew Gumpert
> To: lynton, michael; pascal, amy; belgrad, doug
> **Andrew Gumpert:**
> "The fact is there is only so much in the kitty. Unless the movie massively breaks out they can never make real money, nor can we and our investors.They have a 50pt pool with the best definition and 5m of box office bonuses. **Do they want to make MORE than the equity? I think they do.** There is a huge philosophical gap (given the rude and insolent responses from Ari and **Scott**)..."

137.   Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott Rudin weren't adhering to established guidelines.

138.   Although there have surely been occasions when Sony Pictures did cave-in to Def Emanuel's arm-twisting, this would not be one of those occasion. But oddly, Michael Lynton, CEO of Sony Pictures, responds to Gumpert only with silence—because Def Ari Emanuel is his close friend and secret business partner in Screenbid.

**"Steve Jobs" Film's Not-So Surprising *Twist* Ending:**

139.   Fox Searchlight never touched "Steve Jobs".

140.   Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the price of the film above market value, to increase his profit margin. He didn't need Sony Pictures to give him standard market value for "Steve Jobs", he could get standard value from Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari Emanuel took the film to the Studio that has distributed all of his films, since around 1999.

141.   On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs", after so much posturing and tumult, "Steve Jobs" was distributed by **Universal Pictures**.

SONY PICTURES EMAILS SHOW DEFS EMANUEL & BILL BLOCK & SONY
    PICTURES' CEO (M. LYNTON) MAINTAIN UNETHICAL RELATIONSHIPS,
    AS THEY CO-OWN "SCREENBID" TOGETHER (CONFLICT OF INTERESTS)

142.   The "Steve Jobs" emails reveal Defs Emanuel and Bill Block are in a co-ownership business with Sony Pictures' then-CEO Michael Lynton. As we see Def Ari Emanuel write Michael Lynton to ask Lynton to check on their co-owned business, *Screenbid*.

> On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com
> To: lynton, michael;
> **ARI EMANUEL:**
>      Michael -
>      What are we doing on Screenbid? We had success on our early tests,
>      nothing since. You guys own a piece of this company, we've had
>      nothing since our early success. We have to keep the engines going.

143.   In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of Screenbid is confirmed by the repeated use of pronoun"we". Def Ari Emanuel asks "What are we doing..." Then he states "**We** had success on our early tests..." Then he reminds Lynton that he (and some unknown party, or parties) also own shares of this company. Then, implying Lynton has a responsibility, Def Emanuel says, "**You guys own a piece of this company...**" Then Def Emanuel exhorts CEO Michael Lynton to take action, saying: "**We have to keep the engines going.**"

144.   These are not the messages of quiet stockholders. These men are owners.

145.   Sony Picture's CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his business partners a business report, pasted below his reply text. (Bill Block was the CEO of QED International, a Defendant in Briggs v Blomkamp.) Def Bill Block's reply email reads:

> 2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
> From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
> michael_lynton@spe.sony.com

**BILL BLOCK:**
Going well gentlemen.
Bill
From: Jeffrey A. Dash [mailto:jdash@screenbid.com]
Sent: Monday, October 27, 2014 10:13 AM
To: Bill Block
Subject: SCREENBID AUCTION UPDATE
AUCTION UPDATE:

TRUE BLOOD: (HBO) We are winding down aftermarket sales and fulfillment and are on schedule to present audited reports to HBO accounting within 14 days.

SONS OF ANARCHY: (FOX) We visited the set on Friday 10/24/14 and met with the department heads for props, wardrobe, transportation and set decoration. They are scheduled to wrap next week and we will take delivery by 11/5/14, immediately inventory and shoot. Writing began about 2 weeks ago The auction is scheduled to go live on 12/01/14 and bidding will end on 12/10/14. Fulfillment time will be tight. In order to get everything shipped prior to XMAS we will have extra staff in place to facilitate…"

146.   In this unethical relationship, Sony Pictures' CEO Lynton, personally profited as Screenbid's owner, in such ways as directing Sony Pictures to give Screenbid millions in set furnishings to auction on Screenbid, where he and Def Emanuel profited as owners. Lynton's secret relationship with Def Emanuel is why Sony Pictures did not do due diligence to vet Def Blomkamp's Elysium script.

COMPLAINT
31

## SONY EMAILS SHOW DEF EMANUEL PERFORMS
## PRODUCORIAL SERVICES:  CALLING SONY'S CEO & CHAIRMAN
## TO ARRANGE A DEAL WITH HASBRO

147.   On March 28, 2014, Def Ari Emanuel emailed/texted Sony's Pictures' CEO and Chairman to close an animation co-financing deal with Hasbro. Def Emanuel's email read:

> 2014-03-28  re: HASBRO Animation deal
> From: aemanuel@wmeentertainment.com
> To:amy_pascal@spe.sony.com;  michael_lynton@spe.sony.com
> **ARI EMANUEL:**
> "HASBRO Animation deal
> Amy & Michael -
> We have sent Ronni our proposal for the animation co-financing deal. Please take a look when you get a chance and lets lock this down.
> Ari

148.   Talent Agents don't arrange animation co-financing deals with Hasbro, producers and studios do. Curiously, after Billionaire Def Ari Emanuel recently purchased the UFC he arranged a UFC Hasbro deal. (An article where Def Emanuel discusses UFC and Hasbro is attached as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.)


**SONY EMAILS SHOW DEFENDANTS COMMITTED PERJURY REGARDING**
**THEIR EFFORTS TO HIDE INFRINGEMENT IN BRIGGS V BLOMKAMP**

149.   The Defendants' fraud, conspiracy and routine deceit included committing perjury by lying on documents signed under oath.

150.   During the discovery phase of Briggs v Blomkamp, et al (C13 4679 PJH) the Plaintiff informed the district court that he suspected that writer/producer Simon Kinberg was hired to rewrite Def Blomkamp's poorly written screenplay. In response to Plaintiff's interrogatories to MRC II LP, the Defendants  made false statement, under oath, regarding a substantial matter in that case, which may impact the Plaintiff's ability to prevail in that lawsuit (currently in appeals). (Said Def MRC II LP's Interrogatory Responses from Briggs v Blomkamp are attached as "**Exhibit AA**"  and is incorporated by reference as if fully set out herein.)

151.   That deceit occurred when the Defs responded to interrogatory #17; believing Simon Kinberg helped disguise Def Blomkamp's infringement, the Plaintiff asked:

>    **Plaintiff's Interrogatory:**
>    INTERROGATORY #17:
>    "Simon Kinberg is a writer and "script doctor" (a writer who fixes scripts that have serious problems). Simon Kinberg is listed as a producer of Elysium. Exactly what duties did Simon Kinberg play in the production and script doctoring of the screenplay and film "Elysium"?"
>
>    **Defendants' Answer:**
>    "Defendant incorporates by reference the preliminary statement and general objections... Subject to and without waiving the foregoing objections, Defendant responds as follows:
>        Simon Kinberg produced the Film. As producer, Mr. Kinberg also **assisted with a polish of the Film's screenplay** during the later stages of writing."

**But The Leaked Sony Emails Reveal The Truth About Said Perjury:**

152.   The Defendants admitted that Simon Kinberg helped improve the weak screenplay, BUT suggested that his help was just a "polish", which suggests merely dotting I's and crossing T's, and maybe a dialogue suggestion here and there. But, in fact, Simon Kinberg had to do exhaustive work to try to salvage Elysium's terrible screenplay.

153.   The gross underestimation and misrepresentation of all the work Simon Kinberg had to do to repair Def Blomkamp's Elysium script is revealed in the 2015 Wikileaks're-posting of the Sony Pictures' hacked emails, in five (5) key email exchanges between Defs **Modi Wiczyk, Simon Kinberg**, and Sony Pictures Chairperson **Amy Pascal**. In the first email, Def Wiczyk explains Kinberg's role:

>    2014-10-27 13:36:12 Fwd: CHAPPIE NOTES
>    From: mwiczyk@mrcstudios.com To: pascal, amy
>    **MODI WICZYK:,**
>    "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying. great detail and very specific.he also included rachels document and merged it.**simon is a fixer and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  nb has been ignoring him the past few weeks after listening to him up until then. dont know why, dont care. its our turn now.i told doug that we should

leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

154.   Def Wiczyk, Simon Kinberg, and Amy Pascal continued to discuss the endless and unimaginable problems Kinberg was having helping director Def Blomkamp's save his film, *Chappie*; the executives discuss reshoots, dialogue rewrites, other huge changes, and how to protect Def Blomkamp's insecure ego. Yet, amid these massive problems, Kinberg comments that Def Blomkamp was handling Kinberg's executive ordered changes much better than he handled them on Elysium, where Kinberg explains Blomkamp **"shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once."** In this email to Amy Pascal, Simon Kinberg wrote:

> 2014-08-07 07:02:55  Re: Chappie  from:
> sdkinberg@aol.com  to: pascal, amy
> **SIMON KINBERG:**
> "cool! neill has been really open throughout this process, and wants to get the audience all the way there. i think we're all feeling the same things now, so we can put it together and deliver to him, and he'll take it as an assignment not a judgement, and stay creative. **i saw him shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once. so i don't think he will now..."**

155.   In fact, the text/emails reveal Def Wiczyk and Amy Pascal were forced to hide from Def Blomkamp the fact that Simon Kinberg had to take over the film to finish it. This is revealed when Def Wiczyk wrote to Sony's Chairperson, Amy Pascal:

> 2014-10-27 13:42:22  Re: To discuss
> From: mwiczyk@mrcstudios.com; To: pascal, amy
> **MODI WICZYK:**
> "not to oversimplify but i know simon has been biting his tongue for a month and all the sloppy stuff has been making him crazy. when i speak to him he seems to have a very clear view of what he wants to do. it lines up w what ur saying. i hink if we make them do it we will have a much much much better film that works. we just cant literally tell neill si is taking over....so its "our" notes"

156.   Additional evidence of the extreme measures that Defendants Simon Kinberg, Sony Pictures, MRC and Modi Wiczyk resorted to salvage Chappie. Can be seen in such

1  emails/texts as when Def Modi Wiczyk explains director Def Neill Blomkamp's inability to

2  even write or direct "basics". In an email text to Amy Pascal, Wiczyk wrote:

3              2014-10-27 13:52:57 Re: To discuss
                From: mwiczyk@mrcstudios.com, To: pascal, amy
4      **MODI WICZYK:**

5          "yes thats what i meanthe right version of this could be iconic and do 300
            and have a huge sequelwhat bugs me is how obvious and unpolished the
6          problems areall the hard stuff is great but all the basics are killing us"

7

8      157.    A week later, Def Modi Wiczyk emailed Amy Pascal to discuss BlomKamp's

9  insecurities, and how they were impacting production.

10             2014-11-03 04:31:07 Re: From:
                mwiczyk@mrcstudios.com To: pascal, amy
11     **MODI WICZYK:**

12         "dunno re simon. maybe insecure, maybe thinks simon is on "studio"
            side, which is juvenile. hes always mad at somebody. vacillates btwn
13         targets. i ignore it until it stops forward progress.
            re edgar i actually initiallygot nervous the music was too old to be
14         cool,but all my assistants say lots of these songs are in the collective
15         consciousness, played in bars and clubs. shows what i know....i dug the
            reel he did. and i loved the app w script and music."
16

17     158.   There are many more such emails that further reveal how inept and difficult Def

18  Blomkamp is. But from these select emails, we see that to revise Blomkamp's *Chappie*,

19  Kinberg took extraordinary measures, and that Blomkamp's inept, "insecure" and "juvenile"

20  conduct made Kinberg "crazy", forcing the executives to takeover the edit. Yet, Kinberg

21  implied these problems were mild compared to what he endured with Blomkamp revising

21  *Elysium*, where the problems were so extreme that Blomkamp **"shut down"** and **"didn't**

22  **have the answers"**. Clearly, the script work Kinberg did on Elysium was **exhaustive**, and

23  not a mere "polish" as Def MRC II LP stated under oath. This was a clear act of perjury.

24

25     **SONY EMAILS CONFIRM DEFS RULE 37 VIOLATION IN BRIGGS V**

26     **BLOMKAMP, SHOWING DEFS OMITTED TESTIMONY & EVIDENCE**

27     159.   On page 28 of the Plaintiff's First Amended Complaint in Briggs v Blomkamp, et

28  al, the Plaintiff made a bold prediction: that sometime after May of 2013 (when Blomkamp

1  learned the details of Plaintiff's impending copyright lawsuit) Defendant Neill Blomkamp
2  went back into the editing room and tried to edit-out key headache scenes, which were
3  identical to the Plaintiff's work. The Plaintiff explained that Blomkamp did this to try to
4  cover-up his theft of the Plaintiff's intellectual property.

5     160.   Supporting this prediction, during the discovery phase of Briggs v Blomkamp, the
6  Plaintiff found a report on TheProvince.com (titled: "Elysium's ready as director Blomkamp
7  looks forward to next project" from February 2013) in which Def Blomkamp stated the film
8  was finished back in February 2013. (Said article from "The Province" is attached as
9  "**Exhibit BB**" and is incorporated by reference as if fully set out herein.) Then, proving the
10 Plaintiff's prediction, in sworn responses to Plaintiff's interrogatories, during discovery in
11 Briggs v Blomkamp, Def Blomkamp admitted film editing was finished "Sometime in or
12 about June 2013." (Said Defendant Blomkamp's Interrogatory Responses from Briggs v
13 Blomkamp are attached as "**Exhibit CC**" and are incorporated by reference, as if fully set
14 out herein.)

15    161.   The Plaintiff then filed a motion to compel documents, asking for all texts and
16 emails between Def Blomkamp and both *Elysium* film editors: Julian Clarke and Lee Smith
17 (Smith was the final editor—the editor who would have made these headache changes). The
18 Plaintiff made this motion to prove that Def Blomkamp resumed film editing after February
19 2013, to try to remove or alter the "headache" scenes. However, **the Defendants would not
20 provide a response from Lee Smith**, only from Clarke (Clarke stated that editing ended
21 well before June 2013—contradicting Blomkamp, who said editing ended June 2013). But
21 Lee Smith returned to the editing room to fix the headache scenes in May and June 2013.

22    162.   As well as doing the final edit of Elysium, the 2014 Sony email leak show that Lee
23 Smith also did the final edits for Blomkamp's next film, *Chappie* (although Smith isn't
24 credited on IMDB or Wikipedia).

25    163.   Lee Smith's final edit of Chappie is revealed in the Sony email leaks as Def Modi
26 Wiczyk writes to Amy Pascal:

27                 2014-08-12 00:13:30  saw it.  From:
                   mwiczyk@mrcstudios.com  To:
28

amy_pascal@spe.sony.com

**MODI WICZYK:**
    "we are going to get there and have a big success with this one. **lee
    smith** will be huge, **nb** is in GREAT frame of mind."

164.   Def Wiczyk knew Smith would be "huge" because of how Smith helped salvage Elysium. A few months later Def Wiczyk told Amy Pascal about all the work Lee Smith had left to do on the film, and the continued problems between Blomkamp and Kinberg.

2014-11-03 02:03:10 Re: From: mwiczyk@mrcstudios.com
                        To; pascal, amy

**MODI WICZYK:**
    "Hi!
    in terms of neill, totally ur call but...
    i feel like this coming week is critical bc neill has to really really let lee
    in to polish, refine, etc. alot of little indulgences are gonna have to go.
    so--- i was trying to be positive but also let him know theres real real
    work yet to do. and in a short period of time.... i talked to lee for a
    while today who says neills been very open so thats good...but hes
    been a dick to simon for whatever reason. so a long way of saying i
    want to keep the pressure on him. because i agree it can be special.
    make sense?"

165.   The Plaintiff filed his Motion to Compel (seeking a statement from Lee Smith) three (3) weeks before the deadline for dispositive motions (liability), July 9th, 2013. But the district court set the motion hearing for more than a week AFTER the deadline for dispositive motions (Aug 7th, 2013).   Thus, the Plaintiff had to file his Motion For Summary Judgment (**MFSJ**), without being able to inform the court of the Defendants' **violation of Rule 37** (failure to cooperate to compel a discovery response); a violation that, in this case, resulted in the omission of evidence of a cover-up (that cover-up being: Neill Blomkamp returned to the editing room with Lee Smith, in June 2013, to ask Smith to try to erase edit and remove the headaches from Elysium). Thus, during the teleconference hearing with Magistrate Judge Laurel Beeler, the Plaintiff explained that the matter was unresolved but was effectively "moot" because both parties' MFSJs had been filed, and the Plaintiff had less than a week to file his Reply Brief (Magistrate Beeler thus ruled the issue moot). (Note: the Defs also refused ALL of the Plaintiff's discovery requests for texts or emails regarding ANY Elysium matters; expanding the Defendants' **Rule 37 violations**).

**MRC & SONY PICTURES NEGLECTED TO DO BASIC
DUE DILIGENCE, BUYING THE RIGHTS TO ELYSIUM
WITHOUT EVEN READING A SCREENPLAY**

166.   In 2008, Def Neill Blomkamp filmed *District 9* without a screenplay.  District 9's star, Sharlto Copley, has given many interviews discussing the fact that he improvised every line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article with Sharlto Copley is attached as **"Exhibit DD"** and is incorporated by reference as if fully set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO Michael Lynton and Def Bill Block (of QED Int.), Emanuel was able to get QED and Sony Pictures' subsidiary *TriStar* to produce and distribute District 9, without a screenplay —using only Def Blomkamp's notes, which they referred to as a "script". Countless writers in online forums, have tried to find a copy of a District 9 script. All have failed.

167.   Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures bought the film and distribution rights to Elysium from Def Blomkamp, without ever reading a screenplay. Sony Pictures bought the rights to Elysium in a hasty meeting in 2008. In this well documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures agreed to buy the rights, immediately, never bothering to read the script. HollywoodReporter.com reported the details of the stunningly hasty meeting between Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011. MRC scheduled meetings with several other distributors that same day, but Sony Pictures was so rushed and eager to buy the film that MRC canceled all other distribution meetings scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that secured this deal, but never mentions a "screenplay" or a "script".  (Said Hollywood Reporter article about Blomkamp, MRC closing the deal with Sony Pictures is attached as **"Exhibit EE"** and is incorporated by reference as if fully set out herein.)  This same meeting and concept art were also recounted in the book "Elysium: The Art of the Film" —a book primarily made up of interviews with Def Blomkamp, himself. On August 6th, 2013, Deep Focus Review (deepfocusreview.com) reviewed the book "Elysium: The Art of

1  the Film", reflecting on this meeting. (Said Deep Focus Review article is attached as
2  "**Exhibit FF**" and and is incorporated by reference as if fully set out herein.)   Upon
3  interviewing Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and
4  MRC staged 50-60 concept art paintings "and set them against the screenplay", explaining:

> "On the strength of these images—not to mention the strength of his first
> film, *District 9*—he garnered himself a $100 million budget and signed
> stars Matt Damon and Jodie Foster."

8      168.   The Defendants used the amazing artwork to strategically distract attention from
9  the flawed screenplay. Sony Pictures took the bait. Within an hour or so, a deal for about
10  $115 million was made, and no executive from Sony Pictures ever read a script. MRC
11  didn't do due diligence because Defendant Ari Emanuel was a co-owner of MRC and Def
12  Blomkamp's personal agent; thus, they stood to make millions from the deal. Sony Pictures
13  failed to do due diligence because CEO Michael Lynton had an improper, secret business
14  partnership with Def Emanuel (Screenbid.com), and wanted to maintain good relations with
15  Defs Emanuel and MRC—and make millions without regard for whose work they pirated.

16      169.   Def Blomkamp's script was so poorly executed and riddled with evidence of
17  misappropriation of the Plaintiff's work, that Defs Blomkamp, MRC and Sony Pictures took
18  extreme measures to protect the script during film production. The website Games Radar
19  (gamesradar.com) interviewed one of Elysium's stars, film icon **Jodie Foster**, who revealed
20  the producer's paranoia as she explained she wasn't allowed to possess a script.   (Said
21  Games Radar interview with Jodie Foster is attached as "**Exhibit GG**" and is incorporated
21  by reference as if fully set out herein.)  Foster said:

> **"They won't even give me a screenplay. I've read it, but they won't
> give me one to physically keep in my home 'cause they're so worried
> about everybody."**

25   170.  How Sony Pictures and MRC committed $115 million to a movie without reading a
26  screenplay, but invested millions to keep the screenplay secret defies reason. This was done
27  to keep the Plaintiff from learning details of the film's plot before it was released, to prevent
28  the Plaintiff from getting an injunction to stop  production.

171. Had Sony Pictures behaved ethically, AND done their due diligence, they would have read Blomkamp's screenplay, then they would have seen Def Blomkamp's unfocused ideas, vast story weakness, and his poor literary skills. These shortcomings, juxtaposing concepts that were beyond such limited literary skills, should have raised red flags that Blomkamp's story may have been misappropriate, thus killing the deal. Hence, the Plaintiff would have filed no claims, including all claims herein.

172. When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal. Wiczyk wrote:

2014-10-27 13:36:12 Fwd: CHAPPIE NOTES
From: mwiczyk@mrcstudios.com To: pascal, amy
**MODI WICZYK:**

"hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a fixer and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb</u> <u>has</u> <u>been</u> <u>ignoring</u> <u>him</u> <u>the</u> <u>past</u> <u>few</u> <u>weeks</u> <u>after</u> <u>listening</u> <u>to</u> <u>him</u> <u>up</u> <u>until</u> <u>then</u>. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

173. A company has a responsibility to do basic due diligence, to make sure their products are what they allege: original works. Having a CEO who is secret business partners with the CEO of a talent agency subcontractor, undermines due diligence. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" to hide evidence of misappropriation is not doing due diligence. Rather, these are the methods of corrupt, mob-like conspirators.

174. Further, during discovery in Briggs v Blomkamp et al, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants failed to produced any such documentation.

**Defendant Blomkamp Gets Caught Lying To The World About**

**His "Aliens" Script (Which Also Did Not Exist) , in 2017:**

175.   Just as Def Blomkamp (with Def Wiczyk's help) sold Elysium to Sony and MRC without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" film without a script—but this time he did it openly, online, for the world to see. Unfortunately, in the process he ensnared several other Hollywood notables in his' strange world of lies.

176.   On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his Twitter account, expressing hope of one day shooting the film. Soon dozens of Blomkamp fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, including in an article on Nerdist.com. (Said article from Nerdist.com is attached as "**Exhibit HH**" and is incorporated by reference as if fully set out herein.)

177.   By July **2016**, websites like ScreenRant.com were reporting Def Blomkamp had recruited actress Sigourney Weaver and director James Cameron to tell the world how great Blomkamp's script was. (Said ScreenRant article is attached as "**Exhibit II**" and is incorporated by reference as if fully set out herein.)  In ScreenRant Sigourney Weaver said:

> **"There is an incredible script by Neill. I didn't want to do a fifth one. I thought going to earth wouldn't be fun. I got this script that was amazing and gives fans everything they're looking for..."**

178.   And James Cameron also praised the script in the ScreenRant article:

> **Director James Cameron (*Avatar*) then went on to throw in his two cents, saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"**

179.   "Gangbusters."

180.   Then, in April 2017, ScreenCrush.com reported that director Ridley Scott, owner of the Aliens franchise, had announced there would be no *Aliens 5* movie.  Mr. Scott explained Defendant Blomkamp **never even had a script**. (Said Screen Crush article is attached as "**Exhibit JJ**" and incorporated by reference as if fully set out herein.)  Ridley Scott stated:

> **"I don't think it will ever see the light of day. There was never a script. Just an idea that evolved from a dozen or so pages."**

181.   This all caused the article writer to wonder who was lying: "We seem to find

1   ourselves in a bit of a '*he said, she and he said*' situation here," Monagle wrote.

2   182.   Remember, in 2000 Def Wiczyk helped sell his brother's script to Summit without

3   so much as a script name, and Sony Pictures was right there, negotiating for the rights to

4   that unwritten, nameless script—eager to please any good friend of Ari Emanuel's.

5   By 2016, with *Aliens 5*, the Defendants had grown so brazen that they let Def Blomkamp go

6   out and lie to the world for himself, believing they could throw a script together after the

7   contract was signed. Rubbing their hands in anticipation of all that money, none of them

8   expected Ridley Scott to do due diligence and insist on seeing a script, ruining their scheme.

9

10   **IN BRIGGS V BLOMKAMP THE DEFS  HIRED A CONMAN, JEFF ROVIN**

11   **(WHO COMMITTED FRAUD UPON THE COURT & WENT ON FOX NEWS**

12   **TO ADMIT HE WAS A"FIXER" FOR BILL CLINTON) AS THEIR "EXPERT"**

13   183.   Not only does this case reveal how effortlessly seemingly everyone in Hollywood

14   lies, it reveals that when they get caught lying and stealing other people's work, they call on

15   world-class liars.

16   184.   In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of

17   thousands of California intellectual property attorneys as an expert witness, the Defs hired

18   Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the

19   same Jeff Rovin who confessed (two years <u>after</u> Briggs v Blomkamp went to MFSJ) to the

20   *National ENQUIRER (*October 19th, 2016), and confessed on **Fox News'** live telecast of

21   *The Sean Hannity Show* (Oct 24, 2016), that he was a professional "fixer" who

21   orchestrated false "smear" reports on people who disparaged President Bill and Hillary

22   Clinton—while Bill Clinton was President. Rovin claimed he then published these smear

23   articles in tabloid newspapers. Rovin's interview with Hannity can be seen at

24   https://www.youtube.com/watch?v=L3mzoKuFN5o. The story carried in countless other

25   publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit**

26   **KK**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER

27   article is attached as as "**Exhibit LL**" and is incorporated by reference as if fully set out

28   herein.)

185.  **Rovin made these self-incriminating admissions on camera, in his own words.** Rovin admitted that he also bribed the victims of his smears to stay quiet. Shockingly, Rovin says the bribes were so effective that they rarely needed to resort to other measures. In Rovin's words, "**Most of the time** it was just money, it never had to be any threats." Witlessly, Rovin admitted threats, violence—or worse—might ensue if the money wasn't accepted.

186.  Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

187.  Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort."

188.  Rovin went on to explain he had worked as a "fixer" many times in the past.

189.  In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.

190.  In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff moved the the court to exclude Rovin's "expert" report, as Rovin had falsified dozens of citations and fabricated evidence to substantiate his own claims, including a lengthy "quote" in which he fraudulently omitted 42 words—that wholly countered what Rovin reported. (Said Motion to Exclude is attached as "**Exhibit MM**" and is incorporated by reference as if fully set out herein.)  Oddly, the court took no interest in the fraud contained in Rovin's report—which became the base of the district court's summary judgment opinion—and denied the motion.

191.  How the Defendants knew such a devious man's "expert" report would go unchallenged is a mystery. How the Defendants knew such a sinister man existed—at all—is stunning.  Rovin explained that he worked for President Clinton when Bill Clinton was in office (1991-2001). When asked how he came to be involved with the Clintons, Rovin explained that the Clintons became aware of Rovin because, in Rovin's words, he was "**fixing something for an actor who was in their** (the Clinton's) **inner circle.**" Rovin does not identify who this cabinet member is, but during the time Rovin was involved with the Clintons (1991-1998), **Rahm Emanuel** worked as the senior adviser to President Clinton (1993-1998). Rahm Emanuel is Defendant Ari Emanuel's brother.

**Defendants May Use Campaign Donation To Avoid Prosecution**

192.   July 17, 2017, Observer.com reported that when Senator **Kamala Harris** was California's Attorney General she ignored corporate lawbreakers who made max donations to her campaign. (Said Observer article is attached as "**Exhibit NN**" and is incorporated by reference, as if fully set out herein). CampaignMoney.com reported **Def Emanuel** made max donations to Harris's campaign. (Said Campaign Money report is attached as "**Exhibit OO**" and is incorporated by reference as if fully set out herein.) The L.A. Times also reported Def Emanuel hosted a fundraiser for California's Lieutenant Governor Gavin Newsom. (Said LA Times article is attached as "**Exhibit PP**" and incorporated by reference, as if fully set out herein.)  Emanuel likely made said donations to keep Harris, Newsom, and the Dept of Bus Oversight from investigating his improper ties with Universal, MRC, Screenbid, Sony, etc.

### 9TH CIRCUIT FILM RULING IRREGULARITIES & CONFLICTS

193.   The district court's Briggs v Blomkamp summary ruling applied reversed law, rather than the prevailing law (cited by the Plaintiff). Such irregularities seem common in film industry cases in the 9th.  In 2014, the L.A. Times asked Chief Justice **Alex Kozinski** about this and the 9th's relationship with the film industry. (Said article is attached as "**Exhibit QQ**" and incorporated by reference as if fully set out herein.) Kozinsky explained:

> "He holds movie nights at the 9th Circuit courthouses in Pasadena, San Francisco and occasionally Seattle, where judges and lawyers pitch in for pizza and beer, **watch films and hear from scriptwriters and other industry insiders about the movies. Director <u>George Lucas</u> used to provide the court with films before they came out on DVDs**..."

194.   Many readers were stunned to learn that The Studios had such access to the very judges trying their cases. The article quotes attorney Steven T. Lowe, who, implying bias in the Ninth, said, "The studios and networks always win." In 2010, *The Los Angeles Lawyer* published Lowe's article "Death of Copyright". (Said article is attached as "**Exhibit RR**" and is incorporated by reference as if fully set out herein.)  In the article Lowe explains:

> "Of the **48** copyright infringement cases against studios or networks that resulted in a final judgment within the Second and **Ninth Circuits** (<u>and the district courts within those circuits</u>) **in the last two decades, the studios and networks prevailed in all of them** and nearly always on motions for summary judgment."

COMPLAINT
44

## SUMMARY

### Review Of Facts  Regarding Defendants' Actions,

### Resulting In Injury To  Plaintiff:

195.   The Defendants are accountable for taking the following actions, which resulted in injury to the Plaintiff:

**(1)**

196.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other Defendants, create a social network website, called Trigger Street, or TriggerStreet ("TS" herein), located at triggerstreet.com from 2002 until 2011, and at labs.triggerstreet.com from 2011 until 2014.

**(2)**

197.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other Defendants, published and rendered the TS "Terms of Use" contract page, which stated:

> Unless otherwise specified, the materials on the Site and in the Services are presented **solely for** the purpose of promoting the entertainment, information, and community resources and services available in, and other uses in, **the United States of America.** We control and operate the Site and the Services from within the United States. We make no representation that materials on the Site or the Services are appropriate or available for use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose to access the Site from other locations do so on their own initiative and are responsible for compliance with local laws.

198.   The previous statement from the TS "Terms of Use" page was deliberately false and/or misleading, and intended to inform members (or suggest, imply or insinuate) that TS was intended for use by and for, users in the USA. This was false, and WAS FRAUD, A MISREPRESENTATION, A FALSE STATEMENT, AND A DECEIT. These false statements were made to falsely assure informed, savvy writers that the website was safe from foreign "bad actors', as there are many nations that do not, or cannot enforce the Universal Copyright Convention, and often American copyright holders never learn that their works were misappropriated by foreign infringers, because the stolen works are only displayed in the infringers' nation. (TS also may have stated it was intended for US use to

1   avoid paying taxes on the international earnings from its Budweiser endorsement deal.)

2     199.   In truth, unbeknownst to American users, from the outset TS was intended for

3   international use.

4     200.   The Defendants' action were also a violation of 18 U.S. Code § 1001 - Statements

5   or entries generally (a) (1), which makes it illegal to make any materially false, fictitious,

6   or fraudulent statement or representation.

7                                     **(3)**

8     201.   Defendant Kevin Spacey made numerous trips abroad, to London, Spain, etc., to

9   give speeches and interviews, and throw parties, intent to recruit new TS members. While in

10   Spain, in 2009, Spacey stated, "I started the website about six years ago, and we now have

11   close to 400,000 members around the world."

12     202.   This was **BREACH OF CONTRACT**, as most (perhaps all) members in the USA

13   believed the website was solely for use in the USA.

14                                       **(4)**

15     203.   TS and the Defendants provided content and programming from TS to Bud.TV

16   from 2007 to 2009. Bud.TV also ran an international advertising campaign about this. This

17   international ad campaign advertised TS all around the world, as well as Bud.TV. Both,

18   advertising TS in Bud.TV promotions, AND advertising TS on Bud.TV itself, were

19   **BREACHES OF CONTRACT** of TS's Terms of Use contract page.

20                                       **(5)**

21     204.   The Defendant(s) made the TS website with effectively no security features, as

21   ALL members were allowed to ANONYMOUSLY read ALL screenplays. This, while TS

22   claimed to be industry standard, encapsulating all of the desires and needs of its users, and

23   touted its state of the art security. This was a violation of state and federal conspiracy,

24   negligence, gross negligence, fraud, deceit, misrepresentations, and false statements laws.

25                                       **(6)**

26     205.   Unlike a truly "industry standard" site like WritersScriptNetwork.com, all TS

27   members/users were encouraged and deceived into using and navigating the website with

28   false identities (even for writing reviews). Intent to protect the identities of misappropriating

conspirators, the Privacy page was written and designed to scare user/members into using false identities. The TS Privacy page stated:

> User Names and User Disclosure
> The user name you select or are provided with upon registration with the Site is deemed non-personally identifiable information. Your user name may be published on the Site and may be disclosed to others, including, without limitation, to the public, and to any third parties with whom we elect to share such information. In addition, **if you include <u>your</u> <u>name</u> or any other personally identifying information** in any material transmitted or posted on public areas of the Site or the Services (including, without limitation, message boards, **reviews** and chat rooms), **such information will become public information and will be published on the Site and will be disclosed to other users of the Site and to other third parties who may have access to or otherwise see a display of such information.**

206. These statements were made to encourage users to take risks they ordinarily would not take, and should not take, as part of the Defendants efforts to persuade users/members to make their wares accessible to the Defendants. This was CONSPIRACY and DECEIT.

(7)

207. The TS Privacy page suggested that the website had a method to reveal the true identity of all "accessors", if necessary.

> Information Disclosure
> We reserve the right to disclose information submitted by or concerning any user as we feel is necessary to protect our systems or business. Specifically, but without limitation, we reserve the right to disclose such information when a visitor or member is in violation of our Terms of Use or any other agreement with us, or engages (or is suspected of engaging) in any harmful, infringing or illegal activity....

208. However, there is no evidence to support that TS ever, truly, had any method of retrieving any access records, or the accessor's true identity, etc. Nor is there any reason to believe such a system ever existed on TS. Thus, the Defendants' action were in violation of 18 U.S. Code § 1001 - Statements or entries generally, which makes it illegal to make any materially false, fictitious, or fraudulent statement or representation.

**(8)**

209.  The Defendant(s) made extraordinary and fraudulent claims about website security; doing so to lure in the best undiscovered writers, and eliminate any doubts or suspicions users might otherwise reasonably have. Such false and exceptional claims as:

a.  The TS "About Us" page stated:

> "Our team has been extensively researching and designing TriggerStreet.com to ensure that it **encapsulates every aspect of the user's desires and needs**."

210.  THIS WAS FRAUD. All reasonable screenwriter members would expect (from a website assuring that the website "**encapsulates every aspect of the user's desires and needs**") that records be preserved of all access of writers' work, identifying which members accessed which works, AND recorded by the accessor's true name —AND NOT erase all access history if the member removes his/her work because he/she worries his work may be unsafe on the website. Members would reasonably expect and *desire* this (from a site claiming to be industry standard) because other websites were already doing this (InkTip.com, perhaps others). Further, all reasonable members would **desire** and **need** a website to use accurate language, and behave in accordance with the implicit language of the Website's Terms of Use". And if the "Terms of Use" stated, suggested, implied—or used language that implied—that the website was solely for use in the USA, members should expect that site operators would act in accordance with that agreement, and not advertise or recruit abroad. This false claim was made to lure writers to an unsafe website.

211.  This was deceit. The Defendants' action were also in violation of 18 U.S. Code § 1001 - Statements or entries generally, which makes it illegal to make any materially false, fictitious, or fraudulent statement or representation.

a.  On the TS Privacy page, the "Security" message stated:

> "Security
> When you submit information via the Site, your information is protected using secure data networks protected by **industry standard firewall and password protection systems**. Our security practices and policies are periodically reviewed and updated as necessary, and only authorized individuals have access to the information provided by our users."

212.   THIS WAS FRAUD. There was nothing "industry standard" about the TS screenwriter website. The standard was set by Writers Script Network.com (InkTip.com). InkTip kept all records of all access, even after members left. On Inktip.com, there was no feature erasing all access records upon script removal. By implying all information was protected and secure and industry standard, reasonable members would assume all members' access activity would be recorded, stored, and protected —not erased.

213.   The Defendants' action were also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to make any materially false, fictitious, or fraudulent statement or representation.

      b.   The Defendant(s) and TS used Def Spacey's stardom to lure in writers, then writers were **promised** "industry access and exposure"; using Spacey's fame and Academy Award winning laurels to leverage a false promise. TS's statement from its "About Us" page promised that:

> "Based on the principles of creative excellence, it (the TS website) provides **industry access and exposure** to help build the careers of notable new filmmakers and screenwriters."

214.   THIS FALSE PROMISE, bolstered by the other fraudulent statements on the "Terms of Use", "About Us", and "Privacy" pages, expanded a pattern of false statements, misrepresentations, fraud and deceit. The Plaintiff did NOT expect to be *discovered*. But he also did NOT expect to be cheated by these industry insiders.

**(9)**

215.   The Defendants added a new counter security feature, whereby if a member removed his/her screenplays from the TS website because he/she worried that it might be unsafe or the target of infringers or pirates, the moment the writer removed his script ALL access records would be erased. The Plaintiff believes the Defs added this feature in 2007 to access and steal the Plaintiff's work. But whether this extra hidden layer of counter-security was added when the website was made, in 2002, or if it was added in 2007, the Defendant(s) and TS did not inform members about this feature, and it was never mentioned on the TS website. The Defendants' failure to inform members of this counter-security

feature, and the risks it posed, was a deliberate omission of imperative information. The Defendants actions were in violation of California Civ. Code § 1572, fraud by omission, and constitute DECEIT in violation of California Civ. Code § 1709, and these actions and inactions were in violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to conceal or cover up such facts.

### (10)

216.    Corporations are expected to do due diligence in all substantial purchases, transactions and deals (such as investing $120 million in a film). Due diligence means doing **"a complete and appropriate review of documentation and facts by a potential buyer or its agents before purchasing an asset or engaging in business with a prospect"** (from the Law Offices of Stimmel, Stimmel & Smith); this definition goes on to require a "...complete review using lawyers and CPAs to assist so that when one is done, one knows all that one needs to know before engaging in business with or buying a company or other asset or piece of property." The Defendants did not do due diligence —not even reading the screenplay before buying its rights; thus, the Defendants engaged in **gross negligence.**

### (11)

217.    The Defendants engaged in conflicts of interests that violated **CALIFORNIA LABOR CODE SECTION 1700.39**, which states, "No talent agency shall divide fees with an employer, an agent or other employee of an employer." Defendant Ari Emanuel was the central talent agent in making the film Elysium, representing Elysium's star Def Matt Damon, and its writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an owner of MRC (the employer of Def Neill Blomkamp for the making of Elysium, and the buyer of Elysium's film rights). Thus, Def Ari Emanuel divided fees as a talent agent and employer. The Plaintiff was injured by this violation of California law.

### (12)

218.    The Defendants engaged in VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, ET SEQ., UNFAIR BUSINESS PRACTICES ACT. Sony Pictures' (a publicly traded company), and its CEO Michael Lynton, violated California Business & Professions Code  § 17200, ET SEQ., by engaging in improper and unethical

1   business relationship, whereby Michael Lynton, acting as an officer of Sony Pictures, hired

2   a subcontract, Screenbid, to sell numerous items of substantial value for Sony Pictures.

3   Thus, Def Lynton profited as Sony Pictures' CEO, and he and Def Ari Emanuel profited as

4   the owners of Screenbid, the subcontracted auction service. This was a conflict of interest.

5       219.    This improper relationship caused CEO Michael Lynton to encourage his

6   subordinates and peers NOT to scrutinize projects, clients or business entities associated

7   with his secret business partner Def Ari Emanuel. Thus, Sony Pictures agreed to distribute

8   Elysium without doing due diligence to read a screenplay to see to it that it was reasonably

9   executed. Had Sony Pictures employed a reasonable standard of due diligence, Elysium

10  would not have been made; thus, no injury would have come to the Plaintiff.

11                                    **(13)**

12      220.    The Defendants engaged in Obstruction Of Justice by closing and destroying the

13  TS website 6 days after the Plaintiff filed his Notice of Appeal to the Ninth Circuit Court of

14  Appeals. The Defendants did this to destroy incriminating evidence, because the district

15  court based its MFSJ ruling on reversed law, cited by the Defendants, rather than the

16  prevailing law, cited by Plaintiff. Thus, Briggs v Blomkamp, et al, is/was apt to be returned

17  to the lower court, where the Plaintiff will/would subpoena all website access records, to

18  confirm the Defendants used TS to access the Plaintiff's work, and confirm that TS

19  misrepresented its security and ID protection features, and had no such records or oversight

20  at all.

21                                    **(14)**

21      221.    By conspiring to hire an admitted "fixer", Jeff Rovin (who spent years of his life

22  preparing false smear stories for tabloid news), to prepare and submit a falsified "expert"

23  report to the court, the Defendants engaged in SUBORNATION OF PERJURY. This was

24  also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which

25  makes it illegal to knowingly and willfully: (1) falsify, conceal, or cover up by any trick,

26  scheme, or device a material fact; (2) make any materially false, fictitious, or fraudulent

27  statement or representation; or (3) make or uses any false writing or document knowing the

28  same to contain any materially false, fictitious, or fraudulent statement or entry.

**(15)**

222.   By stating, in their answers to the Plaintiff's interrogatories, that Simon Kinberg only provided a "polish" to the Defendants script, "Elysium", when, in fact, he did exhaustive work to salvage the screenplay, the Defendant(s) committed **Perjury**. This was also a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1), which makes it illegal to conceal or cover up such facts.

**(16)**

223.   In Briggs v Blomkamp, the Plaintiff stated that the Elysium film editor(s) would confirm that the Film's editing resumed in June, 2013 (after wrapping up originally in February 2013), after the Defendants learned of the Plaintiff's immanent lawsuit. The Plaintiff stated the editor(s) would also confirm that this final film editing was done to try to remove the the hero's headaches. But the Defendants refused to provide Plaintiff any access to Elysium's final editor, Lee Clarke. In doing so the Defendants **VIOLATED RULE 37** —a violation that may have changed the outcome of the case. In doing so, the Defendants endeavored to **conceal and cover** up their misappropriation of the Plaintiff's work; a violation of 18 U.S. Code § 1001 - Statements or entries generally (a) (1).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### CONSPIRACY
Violating California Penal Code 182(a)(3),(4), and/or (5)
**(Against All Defendants)**

224.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 223, as if fully set out herein.

California Penal Code 182 (a)(3)(4)(5) makes it unlawful:

(a) If two or more persons conspire:
(3) Falsely to move or maintain any suit, action, or proceeding.
(4) To cheat and defraud any person of any property, by any means which
arc in themselves criminal, or to obtain money or property by false pretenses
or by false promises with fraudulent intent not to perform those promises.
(5) To commit any act injurious to the public health, to public morals, or to
pervert or obstruct justice, or the due administration of the laws.

225.   The Defendants engaged in three (3) conspiracies, in violation of California Penal Code 182(a) (3)(4) and/or (5). California Penal Code requires that one of the conspirators commit an **overt act** in the process. The Defendants committed many overt actions:

**First Conspiracy**

226.   To unlawfully enrich themselves, the Defendants conspired to create a social network for screenwriters and filmmakers, with little or no security features. The Defendants would then mislead screenwriters that the website was safe, then the Defendants could access and misappropriate these screenwriter's work.

227.   **Overt Act #1:** The Defendants conspired to create a social network website.

228.   **Overt Act #2:** The Defendants conspired to design the website with effectively no security features.

229.   **Overt Act #3:** The Defendants conspired to commit fraud and mislead website member/users that the website had reasonable security features, when it had none.

230.   **Overt Act #4:** The Defendants conspired to add a counter security feature that erased all access information if members removed their screenplays.

231.   **Overt Act #5:** The Defendants apparently conspired to add this feature (described in the previous paragraph) in 2007, to erase evidence of their access of the Plaintiff's script.

232.   **Overt Act #6:** The Defendants conspired to make the film Elysium (which may still be legally proven to be derived from the Plaintiff's work), careful not to leak any information about the project.

233.   **Overt Act #7:** The Defendants conspired to create website *Terms of Use* page that stated the website was intended solely for use in America, but the Defendants repeatedly sent Def Spacey around the globe to recruit members. The Defendants ALSO secretly advertised TS on international websites (like Bud.TV) and in other international publications. The Defendants knew what the Terms of Use rules stated, and they agreed amongst themselves that it was important to violate said rules, to get international members.

234.   **Overt Act #8:** While producing the film Elysium, the Defendants conspired to keep the Elysium script an absolute secret, not even allowing Hollywood giants like Jody Foster to take her script home.

COMPLAINT

235.   **Overt Act #9:** The Defendants (particularly Ari Emanuel, who profited the most from these acts and arrangements) also had Def Matt Damon and Ben Affleck start a screenwriter/filmmaker website, similar to TriggerStreet, called Project Greenlight. Affleck and Damon have been Def Emanuel's clients (through Endeavor and WME-IMG) for most of their careers. Both websites (TS and Project Greenlight) have been accused of being the place of access in major film and TV copyright infringement suits. Both "stolen" film or TV projects were eventually sold to companies with questionable relationships to Def Emanuel (MRC and Universal Pictures -or their parents or subsidiaries). Both websites (TS and Project Greenlight) used suspiciously similar language: "peer reviews," "peer-to-peer," etc.

**Second Conspiracy**

236.   Once the Plaintiff realized the Defendants misappropriated his work, he sued.

237.   In response, the Defendants designed a second conspiracy, to prevent the Plaintiff from duly prevailing in his copyright lawsuit. This would require cheating the Plaintiff, and cheating the US and California civil justice systems.

238.   **Overt Act #10:** Rather than hiring any one of of perhaps ten-thousand well qualified California intellectual property attorneys for their expert witness in Briggs v Blomkamp, et al, the Defendants opted to hire a New York conman named Jeff Rovin, who admitted on Fox News "The Sean Hannity Show" that he was a professional "fixer" who worked for President Bill Clinton's administration, and used his literary skill to create "smear" stories for junk tabloid newspapers to attack Clinton critics. Rovin said he came to work for Bill and Hillary Clinton because he was working for another "actor" in the Clinton White House. The Plaintiff is certain that other actor is Rahm Emanuel, who was Senior Advisor to the President (Clinton). Rahm Emanuel is Defendant Ari Emanuel's brother. Rahm likely referred Def Ari Emanuel to hire Jeff Rovin to "fix" the expert report. Def Ari Emanuel is a co-owner of MRC, Defs Blomkamp's agent, and business partner of Bill Block (CEO of QED Int.), all of whom were named in Briggs v Blomkamp, et al.

239.   **Overt Act #11:** Defendants conspired to prevent the Plaintiff from speaking to editor Lee Smith in Briggs v Blomkamp.

240.   **Overt Act #12:** The Defendants conspired to commit perjury, stating that Simon

COMPLAINT

54

1   Kinberg merely "polished" Def Blomkamp's script.

2     241. **Overt Act #13:** The Defendants conspired to shut-down and destroy the TS social

3 network 6 days after the Plaintiff filed his Notice Of Appeal, also obstructing justice.

4 **Third Conspiracy**

5     242. To greatly increase and accelerate their rate of personal enrichment, the Defendants

6 conspired to break California business, labor and ethics codes. Breaking these business

7 labor and ethics codes caused a disintegration in the Defendants' business practices, causing

8 them to act recklessly, and negligently.

9     243. **Overt Act #14:** The Defendants conspired to commit to invest over $100,000,000

10 to make the film Elysium, without reading a script.

11     244. **Overt Act #15:** The Defendants conspired to create an arrangement where

12 Universal Pictures or its parent or its subsidiaries, will finance and/or distribute any project

13 Def Ari Emanuel brings Universal Pictures—even unlawfully acquired projects.

14     245. **Overt Act #16:** The Defendants conspired to engage in inappropriate business

15 relationships, such as Def Emanuel and Sony Pictures CEO Michael Lynton co-owning

16 Screenbid, and Defendant Emanuel co-owning MRC (violating Cal Labor Code 1700.39).

17     246. In the aforementioned actions, and others detailed in this Complaint, and perhaps

18 others to be revealed at trial, the Defendants willfully, maliciously, fraudulently, with

19 wrongful intent to harm the Plaintiff, with disregard for the Plaintiff's rights and welfare,

20 and with disregard for ethics and for the law, engaged in one or more conspiracies.

21     247. The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

21 Defendants' actions, in an amount to be determined at trial.

22 **SECOND CLAIM FOR RELIEF**

23 <u>OBSTRUCTION OF JUSTICE & ANTICIPATORY OBSTRUCTION OF JUSTICE</u>
**Violating 18 U.S. Code § 1519**

24 Destruction, Alteration, Or Falsification Of Records In A Federal Investigation

25 **(Against All Defendants)**

26     248. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

27 247, as if fully set out herein.

28     249. 18 U.S. Code § 1519 makes it unlawful to destroy evidence, etc., in anticipation or

1    contemplation of a legal action; stating:

2        Whoever knowingly alters, destroys, mutilates, conceals, covers up,
    falsifies, or makes a false entry in any record, document, or tangible object
3        with the intent to impede, obstruct, or influence the investigation or proper
4        administration of any matter within the jurisdiction of any department or
    agency of the United States or any case filed under title 11, or in relation
5        to or **contemplation** of any such matter or case, shall be fined under this
6        title, imprisoned not more than 20 years, or both.

7        250.   The Defendants engaged in obstruction of justice (and/or anticipatory obstruction

8    of justice), violating 18 U.S. Code § 1519, by endeavoring to close and destroy their social

9    network TriggerStreet.com, as detailed throughout this Complaint. Although the Defendants

10   knew the website was the central access point of an ongoing legal case, they closed the site

11   6 days after the Plaintiff filed his Notice Of Appeal; doing so while the site was still

12   growing, without giving the website's perhaps 700,000 members an explanation.

13       251.   In these actions, detailed in this Complaint, and perhaps others to be revealed at

14   trial, the Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff, and

15   with disregard for the law, acted to violate the law and obstruct justice.

16       252.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

17   Defendants' actions, in an amount to be determined at trial, in addition to any other

18   remedies deemed necessary and appropriate by the court.

19                    **THIRD CLAIM FOR RELIEF**
                 FRAUD AND FALSE STATEMENTS
20       **Violating 18 U.S. Code § 1001** (Statements or entries generally)
21                  **(Against All Defendants)**

21       253.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

22   252, as if fully set out herein.

23       254.   In their actions, detailed in this Complaint, the Defendants willfully, maliciously,

24   with wrongful intent to harm the Plaintiff and perhaps others, with disregard for the law,

25   committed numerous acts of fraud, misrepresentations, deceit, fraudulent omissions, false

26   statements, etc., in violation of 18 U.S. Code § 1001.

27       255.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

28   Defendants' actions, in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
BREACH OF CONTRACT
Violating California Code, Civil Code § 3294
**(Against All Defendants)**

256.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 255, as if fully set out herein.

257.   In their actions detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully and with disregard for ethics and law, committed numerous acts of Breach Of Contract, in violation of California Civil Code § 3294.

258.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
FRAUD
Violating California Civ. Code § 1572
**(Against All Defendants)**

259.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 258, as if fully set out herein.

260.   In their actions detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully, maliciously, and with wrongful intent to harm the Plaintiff and perhaps others, and with disregard for the law, committed numerous acts of fraud, misrepresentation, deceit, fraudulent omissions, false statements, etc., in violation of California Civ. Code § 1572.

261.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
DECEIT
Violating California Civ. Code § 1709
**(Against All Defendants)**

262.   The Plaintiff Hereby realleges and incorporates by reference paragraphs 1 through 261, as if fully set out herein.

263.   In their actions detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully, maliciously, and with wrongful intent to harm the Plaintiff

1 (and perhaps others), and with disregard for the law, committed numerous acts of deceit, in

2 violation of California Civ. Code § 1709.

3   264.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

4 Defendants' actions, in an amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
NEGLIGENCE
Violating 19 U.S. Code § 1592 (Penalties for fraud, gross negligence, and negligence)
**(Against All Defendants)**

8   265.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

9 264, as if fully set out herein.

10   266.  In their actions, detailed in this Complaint, and perhaps other actions to be revealed

11 at trial, the Defendants, with wrongful intent to harm the Plaintiff (and perhaps others), with

12 disregard for ethics and the law, acted with negligence, in violation of 19 U.S. Code § 1592.

13   267.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

14 Defendants' actions, in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
GROSS NEGLIGENCE
**Violating 19 U.S. Code § 1592 (Penalties for fraud, gross negligence, and negligence)**
**(Against All Defendants)**

18   268.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

19 267, as if fully set out herein.

20   269.  In their actions, detailed in this Complaint, and perhaps other actions to be

21 revealed at trial, the Defendants willfully, maliciously, with wrongful intent to harm the

21 Plaintiff (and perhaps others), with disregard for the Plaintiff, ethics, and the law, acted

22 with gross negligence, in violation of 19 U.S. Code § 1592.

23   270.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

24 Defendants' actions, in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**
VIOLATING CALIFORNIA LABOR CODE § 1700.39
**(Against All Defendants)**

28   271.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

270, as if fully set out herein.

272.   In their actions, detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully, with wrongful intent, and disregard for others, ethics and the law, violated California Labor Code 1700.39.

273.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF
### VIOLATION OF UNFAIR BUSINESS PRACTICES ACT
### [CAL BUS & PROF CODE§ 17200, ET SEQ.]
**(Against All Defendants)**

274.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 273, as if fully set out herein.

275.   In their actions, detailed in this Complaint, and perhaps others to be revealed at trial, the Defendants willfully, with wrongful intent, motivated to unlawfully enrich themselves, with negligent disregard for the Plaintiff, others, ethics and the law, violated the Unfair Business Practices Act [Cal Bus & Prof Code§ 17200, Et Seq., namely: officers of separate but cooperating businesses, willfully entered a conflict of interest, by going into a secret, private business partnership as co-owners of Screenbid, which the Defendants used as a subcontractor for their separate businesses. These conflicts of interests eroded the Defendants business standards and practices; creating the circumstances whereby the Defendants were able to misappropriate the Plaintiff's intellectual property.

276.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### PERJURY
### Violating 18 U.S. Code § 1621 (Perjury generally)
**(Against All Defendants)**

277.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 276, as if fully set out herein.

278.   In their actions, detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully, maliciously, with disregard for the law,

1  committed perjury, in violation of 18 U.S. Code § 1621.

2     279.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of

3  the Defendants' actions, in an amount to be determined at trial.

4            **TWELFTH CLAIM FOR RELIEF**

           TAMPERING WITH EVIDENCE

5  **Violating 18 U.S. Code § 1512(c)(1) (Tampering with a witness, victim, or informant)**

6                 **(Against All Defendants)**

7     280.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

8  279, as if fully set out herein.

9      281.  In their actions, detailed in this Complaint, and perhaps other actions to be

10  revealed at trial, the Defendants willfully, maliciously, and with disregard for the law,

11  engaged in tampering with evidence, in violation of 18 U.S. Code § 1512(c)(1).

12     282.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of

13  the Defendants' actions, in an amount to be determined at trial.

14           **THIRTEENTH CLAIM FOR RELIEF**

            WITNESS TAMPERING

15  **Violating 18 U.S. Code § 1512(c)(2) (Tampering with a witness, victim, or informant)**

16                 **(Against All Defendants)**

17     283.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

18  282, as if fully set out herein.

19      284.  In their actions, detailed in this Complaint, and perhaps other actions to be

20  revealed at trial, the Defendants willfully, and with disregard for the law, justice, and the

21  Plaintiff's rights, engaged in tampering with evidence, in violation of 18 U.S. Code §

21  1512(c)(1).

22     285.  The Plaintiff was injured as a direct, foreseeable and proximate consequence of the

23  Defendants' actions, in an amount to be determined at trial.

24           **FOURTEENTH CLAIM FOR RELIEF**

           SUBORNATION OF PERJURY

25             **Violating 18 U.S. Code § 1622**

26  **(Against All Defendants Except The California Dept. Of Business Oversight)**

27      286.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1

28  through 285, as if fully set out herein.

287.   In their actions, detailed in this Complaint, and perhaps other actions to be revealed at trial, the Defendants willfully and maliciously violated the Plaintiff's rights and the law, to engage in subornation of perjury, in violation of 18 U.S. Code § 1622.

288.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**:

WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

1.  For general damages in an amount according to proof at the time of trial;

2.  For exemplary damages;

3.  For special damages in an amount according to proof at trial;

4.  For restitution and disgorgement of all profits (estimated at $850,000,000—which represents the total projected profits that the Defendants will realize from the misappropriation of the Plaintiff's work, see page 18, para 2) in favor of the Plaintiff, consistent with US copyright remedies (plus any exemplary damages for deceiving the district court);

5.  For Plaintiff's cost of this lawsuit and reasonable attorney's fees;

6.  For such injunctions and additional relief the Court may deem proper..

DATED: November 13th, 2017

Respectfully Submitted

By: _____

Steve Wilson Briggs, Plaintiff

COMPLAINT

61

# Exhibit F

| | |
|---|---|
| 1 | Steve Wilson Briggs |
| 2 | 681 Edna Way, |
| 3 | San Mateo, CA 94402 |
| 4 | 510 200 3763 |
| 5 | snc.steve@gmail.com |
| 6 | PLAINTIFF In Propria Persona |
| 7 | |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE WILSON BRIGGS | Civ No: CV 17 6552 |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| vs | **FOR:** |
| UNIVERSAL CITY STUDIOS LLC;<br>NBCUNIVERSAL MEDIA, LLC;<br>SONY PICTURES ENT INC.;<br>KEVIN SPACEY;<br>ARI (ARIEL) EMANUEL;<br>MATT DAMON;<br>BEN AFFLECK;<br>NEILL BLOMKAMP;<br>MORDECAI (MODI) WICZYK;<br>ASIF SATCHU;<br>BILL BLOCK;<br>DANA BRUNETTI;<br>MRC II DISTRIBUTION COMPANY LP<br>(AKA MRC, Media Rights Capital, and<br>all other MRC entities and subsidiaries)<br><br>Defendants. | 1. CIVIL CONSPIRACY<br>2. SPOLIATION OF EVIDENCE<br>3. BREACH OF CONTRACT<br>4. FRAUD / INTENTIONAL<br>MISREPRESENTATIONS<br>5. DECEIT<br>6. CONCEALMENT<br>7. NEGLIGENCE<br>8. GROSS NEGLIGENCE<br>9. VIOLATION OF CALIFORNIA<br>LABOR CODE § 1700.39<br>10. VIOLATION OF UNFAIR<br>BUSINESS PRACTICES ACT [CAL<br>BUS & PROF CODE<br>§ 17200, ET SEQ.]<br>11. WITNESS TAMPERING<br>12. INFRINGING EXPORTATION<br>(17 USC § 602, under 17 USC § 501)<br>13. COPYRIGHT INFRINGEMENT<br>(17 U.S.C § 501)<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

1

| | |
|---|---|
| 1 | **NATURE OF ACTION:** |
| 2 | **1.** Pursuant to 28 U.S. Code § 1331 (as this matter involves violations of US federal |
| 3 | law) and 28 U.S. Code § 1367(a) (as this matter is substantially related to the prior action, |
| 4 | Briggs v Blomkamp, currently in appeals), Plaintiff brings this action against the Defendants |
| 5 | (**Defs**) for their violations of federal and state law. In pursuit of personal enrichment and/or |
| 6 | to gain unlawful competitive advantage, the Defendants engaged in such violations as: |
| 7 | 1. Spoliation: 6 days after Plaintiff filed Notice of Appeal (in Briggs v Blomkamp, |
| 8 | C134679), the Defs closed their social network *TriggerStreet.com* **(TS)** to destroy |
| 9 | evidence and records, as this was their *access* point in Briggs v Blomkamp; Plaintiff |
| 10 | would subpoena these records if the 9th Circuit remands the matter for trial. |
| 11 | 2. Defs Spacey and Brunetti (likely acting at Def Emanuel's behest) created the social |
| 12 | network, TS, to secretly and unlawfully access, appropriate and alter the original |
| 13 | works of undiscovered writers. The Defs financially profited from these activities, |
| 14 | or received film acting roles, or film production or distribution benefits. |
| 15 | 3. **Breach:** TS's *Terms Of Use* stated the site was **solely for use in the USA,** yet |
| 16 | secretly the site operated around the world. Further, secretly and without consent |
| 17 | from US members, Spacey and Brunetti went to London (2002) and Spain (2009) to |
| 18 | recruit new members, touting TS's **"400,000 members <u>around the world</u>."** |
| 19 | 4. By making Plaintiff's work available in foreign markets, without Plaintiff's consent, |
| 20 | the Defs committed Infringing Exportation, infringing on the Plaintiff's copyright. |
| 21 | 5. Without informing TS members, the Defendants installed an anti-security feature on |
| 21 | TS, which erased all access records if a member deleted their work. |
| 22 | 6. In *Briggs v Blomkamp*, the Defs hired 'fixer" **Jeff Rovin** (a high school-educated |
| 23 | fantasy writer) as their sole "expert" witness. Rovin provided a falsified report to the |
| 24 | court. Two years after Briggs v Blomkamp went to appeals, on Oct. 24, 2016, Rovin |
| 25 | went on national TV, Fox News' *The Sean Hannity Show*, to admit he was a |
| 26 | professional "fixer" (someone who makes problems go away by producing false |
| 27 | stories and documents) for President Bill Clinton's administration. Clearly, the Defs |
| 28 | hired Rovin to "fix" his expert report, and violate the judicial process. In June 2014, |

1     the Plaintiff moved to exclude Rovin's report due to its gross fraud: Motion denied.

2   7. Evidence will show Def Ari Emanuel, a talent agent, is also Hollywood's most

3       powerful film producer—against California labor & business codes § 1700.39,

4       which makes it unlawful for a talent agent to act as both agent and as an employer.

5   8. Defs boasted TS had "industry standard" security, when, in fact, they removed all

6       security features to allow themselves constant anonymous access to writer's works.

7   9. Defs made wild false promises to entice new writers to TS, such as: "Our team has

8       been extensively researching and designing TriggerStreet.com **to ensure that it**

9       **encapsulates every aspect of the user's desires and needs**".

10  10. The Defs used Def Emanuel's influence with Universal Pictures to entice, persuade

11       or bribe the enlistment of other conspirators and as leverage against business rivals.

12  11. The Defs unlawful relationships (e.g. Defs Emanuel's and Block's co-ownership of

13       Screenbid.com with Sony Picture's CEO M. Lynton; Emanuel's co-ownership of

14       MRC with Defs Satchu and Wiczyk) created a culture where the Defs neglected to

15       do due diligence. Thus, **before they ever read a script**, Sony Pictures and MRC

16       bought the rights to the film *Elysium* (which was misappropriated from the Plaintiff).

17                              **JURISDICTION:**

18   2. **Jurisdiction:** This court has subject matter jurisdiction per 28 USC **§** 1331, as this

19 action involves violation of federal law; per 28 U.S. Code § 1367(a), as this matter is

20 substantially related to Plaintiff's prior federal action, Briggs v Blomkamp; and perhaps

21 partially under 28 USC **§** 1332(a)(2), as one or more Defendant is/are foreign citizens.

21   3. **Venue:** venue is proper pursuant to 28 **§** 1391(b)(2) as events giving rise to this

22 complaint occurred in this district, and 28 § 1391(d), by virtue of the Defendants' business

23 transaction with this dist., and under 326 US 310 the Defs meet the minimum contact rule.

24   4. **Intradistrict Assignment:** San Francisco is the proper intradistrict assignment as a

25 substantial part of the events and omissions, leading to this lawsuit, occurred in this district.

26                               **THE PARTIES:**

27   5. **Plaintiff,** Steve Wilson Briggs, is a filmmaker, screenwriter, author, musician and a

28 makerspace tinkerer/teacher at Cesar Chavez & Green Oaks Academy.

6. **Defendant** Universal Pictures is an American film studio; NBCUniversal subsidiary.

7. **Defendant** Sony Pictures is a subsidiary of the Japanese multinational Sony Corp.

8. **Def** NBCUniversal is a multinational media conglomerate & Comcast subsidiary.

9. **Defendant** Kevin Spacey is an American actor, and one of the men purportedly responsible for creating the now defunct social network TriggerStreet (TS).

10. **Defendant** Ariel (Ari) Emanuel is a talent agent and co-CEO of WME-IMG.

11. **Defendant** Matt Damon is an American actor and screenwriter.

12. **Defendant** Ben Affleck is an American actor and screenwriter.

13. **Defendant** Neill Blomkamp is a South African-born film director. He is, on information and belief, a Canadian or South African citizen.

14. **Defendant** Mordecai Wiczyk is the co-CEO of Media Rights Capital (MRC);

15. **Def** Asif Satchu is the co-CEO of MRC, and is believed to be a citizen of Canada.

16. **Def** Bill Block is CEO of Miramax (a subsidiary of Qatari's beIN Media & Al Jazeera).

17. **Defendant** Dana Brunetti is credited with the conception of TriggerStreet.

18. **Defendant** MRC is a diversified global media company, with many subsidiaries and/or aliases, including: Media Rights Capital, MRC II LP; MRC II Distribution Company LP; ; MRC II Holdings, L.P.; AsgarI Inc.; Oaktree Entertainment, Inc., and more.

NOTE:

19. Some of the issues in this Complaint concern false statements made during discovery and a falsified witness report submitted in Briggs v Blomkamp, C134679 PJH. Some of the issues concern certain the Defendants destroying property/evidence related to Briggs v Blomkamp, as that matter moved into appeals—actions which were unknown to the Plaintiff until February 2016. Some of the issues involve the Defendants creating a business culture that encouraged deceit and neglect, creating the conditions under which the Plaintiff's property was violated. Some of the issues involve the Defendants writing and entering into falsified contracts and/or breaching these contracts, which bound the Defendants and Plaintiff until the contract terminated when TriggerStreet.com (or labs.triggerstreet.com) went out of business, November 6th, 2016.

| | |
|---|---|
| 1 | **STATEMENT OF FACTS & ALLEGATIONS:** |
| 2 | **Brief Case Overview** |
| 3 | 20.  The Defendants conspired to create and operate (for 12 years) a social network for |
| 4 | screenwriters and filmmakers, known as **TriggerStreet** (referred to as **TS** in this |
| 5 | Complaint). TriggerStreet (**TS**) was located at www.triggerstreet.com from 11/2002 to |
| 6 | 07/2011, and at www.labs.triggerstreet.com from 07/2011 to 11/2014. The Defendants used |
| 7 | TS to fraudulently access and acquire original film ideas. By using TS's 400,000+ members |
| 8 | to review, judge, and rank the best work, the Defendants were able to peruse the very best |
| 9 | scripts at their leisure, alter them slightly, then produce and market them, as their own. |
| 10 | 21.  To entice the best undiscovered writers into joining TS and submitting their |
| 11 | screenplays, the Defs published and rendered a contract comprised of false claims, |
| 12 | deception and concealments. TS's "Terms of Use", "About Us" and "Security" pages |
| 13 | claimed to employ "industry standard" security, and boasted that TS "encapsulates every |
| 14 | aspect of the user's desires and needs", when, in fact, TS's security features were effectively |
| 15 | non-existent. (Said TS websites pages "Terms of Use", "About Us" and "Privacy" are |
| 16 | attached, respectively, as **Exhibit A**, **Exhibit B**, **Exhibit C**, and are incorporated by |
| 17 | reference as if fully set out herein.)  The Defs conspired to remove all security features on |
| 18 | the website. Any member could download any script, without the writer knowing the |
| 19 | downloader's ID. Only if an accessor chose to write a script review would the writer be |
| 20 | informed of the accessor's ID —but only the accessor's pseudonym (fake name) ID, while |
| 21 | others users who downloaded the script without leaving a review, left no trace at all. |
| 21 | 22.  More astounding, in 2007, the Defs added a new **anti**-security feature, **without** |
| 22 | **informing members,** whereby if a member—concerned about security—deleted his script |
| 23 | from TS, the deletion would trigger the erasure of all access records. This was done to |
| 24 | conceal the Defs accessing the Plaintiff's work (only posted in 2007). In May 2016, in an |
| 25 | Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95) a |
| 26 | former TS member recalled that this **"memory dump"** feature was added in 2007. (Said |
| 27 | forum is attached as "**Exhibit D**" and incorporated by reference as if fully set out herein; |
| 28 | see last entry, page 4.) In 2014, as Briggs v Blomkamp proceeded through discovery, the |

1  Plaintiff contacted TS to ask for their records of all the members who accessed his work.

2  (Said email is attached as "**Exhibit E**" and  incorporated by reference as if fully set out

3  herein). TS replied that when his work was removed, all access records were erased.  (Said

4  email is attached as "**Exhibit F**" and is incorporated by reference as if fully set out herein.)

5      23.  TS falsely assured members that the site was intended <u>solely</u> <u>for</u> <u>use</u> <u>in</u> <u>the</u> <u>USA</u>.

6  But Spacey and Brunetti secretly marketed TS all around the world.

7      24.  Through secret and private business co-ownerships with key CEOs, in businesses

8  like Screenbid and MRC, Def Emanuel cultivated unethical relationships with Universal

9  Pictures, Sony Pictures, MRC, QED, etc. Thus, these companies would finance and

10  distribute almost any project Emanuel asked, ignoring due diligence and best practices.

11      25.  The Defendants' final illegal action occurred on Nov 6th, 2014, 6 days after

12  Plaintiff filed his Notice Of Appeal (Briggs v Blomkamp), when the Defs surreptitiously

13  closed TS, to destroy incriminating evidence —understanding the district court based its

14  MFSJ ruling on vacated law, rather than prevailing law (cited by Plaintiff). Thus, the case

15  was apt to be remanded for trial, where the Plaintiff would subpoena all site access records.

16                                   NOTE:

17  26.  This Complaint reveals Def Ari Emanuel lead a conspiracy to misappropriate ideas

18  using TS and ProjectGreenlight.com (**Project Greenlight**), to market these ideas to his

19  business partners at Sony Pictures, MRC, Universal Pictures, NBCUniversal, etc.  Relevant

20  to this, Def Emanuel or WME has represented Defs Ben Affleck and Matt Damon for most

21  of their careers. Curiously, like Spacey, Affleck and Damon ran a screenwriter/filmmaker

21  website, *Project Greenlight,* from 2000-05 and 2015-16**.** Curiously, both sites used peculiar

22  language like *peer-to-peer,* and used *peer reviews* to weed out bad scripts. And curiously,

23  Spacey, Damon and Affleck were the only celebrities with screenwriter websites from

24  2000-2014.   In 2005, writer Joel Lamontagne sued Project Greenlight and **Harvey**

25  **Weinstein's** *Miramax,* alleging the TV series *Project Runway* (2005-present) was stolen

26  from a treatment he submitted to Project Greenlight. The allegedly stolen work became the

27  property of Universal Pictures' parent, **NBCUniversal**. Def Emanuel's shadowy projects

28  eventually becoming the property of Universal is a recurring pattern in this Complaint.

**BACKGROUND FACTS:**

**(Understanding This Case Requires Knowledge Of Key Background Facts & Actors;**

**A Review Of Facts Directly Pertaining To The Defs Violations Begins On Page 18)**

THE SIX (6) PRIMARY DEFENDANT ACTORS:

**ARI EMANUEL** (DEFENDANT)

27.   Defendant Ari Emanuel is the co-CEO of William Morris Endeavor (WME, aka WME-IMG). Prior Emanuel was CEO of Endeavor Talent Agency (1995-2009), where his aggressive, unethical business practices inspired the character *Ari Gold*, in the HBO TV series *Entourage*. In 2002, Def Emanuel's *Endeavor* was sued for sexual harassment by Sandra Epstein. Epstein also accused Def Emanuel of making racist remarks. In 2014 WME was found guilty at arbitration of racial discrimination. Logically, WME-IMG attracts clients who share Def Emanuel's values; thus, WME-IMG disproportionately represents aging white clients and *difficult* clients that other agencies avoid (Charlie Sheen, Russell Crowe), and clients who are politically conservative, or politically unaware or inactive.

28.   November 20th, 2016, Def Emanuel traveled to New Jersey to congratulate President-elect Trump. Emanuel is also President Trump's former talent agent. Predictably, *The Apprentice* (starring Trump) was broadcast on **NBCUniversal**. Recently, *The Hill* (and others) reported that it was Def Emanuel who helped seal the Miss Universe tape archives, so no further tapes of candidate Trump sexually harassing beauty contestants would be released. (Said "The Hill" article is attached as **"Exhibit G"** and is incorporated by reference as if fully set out herein.)

**ASIF SATCHU (Defendant)**

29.   Defendant Asif Satchu was born in Kenya but moved to **Canada** when he was 6 years old. Satchu, like Def Blomkamp, is believed to be a Canadian citizen. (Canadian connections are a recurring feature in this matter.)  Def Satchu is a co-founder of MRC, with Wiczyk. Def Satchu is the brother of **Reza Satchu**, an enormously successful Canadian businessman. Def Satchu and Reza, both graduated from Canada's **McGill** University. Def Satchu is something of a business and business-technology genius.  **In 1999 Satchu co-founded SupplierMarket.com** with Jon Burgstone (Reza Satchu was also a heavily

COMPLAINT

7

invested partner). SupplierMarket.com facilitated the **international sale**s **and distribution** of software, bolts, nuts, fasteners, rubber and glass products, corrugated packaging, and probably anything else. **Only 18 months later, Aug. 2000, Satchu and his partners sold SupplierMarket for $950,000,000.** Def Satchu graduated from Harvard (MBA) in 1999.

**MORDECAI (MODI) WICZYK (Defendant)**

30.  Defendant Modi Wiczyk is an American born businessman, co-CEO and co-founder of MRC (with Defendant Satchu). Wiczyk is the **visionary** of this conspiracy.

31.  Around 1995, fresh out of college, Defendant Wiczyk began working at Summit Entertainment, LLC. That was the first year Summit began producing and financing films (prior, Summit had exclusively sold US films abroad); surely the vision of Def Wiczyk.

32.  Only four years later, in 1999, when Wiczyk was only 27, Summit Entertainment made Wiczyk their Senior Vice President of Production and Acquisitions. That same year, 1999, Wiczyk sent out his now famous **memo**, **which would make him one of the most influential and sought after men in Hollywood**. Within a year, in 2000, likely on the order of Def Ari Emanuel, Def Wiczyk was **hired by** **Universal** **Pictures** as Vice President of Productions, where Wiczyk served for 2 years, until January 2002, when Def Ari Emanuel made Wiczyk a partner at Emanuel's Endeavor Talent Agency.  Def Wiczyk graduated from Harvard (MBA) in 1999.

**KEVIN SPACEY** (Defendant).

33.  Defendant Kevin Spacey is an Academy Award winning actor. His career was floundering and at its nadir in 2000 when the conspiracy(s) detailed herein began, and when, purportedly, he and Def Brunetti conceived of TS. Def Spacey, who dropped out of Juilliard School in his sophomore year, has no known web-design skills. Seemingly, Spacey's only value to the TS social network was as a high-profile, semi-likeable celebrity whose promise of "industry access and exposure" would lure the best undiscovered writers to the website, to unwittingly surrendering their wares to the Defendants.

**DANE BRUNETTI** (Defendant)

34.  Defendant Brunetti has no known college education. He joined the US coast guard in 1992, at 18 or 19. Brunetti met Spacey around 1998, while Brunetti was selling cell phones

in New York. Brunetti soon became Spacey's partner and personal assistant. It is purported around the internet (including on Wikipedia) that Brunetti was responsible for designing TriggerStreet.com. That is possible. However, there is no evidence that Brunetti possessed any of the skills required to design a social network. The Plaintiff suspects Def Asif Satchu (who founded the internet-based marketplace SupplierMarket.com) may be the website's true designer and talent coordinator.

**MRC**

35.  MRC is a television and film studio, founded by its co-CEOs Defs Asif Satchu and Modi Wiczyk. MRC was started in 2003 with money provided by Def Ari Emanuel (although MRC often reports it was started in 2006 or 2007). Def Emanuel is a silent partner in MRC. Unlike most ethical companies MRC operates under many names. Likely, only Defs Emanuel, Satchu and Wiczyk know what these companies do. But such LLC companies are a hallmark of money laundering networks (see Dept of Treasury's FinCEN report). The Plaintiff is aware of 11 MRC companies: **MRC, Media Rights Capital; MRC II LP; MRC II Distribution Company LP (foreign based); MRC II Holdings, LP; Oaktree Entertainment, Inc. (a foreign stock business); MRC I Hedge Co, LLC; MRC II Capital Company, LP; MRC Sub Gp, LLC; MRC I Project Company, LLC; Asgari Inc.** Plaintiff believes that most of these *companies* are "shell" companies (fronts for illegal activity), existing to launder money and other transactions. Working in conjunction with Def Bill Block (**Miramax** CEO) and *Al Jazeera or beIN Media Group* (Miramax's parent), and perhaps with Satchu's Kenyan-based family, these shells may also be responsible for:

a.  producing and selling ideas taken from TS to foreign markets (not for US release);

b.  financing foreign films that utilize ideas taken from TS (not for US release).


**Def Ari Emanuel's Relationship With Defendant Spacey:**

36.  Defendant Ari Emanuel likely first met Defendant Kevin Spacey between 1987 and 1989, when both men were at Creative Artist Agency (CAA). In 1987 Def Ari Emanuel was a new CAA talent agent, working in **TV** casting. In 1987 Def Kevin Spacey, represented by CAA, was working in Los Angeles and appeared in 9 episodes of the **TV** series "Wiseguy".

**Def Emanuel's Notorious Connection to Def Wiczyk & Satchu:**

37.  Defendant Ari Emanuel is a quiet partner in MRC. Thus, by casting WME-IMG actors in MRC films, Def Emanuel profits both as an agent and as a studio owner. This arrangement is a conflict of interest, in violation of CA Labor Code 1700.39.

38.  In 2007, The New York Times published an article called *"Tilting The Balance of Power Toward Talent Agency Clients"* (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients" is attached as "**Exhibit H**" and is incorporated by reference as if fully set out herein.) The article states:

> ….representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist."According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

39.  Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

> ...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.
> "For us, financing opportunities are always exciting and interesting,"said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"
> Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that **no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.**

COMPLAINT

10

| | |
|---|---|
| 1 | **BACKGROUND FACTS** (CONTINUED) |
| 2 | THE 4 MAJOR EVENTS THAT SET UP THE CONSPIRACY(S) |
| 3 | **40.**  The seeds of the Defendants unlawful actions were planted about two decades ago, |
| 4 | by **4 events:** two of these events occurring in 1995, two occurring in 1999. |
| 5 | 1.  **In 1995**  Def Ari Emanuel started Endeavor Talent Agency. |
| 6 | 2.  **In 1995** Edgar Bronfman Jr. (CEO of Seagram's) bought Universal Pictures. |
| 7 | 3.  **In   1999**,   Jerrol   LeBaron   copyrighted   a   revolutionary   screenwriter-to- |
| 8 | Hollywood-film-industry-professional   website   **Writers' Script Network.com**, |
| 9 | which went online in March 2000, changing its name to "**InkTip**" (inktip.com) in |
| 10 | 2003. |
| 11 | 4.  **In 1999** Defendant Modi Wiczyk wrote  a revolutionary **memo**, titled "Another New |
| 12 | Ball Game",   which   sent   Hollywood's   powerhouses   scrambling.   Wiczyk's memo |
| 13 | would be discussed in  magazines and lounges for years to come. |
| 14 | |
| 15 | **41.**  These 4 events, **each** require a brief explanation to understand how they set the stage |
| 16 | for the Defendants' conspiracy(s). |
| 17 | **(1)  Def Ari Emanuel Comes To Power As CEO Of Endeavor Talent Agency, 1995** |
| 18 | **42.**  In 1995 Def Ari Emanuel started Endeavor Talent Agency. Soon, his aggressive, |
| 19 | unethical practices would make Endeavor the fastest growing talent agency in Hollywood. |
| 20 | **(2) Edgar Bronfman Jr. Comes To Power At Universal Pictures, 1995** |
| 21 | **43.**  In 1995, Canadian based "Seagram's" (the giant beverage company) bought |
| 21 | controlling interest (80%) of Universal Pictures, and Edgar Bronfman Jr. (Seagram's heir; |
| 22 | **Canadian**, graduate of **McGill** College) became owner and CEO of Universal Pictures. |
| 23 | Bronfman remained CEO of Universal Pictures even after Vivendi bought Universal in |
| 24 | 2000.  He stepped down as chief of Universal in 2001, BUT remained Vice-Chairman of the |
| 25 | Board (likely to insure that Def Emanuel's relationship to Universal remained in place) until |
| 26 | December 2003; by then Def Emanuel's role with Universal Pictures was well established. |
| 27 | 44.  To pay for Universal Pictures, Bronfman Jr. sold Seagram's stake in Dupont (for |
| 28 | $9-billion). Most analysts and Seagram's investors considered this a terrible business move. |

1  To make matters worse, Bronfman knew little about the film business. **NOTE:** Bronfman

2  was convicted of insider trading, in France, in 2011, receiving a 15 months suspended

3  sentence, and a €5,000,000 fine.

4      45.  In 1995, Bromfman and Def Ari Emanuel represented big changes in Hollywood,

5  but <u>the biggest change in Hollywood in 1995 was the advent of the **DVD**</u>. DVDs

6  represented huge new opportunities for producers and film companies —opportunities that

7  would make movies FAR more profitable than ever before; but more profitable for

8  producers, NOT talent agents—adding fuel to Emanuel's drive to become a producer and a

9  studio owner.

10        **(3)  <u>The Advent Of Writers' Script Network.com (InkTip.com), 1999</u>**

11      46.  In 1999, Jerrol LeBaron copyrighted his brilliant website **Writers' Script**

12  **Network.com**,  (writersscriptnetwork.com), going online March 2000; changing its name

13  to **InkTip** and its location to inktip.com in 2003. Unlike all other screenwriter websites at

14  that time (which either just posted screenwriter agents' addresses, or just allowed

15  screenwriters to post loglines or synopses, with no ability to bring the writers to the agents

16  and filmmakers), LeBarons website promised something new. Based in Los Angeles

17  County, LeBaron went out and told Hollywood agents and filmmakers about his website,

18  and invited them to join and peruse the works of thousands of undiscovered screenwriters.

19  The site had great safeguards, designed to protect both the writers and industry

20  professionals. Writers' Script Network.com required all users to use their real names.

21  Writers could not read other writers' work, as that would only reduced the writers' safety.

21  However, after registering, the **industry professionals** could freely read any logline (a

22  short description, 60 words or less) on the website. If a professional wanted to read more,

23  they could click on a link to read a synopsis—and immediately the screenwriter would

24  receive notification of who had accessed his work, when, and from where. If the

25  professional wanted to read the entire script, he/she would then need to contact the writer

26  and request a script. Writers' Script Network.com kept all records of access. **LeBarons's**

27  **site was the new online industry <u>standard</u>** (where there had been no standard, rules,

28  safety, or security for screenwriters ); flawless in conception, safety and transparency.

**(4) The Memo, 1999**

47.   In 1999, only 27 years old, Def Mordecai (Modi) Wiczyk, the new Senior Vice President of Production and Acquisitions at Summit Entertainment, LLC, sent out a **memo** titled "Another New Ball Game". That memo sent Hollywood's unethical establishment scrambling after massive new profits. Wiczyk's memo would be discussed in magazines and lounges for years. Within a year, in 2000 (likely at Def Ari Emanuel's bidding) **Universal Pictures** would steal Wiczyk away from Summit, making him VP of Productions. Two years later, Def Ari Emanuel made Wiczyk his **partner** at Endeavor Talent Agency.

48.   In 2007, *Slate* remembered "the memo" in an article called "How An Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate" article is attached as "**Exhibit I**" and is incorporated by reference as if fully set out herein.). Writer Kim Masters wrote:

> ...The memo predicted the decline of the studios, with filmmaking talent as the beneficiary. He also predicted that a management company with a lot of big stars would start to produce and own films. "The most immediate and pressing challenge would be to get the studios to carry the product," he said. The likelihood of a studio boycott was remote, he said, because "whichever studio was suffering at the time would probably break ranks in the name of short-term self-preservation." Hmm.
>
> Michael Ovitz eventually tried to launch such a management company and failed. But Wiczyk's memo said the agencies could also carry out the change. **"A similar structure could be created which complies with the conflict-of-interest laws,"** Wiczyk wrote. "If [a] fund was created as a stand-alone entity and the agency had an arms-length service contract, they could avoid conflict-of-interest violations… Admittedly this is a delicate issue and a tough deal to pull off, but it's certain someone would **try it**." Why? The potential for enhancing agency commission was "too rich to ignore." **In fact, he said, an agency could double its annual revenues.**

49.   Wiczyk's psychopathy is on full display in those final lines of the article, as he enthusiastically implies it is reasonable to behave without ethics —if the profits are "too rich to ignore." But Wiczyk's prediction that "...it's certain someone would try it" would soon prove correct.

50.   But who would want to wander with Wyczyk into such ethically questionable water?

COMPLAINT

13

**THE ENDEAVOR/UNIVERSAL/MRC DEFENDANTS:**

ARI EMANUEL AND HIS SECRET RELATIONSHIP WITH UNIVERSAL

PICTURES; EMANUEL UNITES WITH ASIF SATCHU AND MODI WICZYK

51.   In 1999, Def Ari Emanuel knew producers made the REAL money in Hollywood. But, as a talent agent, he couldn't get in the action—not legally (or not with his name on the product), due to California's conflict of interest laws.

52.   But Def Emanuel saw an opportunity.

53.   Defendant Ari Emanuel had a **distribution problem**. His talent agency (Endeavor) represented many directors, writers and actors, who sometimes decided to make independent and experimental films, only to discover, later, that their films couldn't get national or global distribution because the distributors thought the films weren't marketable. Thus, many of these films died early deaths.

54.   Bronfman Jr., on the other hand, had a **talent problem**. Bronfman Jr. knew the importance of getting marquee names on films. Big American studios crank out about 17 films a year. In this haste, sometimes the studios commit to bad screenplays that no big actors will commit to, thereby dooming the films. But just one or two big names attached to these *inferior* films could increase their returns by tens of millions of dollars.

55.   Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it. Bronfman Jr. came to power in 1995 with Universal in 4th place among the big six studios (20 Century Fox, Disney, Paramount, Warner Bros., Sony Pictures, Universal Pictures). But only one year later, in 1996, Universal was in last place. And last again in 1997. And in 1998, even worse: last place, and Universal had one of its worst years ever, with only a 5.9% market share. Stockholders were restless. (See **Exhibit J**.)

56.   In this tough time, Def Ari Emanuel approached Bronfman with a proposal.

57.   Def Emanuel offered to put special effort into Universal Picture films, and ask his actors, writers and directors to give preference to Universal Pictures films. Emanuel also likely offered to take a reduced agent's fee. **In exchange** Def Ari Emanuel likely received a percentage of the films, and/or a generous share of Seagram's (Universal's parent) stock, but no film credit), and an agreement that Universal Pictures would distribute, and/or provide

1    production money for, any reasonably viable film Def Emanuel brought to Universal
2    Pictures.

3    58.  The agreement was made late 1998.

4    59.  The next year, 1999, Universal pictures would have its best year since Bronfman
5    arrived, climbing to 3rd place, with a 12.7% market share. That was 1999 —the same year
6    Def Modi Wiczyk wrote his memo.

7    60.  Def Ari Emanuel read the memo.

8    61.  Bronfman Jr. surely read the memo. In fact, two years after Wiczyk wrote the memo,
9    in 2001, Bronfman's **Universal Pictures** made Def Wiczyk their vice President of
10   Productions. (An article about Universal hiring Wiczyk is attached as "**Exhibit K**" and is
11   incorporated by reference as if fully set out herein.)

12   62.  And a year after that, in 2002, Def Emanuel would hire Def Wiczyk away from
13   Bronfman Jr., to make Wiczyk a **partner** at Endeavor Talent Agency.

14   ●   63.  But Wiczyk had been Vice President of **productions** at Summit Entertainment,
15   AND Vice President of **productions** at Universal Pictures. Wiczyk was a **producer**. Why
16   would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel
17   was secretly going into the production business with MRC and Universal Pictures.

18   64.  When Def Ari Emanuel stole Wiczyk away from Universal Pictures there were no
19   hard feelings between Def Emanuel, Bronfman and Universal Pictures, and nothing changed
20   in their arrangement. Def Ari Emanuel continued to provide the same talent and producorial
21   services for both MRC and Universal Pictures. And although Bronfman left Universal a
21   year later (2003), Def Emanuel continues to do favors for Bronfman and his Universal
22   "family" to this very day (e.g. Def Emanuel and WME-IMG represent Bronfman Jr's
23   daughter, Hannah).

24                    **Wiczyk's Memo Inspires A Conspiracy**

25   65.  The driving force behind Defs Emanuel's, Wiczyk's and Satchu's involvement in
26   this conspiracy was to create the film production system outlined in Wiczyk's **memo**, to
27   increase—maybe even **double**—profits. The conspiracy required only 3 or 4 players, with
28   the right talents. Def Emanuel had connections to all the studios, and access to huge stars;

1  Asif Satchu was a creative business force who specialized in distribution and networking;
2  Modi Wiczyk was a proven business, financing, and film production prodigy. They had
3  almost everything they needed—except good screenplays. But as a new "questionable"
4  company, established writers were not inclined to work with this unscrupulous band.

5      66.   A film production starts with acquiring a screenplay, a "property". The Defendants
6  knew that. They also knew good screenplays are hard to find, cost good money and are a
7  risky investment. A bad director could ruin a great script, and even the best writers
8  sometimes wrote bad scripts. In 2000 Def Wiczyk helped sell his brother's (Roee Wiczyk)
9  screenplay to his former employer (Summit Ent.). But the script was weak, thus never
10  developed, and Roee Wiczyk never sold another script. "Variety" reported on this script sale
11  in 2000. (Said article is attached as "**Exhibit L**" and is incorporated by reference as if fully
12  set out herein.) As a business man, Wiczyk could sell anything —he sold his brother's script
13  idea without even having a script name. But now, operating as film producers and a *studio*,
14  without an **actual** *good* script, or some good ideas, they couldn't get any project started.

15     67.   The Defendants needed scripts, but they wanted to reduce their risks.

16      68.   Defs Emanuel, Satchu and Wiczyk knew ideas are not copyrightable; only unique
17  arrangements of ideas are copyrightable. If the Defendants had a method to access good
18  writers' work, they could extract the best of those ideas, then pay their own writers to turn
19  them into "new" screenplays, then produce and market those derivatives as their own.

20     69.   The L.A. based Defendants were aware of Writers Script Network.com. As "industry
21  insiders" they had likely even received a call or email from Jerrol LeBaron. They wanted
21  something like Writers Script Network.com—but **without** the good security features.

22

23              **THE TRIGGERSTREET DEFENDANTS**
24         SPACEY'S CAREER SPUTTERS; SPACEY MEETS BRUNETTI;
25         THE CONCEPTION OF THE TRIGGERSTREET SOCIAL NETWORK

26      70.   In 1994 Def Spacey learned Warner Bros intended to make a movie about the life of
27  Bobby Darin (eventually called "Beyond The Sea"). This was Spacey's secret dream role.
28  He offered to play the leading role, but the producers refused, believing Spacey was too old.

71.  In 1995, Def Spacey's career soared with *Usual Suspects* and *Seven*. But in 1996 and 1997 Def Spacey was back to NOT getting solid leading-man roles.

72.  This likely inspired Def Spacey to form his production company, "Trigger Street Productions", to make quality films with himself cast as the lead.  But for the next 7 years his production company floundered. The problem was getting a good screenplay.

73.  It is reported that around 1998 Def Spacey met Def Dana Brunetti, who soon became Spacey's personal assistant.

74.  Although in 1999 Def Spacey won an **Academy Award** for Best Actor (American Beauty), 1999 would mark the beginning of a very difficult period of Def Spacey's career (1999-2003). His production company would go 3 years without making a film (Jan 2000 to Jan 2003). And worse, for some reason Hollywood would not invest much money in any movie with **Kevin Spacey** in a leading role, **his films budgets were far below the Hollywood average** (the average Hollywood budget in 2000 was about $60 million): 1. American Beauty, 1999, **$15 million**; 2. The Big Kahuna, 1999, **$7 million**; 3. Ordinary Decent Criminal, 2000, **$12 million**; 4. Pay It Forward, 2000, **$40 million**.

75.  Def Spacey's difficulty consistently getting good roles, then, was likely due to his terrible reputation around Hollywood as something of a hustler. In 1999, actor Val Kilmer explained in a "Mr Showbiz" interview that in the 1970s Kevin Spacey, who was then a young college student, tricked Kilmer's father out of $18,000 for college tuition —but Spacey, according to Kilmer, kept the money, dropped out of school, and never repaid Kilmer's father. (Said "Mr. Showbiz" article is attached as "**Exhibit M**" and is incorporated by reference as if fully set out herein.)  Stories like Kilmer's, and a tabloid photo journal of Def Spacey participating in a public indiscretion, contributed to Def Spacey's trouble.

76.  But amid all of these struggles, somehow in 2000, Spacey was able to secure the film rights to his dream project -**Bobby Darin's life story**. But since Def Spacey had no production funding, he would have to wait almost 4 more years to make his movie.

77.  It's possible that during these tough times, Spacey and Brunetti looked around online for affordable scripts for Spacey's production company to film. And maybe then they stumbled upon *Writers Script Network.com*, which inspired them to create TS… Then, this

1  unlikely pair—a college dropout actor whose career was on life support, and a cellphone
2  salesman—teamed up to create a massive social network for screenwriters and filmmakers.
3  And soon Ari Emanuel learned about the site and asked Spacey to make some
4  modifications: relaxing security, and making access private and untraceable. That could be
5  how TS was created. It makes little difference to the conspiracy that followed.

6  78.  However, the Plaintiff believes TS was formed in a conspiracy conceived by Def
7  Ari Emanuel, to enrich himself and his conspirators. Elysium, alone, earned $286,000,000
8  worldwide theatrically, and should have earn another $570,000,000 in home entertainment
9  and TV, (typically, movies earn twice their theatrical total in home ent., TV, and auxiliary
10  sales), for a total of **$856,000,000** —almost a billion dollars. **This is why setting up TS and**
11  **Project Greenlight were so important to Def Ari Emanuel. One good script can easily**
12  **earn a billion dollars, and one big TV show can earn far more than that.**

13

14  **THE DEFENDANTS' CONSPIRACY BEGINS:**

15

16  79.  In 2000, shortly after Def Emanuel discovered Writers Script Network.com, Def
17  Emanuel planned his own screenwriter/filmmaker website, with minimal or no security
18  features. He would use his clients, Def Matt Damon and Ben Affleck, as the website's
19  spokesmen and its alleged *conceivers*. In August 2000 Project Greenlight was born. (An
20  Internet Archives screenshot of projectgreenlight.com—showing its origin time—is
21  attached as "**Exhibit N**" and is incorporated by reference as if fully set out herein.)

21  80.  Then misfortune struck Universal Pictures in 2000, and  Def Ari Emanuel seized the
22  occasion to launch a **second** website, allegedly conceived by Defs Spacey and Brunetti.

23  81.  In 2000, Universal Pictures was in a bind. They were just a few months away from
24  beginning to film "K-PAX" but they didn't have a leading actor (after Will Smith and others
25  dropped out). Smith, and other actors and directors (with integrity) were perhaps dropping
26  out due to rumours that Argentinian film director and screenwriter, Eliseo Subiela, learned
27  about writer Gene Brewer's 1995 book "K-PAX" and planned to sue Brewer and Universal
28  Pictures for copyright infringement of Subiela's 1986 film "Man Facing Southeast".

82.  But Universal Pictures, not worried about a small director from Argentina suing, decided to push forward, film, release, make a fortune, and fight Subiela in court later.

83.  By mid 2000, with little time to find a leading man, Universal Pictures was desperate enough to consider casting Def Kevin Spacey in the leading role.

84.  Def Ari Emanuel could have just asked Spacey to take the leading role. Spacey would have leaped at the chance. But Spacey wasn't an Endeavor client, so Def Emanuel wouldn't receive his casting fee.  Def Ari Emanuel was a businessman. As such, even though he needed a favor from Spacey, he wasn't going to just give Spacey a leading role, he wanted something in return. Def Ari Emanuel knew Def Spacey's career was in trouble.

85.  Def Ari Emanuel approached Def Spacey to ask him about starting or endorsing, a screenwriter/filmmaker social network; a social network with little or no security features. The conversation likely started with Def Ari Emanuel asking how Spacey's career was going.  Def Spacey likely explained his recent career setbacks, and his hope to one day film Bobby Darin's life story. He may have explained that he had recently secured the rights to his Bobby Darin film (Beyond the Sea), but had no funding to shoot his dream film.

**Quid Pro Quo**

86.  Upon hearing about Spacey's career troubles, Def Emanuel made Def Spacey and Brunetti an offer: (1) he asked Defs Spacey and Brunetti to design a social network so that ALL user could access ALL screenplays, anonymously, with few security safeguards (it is possible/probable that Def Asif Satchu facilitated the website design); (2) Def Emanuel also may have asked Spacey and Brunetti to include a counter-security feature whereby if a screenplay was removed from the website all access history would also be erased (**although the Defs seem to have added this second features in 2007, shortly before accessing the Plaintiff's work**). The Plaintiff believes that in exchange for agreeing to operate such a social network, Def Ari Emanuel promised Defs Spacey and Brunetti a few things in return:

1.  Spacey would star in K-PAX, a film with a solid $68 million budget;

2.  Def Ari Emanuel would finance Spacey's production company to make Def Spacey's dream film, Beyond the Sea;

3.  Def Emanuel would help Spacey's production company arrange financing and

1    distribution (as needed) for the life of the social network;

2    **4.** Def Emanuel would introduce Spacey and Brunetti to the financial and distribution

3    partners necessary for their production company to succeed;

4    **5.** Emanuel would try to find Spacey a meaningful, perhaps "career defining," role.

5    87.  The agreement was made.

6    88.  Thus, September 2000, only <u>one month after the birth of Project Greenlight</u>,

7    **TriggerStreet.com (TS) was born.** (Internet Archives screenshot of projectgreenlight.com,

8    showing the origin time of Project Greenlight is attached as "**Exhibit O**" and incorporated

9    by reference as if fully set out herein.) The probability that both of the world's only

10   screenwriter/filmmaker social websites (both of which also happened to be prominently

11   celebrity-endorsed) coincidentally starting only a month apart is infinitesimal.

12   89.  But TS would remain a closed and inactive site for 2 years, not having its official

13   "launch" party until 2002. This helped avert suspicion, kept TriggerSteet from competing

14   with Project Greenlight, and allowed TS to learn from Project Greenlight's mistakes.

15   90.  In November 2000, as agreed, Spacey began filming KPAX. When the film was

16   released it would be the first smoking gun in this conspiracy:

17   ●  91.  KPAX was released Oct 2001. It would be the first time **Universal Pictures**

18   **EVER** cast Kevin Spacey in a leading role (in fact, Universal had only ever cast Spacey in

19   **one [1]** film, a **supporting** role, ten years prior, in 1990, in "Henry & June"). (*Spacey was

20   most commonly cast in **Warner Bros** films and independent films.) <u>Casting Spacey to star</u>

21   <u>in K-PAX, a $68 million film, at such a low point in Spacey's career, was almost</u>

21   <u>inconceivable</u>. **Def Spacey wouldn't star in a film with a budget over $40 million for 5**

22   **more years** (Superman Returns). Spacey would only appear in one other Universal Pictures

23   film, 2 years later, *The Life of David Gale*—originally a Warner Bros (Spacey's stable)

24   property that Universal Pictures optioned. Spacey just came with the deal.

25   ●  92.  A month after K-PAX was released, in November 2001, director/writer **Eliseo**

26   **Subiela (via Jason Laskay) sued Universal Pictures**, Gene Brewer, et al, for plagiarizing

27   his film *Man Facing Southeast*. The suit was eventually withdrawn when Subiela and

28   Laskay could no longer afford to litigate against a giant corporation like Universal Pictures.

**TS LAUNCHES, NOVEMBER 2002**

93.   After giving Project Greenlight two years to gain traction, November 2002, the Defendants prepared to launch TS. To attract the best undiscovered writers, the Defendants planned to generate "buzz" by throwing 3 huge TS "launch parties": one in New York, one in Los Angeles, and one in **London**. (A photo of Kevin Spacey at the TS London Launch party is attached as "**Exhibit P**" and is incorporated by reference as if fully set out herein.) While in Britain, Def Spacey did many interviews about TS. The Guardian featured a piece called "Cyber Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's well-rehearsed lines. (Said Guardian article in which Def Spacey went to London to discuss TS is attached as "**Exhibit Q**" and incorporated by reference as if fully set out herein.) Writer Sean Clarke wrote:

> Spacey tells an anecdote about the original idea for the site, which is essentially Brunetti's brainchild. He says they "came up with a sketchy plan, which at the time..." and chuckles wryly, on which cue Brunetti take up the story "... which at the time, we thought was great." They both shake their heads ruefully. Later, I watch as the pair address a press conference, they repeat the story, with exactly the same pauses, the same chuckle, the same interruptions. It's beat-perfect, like a Mamet script.

94.   And to generate even more buzz, before the website was launched, Budweiser announced their corporate sponsorship of the TS social network.

95.   Along with the sponsors, parties and interviews, to help repair Def Spacey's damaged reputation, the TS website posted a heartwarming story that Spacey started his new social network "to help undiscovered writers and filmmakers get industry access and exposure."

96.   **TriggerStreet.com was "launched", and went online, November 2002**

- 97.   Def Spacey held a New York TriggerStreet **launch party** on Nov 11th, 2002.
- 98.   Def Spacey held a Los Angeles TS **launch party** on Nov 18th, 2002.
- 99.   Def Spacey held a London TS **launch party** on Nov 26th, 2002.

COMPLAINT
21

**After TriggerStreet Officially Launched, Nov 11th, 2002,**

**The Following Events (Connecting The Defendants) Occurred:**

100.  Within just a few months of TS's official launch (Nov 2002), Def Spacey would receive **3** huge payments from Defs Ari Emanuel and Universal Pictures (although Spacey would receive many other "benefits" during the 12 year lifespan of TS): **1)** Universal Pictures would distribute "The Life of David Gale"; **2)** Spacey's production company would receive distribution money for "United States of Leland"; **3)** after 3 long years, Spacey's production company would receive **$25,000,000** to produce "Beyond the Sea".

● 101.  In **February** 2003, 3 months after TS launched, **Universal Pictures** distributed Spacey's film "**The Life of David Gale**" (again, originally a property of Spacey's home studio, Warner Bros). This would be the last time Universal Pictures would be involved in a Spacey film (to the date of the filing of this Complaint). Thus, the only two Universal Pictures films featuring Spacey as a lead are *K-PAX*, and *The Life of David Gale*.

● 102. That same month, **February of 2003**, Spacey's production company would magically get money to release and distribute its first movie in 3 years: "United States of Leland". The film would only be released in 14 theaters, losing millions, and bringing in only $344,000. Likely, Universal Pictures wouldn't put their name on the film, because after two bad years, Universal was back in 5th place (second to last place), and they didn't want *United States of Leland* to move them into last place.

● 103.  That same month, again, **February 2003**, it was announced that production of Spacey's Dream film, "Beyond the Sea," was being fast-tracked—directed by and starring Spacey and produced by Spacey's production company, with a $25,000,000 budget.

104.  Suddenly, in the nadir of Spacey's career, inexplicably Hollywood was showing him tremendous support—when 4 of Spacey's previous 5 films were major money losers.

Footnotes:

105.  Shortly after TS launched, in **2003**, Ari Emanuel gave Asif Satchu and Mordecai Wiczyk financing to start MRC.

106. **December 17th, 2004,** *Beyond the Sea* was released. It would be Spacey's **greatest failure**; costing $25 million, but only earning $8.4 million; losing over $16,000,000.

| | |
|---|---|
| 1 | **Additional Facts Regarding TS And The Defendants** |
| 2 | ● 107. Spacey's production company made no films for 3 years, January 2000 to |
| 3 | January 2003: Ordinary Decent Criminal (Jan 2000, direct to DVD in USA), and United |
| 4 | States of Leland (Jan 2003, released in only 14 theaters). |
| 5 | ● 108. Since TS launched, Def Spacey's production company has made 22 films. |
| 6 | ● 109. May 2005, 2.5 years after TS launched, Project Greenlight was effectively |
| 7 | dead (no new contests for filmmakers or screenwriters); killed by the success of TS. |
| 8 | Although, oddly, the Project Greenlight website remained open, but inactive —no new |
| 9 | contests, no new submissions accepted; just an open, inactive website (until 2015). |
| 10 | ● 110. In 2006 Spacey held a TriggerStreet "RE-launch" party in Los Angeles. |
| 11 | ● 111. 2007, Plaintiff's screenplay, Butterfly Driver, was posted and accessed on TS. |
| 12 | ● 112. 2007-2009 TS secretly joined Bud.TV (Budweiser TV), without informing |
| 13 | members or revising its Term of Use page. In a 2007 Anheuser-Busch announced it was |
| 14 | launching Bud.TV with TriggerStreet.com providing programming. (Said Bud.TV news |
| 15 | release is attached as "**Exhibit R**" and incorporated by reference as if fully set out herein.) |
| 16 | Curiously, Bud.TV's Wikipedia page shows Defs Matt Damon and Ben Affleck (Project |
| 17 | Greenlight), and Kevin Spacey (TS) all provided Bud.TV programming. (Said Wikipedia |
| 18 | article is attached as "**Exhibit S**" and incorporated by reference as if fully set out herein.) |
| 19 | ● 113. Feb 2009, the BBC reported Def Spacey hosted the Mofilm Film Festival, in |
| 20 | Spain, where he boasted of TS's **"400,000 members around the world."** (Said BBC article |
| 21 | is attached as "**Exhibit T**" and is incorporated by reference as if fully set out herein.) |
| 21 | Willfully marketing TS outside of the USA violated the Plaintiff's copyrights. |
| 22 | ● 114. On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency (ETA) |
| 23 | merged with the William Morris Agency (WMA), creating William Morris Endeavor. |
| 24 | **17 days later**, May 14th 2009, **after about 20 years with the William Morris Agency**, |
| 25 | Def Spacey signed with CAA (Creative Artist Agency). Def Spacey did so to keep TS |
| 26 | members (and any observing regulatory authorities) from becoming suspicious of his link to |
| 27 | Def Ari Emanuel through TS. (A New York Times article about the April 2009 merger of |
| 28 | WMA and Endeavor is attached as **"Exhibit U"** and is incorporated by reference as if fully |

set out herein.) (A May 2009 Variety article about Def Spacey leaving WME is attached as "**Exhibit V**" and is incorporated by reference as if fully set out herein.)

● 115. May 2010, "Deadline Hollywood" reported Defendant **Universal Pictures** and Defendant Media Rights Capital (MRC) announced a 20 picture, 5-year production and distribution deal. (Said "Deadline Hollywood" article is attached as "**Exhibit W**" and is incorporated by reference as if fully set out herein.) Thus, MRC's (a company co-owned by Defendant Ari Emanuel) first mega-deal would be with **Universal Pictures**.

● 116. March 15th, 2011, **Netflix** and Def **MRC** (owned by Defs Emanuel, Wiczyk and Satchu) announced their mega $100 million dollar 2-season deal to produce the new series *House of Cards*, starring Def Kevin Spacey. Quietly, a few months later, July 2011, **with the role of a lifetime secured**, Spacey moved TS to http//www.labs.triggerstreet.com, and begin to use the web address triggerstreet.com as his production company's site.

● 117. August 2013, the film ***Elysium*** (infringing on the Plaintiff's work) was released. The Plaintiff then sued for copyright infringement, October 2013.

● 118. November 6th, 2014, 6 days after the Plaintiff filed his Notice Of Motion of appeal, Defs Spacey and Brunetti closed and destroyed the TS social network.

● 119. In 2015, almost immediately after TS closed, Project Greenlight (which had been **dead for 10 years**, came back to life, with a new HBO TV show, airing fall of 2015.

● 120. July 2016, HBO announced the Project Greenlight TV show was cancelled.

● 121. In 2016, with the cancellation of the TV show *Project Greenlight*, and with the closing of TS—with no way to gain access to original screenplays to misappropriate— ProjectGreenlight**.com** went active, again. **After 10 years of online inactivity**, Def Matt Damon, Ben Affleck and ProjectGreenlight.com began seeking new screenplays again.

● 122. In 2015, Def Dana Brunetti produced his **first** solo effort (without Kevin Spacey or their *Trigger Street Production* company), ***50 Shades of Grey***. *50 Shades of Grey* was, of course, underlined distributed by **Universal Pictures,** apparently the only major distributor that will touch a Brunetti film (without Def Spacey or their *Trigger Street Productions* company attached). (A Wikipedia article showing the producers and distributors of 50 Shades of Grey is attached as "**Exhibit X**" and is incorporated by reference as if fully set out herein.)

**SONY PICTURES EMAIL LEAK EXPOSE DEF ARI EMANUEL'S SECRET UNIVERSAL PICTURES TIES, HIS UNLAWFUL RELATIONSHIPS WITH SONY PICTURES' CEO (M. LYNTON), & HIS BULLYING, THUGGISH METHODS**

123.    Further confirming all allegation herein, in 2015 Wikileaks released thousands of Sony Pictures emails, which had been previously released in 2014, when North Korea hacked and published thousands of Sony's emails. Within days hundreds of respected news agencies carried the story —The NYTimes, LATimes, Hollywood Reporter, all reported the juicy details—and the juiciest story was the story of how Sony Pictures lost -or passed on- "Steve Jobs", the movie.

124.    All of the reports are similar: the emails provide an inside view of bunch of super-rich Hollywood producers, writers, and directors negotiating the production budget of the film "Steve Jobs", until the deal went bad and Sony gave up on the film. And right in the eye of the storm is Def Ari Emanuel. (An articles from "Mashable.com" about said "Steve Jobs" film emails is attached as "**Exhibit Y**"and is incorporated by reference as if fully set out herein.)

125.    A few of the celebrities captured on Sony Pictures email/text leak, at times, behaved poorly, but no one behaved worse than, Def Emanuel. Brazen and thuggish, we see Def Ari Emanuel berate Sony Pictures' Chairman Amy Pascal, with impunity. And when the other Sony execs learned of this, they only called Def Emanuel a *bully*—behind his back. No one dared to confront Def Emanuel. But more surprisingly, through a tiny sliver of Def Ari Emanuel's emails (just those going into, or out of, Sony Pictures) we learn:

1. Def Ari Emanuel is a major film producer —in conflict with his role as a talent agent, and in violating California labor law which forbids employers (a producer) from charging employees (his actors) fees to be hired—perhaps an even more significant conflict of interest than Def Emanuel's partnership in MRC II LP.

2. Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures CEO and Chairman) are secretly business partners: co-owners in the company *Screenbid*.

3. Ari Emanuel is also a film financier, or executive producer (a person who provides or finds money to make films).

4.  Def Ari Emanuel also arranges peripheral services for Sony Pictures (and others), like making deals with Hasbro Toy Co. for Sony Pictures  (for Spider-Man 2 & Minions  action figures?).

5.  <u>Whenever necessary, **Universal Pictures** will distribute ANY film for Ari Emanuel</u>.

<u>"STEVE JOBS" EMAILS CONFIRM DEF ARI EMANUEL</u>

<u>IS SECRETLY A MAJOR FILM PRODUCER, AND THE TRUE</u>

<u>PRODUCER OF "STEVE JOBS" —NOT SCOTT RUDIN</u>

126.   Through the Sony "Steve Jobs" email trail we see the "Steve Jobs" negotiation go on for about 8 months, then it begins to fall apart on October 16th, 2014, after Sony Pictures' President of Business Affairs, Andrew Gumpert, sends Sony Pictures Chairperson Amy Pascal, film producer Scott Rudin, Def Ari Emanuel, and WME co-CEO Patrick Whitesell a financing offer, which the filmmakers felt was too low.  October 18th, 2014, two days after Gumpert's low offer, Scott Rudin, angrily responds:

> 2014-10-18 16:09:38  Re: wwbo bumps/jobs  From: Scott Rudin
> <sr@scottrudinproductions.com>  To: pascal, amy
> gumpert, andrew  aemanuel@wmeentertainment.com
> pwhitesell@wmeentertainment.com

**SCOTT RUDIN:**
> "You have NO risk in the movie but WE should have risk? You lay off every cent except what you choose to keep and WE should then also fund you --- that's how this should work?
> I cannot believe you're serious. What idiot would make this deal? The presumption that five Oscar winners would be desperate enough to give up all value for their services and then also risk the baseline bargain-basement fees on top of it is beyond comprehension.
> Every single movie like this that we have made for you has worked. And you think this is fair?"

127.   At Rudin's words, Def Ari Emanuel, who purports to the world that he is just a talent agent, would then take over the email exchange —seemingly eager to bully a woman.

> On Oct 18, 2014, at 9:15 AM,  From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com>  To: pascal, amy

COMPLAINT

26

sr@scottrudinproductions.com  gumpert, andrew
pwhitesell@wmeentertainment.com

**ARI EMANUEL:**

"This offer is fucking bull shit. Give us the movie back. You you guys
in the business. No other studio would even ask for this. Pass"

128.   Def Ari Emanuel immediately establishes and retains dominance and control of the matter for the remainder of the negotiation, and Scott Rudin would remain quiet and subordinate to Def Emanuel. But the key detail in this email is that Def Emanuel has the authority to say "Pass", meaning: we choose NOT to do business with you, we will find another partner. No mere talent agent can usurp that power from the producer.  Scott Rudin put Ari Emanuel on that email chain because Ari Emanuel is the true producer.

129.   The exchange goes on. Amy Pascal writes:

On Oct 18, 2014, at 10:18 AM  From: Amy_Pascal@spe.sony.com
To: aemanuel@wmeentertainment.com
sr@scottrudinproductions.com gumpert, Andrew
pwhitesell@wmeentertainment.com

**AMY PASCAL:**

"Can we please deal with this Monday
Maybe we all get in a room and close it up"

130.   But Def Ari Emanuel will not be silenced by Ms Pascal's request to wait until Monday. He replies five minutes later::

On Oct 18, 2014, at 10:23 AM,  From: Ariel Emanuel
<AEmanuel@wmeentertainment.com>  To: pascal,
amy  sr@scottrudinproductions.com  gumpert,
andrew pwhitesell@wmeentertainment.com

**ARI EMANUEL:**

"Whatever
**You guys ask us to find financing. Scott, Patrick and myself get
Modi** and we still get no respect. Amy, this is not what you want to
hear - but this NEVER happens and any other studio. In fact they
then would go out of their way to make a proper deal.
Even Harvey.
Monday is fine."

131.   With that statement **Def Ari Emanuel admitted he found film financiers for "Steve Jobs", which is a strictly a producer's, or an executive producer's job.** Def Ari

| | |
|---|---|
| 1 | Emanuel also generously (and falsely) shares credit with Rudin and Whitsell for getting |
| 2 | Modi Wiczyk to help with financing, to make Rudin and Whitsell appear more significant to |
| 3 | the process. Again, Defs Modi Wiczyk and Ari Emanuel had been a business partners since |
| 4 | 2002 (at Endeavor, as well as in MRC). Getting Def Modi Wiczyk involved was entirely |
| 5 | Def Ari Emanuel's doing. Amy Pascal responds to Def Emanuel's provocation: |

> On Oct 18, 2014, at 10:51 AM, From: Amy_Pascal@spe.sony.com
> To: aemanuel@wmeentertainment.com
> sr@scottrudinproductions.com gumpert,Andrew
> pwhitesell@wmeentertainment.com
>
> **AMY PASCAL:**
> "arithat is totally unnecessary we are in a negotiationwe have all
> been doing this a long timewe want to make moneyyou want to
> make money for yourselves andyour clientsthis has nothing to do
> with respect and to be fair and its a credit to the movie that scott
> put together there are more financing partners  than we know
> what todo with here....thats not the issue...we are the only major
> studio that even tries to make thesekind of movesdont make it
> harder than it isthe tone is really uncalled for  and unfairand
> doesnt help get things doneamy"

132.   Through all of this, Scott Rudin never commented or told Def Ari Emanuel to disengaged. That is not his place. Ari runs the show. Def Ari Emanuel replies:

> 2014-10-18 10:58:41  Re: wwbo bumps/jobs From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com>  To: pascal, amy
> sr@scottrudinproductions.com   gumpert,
> andrew pwhitesell@wmeentertainment.com
>
> **ARI EMANUEL:**
> "Ok not true. Other studios make these movies"

133.   Def Ari Emanuel was alluding to Universal Pictures, who would produce any film Def Emanuel suggested. Texting stopped for 7 or 8 hours, until Def Ari Emanuel resumed.

> 2014-10-18 16:20:47 From: aemanuel@wmeentertainment.com
> To: gumpert, andrew sr@scottrudinproductions.com,
> pwhitesell@wmeentertainment.com,  pascal, amy
>
> **ARI EMANUEL:**
> "In the real world when some one either risks something or gives something
> up they get something in return. You guys seem to think we should be
> honored just to be in business with you based on your offer. Why?"

134. After this, the negotiation disintegrated over the next 4 weeks. The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:

> 2014-11-14 22:57:02 From: aemanuel@wmeentertainment.com
> To: pascal, amy
>
> **ARI EMANUEL:**
> "Is business affairs calling me so I can take this to Fox Searchlight officially?"

135. <u>With that statement Def Emanuel showed that, in addition to producing, **he even arranges distribution**</u>. Def Emanuel is asking Amy Pascal if Sony Pictures' President of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants "Steve Jobs". Def Emanuel is bluffing that Fox Searchlight has agreed to take the film. He never had a deal with Fox Searchlight. He was just playing hardball; trying to get a better offer out of Sony, AND keep them in the dark about his distribution relationship with **Universal Pictures.**

136. As this deal dragged on over 8 months, 3 weeks before the previous exchange, Sony Pictures' Andrew Dumpert, spotted Def Emanuel's chicanery and bad motives. In an email to Sony execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

> 2014-10-18 16:59:16 From: Andrew Gumpert
> To: lynton, michael; pascal, amy; belgrad, doug
>
> **Andrew Gumpert:**
> "The fact is there is only so much in the kitty. Unless the movie massively breaks out they can never make real money, nor can we and our investors.They have a 50pt pool with the best definition and 5m of box office bonuses. **<u>Do they want to make MORE than the equity? I think they do.</u>** There is a huge philosophical gap (given the rude and insolent responses from Ari and **Scott**)..."

137. Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott Rudin weren't adhering to established guidelines.

138. Although there have surely been occasions when Sony Pictures did cave-in to Def Emanuel's arm-twisting, this would not be one of those occasion. But oddly, Michael Lynton, CEO of Sony Pictures, responds to Gumpert only with silence—because Def Ari Emanuel is his close friend and secret business partner in Screenbid.

**"Steve Jobs" Film's Not-So Surprising *Twist* Ending:**

139.    Fox Searchlight never touched "Steve Jobs".

140.    Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the price of the film above market value, to increase his profit margin. He didn't need Sony Pictures to give him standard market value for "Steve Jobs", he could get standard value from Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari Emanuel took the film to the Studio that has distributed all of his films, since around 1999.

141.    On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs", after so much posturing and tumult, <u>"Steve Jobs" was distributed by **Universal Pictures.**</u>

<u>SONY PICTURES EMAILS SHOW DEFS EMANUEL & BILL BLOCK & SONY</u>

<u>PICTURES' CEO  (M. LYNTON) MAINTAIN UNETHICAL RELATIONSHIPS,</u>

<u>AS THEY CO-OWN "SCREENBID" TOGETHER (CONFLICT OF INTERESTS)</u>

142.   The "Steve Jobs" emails reveal Defs Emanuel and Bill Block are in a co-ownership business with Sony Pictures' then-CEO Michael Lynton. As we see Def Ari Emanuel write Michael Lynton to ask Lynton to check on their co-owned business, *Screenbid.*

> On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com
> To: lynton, michael;
> **ARI EMANUEL:**
>  Michael -
>  What are we doing on Screenbid? We had success on our early tests,
>  nothing since. You guys own a piece of this company, we've had
>  nothing since our early success. We have to keep the engines going.

143.    In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of Screenbid is confirmed by the repeated use of pronoun"we". Def Ari Emanuel asks "What are **we** doing..." Then he states "**We** had success on our early tests…" Then he reminds Lynton that he (and some unknown party, or parties) also own shares of this company. Then, implying Lynton has a responsibility, Def Emanuel says, "**You guys own a piece of this company…**" Then Def Emanuel exhorts CEO Michael Lynton to take action, saying: "<u>**We** have to keep the engines going</u>."

144.   These are not the messages of quiet stockholders. These men are owners.

145.   Sony Picture's CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his business partners a business report, pasted below his reply text. (Bill Block was the CEO of QED International, a Defendant in Briggs v Blomkamp.) Def Bill Block's reply email reads:

2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
michael_lynton@spe.sony.com

**BILL BLOCK:**
 Going well gentlemen.
 Bill
 From: Jeffrey A. Dash [mailto:jdash@screenbid.com]
 Sent: Monday, October 27, 2014 10:13 AM
 To: Bill Block
 Subject: SCREENBID AUCTION UPDATE
 AUCTION UPDATE:

 TRUE BLOOD: (HBO) We are winding down aftermarket sales and fulfillment and are on schedule to present audited reports to HBO accounting within 14 days.

 SONS OF ANARCHY: (FOX) We visited the set on Friday 10/24/14 and met with the department heads for props, wardrobe, transportation and set decoration. They are scheduled to wrap next week and we will take delivery by 11/5/14, immediately inventory and shoot. Writing began about 2 weeks ago The auction is scheduled to go live on 12/01/14 and bidding will end on 12/10/14. Fulfillment time will be tight. In order to get everything shipped prior to XMAS  we will have extra staff in place to facilitate…"

146.   In this unethical relationship, Sony Pictures' CEO Lynton, personally profited as Screenbid's owner, in such ways as directing Sony Pictures to give Screenbid millions in set furnishings to auction on Screenbid, where he and Def Emanuel profited as owners. Lynton's secret relationship with Def Emanuel is why Sony Pictures did not do due diligence to vet Def Blomkamp's Elysium script.

| | |
|---|---|
| 1 | <u>SONY EMAILS SHOW DEF EMANUEL PERFORMS</u> |
| 2 | <u>PRODUCORIAL SERVICES:  CALLING SONY'S CEO & CHAIRMAN</u> |
| 3 | <u>TO ARRANGE A DEAL WITH HASBRO</u> |
| 4 | 147.   On March 28, 2014, Def Ari Emanuel emailed/texted Sony's Pictures' CEO and |
| 5 | Chairman to close an animation co-financing deal with Hasbro. Def Emanuel's email read: |
| 6 | 2014-03-28  re: HASBRO Animation deal |
| 7 | From: aemanuel@wmeentertainment.com<br>To:<u>amy_pascal@spe.sony.com</u>;  michael_lynton@spe.sony.com |
| 8 | **ARI EMANUEL:** |
| 9 | "HASBRO Animation deal<br>Amy & Michael - |
| 10 | We have sent Ronni our proposal for the animation co-financing |
| 11 | deal. Please take a look when you get a chance and lets lock this<br>down. |
| 12 | Ari |
| 13 | 148.   Talent Agents don't arrange animation co-financing deals with Hasbro—producers |
| 14 | and studios do. Curiously, after Billionaire Def Ari Emanuel recently purchased the UFC he |
| 15 | arranged a UFC Hasbro deal. (An article where Def Emanuel discusses UFC and Hasbro is |
| 16 | attached as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.) |
| 17 | |
| 18 | **SONY EMAILS SHOW DEFENDANTS COMMITTED PERJURY REGARDING** |
| 19 | **THEIR EFFORTS TO HIDE INFRINGEMENT IN BRIGGS V BLOMKAMP** |
| 20 | 149.   The Defendants' fraud, conspiracy and routine deceit included committing perjury |
| 21 | by lying on documents signed under oath. |
| 21 | 150.   During the discovery phase of Briggs v Blomkamp, et al (C13 4679 PJH) the |
| 22 | Plaintiff informed the district court that he suspected that writer/producer Simon Kinberg |
| 23 | was hired to rewrite Def Blomkamp's poorly written screenplay. In response to Plaintiff's |
| 24 | interrogatories to MRC II LP, the Defendants  made false statement, under oath, regarding a |
| 25 | substantial matter in that case, which may impact the Plaintiff's ability to prevail in that |
| 26 | lawsuit (currently in appeals). (Said Def MRC II LP's Interrogatory Responses from Briggs |
| 27 | v Blomkamp are attached as "**Exhibit AA**"  and is incorporated by reference as if fully set |
| 28 | out herein.) |

151.   That deceit occurred when the Defs responded to interrogatory #17; believing Simon Kinberg helped disguise Def Blomkamp's infringement, the Plaintiff asked:

**Plaintiff's Interrogatory:**
INTERROGATORY #17:
"Simon Kinberg is a writer and "script doctor" (a writer who fixes scripts that have serious problems). Simon Kinberg is listed as a producer of Elysium. Exactly what duties did Simon Kinberg play in the production and script doctoring of the screenplay and film "Elysium"?"

**Defendants' Answer:**
"Defendant incorporates by reference the preliminary statement and general objections... Subject to and without waiving the foregoing objections, Defendant responds as follows:
        Simon Kinberg <u>produced</u> <u>the</u> <u>Film</u>. As producer, Mr. Kinberg also **assisted with a <u>polish</u> of the Film's screenplay** during the later stages of writing."

**<u>But The Leaked Sony Emails Reveal The Truth About Said Perjury:</u>**

152.   The Defendants admitted that Simon Kinberg helped improve the weak screenplay, BUT suggested that his help was just a "polish", which suggests merely dotting I's and crossing T's, and maybe a dialogue suggestion here and there. But, in fact, Simon Kinberg had to do exhaustive work to try to salvage Elysium's terrible screenplay.

153.   The gross underestimation and misrepresentation of all the work Simon Kinberg had to do to repair Def Blomkamp's Elysium script is revealed in the 2015 Wikileaks're-posting of the Sony Pictures' hacked emails, in five (5) key email exchanges between Defs **Modi Wiczyk**, **Simon Kinberg**, and Sony Pictures Chairperson **Amy Pascal**. In the first email, Def Wiczyk explains Kinberg's role:

2014-10-27 13:36:12  <u>Fwd: CHAPPIE NOTES</u>
From: mwiczyk@mrcstudios.com To: pascal, amy
**MODI WICZYK:,**
"hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying. great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then</u>. dont know why, dont care. its our turn now.i told doug that we should

leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

154.   Def Wiczyk, Simon Kinberg, and Amy Pascal continued to discuss the endless and unimaginable problems Kinberg was having helping director Def Blomkamp's save his film, *Chappie*; the executives discuss reshoots, dialogue rewrites, other huge changes, and how to protect Def Blomkamp's insecure ego. Yet, amid these massive problems, Kinberg comments that Def Blomkamp was handling Kinberg's executive ordered changes much better than he handled them on Elysium, where Kinberg explains Blomkamp **"shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once."** In this email to Amy Pascal, Simon Kinberg wrote:

> 2014-08-07 07:02:55  Re: Chappie   from:
>         sdkinberg@aol.com   to: pascal, amy
> **SIMON KINBERG:**
> "cool! neill has been really open throughout this process, and wants to get the audience all the way there. i think we're all feeling the same things now, so we can put it together and deliver to him, and he'll take it as an assignment not a judgement, and stay creative. **i saw him shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once. so i don't think he will now…**"

155.   In fact, the text/emails reveal Def Wiczyk and Amy Pascal were forced to hide from Def Blomkamp the fact that Simon Kinberg had to take over the film to finish it. This is revealed when Def Wiczyk wrote to Sony's Chairperson, Amy Pascal:

> 2014-10-27 13:42:22  Re: To discuss
>         From: mwiczyk@mrcstudios.com; To: pascal, amy
> **MODI WICZYK:**
> "not to oversimplify but i know simon has been biting his tongue for a month and all the sloppy stuff has been making him **crazy.** when i speak to him he seems to have a very clear view of what he wants to do. it lines up w what ur saying. i hink if we make them do it we will have a much much much better film that works. we just cant literally tell neill **si is taking over....**so its "our" notes"

156.   Additional evidence of the extreme measures that Defendants Simon Kinberg, Sony Pictures, MRC and Modi Wiczyk resorted to salvage Chappie. Can be seen in such

emails/texts as when Def Modi Wiczyk explains director Def Neill Blomkamp's inability to even write or direct "basics". In an email text to Amy Pascal, Wiczyk wrote:

> 2014-10-27 13:52:57  Re: To discuss
> From: mwiczyk@mrcstudios.com, To: pascal, amy
> **MODI WICZYK:**
> "yes thats what i meanthe right version of this could be iconic and do 300 and have a huge sequel what bugs me is how obvious and unpolished the problems areall the hard stuff is great but all the basics are killing us"

157.    A week later, Def Modi Wiczyk emailed Amy Pascal to discuss BlomKamp's insecurities, and how they were impacting production.

> 2014-11-03 04:31:07  Re:  From:
> mwiczyk@mrcstudios.com  To: pascal, amy
> **MODI WICZYK:**
> "dunno re simon. maybe insecure, maybe thinks simon is on "studio" side, which is juvenile. hes always mad at somebody. vacillates btwn targets. i ignore it until it stops forward progress.
> re edgar i actually initiallygot nervous the music was too old to be cool,but all my assistants say lots of these songs are in the collective consciousness, played in bars and clubs. shows what i know....i dug the reel he did. and i loved the app w script and music."

158.    There are many more such emails that further reveal how inept and difficult Def Blomkamp is. But from these select emails, we see that to revise Blomkamp's *Chappie*, Kinberg took extraordinary measures, and that Blomkamp's inept, "insecure" and "juvenile" conduct made Kinberg "crazy", forcing the executives to takeover the edit. Yet, Kinberg implied these problems were mild compared to what he endured with Blomkamp revising *Elysium*, where the problems were so extreme that Blomkamp **"shut down"** and **"didn't have the answers".** Thus, clearly the script work Kinberg did on Elysium was **exhaustive**, and not a mere "polish" as Def MRC II LP stated under oath. This was a clear act of perjury.

## SONY EMAILS CONFIRM DEFS RULE 37 VIOLATION IN BRIGGS V BLOMKAMP, SHOWING DEFS OMITTED TESTIMONY & EVIDENCE

159.    On page 28 of the Plaintiff's First Amended Complaint in Briggs v Blomkamp, et al, the Plaintiff made a bold prediction: that sometime after May of 2013 (when Blomkamp

1   learned the details of Plaintiff's impending copyright lawsuit) Defendant Neill Blomkamp
2   went back into the editing room and tried to edit-out key headache scenes, which were
3   identical to the Plaintiff's work. The Plaintiff explained that Blomkamp did this <u>to try to</u>
4   <u>cover-up his theft of the Plaintiff's intellectual property</u>.

5   160.   Supporting this prediction, during the discovery phase of Briggs v Blomkamp, the
6   Plaintiff found a report on TheProvince.com (titled: "Elysium's ready as director Blomkamp
7   looks forward to next project" from February 2013) in which Def Blomkamp stated the film
8   was finished back in February 2013. (Said article from "The Province" is attached as
9   "**Exhibit BB**" and is incorporated by reference as if fully set out herein.) Then, proving the
10  Plaintiff's prediction, in sworn responses to Plaintiff's interrogatories, during discovery in
11  Briggs v Blomkamp, Def Blomkamp admitted film editing was finished "Sometime in or
12  about June 2013." (Said Defendant Blomkamp's Interrogatory Responses from Briggs v
13  Blomkamp are attached as "**Exhibit CC**" and are incorporated by reference, as if fully set
14  out herein.)

15  161.   The Plaintiff then filed a motion to compel documents, asking for all texts and
16  emails between Def Blomkamp and both *Elysium* film editors: Julian Clarke and Lee Smith
17  (Smith was the final editor—the editor who would have made these headache changes). The
18  Plaintiff made this motion to prove that Def Blomkamp resumed film editing after February
19  2013, to try to remove or alter the "headache" scenes. However, **the Defendants would not**
20  **provide a response from Lee Smith**, only from Clarke (Clarke stated that editing ended
21  well before June 2013—contradicting Blomkamp, who said editing ended June 2013). But
21  Lee Smith returned to the editing room to fix the headache scenes in May and June 2013.

22  162.   As well as doing the final edit of Elysium, the 2014 Sony email leak show that Lee
23  Smith also did the final edits for Blomkamp's next film, *Chappie* (although Smith isn't
24  credited on IMDB or Wikipedia).

25  163.   Lee Smith's final edit of Chappie is revealed in the Sony email leaks as Def Modi
26  Wiczyk writes to Amy Pascal:

27           2014-08-12 00:13:30  <u>saw it.</u>  From:
28           mwiczyk@mrcstudios.com  To:

COMPLAINT

36

| | |
|---|---|
| 1 | amy_pascal@spe.sony.com |
| 2 | **MODI WICZYK:** |
| 3 | "we are going to get there and have a big success with this one. **lee smith** will be huge, **nb** is in GREAT frame of mind." |

164.    Def Wiczyk knew Smith would be "huge" because of how Smith helped salvage Elysium. A few months later Def Wiczyk told Amy Pascal about all the work Lee Smith had left to do on the film, and the continued problems between Blomkamp and Kinberg.

> 2014-11-03 02:03:10 <u>Re:</u>  From: mwiczyk@mrcstudios.com
> To; pascal, amy

**MODI WICZYK:**
> "Hi!
> in terms of neill, totally ur call but...
> i feel like <u>this</u> <u>coming</u> <u>week</u> <u>is</u> <u>critical</u> <u>bc</u> <u>neill</u> <u>has</u> <u>to</u> <u>really</u> <u>really</u> <u>let</u> <u>lee</u>
> <u>in</u> <u>to</u> <u>**polish,**</u> <u>refine,</u> etc. alot of little indulgences are gonna have to go.
> so--- i was trying to be positive but also let him know theres real real
> work yet to do. and in a short period of time.... i talked to lee for a
> while today who says neills been very open so thats good...but hes been
> a dick to simon for whatever reason. so a long way of saying i want to
> keep the pressure on him. because i agree it can be special.
> make sense?"

165.    The Plaintiff filed his Motion to Compel (seeking a statement from Lee Smith) three (3) weeks before the deadline for dispositive motions (liability), July 9th, 2013. But the district court set the motion hearing for more than a week AFTER the deadline for dispositive motions (Aug 7th, 2013).   Thus, the Plaintiff had to file his Motion For Summary Judgment (**MFSJ**), without being able to inform the court of the Defendants' **violation of Rule 37** (failure to cooperate to compel a discovery response); a violation that, in this case, resulted in the omission of evidence of a cover-up (that cover-up being: Neill Blomkamp returned to the editing room with Lee Smith, in June 2013, to ask Smith to try to erase edit and remove the headaches from Elysium). Thus, during the teleconference hearing with Magistrate Judge Laurel Beeler, the Plaintiff explained that the matter was unresolved but was effectively "moot" because both parties' MFSJs had been filed, and the Plaintiff had less than a week to file his Reply Brief (Magistrate Beeler thus ruled the issue moot). (Note: the Defs also refused ALL of the Plaintiff's discovery requests for texts or emails regarding ANY Elysium matters; expanding the Defendants' **Rule 37 violations**).

|    |  |
|----|--|
| 1  | **MRC & SONY PICTURES NEGLECTED TO DO BASIC** |
| 2  | **DUE DILIGENCE, BUYING THE RIGHTS TO ELYSIUM** |
| 3  | **WITHOUT EVEN READING A SCREENPLAY** |

4    166.    In 2008, Def Neill Blomkamp filmed *District 9* without a screenplay.  District 9's

5    star, Sharlto Copley, has given many interviews discussing the fact that he improvised every

6    line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article

7    with Sharlto Copley is attached as "**Exhibit DD**" and is incorporated by reference as if fully

8    set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO

9    Michael Lynton and Def Bill Block (of QED Int.), Emanuel was able to get QED and Sony

10   Pictures' subsidiary *TriStar* to produce and distribute District 9, without a screenplay

11   —using only Def Blomkamp's notes, which they referred to as a "script". Countless writers

12   and fans, in online forums, have tried to find a copy of a District 9 script. All have failed.

13   167.    Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures bought the film

14   and distribution rights to Elysium from Def Blomkamp, without ever reading a screenplay.

15   Sony Pictures bought the rights to Elysium in a hasty meeting in 2008. In this well

16   documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of

17   scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures

18   agreed  to  buy  the  rights,  immediately,  never  bothering  to  read  the  script.

19   HollywoodReporter.com reported the details of the stunningly hasty meeting between

20   Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011.

21   MRC scheduled meetings with several other distributors that same day, but Sony Pictures

21   was so rushed and eager to buy the film that MRC canceled all other distribution meetings

22   scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that

23   secured this deal, but never mentions a "screenplay" or a "script".   (Said Hollywood

24   Reporter article about Blomkamp, MRC closing the deal with Sony Pictures is attached as

25   "**Exhibit EE**" and is incorporated by reference as if fully set out herein.)   This same

26   meeting and concept art were also recounted in the book "Elysium: The Art of the Film"

27   —a book primarily made up of interviews with Def Blomkamp, himself. On August 6th,

28   2013, Deep Focus Review (deepfocusreview.com) reviewed the book "Elysium: The Art of

1  the Film", reflecting on this meeting. (Said Deep Focus Review article is attached as

2  "**Exhibit FF**" and and is incorporated by reference as if fully set out herein.)  Upon

3  interviewing Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and

4  MRC staged 50-60 concept art paintings "and set them against the screenplay", explaining:

5  
6        "On the strength of these images—not to mention the strength of his first
      film, *District 9*—he garnered himself a $100 million budget and signed
      stars Matt Damon and Jodie Foster."

7  

8    168.  The Defendants used the amazing artwork to strategically distract attention from

9  the flawed screenplay. Sony Pictures took the bait. Within an hour or so, a deal for about

10  $115 million was made, and no executive from Sony Pictures ever read a script. MRC didn't

11  do due diligence because Defendant Ari Emanuel was a co-owner of MRC and Def

12  Blomkamp's personal agent; thus, they stood to make millions from the deal. Sony Pictures

13  failed to do due diligence because CEO Michael Lynton had an improper, secret business

14  partnership with Def Emanuel (Screenbid.com), and wanted to maintain good relations with

15  Defs Emanuel and MRC—and make millions without regard for whose work they pirated.

16    169.  Def Blomkamp's script was so poorly executed and riddled with evidence of

17  misappropriation of the Plaintiff's work, that Defs Blomkamp, MRC and Sony Pictures took

18  extreme measures to protect the script during film production. The website Games Radar

19  (gamesradar.com) interviewed one of Elysium's stars, film icon **Jodie Foster**, who revealed

20  the producer's paranoia as she explained she wasn't allowed to possess a script.  (Said

21  Games Radar interview with Jodie Foster is attached as "**Exhibit GG**" and is incorporated

21  by reference as if fully set out herein.)  Foster said:

22  
23        **"They won't even give me a screenplay. I've read it, but they won't
      give me one to physically keep in my home 'cause they're so worried
      about everybody."**

24  

25    170.  How Sony Pictures and MRC committed $115 million to a movie without reading a

26  screenplay, but invested millions to keep the screenplay secret defies reason. This was done

27  to keep the Plaintiff from learning details of the film's plot before it was released, to prevent

28  the Plaintiff from getting an injunction to stop  production.

171.   Had Sony Pictures behaved ethically, AND done their due diligence, they would have read Blomkamp's screenplay, then they would have seen Def Blomkamp's unfocused ideas, vast story weakness, and his poor literary skills. These shortcomings, juxtaposing concepts that were beyond such limited literary skills, should have raised red flags that Blomkamp's story may have been misappropriate, thus killing the deal. Hence, the Plaintiff would have filed no claims, including all claims herein.

172.   When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal.  Wiczyk wrote:

2014-10-27 13:36:12  Fwd: CHAPPIE NOTES
From: mwiczyk@mrcstudios.com To: pascal, amy
**MODI WICZYK:**
>"hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a fixer and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  nb has been ignoring him the past few weeks after listening to him up until then. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

173.   A company has a responsibility to do basic due diligence, to make sure their products are what they allege: original works. Having a CEO who is secret business partners with the CEO of a talent agency subcontractor, undermines due diligence. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" to hide evidence of misappropriation is not doing due diligence. Rather, these are the methods of corrupt, mob-like conspirators.

174.   Further, during discovery in Briggs v Blomkamp et al, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants failed to produced any such documentation.

**Defendant Blomkamp Gets Caught Lying To The World About**

**His "Aliens" Script (Which Also Did Not Exist) , in 2017:**

175.  Just as Def Blomkamp (with Def Wiczyk's help) sold Elysium to Sony and MRC without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" film without a script—but this time he did it openly, online, for the world to see. Unfortunately, in the process he ensnared several other Hollywood notables in his' strange world of lies.

176.  On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his Twitter account, expressing hope of one day shooting the film. Soon dozens of Blomkamp fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, including in an article on Nerdist.com. (Said article from Nerdist.com is attached as "**Exhibit HH**" and is incorporated by reference as if fully set out herein.)

177.  By July **2016,** websites like ScreenRant.com were reporting Def Blomkamp had recruited actress Sigourney Weaver and director James Cameron to tell the world how great Blomkamp's script was. (Said ScreenRant article is attached as "**Exhibit II**" and is incorporated by reference as if fully set out herein.)  In ScreenRant Sigourney Weaver said:

>  **"There is an incredible script by Neill. I didn't want to do a fifth one. I thought going to earth wouldn't be fun. I got this script that was amazing and gives fans everything they're looking for..."**

178.  And James Cameron also praised the script in the ScreenRant article:

>  **Director James Cameron (*Avatar*) then went on to throw in his two cents, saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"**

179.  "Gangbusters."

180.  Then, in April 2017, ScreenCrush.com reported that director Ridley Scott, owner of the Aliens franchise, had announced there would be no *Aliens 5* movie.  Mr. Scott explained Defendant Blomkamp **never even had a script**. (Said Screen Crush article is attached as "**Exhibit JJ**" and incorporated by reference as if fully set out herein.)  Ridley Scott stated:

>  **"I don't think it will ever see the light of day. There was never a script. Just an idea that evolved from a dozen or so pages."**

181.  This all caused the article writer to wonder who was lying: "We seem to find

COMPLAINT

41

1   ourselves in a bit of a '*he said, she and he said*' situation here," Monagle wrote.

2   182.  Remember, in 2000 Def Wiczyk helped sell his brother's script to Summit without

3   so much as a script name, and Sony Pictures was right there, negotiating for the rights to

4   that unwritten, nameless script—eager to please any good friend of Ari Emanuel's.        By

5   2016, with *Aliens 5*, the Defendants had grown so brazen that they let Def Blomkamp go out

6   and lie to the world for himself, believing they could throw a script together after the

7   contract was signed. Rubbing their hands in anticipation of all that money —none of them

8   expected Ridley Scott to do due diligence and insist on seeing a script, ruining their scheme.

9

10      **IN BRIGGS V BLOMKAMP THE DEFS  HIRED A CONMAN, JEFF ROVIN**

11      **(WHO COMMITTED FRAUD UPON THE COURT & WENT ON FOX NEWS**

12      **TO ADMIT HE WAS A "FIXER" FOR BILL CLINTON) AS THEIR "EXPERT"**

13      183.   Not only does this case reveal how effortlessly seemingly everyone in Hollywood

14  lies, it reveals that when they get caught lying and stealing other people's work, they call on

15  world-class liars.

16      184.   In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of

17  thousands of California intellectual property attorneys as an expert witness, the Defs hired

18  Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the

19  same Jeff Rovin who confessed (two years <u>after</u> Briggs v Blomkamp went to MFSJ) to the

20  *National ENQUIRER (*October 19th, 2016), and confessed on **Fox News'** live telecast of

21  *The Sean Hannity Show* (Oct 24, 2016), that he was a professional "fixer" who

21  orchestrated false "smear" reports on people who disparaged President Bill and Hillary

22  Clinton—while Bill Clinton was President. Rovin claimed he then published these smear

23  articles in tabloid newspapers. Rovin's interview with Hannity can be seen at

24  https://www.youtube.com/watch?v=L3mzoKuFN5o. The story carried in countless other

25  publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit**

26  **KK**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER

27  article is attached as as **"Exhibit LL"** and is incorporated by reference as if fully set out

28  herein.)

185.   **Rovin made these self-incriminating admissions on camera, in his own words.** Rovin admitted that he also bribed the victims of his smears to stay quiet. Shockingly, Rovin says the bribes were so effective that they rarely needed to resort to **other measures**. In Rovin's words, "**Most of the time** it was just money, it never had to be any threats." Witlessly, Rovin admitted threats, violence—or worse—might ensue if the money wasn't accepted.

186.   Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

187.   Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort."

188.   Rovin went on to explain he had worked as a "fixer" many times in the past.

189.   In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.

190.   In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff moved the the court to exclude Rovin's "expert" report, as Rovin had falsified dozens of citations and fabricated evidence to substantiate his own claims, including a lengthy "quote" in which he fraudulently omitted 42 words—that wholly countered what Rovin reported. (Said Motion to Exclude is attached as "**Exhibit MM**" and is incorporated by reference as if fully set out herein.)   Oddly, the court took no interest in the fraud contained in Rovin's report—which became the base of the district court's summary judgment opinion—and denied the motion.

191.   How the Defendants knew such a devious man's "expert" report would meet no skepticism by the court is a mystery. How the Defendants knew such a sinister man existed—at all—is stunning.   Rovin explained that he worked for President Clinton when Bill Clinton was in office (1991-2001). When asked how he came to be involved with the Clintons, Rovin explained that the Clintons became aware of Rovin because, in Rovin's words, he was **"fixing something for an actor who was in their** (the Clinton's) **inner circle."** Rovin does not identify who this cabinet member is, but during the time Rovin was involved with the Clintons (1991-1998), **Rahm Emanuel** worked as the senior adviser to President Clinton (1993-1998). Rahm Emanuel is Defendant Ari Emanuel's brother.

| | |
|---|---|
| 1 | **SUMMARY OF THE DEFENDANTS'** |
| 2 | **UNLAWFUL ACTIONS** |
| 3 | **Act 1** |
| 4 | 192.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 5 | Defendants, created a social network website called Trigger Street, or TriggerStreet ("TS |
| 6 | herein), located at triggerstreet.com from 2002 until 2011, and at labs.triggerstreet.com from |
| 7 | 2011 until 2014. |
| 8 | 193.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other |
| 9 | Defendants, published and rendered the TS "Terms of Use" contract page, which stated: |

> Unless otherwise specified, the materials on the Site and in the Services are presented **solely for** the purpose of promoting the entertainment, information, and community resources and services available in, and other uses in, **the United States of America.** We control and operate the Site and the Services from within the United States. We make no representation that materials on the Site or the Services are appropriate or available for use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose to access the Site from other locations do so on their own initiative and are responsible for compliance with local laws.

| | |
|---|---|
| 17 | 194.   The previous statement from the TS "Terms of Use" page was deliberately false |
| 18 | and/or misleading, and intended to inform members (or suggest, imply or insinuate) that |
| 19 | TS was intended for use by and for users in the USA. This was Fraud, Intentional |
| 20 | Misrepresentation, False Statements, and Deceit. These false statements were made to |
| 21 | falsely assure informed, savvy writers that the website was safe from foreign "bad actors', |
| 21 | as there are many nations that do not, or cannot enforce the Universal Copyright |
| 22 | Convention, and often American copyright holders never learn that their works were |
| 23 | misappropriated by foreign infringers, because the stolen works are only displayed in the |
| 24 | infringers' nation. (TS also may have stated it was intended for UAS use to avoid paying |
| 25 | taxes on the international earnings from its Budweiser endorsement deal.) |
| 26 | 195.  In truth, unbeknownst to American users who had been deceived by the Defendants, |
| 27 | from the outset TS was intended for international use. |
| 28 | 196.   The Defendants' action were also a violation of Cal Civ 1572, 3294, and 1709. |

| | |
|---|---|
| 1 | **Act 2** |
| 2 | 197.   Defendant Kevin Spacey made numerous trips abroad, to London, Spain, etc., to |
| 3 | give speeches and interviews, and throw parties, intent to recruit new TS members. While in |
| 4 | Spain, in 2009, Spacey stated,  "I started the website about six years ago, and we now have |
| 5 | close to 400,000 <u>members around the world</u>." |
| 6 | 198.   This was **BREACH OF CONTRACT**, as the Plaintiff—like most  members in the |
| 7 | USA (perhaps all US members)—believed the website was solely for use in the USA. |
| 8 | **Act 3** |
| 9 | 199.   TS and the Defendants provided content and programming from TS to Bud.TV |
| 10 | from 2007 to 2009.  Bud.TV also ran an international advertising campaign about TS. This |
| 11 | international ad campaign advertised TS (as well as Bud.TV) all around the world. In both, |
| 12 | advertising TS in Bud.TV promotions, AND advertising TS on Bud.TV itself, the |
| 13 | Defendants **breached** the terms of TS's *Terms Of Use* contract page. |
| 14 | **Act 4** |
| 15 | 200.   The Defendant(s) made the TS website with effectively no security features, as |
| 16 | ALL members were allowed to ANONYMOUSLY read ALL screenplays. This, while TS |
| 17 | claimed to be industry standard, encapsulating all of the desires and needs of its users, and |
| 18 | touted its state of the art security. This was a violation of state and federal conspiracy, |
| 19 | negligence, gross negligence, fraud, deceit, misrepresentations, and false statements laws. |
| 20 | **Act 5** |
| 21 | 201.   Unlike a truly "industry standard" site like Writers Script Network.com, all TS |
| 21 | members/users were encouraged and deceived into using and navigating the website with |
| 22 | false identities (even for writing reviews). The Defendants' intent was to protect the |
| 23 | identities of their misappropriating conspirators, the Privacy page was written and designed |
| 24 | to scare user/members into using false identities. The TS Privacy page stated: |
| 25 | User Names and User Disclosure |
| 26 | The user name you select or are provided with upon registration with the Site is deemed non-personally identifiable information. Your user name |
| 27 | may be published on the Site and may be disclosed to others, including, |
| 28 | without limitation, to the public, and to any third parties with whom we |

elect to share such information. In addition, **if you include your name or any other personally identifying information** in any material transmitted or posted on public areas of the Site or the Services (including, without limitation, message boards, **reviews** and chat rooms), **such information will become public information and will be published on the Site and will be disclosed to other users of the Site and to other third parties who may have access to or otherwise see a display of such information**.

202.   These statements were made to encourage users to take risks they ordinarily would not take and should not take, as part of the Defendants efforts to persuade users/members to make their wares accessible to the Defendants. This was CONSPIRACY and DECEIT.

### Act 6

203.   The TS Privacy page suggested that the website had a method to reveal the true identity of all "accessors", if necessary.

Information Disclosure
We reserve the right to disclose information submitted by or concerning any user as we feel is necessary to protect our systems or business. Specifically, but without limitation, we reserve the right to disclose such information when a visitor or member is in violation of our Terms of Use or any other agreement with us, or engages (or is suspected of engaging) in any harmful, infringing or illegal activity....

204.   However, there is no evidence to support that TS ever, truly, had any method of retrieving any access records, or the accessor's true identity, etc. Nor is there any reason to believe such a system ever existed on TS. Thus, the Defendants' action were in violation of California Civ. Code § 1572, which makes it unlawful to make materially false, fictitious, deceitful, or fraudulent statement or representation.

### Act 7

205.   The Defendant(s) made extraordinary and fraudulent claims about website security; doing so to lure in the best undiscovered writers, and eliminate any doubts or suspicions users might otherwise reasonably have. TS made such false and exceptional claims as:

a.   The TS "About Us" page stated:

"Our team has been extensively researching and designing TriggerStreet.com to ensure that it **encapsulates every aspect of the user's desires and needs**."

COMPLAINT
46

206.     This was Fraud. All reasonable screenwriter members would expect (from a website assuring that the website "**encapsulates every aspect of the user's desires and needs**") that records be preserved of all access of writers' work, identifying which members accessed which works, AND recorded by the accessor's true name —AND NOT erase all access history if the member removes his/her work because he/she worried his work may be unsafe on the website. Members would reasonably expect and *desire* this from a site claiming to be industry standard, because websites like InkTip.com were already doing this. Further, all reasonable members would **desire** and **need** a website to use accurate language, and behave in accordance with the implicit language of the website's *Terms Of Use*. And if these "Terms of Use" stated, suggested, implied that the website was solely for use in the USA, members should expect that site operators would act in accordance with that agreement, and not advertise or recruit abroad. This false claim was made to fraudulently lure writers to an unsafe website.

207.   This was deceit. The Defendants' actions were also in violation of California Civ. Code § 1572 - Statements or entries generally, which makes it unlawful to make any materially false, fictitious, or fraudulent statement or representation. On the TS "*Privacy*" page, the "Security" message stated:

> "Security
> When you submit information via the Site, your information is protected using secure data networks protected by **industry standard firewall and password protection systems**. Our security practices and policies are periodically reviewed and updated as necessary, and only authorized individuals have access to the information provided by our users."

208.    This was also Fraud. There was nothing "industry standard" about the TS screenwriter website. The standard was set by Writers Script Network.com (InkTip.com). InkTip kept all records of all access, even after members left. On Inktip.com, there was no feature erasing all access records upon script removal. By implying all information was protected and secure and industry standard, reasonable members would assume all members' access activity would be recorded, stored, and protected —not erased.

209.   The Defendant(s) and TS used Def Spacey's stardom to lure in writers. Then

COMPLAINT
47

1  writers were **promised** "industry access and exposure"—using Spacey's fame and
2  Academy Award winning laurels to leverage this false promise. TS's statement from its
3  "About Us" page promised that:

4  > "Based on the principles of creative excellence, it (the TS website) provides
5  > **industry access and exposure** to help build the careers of notable new
   > filmmakers and screenwriters."
6

7  210.  This false promise, bolstered by the other fraudulent statements on the "Terms of
8  Use", "About Us", and "Privacy" pages, expanded a pattern of fraud, false statements,
9  false promises, concealment, intentional misrepresentations, and deceit.

10                                      **Act 8**

11  211.  The Defendants added a new anti-security feature, whereby if a member removed
12  his/her screenplays from the TS website because he/she worried that his/her work might be
13  unsafe or the target of infringers or pirates, the moment that writer removed his script from
14  the site ALL access records would be erased. The Plaintiff believes the Defs added this
15  feature in 2007 to access and steal the Plaintiff's work. Whether this extra hidden layer of
16  counter-security was added when the website was made, in 2002, or if it was added in 2007,
17  the Defendant(s) and TS did not inform members about this feature, and it was never
18  mentioned on the TS website. The Defendants' failure to inform members of this
19  anti-security feature, and the risks it posed, was a deliberate omission of imperative
20  information. The Defendants actions were in violation of California Civ. Code § 1572, fraud
21  by omission, and constitute DECEIT in violation of California Civ. Code § 1709.

21                                      **Act 9**

22  212.  Corporations are expected to do due diligence in all substantial purchases,
23  transactions and deals (such as investing $120 million in a film). Due diligence means doing
24  **"a complete and appropriate review of documentation and facts by a potential buyer**
25  **or its agents before purchasing an asset or engaging in business with a prospect"** (from
26  the Law Offices of Stimmel, Stimmel & Smith) This definition goes on to require a
27  "...complete review using lawyers and CPAs to assist so that when one is done, one knows
28  all that one needs to know before engaging in business with or buying a company or other

asset or piece of property." The Defendants did not do due diligence —failing to even read the screenplay before buying its rights. Thus, the Defendants engaged in **gross negligence.**

### Act 10

213.   The Defendants engaged in conflicts of interests that violated **CALIFORNIA LABOR CODE SECTION 1700.39**, which states, "No talent agency shall divide fees with an employer, an agent or other employee of an employer." Defendant Ari Emanuel was the central talent agent in making the film Elysium, representing Elysium's star Def Matt Damon and its writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an owner of MRC (the employer of Def Neill Blomkamp for the making of Elysium, and the buyer of Elysium's film rights). Thus, Def Ari Emanuel divided fees as a talent agent and employer. The Plaintiff was injured by this violation of California law.

### Act 11

214.   The Defendants engaged in **Violations Of California Business & Professions Code § 17200, Et Seq., Unfair Business Practices Act.** Sony Pictures' (a publicly traded company), and its CEO Michael Lynton, violated California Business & Professions Code § 17200, ET SEQ., by engaging in improper and unethical business relationship, whereby Michael Lynton, acting as an officer of Sony Pictures, hired a subcontractor (Screenbid) to sell numerous items of substantial value for Sony Pictures. Thus, Def Lynton profited as Sony Pictures' CEO, and he and Defs Ari Emanuel and Bill Block profited as the owners of Screenbid, the subcontracted auction service. This was a conflict of interest.

215.   This improper relationship caused CEO Michael Lynton to encourage his subordinates and peers NOT to scrutinize projects, clients or business entities associated with his secret business partner Def Ari Emanuel. Thus, Sony Pictures agreed to distribute Elysium without doing due diligence to read a screenplay to see to it that it was reasonably executed. Had Sony Pictures employed a reasonable standard of due diligence, Elysium would not have been made; thus, no injury would have come to the Plaintiff.

### Act 12

216.   The Defendants engaged in Spoliation Of Evidence by closing and destroying the TS website  6 days after the Plaintiff filed his Notice of Appeal to the Ninth Circuit Court of

1   Appeals. The Defendants did this to destroy unfavorable evidence, because the district court

2   based its MFSJ ruling on reversed law (cited by the Defendants), rather than the prevailing

3   law (cited by Plaintiff). Thus, Briggs v Blomkamp, et al, is/was apt to be returned to the

4   lower court, where the Plaintiff will/would subpoena all website access records, to confirm

5   the Defendants used TS to access the Plaintiff's work, and/or confirm that TS

6   misrepresented its security and ID protection features, and had no such records or oversight.

7   **Act 13**

8   217.   By conspiring to hire "fixer" Jeff Rovin (who spent years of his life writing false

9   "smear" stories for tabloid news) to submit a falsified "expert" report to the court, the

10   Defendants engaged in civil conspiracy, as well as fraud and deceit in violation of California

11   Civ. Code §§ 1572 and 1709. In these actions may also constitute Subornation Of Perjury

12   **Act 14**

13   218.   By stating, in their answers to the Plaintiff's interrogatories, that Simon Kinberg

14   only provided a "polish" to the Defendants script *Elysium* (when, in fact, Kinberg did

15   exhaustive work to salvage the screenplay) the Defendants engaged a conspiracy to commit

16   fraud and deceit, violating California Civ. Code §§ 1572 and 1709. Beyond these civil

17   infractions, the Defendants may have committed **Perjury,** violating 18 U.S. Code § 1001.

18   **Act 15**

19   219.   In the Briggs v Blomkamp Complaint, the Plaintiff stated that the *Elysium* film

20   editor(s) would confirm that Film editing resumed in June, 2013 (after initially wrapping up

21   in February 2013) —after the Defendants learned of the Plaintiff's impending lawsuit. The

21   Plaintiff predicted the editor(s) would confirm that this final editing was done to remove the

22   hero's headaches. But during discovery, the Defs gave Plaintiff only a statement from Julian

23   Clarke, refusing to provide a statement from final editor, Lee Clarke. Thus, the Defendants

24   **violated RULE 37** —a violation that may have changed the outcome of the case**. The**

25   **Defendants' actions violated Cal Civ 1572 and 1709** —and perhaps 18 U.S. Code § 1001.

26   **Act 16**

27   220.   Using the TS website, Defendants Spacey and Brunetti marketed the Plaintiff's

28   original screenplay in foreign markets all around the world, without informing the Plaintiff.

The TS social network website made representations that the website was solely for use in the USA. The plaintiff relied on these claims. Unbeknownst to the Plaintiff, the Defendants repeatedly travelled to foreign markets to invite foreign citizens to join TS, where they could freely access the Plaintiff's screenplay ("Butterfly Driver", posted on TS in 2007). In engaging in these actions, **the Defendant committed INFRINGING EXPORTATION of the Plaintiff's copyright protected property,** under 17 USC § 602(a)(2), which makes it unlawful to export copyrighted property from the USA, without the authority of the owner of copyright, as this would infringe of the copyright owner's exclusive right to distribute, under 17 USC § 106; actionable under sections 17 USC § 501.

221.   The Plaintiff was unaware of  Defendants Spacey's and Brunetti's infringing exportation of his work until February of 2016, when the Plaintiff discovered a BBC article, written in 2009, about Kevin Spacey travelling to Barcelona, Spain to tout TS's "400,000 members around the world." (See Exhibit T). **Immediately, upon discovering the article, the Plaintiff notified the 9th Circuit Court of Appeals, via a court filing on February 29th, 2016.** Shortly after discovering the article, the Plaintiff discovered other articles about Spacey travelling abroad to market TS, dating back to 2002. (See **Exhibit P and Q.**) American users were never informed that TS was being marketed around the world.

222.   The 3 year statute of limitations to take legal action on this infringement started to run in February 2016, when the Plaintiff learned of the Defendants' infringement.

### Act 17

223.   Defendants Spacey's and Brunetti's actions (detailed in the 3 preceding paragraphs under the heading "Act 16") infringed on the Plaintiff's exclusive copyrights of his screenplay *Butterfly Driver*, posted on the TS website in 2007, as the Defendants' actions violated the Plaintiff's exclusive right to distribute his work, under section 17 USC § 106.

### STATEMENT OF INJURY

224.  Among the injuries caused by the Defendants' actions were (1) the misappropriation of Plaintiff's work; (2) the infringement of the Plaintiff's copyright —by a foreign actor (Blomkamp); (3) a judgement against the Plaintiff in his effort to protect his copyright.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
CIVIL CONSPIRACY
(**Against All Defendants**)

225.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 224, as if fully set out herein.

226.   Judicial Council of California Civil Jury Instructions states that "A conspiracy is an agreement by two or more persons to commit a wrongful act. **Such an agreement may be made orally or in writing <u>or</u> <u>may</u> <u>be</u> <u>implied</u> <u>by</u> <u>the</u> <u>conduct</u> <u>of</u> <u>the</u> <u>parties</u>**." Keeping with standard, the Defendants engaged in three (3) conspiracies. While engaged in these conspiracies, the Defendants committed many clear, overt acts.

#### First Conspiracy

227.   To unlawfully enrich themselves, the Defendants conspired to create a social network for screenwriters and filmmakers, with little or no security features. The Defendants would then mislead screenwriters that the website was safe, then the Defendants could access and misappropriate the screenwriters' work. In the execution of this conspiracy the Defendants took the following overt actions:

1. The Defendants conspired to create a social network website (TS) for screenwriters and filmmakers, a website with effectively no security features.

2. The Defendants conspired to commit fraud and mislead TS member/users that the website had reasonable security features, when it had none.

3. The Defendants conspired to add a anti-security feature that erased all access information if members removed their screenplays.

4. The Defendants conspired to add the anti-security feature in 2007, to erase evidence of their access of the Plaintiff's script.

5. The Defendants conspired to make the film Elysium, careful not to leak any information about the project .

6. The Defendants conspired to create a *Terms of Use* page that stated the website was intended solely for use in America, but the Defendants repeatedly sent Def Spacey around the globe to recruit members, in violation of the *Terms of Use* agreement.

7.  Also in violation of the Terms of Use agreement the Defendants secretly advertised TS on international websites like Bud.TV, and other international media outlets.

8.  While producing *Elysium*, the Defendants conspired to keep the script an absolute secret, not even allowing Hollywood giants like Jody Foster to take the script home.

9.  The Defendants (particularly Ari Emanuel, who profited the most from these acts and arrangements) had actors Def Damon and Affleck start a screenwriter/filmmaker website, similar to TS, called Project Greenlight. Not coincidentally, these two websites were created only a month apart; both websites used celebrity endorsers; both websites have been accused of being the *access* point in major film and TV copyright infringement suits; both of these "stolen" projects were eventually sold to companies with deep connections to Def Emanuel (MRC and Universal Pictures).

**Second Conspiracy**

228.  Once the Plaintiff realized the Defendants misappropriated his work, he sued.

229.  In response, the Defendants devised a second conspiracy to prevent the Plaintiff from prevailing in his copyright lawsuit. Their plan involved cheating the Plaintiff and the US federal justice systems. In the execution of this second conspiracy the Defendants took the following actions:

1.  Rather than hiring an intellectual property attorneys as their expert witness in Briggs v Blomkamp, the Defendants opted to hire a con man named Jeff Rovin; who, two years later, admitted on Fox News' "The Sean Hannity Show" that he was a "fixer" who worked for President Bill Clinton, where he used his literary skill to create "smear" stories, to attack Clinton critics in tabloid newspapers. Rovin said he came to work for Bill and Hillary Clinton because he was working for another "actor" in the Clinton White House. This *actor* wss surely Rahm Emanuel, the Senior Advisor to the President (Clinton), who is also Defendant Ari Emanuel's brother;

2.  During discovery in Briggs v Blomkamp, the Defendants conspired to prevent editor Lee Smith from answering the Plaintiff's interrogatories;

3.  The Defendants made false statements in their interrogatory answers, as Simon Kinberg stated that he merely "polished" Def Blomkamp's script;

1   4.   The Defendants conspired to shut-down and destroy the TS social network 6 days
2        after the Plaintiff filed his Notice Of Appeal;

3                                      **Third Conspiracy**

4   230.   To greatly increase their rate of personal enrichment, the Defendants conspired to
5   break California business, labor and ethics codes. Breaking these codes caused an erosion in
6   the Defendants' business practices, causing them to act recklessly and negligently. In the
7   execution of this second conspiracy the Defendants took the following negligent actions:

8   1.   The Defendants conspired to commit to invest over $100,000,000 to make the film
9        Elysium, without reading a script.

10  2.   The Defendants conspired to create an arrangement where Universal Pictures, or its
11       parent or its subsidiaries, would finance and/or distribute any project Def Ari
12       Emanuel brought to Universal Pictures—even unlawfully acquired projects.

13  3.   The Defendants conspired to engage in inappropriate business relationships, such as
14       Def Emanuel and Sony Pictures CEO Michael Lynton co-owning Screenbid, and
15       Defendant Emanuel co-owning MRC (violating  Cal Labor Code 1700.39).

16  231.   In these actions the Defendants willfully, with disregard for the Plaintiff's rights,
17  and with disregard for the law, engaged in one or more conspiracies.

18  232.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the
19  Defendants' actions, in an amount to be determined at trial.

20                             **SECOND CLAIM FOR RELIEF**
                               <u>SPOLIATION OF EVIDENCE</u>
21                                **(Against All Defendants)**

21  233.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through
22  232, as if fully set out herein.

23  234.   California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression or
24  destruction of evidence unlawful, stating: **"You may consider whether one party intentionally**
25  **concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence**
26  **would have been unfavorable to that party."**  Similarly, 18 U.S. Code § 1519 makes it unlawful
27  to destroy evidence —even in **anticipation or contemplation** of a legal action.

28  235.   The Defendants engaged in spoliation of evidence by closing and destroying their

1  social network, TS (TriggerStreet.com). Although the Defendants knew the website was the

2  central access point of an ongoing legal case, they closed the site 6 days after the Plaintiff

3  filed his Notice Of Appeal.

4  236.  The Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff,

5  and with disregard for the law, acted to violate the law and conceal and destroy evidence.

6  237.  The Plaintiff was injured as a consequence of the Defendants' actions, in an

7  amount to be determined at trial, in accordance with prevailing compensatory and/or

8  punitive damages guideline.

9
**THIRD CLAIM FOR RELIEF**
BREACH OF CONTRACT
10
Violating California Code, Civil Code § 3294
11
**(Against Defendants Kevin Spacey and  Dana Brunetti)**

12  238.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

13  237, as if fully set out herein.

14  239.  In joining the TS (TriggerStreet) social network, the plaintiff entered into a contract

15  with Defendant Spacey and Brunetti. By repeatedly travelling abroad to places like London

16  and Barcelona to market TS, the Defendants breached the TS "Terms of Use" contract,

17  which stated the site was made **solely for use in the USA**. The Defendants furthered

18  breached this contract by secretly advertising the TS social network on various media

19  outlets, like Bud.TV.   In these actions the Defendants committed numerous contractual

20  breaches, in violation of California Civil Code § 3294.

21  240.  The Plaintiff was injured as a consequence of the Defendants' actions, in an

21  amount to be determined at trial.

22
**FOURTH CLAIM FOR RELIEF**
FRAUD / INTENTIONAL MISREPRESENTATIONS
23
Violating California Civ. Code § 1572
24
**(Against Defs Satchu, Wiczyk, MRC II Dist Co LP, Blomkamp, Spacey, Brunetti)**

25  241.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

26  240, as if fully set out herein.

27  242.  The Defendants produced contracts in which the Defendants made claims that they

28  purported as true. The Defendants knew these claims were false. The Defendants intended

1  for the Plaintiff, and others, to rely on their representations. The Plaintiff relied on the
2  Defendants' claims. The Plaintiff was harmed by the Defendants' false representations. The
3  Plaintiff's reliance on the Defendants' false representation was a substantial factor in the
4  Plaintiff's harm. In these actions, the Defendants committed fraud, intentional
5  misrepresentation, and fraudulent omission, in violation of Cal Civ. § 1572.

6      243.    The Plaintiff was injured as a consequence of the Defendants' actions, in an
7  amount to be determined at trial.

8                          **FIFTH CLAIM FOR RELIEF**
                                    <u>DECEIT</u>
9                   Violating California Civ. Code §§ 1709 & 1710
10  **(Against Defs MRC II Dist Co LP, Blomkamp, Spacey, Brunetti, Wiczyk, and Satchu)**

11     244.   The Plaintiff hereby realleges and incorporates by reference paragraphs 1 through
12  243, as if fully set out herein.

13     245.    In their numerous acts of Deceit, detailed herein, the Defendants (1) suggested as
14  fact things that were not true and that they did not believe to be true; (2) asserted as fact,
15  that which was not true, which they had no reasonable ground for believing to be true; (3)
16  suppressed facts which they were bound to disclose it, and gave information of other facts
17  which were likely to mislead. In these actions the Defendants engaged in Deceit, in
18  violation of California Civ. Code §§ 1709 and 1710.

19     246.    The Plaintiff was injured as a consequence of the Defendants' actions, in an
20  amount to be determined at trial.

21                         **SIXTH CLAIM FOR RELIEF**
                                 <u>CONCEALMENT</u>
21                    Violating California Civ. Code § 1709
22  **(Against Defendants MRC II Distribution Company LP, Blomkamp, Spacey, Brunetti)**

23     247.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through
24  246, as if fully set out herein.

25     248.   The Defendants engaged in numerous acts of Concealment (e.g. during discovery in
26  Briggs v Blomkamp, witnesses and agents for the Defendants intentionally failed to disclose
27  certain facts that were known only to them, which the Plaintiff could not have discovered),
28  in violation of California Civ. Code § 1709.

249. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
NEGLIGENCE
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

250. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 249, as if fully set out herein.

251. The Defendants engaged in a variety of negligent business practices, in violation of Cal. Civ. Code § 1714(a). The Plaintiff was harmed by the Defendants' negligence. The Defendants' negligence was a substantial factor in causing the Plaintiff's harm.

252. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
GROSS NEGLIGENCE
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

253. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 252, as if fully set out herein.

254. Through their actions as engaging in prohibited business relationships, and failing to read the screenplay before buying its rights, the Defendants engaged in grossly negligent business practices. The Plaintiff was harmed by the Defendants' gross negligence. The Defendants' gross negligence was a substantial factor in causing the Plaintiff's harm. The Defendants actions were in violation of Cal. Civ. Code § 1714(a).

255. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
VIOLATING CALIFORNIA LABOR CODE § 1700.39
(Against Emanuel, Block, MRC II Dist Co lp, Universal City Stu llc, Sony Pictures Ent Inc)

256. The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 255, as if fully set out herein.

257. The Defendants violated **CALIFORNIA LABOR CODE SECTION 1700.39,**

which states, "No talent agency shall divide fees with an employer, an agent or other employee of an employer." Defendant Ari Emanuel represented *Elysium*'s star Def Matt Damon, and represented writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an owner of MRC (the employer of Defs Blomkamp and Damon for the making of *Elysium*). Thus, Emanuel divided fees as an agent and employer. In so doing the Defendants violated California Labor Code 1700.39.

258.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF
### VIOLATION OF UNFAIR BUSINESS PRACTICES ACT
[CAL BUS & PROF CODE§ 17200, ET SEQ.]
**(Against Defendants Emanuel, Block, MRC II Dist Co LP, Sony Pictures Ent Inc)**

259.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 258, as if fully set out herein.

260.    Def Emanuel and Def Block, while acting as the CEOs of WME and Miramax, respectively, secretly entered into  a private business partnership with Sony Pictures Entertainment's CEO Michael Lynton, as co-owners of Screenbid, a business that said Defendants then used as a subcontractor for WME, Miramax, and Sony Picture Ent. In these actions the Defendants violated the California's Unfair Business Practices Act [Cal Bus & Prof Code§ 17200, Et Seq.]. Further, these arrangements contributed to the negligent culture that lead to the Defendants' misappropriation of the Plaintiff's work.

261.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### WITNESS TAMPERING
**(Against Defs Emanuel, Block, Blomkamp, MRC II Dist Co lp,, Sony Pictures Ent Inc)**

262.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 261, as if fully set out herein.

263.   California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression of of evidence unlawful; stating: **"You may consider whether one party intentionally _concealed_ or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have**

been unfavorable to that party." In such actions as (1) hiring a professional "fixer" to provide a falsified expert witness report, and (2) proffering a discovery statement from writer Simon Kinberg stating that he merely "polished" Def Blomkamp's screenplay—when the online film communication records show Kinberg performed a massive reworking of the screenplay— the Defendants willfully engaged in witness tampering.

264.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### TWELFTH CLAIM FOR RELIEF
<u>INFRINGING EXPORTATION</u>
Violating  17 USC § 602(a)(2)
**(Against Defendants Spacey and Brunetti)**

265.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 264, as if fully set out herein.

266.    By marketing and making the Plaintiff's work available around the world on the TS social network website, without the Plaintiff's consent, Defendants Spacey and Brunetti committed Infringing Exportation of the Plaintiff's copyrighted work, under 17 USC § 602(a)(2); thereby violating the Plaintiff's exclusive right to distribute his copyrighted work under 17 USC 106(3), enforceable under 17 USC § 501(a): Copyright Infringement.

267.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### THIRTEENTH CLAIM FOR RELIEF
<u>COPYRIGHT INFRINGEMENT</u>
Under 17 USC § 501(a)
**(Against Defendants Spacey and Brunetti)**

268.    The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 267, as if fully set out herein.

269.    By marketing and making the Plaintiff's work available around the world on the TS social network website, without the Plaintiff's consent, Defs Spacey and Brunetti infringed on the Plaintiff's exclusive right to distribute his work, violating 17 USC § 501(a).

270.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

1.  For general damages in an amount according to proof at the time of trial;

2.  For exemplary damages;

3.  For special damages in an amount according to proof at trial;

4.  For restitution and disgorgement of all profits (estimated at $850,000,000—which represents all projected profits the Defendants will realize from the misappropriation of the Plaintiff's work; see p19, para 2) for the Plaintiff, consistent with US copyright remedies;

5.  For Plaintiff's cost of this lawsuit and reasonable attorney's fees;

6.  For such injunctions and additional relief the Court may deem proper.

DATED: January 2st, 2018

Respectfully Submitted,

By: __/s/ Steve Wilson Briggs____

Steve Wilson Briggs

Plaintiff In Propria Persona

Exhibit G

1    KELLI L. SAGER (State Bar No. 120162)
     kellisager@dwt.com
2    ROCHELLE L. WILCOX (State Bar No. 197790)
     rochellewilcox@dwt.com
3    BRENDAN N. CHARNEY (State Bar No. 293378)
     brendancharney@dwt.com
4    DAVIS WRIGHT TREMAINE LLP
     865 South Figueroa Street, Suite 2400
5    Los Angeles, California 90017
     Telephone:     (213) 633-6800
6    Facsimile:      (213) 633-6899

7    Attorneys for Defendants
     UNIVERSAL CITY STUDIOS LLC and
8    NBCUNIVERSAL MEDIA, LLC

9

10             IN THE UNITED STATES DISTRICT COURT

11             THE NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14    STEVE WILSON BRIGGS,          Case No. 17-cv-06552-VC

15         Plaintiff,             [Hon. Vince Chhabria]

16      v.                  **NOTICE OF MOTION AND MOTION**
                              **TO DISMISS FIRST AMENDED**
17    UNIVERSAL CITY STUDIOS LLC;    **COMPLAINT; MEMORANDUM OF**
     NBCUNIVERSAL MEDIA, LLC;      **POINTS AND AUTHORITIES**
18    SONY PICTURES ENT INC.; KEVIN
     SPACEY; ARI (ARIEL) EMANUEL; MATT    (Proposed Order Filed Concurrently)
19    DAMON; BEN AFFLECK; NEILL
     BLOMKAMP; MORDECAI (MODI) WICZYK;    Date:       February 22, 2018
20    ASIF SATCHU; BILL BLOCK; DANA        Time:       10:00 a.m.
     BRUNETTI; MRC II DISTRIBUTION       Crtrm:      4
21    COMPANY LP (AKA MRC, Media Rights
     Capital, and all other MRC entities and
22    subsidiaries)

23           Defendants.

24

25

26

27

28

PLEASE TAKE NOTICE that on February 22, 2018, at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 4 of the above-entitled court, located at the Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Ave., San Francisco, California, 94102, the Honorable Vince Chhabria presiding, Defendants Universal City Studios LLC and NBCUniversal Media, LLC (collectively, "NBCU") will and hereby do move this Court to dismiss this action pursuant to Federal Rules of Civil Procedure 8(a)(2) and 41(b) and/or Federal Rule of Civil Procedure 12(b)(6). This Motion is brought on the following grounds:

1.      The First Amended Complaint ("FAC") violates the requirement set forth in Federal Rule of Civil Procedure 8(a)(2) that a pleading seeking relief contain a "short and plain statement of the claim" showing entitlement to relief, and is therefore subject to dismissal under Federal Rule of Civil Procedure 41(b);

2.      The FAC is an improper collateral attack on a previously-dismissed lawsuit brought by Plaintiff against some of the same defendants;

3.      The FAC fails to state a claim upon which relief can be granted against NBCU pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically:

a.  The FAC does not state any claim against NBCU that is plausible on its face, in violation of <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). For this reason, Plaintiff's first, second, seventh, eighth and ninth claims for relief – which are the only claims for relief brought against NBCU – should be dismissed.

b.  Because California does not recognize a claim for conspiracy, Plaintiff's first claim for relief against NBCU should be dismissed for this independent reason.

c.  Because California does not recognize a claim for spoliation, Plaintiff's second claim for relief against NBCU should be dismissed for this independent reason.

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

d.  Because the FAC does not allege any facts identifying any purportedly negligent acts by NBCU, Plaintiff's seventh and eighth claims for relief against NBCU should be dismissed for this independent reason.

e.  Because the FAC does not allege any facts identifying any acts by NBCU that could conceivably give rise to a claim for violation of Cal. Labor Code § 1700.39, Plaintiff's ninth claim for relief against NBCU should be dismissed.

This Motion is based on the attached Memorandum of Points and Authorities; the pleadings, files and records in this action; and upon such other arguments as may be received by this Court at the hearing on this Motion.

Respectfully submitted this 16th day of January, 2018

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ROCHELLE L. WILCOX
BRENDAN N. CHARNEY


By: */s/ Rochelle L. Wilcox*
    Rochelle L. Wilcox

Attorneys for Defendants
UNIVERSAL CITY STUDIOS LLC and
NBCUNIVERSAL MEDIA, LLC

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF ARGUMENT .......................................................................... 1

II.     SUMMARY OF FACTS ................................................................................... 2

III.    THE FAC FAILS TO PROVIDE NOTICE OF THE  BASIS FOR PLAINTIFF'S CLAIMS AGAINST NBCU. .......................................................... 4

IV.     THE FAC IS AN IMPROPER COLLATERAL ATTACK ON  THE DISMISSAL OF PLAINTIFF'S PRIOR LAWSUIT. ........................................ 4

V.      THE FAC FAILS TO STATE A CLAIM. ....................................................... 7

        A.      The FAC Fails To State A Plausible Claim Against NBCU. .................... 7

        B.      California Law Does Not Recognize A Claim For Conspiracy. ............... 8

        C.      No Tort Claim Exists For Spoliation Under California Law. ................... 8

        D.      The FAC Fails To Allege Any Conduct By NBCU That Supports A Negligence Claim. ................................................................................. 9

        E.      The FAC Does Not Allege Any Conduct By NBCU Violating The Labor Code. ........................................................................................... 9

VI.     CONCLUSION ............................................................................................. 10

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

DAVIS WRIGHT TREMAINE LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Advocare Intern., L.P. v. Scheckenbach,
    2010 WL 2196449 (W.D. Wash. May 27, 2010) ...................................................................... 6

Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,
    7 Cal. 4th 503 (1994) ............................................................................................................... 8

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ......................................................................................................... 1, 7, 9

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) ............................................................................................................ 7, 9

Brazil v. U.S. Dept. of Navy,
    66 F.3d 193 (9th Cir. 1995) ..................................................................................................... 4

Briggs v. Blomkamp,
    70 F. Supp. 3d 1155 (N.D. Cal. 2014) ................................................................................. 1, 2

Briggs v. Blomkamp,
    N.D. Cal. No 13-cv-04679 ................................................................................................ passim

Briggs v. Sony Pictures Ent.,
    9th Cir. No. 14-17175 (filed Oct. 8, 2013) ............................................................................. 2

Buckey v. County of Los Angeles,
    968 F.2d 791 (9th Cir. 1992) ................................................................................................... 9

Cedars-Sinai Medical Center v. Superior Court,
    18 Cal. 4th 1 (1998) ................................................................................................................. 8

Dydzak v. United States,
    2017 WL 4922450 (N.D. Cal. Oct. 31, 2017) ......................................................................... 5

Harper v. City of Monterey,
    2012 WL 195040 (N.D. Cal. Jan. 23, 2012) ........................................................................... 6

In re Braughton,
    520 F.2d 765 (9th Cir. 1975) ................................................................................................... 5

Kenne v. Stennis,
    230 Cal. App. 4th 953 (2014) .................................................................................................. 8

Liddell v. Smith,
    345 F.2d 491 (7th Cir. 1965) ................................................................................................... 5

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

DAVIS WRIGHT TREMAINE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mangindin v. Washington Mut. Bank,
   637 F. Supp. 2d 700 (N.D. Cal. 2009) ................................................................. 8

Mullis v. U.S. Bankr. Court for Dist. of Nevada,
   828 F.2d 1385 (9th Cir. 1987) ........................................................................ 5, 6

Nevijel v. North Coast Life Ins. Co.,
   651 F.2d 671 (9th Cir. 1981) ............................................................................. 4

Rein v. Providian Fin. Corp.,
   270 F.3d 895 (9th Cir. 2001) ............................................................................. 5

Rinegard-Guirma v. Ocwen Loan Servicing, LLC,
   2016 WL 4257765 (D. Or. Aug. 19, 2016) ..................................................... 5, 6

San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.,
   568 F.3d 725 (9th Cir. 2009) ............................................................................. 6

Temple Cmty. Hosp. v. Superior Court,
   20 Cal. 4th 464 (1999) ................................................................................... 5, 8

Uptergrove v. U.S.,
   2009 WL 1035231 (E.D. Cal. 2009) ................................................................. 5

Warden v. Cross,
   94 Fed. Appx. 474 (9th Cir. 2004) .................................................................... 8

Wawrzynski v. Byron Hibshman,
   2011 WL 1004822 (S.D. Cal. Mar. 18, 2011) ................................................... 6

**Statutes**

California Labor Code § 1700.39 ........................................................... 2, 3, 9, 10

**Rules**

Federal Rule of Civil Procedure
   8(a) ................................................................................................................ 3, 4
   8(a)(2) ............................................................................................................ 1, 4
   8(e) .................................................................................................................... 4
   11(c)(2) ............................................................................................................. 3
   12(b)(6) ....................................................................................................... 1, 3, 7
   41(b) .................................................................................................................. 4

DAVIS WRIGHT TREMAINE LLP

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**
**SUMMARY OF ARGUMENT**

Plaintiff's First Amended Complaint ("FAC") is a transparent attempt to re-litigate claims that already were rejected in an earlier lawsuit. That prior case, which claimed that the space-adventure film <u>Elysium</u> infringed Plaintiff's copyrighted screenplay, was dismissed with prejudice by the Honorable Phyllis J. Hamilton in 2014, and is the subject of an appeal to the Ninth Circuit. <u>Briggs v. Blomkamp</u>, 70 F. Supp. 3d 1155 (N.D. Cal. 2014). Apparently unsatisfied with the progress or likelihood of success of his appeal, Plaintiff has concocted a new lawsuit, which attempts to resurrect his copyright claim by wrapping it into pages of largely incomprehensible theories about some kind of industry-wide "conspiracy."

Despite two attempts, however, Plaintiff has not set out any facts that give rise to any cognizable claim against Defendants Universal City Studios LLC or NBCUniversal Media, LLC (collectively, "NBCU"), or that even identify the conduct that Plaintiff purports to believe was wrongful. Instead, the few direct references to NBCU assert only that it has been involved in <u>entirely unrelated</u> business deals with some of the other defendants, on projects that have nothing whatsoever to do with Plaintiff, his screenplay, or the film <u>Elysium</u> that he claims infringed his copyright. Because Plaintiff has failed to set forth an intelligible statement of facts showing entitlement to any relief against NBCU, his claims against these moving defendants must be dismissed. F.R.C.P. 8(a)(2). Section III, <u>infra</u>.

Independently, Plaintiff's claims should be dismissed as an improper attempt to collaterally attack the result in a prior lawsuit, where his claims were rejected. Basic principles of federal procedure prevent Plaintiff from engaging in this kind of "horizontal appeal." Plaintiff's only avenue for review of Judge Hamilton's order is his pending appeal to the Ninth Circuit; this lawsuit should be dismissed in its entirety. Section IV, <u>infra</u>.

Finally, despite his attempt to amend, the allegations in the FAC fail to meet the requirements of Federal Rule of Civil Procedure 12(b)(6), or the standard for plausibility of <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). There are no facts pleaded against NBCU that explain

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

DAVIS WRIGHT TREMAINE LLP

the basis for any claims against it; there is no tort claim or statutory violation that arises from a company doing business with someone against whom the Plaintiff has entirely unrelated claims. Section V, infra. Moreover, Plaintiff's First and Second Claims For Relief against NBCU purport to assert causes of action for "conspiracy" and "spoliation" that do not exist under California law. Plaintiff's only other claims against the moving parties – his Seventh Claim for Relief for "negligence," Eighth Claim for Relief for "gross negligence," and Ninth Claim for Relief for alleged violation of Labor Code § 1700.39, are not supported by any facts whatsoever concerning NBCU that could support these claims. Section V, infra.

Because Plaintiff's FAC fails again to state any claims against NBCU, demonstrating that further amendment would be futile, this Court should grant NBCU's motion in its entirety, with prejudice.

## II.
## SUMMARY OF FACTS

In 2013, Plaintiff Steven Briggs sued Neill Blomkamp, Sony Pictures, Media Rights Capital ("MRC"), and others, claiming that the film Elysium infringed Plaintiff's copyrighted screenplay, "Butterfly Driver." Briggs v. Blomkamp, N.D. Cal. No 13-cv-04679 (the "Prior Lawsuit"). The District Court for the Northern District of California, the Honorable Phyllis J. Hamilton presiding, granted summary judgment to defendants, rejecting Plaintiffs' copyright claim in a thorough and carefully reasoned opinion. Briggs v. Blomkamp, 70 F. Supp. 3d 1155 (N.D. Cal. 2014). The Court dismissed Plaintiff's claims and entered judgment for Defendants. Judgment, Briggs v. Blomkamp, N.D. Cal. No 13-cv-04679 (October 3, 2014) (ECF No. 87). Plaintiff's appeal from that decision is currently pending in the Ninth Circuit. Briggs v. Sony Pictures Ent., 9th Cir. No. 14-17175 (filed Oct. 8, 2013).

On December 7, 2017, Plaintiff brought this lawsuit against some[1] of the same defendants sued in the Prior Lawsuit. He also added 10 new defendants, including Universal City Studios LLC and NBCUniversal Media, LLC. Plaintiff's initial Complaint stated that it was

---

[1] Neill Blomkamp, Sony Pictures and MRC are named in both this case and Plaintiff's Prior Lawsuit.

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

DAVIS WRIGHT TREMAINE LLP

"related" to the Prior Lawsuit and that "certain new events, related to [the Prior Lawsuit], inform[] this matter" – principally, Plaintiff's allegation that all of the defendants were engaged in some undefined "conspiracy" that Plaintiff believes was relevant to the Prior Lawsuit.  ECF No. 1 at ¶ 19.

On December 28, 2017, NBCU joined a Motion to Dismiss filed by the other defendants in this action, seeking dismissal of the Complaint for lack of subject matter jurisdiction, failure to provide a short and plain statement of the claim under Rule 8(a), and failure to state a claim under Rule 12(b)(6).  ECF Nos. 15, 17.  Five days later, Plaintiff filed the FAC (ECF No. 21), adding copyright and infringing exportation claims that seem to be based on the same alleged facts that gave rise to the Prior Lawsuit – purported infringement of his screenplay "Butterfly Driver."  See FAC at Counts 12 and 13; see also FAC at ¶¶ 111, 117.[2]

Like the initial Complaint, the FAC is indecipherable.  See generally FAC. Through a tangled web of allegations, relying heavily on innuendo and rote speculation, the FAC appears to claim a decades-long conspiracy running rampant throughout Hollywood's major studios.  See id.  As best can be discerned, Plaintiff appears to allege that NBCU conspired with competing film studios and other prominent professionals in the film industry to somehow frustrate Plaintiff's Prior Lawsuit and pending appeal.  See, e.g., FAC at ¶¶ 1, 149-152, 155, 158, 159-161, 165, 174, 184, 190, 217, 219, 221, 224, 229, 235, 236.  At bottom, NBCU's alleged wrong appears to be working with renowned talent agent Ari Emanuel, and producing motion pictures.

As to NBCU, although the FAC asserts claims for conspiracy, spoliation, negligence and gross negligence against both defendants, and a claim for alleged violation of Labor Code § 1700.39 against Universal City Studios, the FAC does not include a single factual allegation tying his claims to alleged wrongs by NBCU.  FAC at ¶¶ 225-237, 250-258.

---

[2] Plaintiff also filed an Opposition to the now-moot Motion to Dismiss his initial Complaint, arguing that the copyright and infringing exportation claims in the FAC confer federal-question jurisdiction.  See ECF No. 23 at 8.  In addition, Plaintiff filed a motion to sanction defense counsel for filing the original Motion to Dismiss and Joinder, although he failed to provide the pre-filing notice required by Fed. R. Civ. Pro. 11(c)(2).  See ECF No. 24.  For the reasons discussed in this Motion and in the previous Motion To Dismiss, Plaintiff's Complaint and FAC are subject to dismissal on multiple grounds, and his Motion for Sanctions is both procedurally improper and patently baseless.

DAVIS WRIGHT TREMAINE LLP

## III.
## THE FAC FAILS TO PROVIDE NOTICE OF THE
## BASIS FOR PLAINTIFF'S CLAIMS AGAINST NBCU.

To give a defendant fair notice of the nature of a lawsuit, Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A "complaint which fails to comply with rules 8(a) and 8(e) may be dismissed with prejudice pursuant to rule 41(b)." Nevijel v. North Coast Life Ins. Co., 651 F.2d 671, 673 (9th Cir. 1981) (dismissing with prejudice complaint that was "verbose, confusing and almost entirely conclusory"). Even pro se pleadings must "meet some minimum threshold in providing a defendant with notice of what it is that it allegedly did wrong." Brazil v. U.S. Dept. of Navy, 66 F.3d 193, 199 (9th Cir. 1995). Plaintiff has now twice failed to meet this threshold requirement.

The FAC, like the initial Complaint, is a perplexing pastiche of innuendo, non sequitur, guesses, and unsupported assumptions and conclusions, all loosely spun together with bizarre conspiratorial themes. See, e.g., FAC at ¶¶ 23, 28, 55-62, 179. It remains impossible to discern what conduct NBCU is alleged to have engaged in that was wrongful, or how NBCU's conduct purportedly caused harm to Plaintiff. There is no legal basis for Plaintiff to sue NBCU simply because it has done business with other companies or individuals with whom Plaintiff has a dispute. Because the FAC fails to meet the fundamental requirement of providing intelligible notice of the nature of and basis for Plaintiff's claims against NBCU, their Motion To Dismiss should be granted.

## IV.
## THE FAC IS AN IMPROPER COLLATERAL ATTACK ON
## THE DISMISSAL OF PLAINTIFF'S PRIOR LAWSUIT.

In this sequel litigation, Plaintiff seeks to revive his Prior Lawsuit by alleging that competing film studios and other film professionals all conspired to engage in a constellation of purportedly improper conduct for the alleged purpose of hindering Plaintiff's Prior Lawsuit and pending appeal. See FAC at ¶¶ 1, 149-152, 155, 158, 159-161, 165, 174, 184, 190, 217, 219, 221, 224, 229, 235, 236. In other words, this case is a collateral attack on Judge Hamilton's order dismissing Plaintiff's Prior Lawsuit. Although Plaintiff is entitled to seek review of that

4

DAVIS WRIGHT TREMAINE LLP

1   order by appealing to the Ninth Circuit – which he has done – he cannot burden a district court

2   with this sort of "horizontal appeal."

3       "The collateral attack doctrine precludes litigants from collaterally attacking the

4   judgments of other courts." <u>Uptergrove v. U.S.</u>, No. 1:08-CV-01900-OWW SMS, 2009 WL

5   1035231, at *3 (E.D. Cal. Apr. l7, 2009) (citing <u>Rein v. Providian Fin. Corp.</u>, 270 F.3d 895, 902

6   (9th Cir. 2001)).  The principle is fundamental:  a losing party may not seek to nullify a district

7   court's decision by seeking relief from another district court.  <u>See</u>, <u>e.g.</u>, <u>Mullis v. U.S. Bankr.</u>

8   <u>Court for Dist. of Nevada</u>, 828 F.2d 1385, 1392-93 (9th Cir. 1987) (even where judicial

9   immunity did not apply, injunctive relief could not be ordered against bankruptcy judges and

10  clerks because "collateral attacks on the judgments, orders, decrees or decisions of federal courts

11  are improper"); <u>In re Braughton</u>, 520 F.2d 765, 766 (9th Cir. 1975) ("the second judge correctly

12  refused to entertain a 'horizontal' appeal from the warrant issued by the first judge"); <u>Dydzak v.</u>

13  <u>United States</u>, No. 17-cv-04360-EMC, 2017 WL 4922450, at *7 (N.D. Cal. Oct. 31, 2017) (a

14  litigant may raise alleged judicial error and litigation misconduct only through "the normal

15  appellate process," not a forbidden "horizontal appeal"), <u>appeal</u> <u>docketed</u>, <u>Dydzak v. U.S.A.</u>, 9th

16  Cir. No. 17-17401 (November 30, 2017); <u>Rinegard-Guirma v. Ocwen Loan Servicing, LLC</u>, No.

17  3:16-cv-01036-HZ, 2016 WL 4257765 at *3 (D. Or. Aug. 10, 2016) ("[T]his Court is without

18  authority to revisit issues that were previously decided in another district court case.").

19      The bar on horizontal appeals is supported by the same policy underlying the doctrine of

20  <u>res judicata</u>:  "the interest of the State that there should be an end to the litigation." <u>Liddell v.</u>

21  <u>Smith</u>, 345 F.2d 491, 493 (7th Cir. 1965).  Clever plaintiffs have attempted this tactic before, and

22  courts readily reject creating such an obvious loophole to finality in judgment.  In <u>Uptergrove</u>,

23  for instance, the court dismissed a complaint as an impermissible collateral attack because it

24  sought relief from an adverse judgment issued against the plaintiff in a prior case.  2009 WL

25  1035231 at *3.  Indeed, the Supreme Court of California has declined to recognize a tort remedy

26  for spoliation of evidence, recognizing that permitting such a claim would produce an "endless

27  spiral of lawsuits over litigation-related misconduct." <u>Temple Cmty. Hosp. v. Superior Court</u>, 20

28  Cal. 4th 464, 473 (1999); <u>see also</u> <u>Liddell</u>, 345 F.2d at 494 (affirming dismissal of previously-

Case 3:17-cv-06552-VC Document 49 Filed 11/09/18 Page 12 of 16

DAVIS WRIGHT TREMAINE LLP

dismissed claims on grounds of <u>res judicata</u>, and dismissing perjury claim arising from prior litigation on grounds that perjury does not give rise to a private cause of action). Moreover, a claim that "false testimony led to a fraudulent verdict is an attack on the merits of the prior proceeding" and violates the collateral attack doctrine. <u>Advocare Intern., L.P. v. Scheckenbach</u>, No. C08-5332 RBL, 2010 WL 2196449 at *2 (W.D. Wash. May 27, 2010); <u>see also</u> <u>Rinegard-Guirma</u>, 2016 WL 4257765 at *2 (a "challenge to the admissibility of certain evidence in either the state or federal case cannot be raised" in a separate federal action).

Given its relationship to <u>res judicata</u>, it also is clear that a party that was not involved in a prior lawsuit nonetheless may seek dismissal of a horizontal appeal of that suit, just as "res judicata may be asserted against a party that was a party in the prior proceeding even if there are new different parties in the later proceeding." <u>Wawrzynski v. Byron Hibshman</u>, No. 10-CV-2347-H (WMC), 2011 WL 1004822, at *3 (S.D. Cal. Mar. 18, 2011) (res judicata barred plaintiff's second lawsuit, notwithstanding the addition of a new defendant), <u>aff'd</u> <u>sub</u> <u>nom</u> <u>Wawrzynski v. Hibsham</u>, 490 F. App'x 70 (9th Cir. 2013). As one court explained, "[u]nder California claim preclusion rules, the only identity of parties required is the identity of the party <u>against whom preclusion is sought</u>." <u>Harper v. City of Monterey</u>, No. 11-cv-02903-LHK, 2012 WL 195040, at *4 (N.D. Cal. Jan. 23, 2012) (emphasis added), <u>aff'd</u>, 519 F. App'x 503 (9th Cir. 2013), citing <u>San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.</u>, 568 F.3d 725, 734 (9th Cir. 2009).

Likewise, courts do not hesitate to dismiss "horizontal appeals" when this improper tack is challenged by a defendant who was not a party in the prior action. <u>See</u>, <u>e.g.</u>, <u>Mullis</u>, 828 F.2d at 1386, 1392-93 (dismissing plaintiff's "horizontal appeal" of treatment of his bankruptcy petition; defendants were not parties to bankruptcy petition). For the same reasons, NBCU may seek dismissal of this horizontal appeal, to avoid being drawn into an endless spiral of litigation arising from Plaintiff's attempt to re-litigate his failed claims against others. All of Plaintiff's claims against NBCU depend on his claims against the other defendants – the purported conspiracy is the thread that Plaintiff invokes to sue NBCU along with the other defendants – and so all of his claims against NBCU must fall with his claims against those defendants.

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

Case 3:17-cv-06552-VC   Document 96   Filed 10/26/18   Page 151 of 160

Here, the essence of the FAC is Plaintiff's grievance about the conduct of litigation in the Prior Lawsuit and alleged impairment of his appeal from dismissal of that lawsuit. See FAC at ¶¶ 1, 149-152, 155, 158, 159-161, 165, 174, 184, 190, 217, 219, 221, 224, 229, 235, 236. After failing to recover damages for alleged copyright infringement in the Prior Lawsuit, Plaintiffs' allegations of spoliation and conspiracy seek essentially the same remedy as in the Prior Lawsuit: millions of dollars of compensation for the claimed "misappropriation of the Plaintiff's work." See FAC, Prayer for Relief at ¶ 4. Indeed, Plaintiff seems to believe that his spoliation claim will allow this court to review the treatment of evidence in the Prior Lawsuit and "decide that the [concealed or destroyed] evidence would have been unfavorable to" the defendants in the Prior Lawsuit. FAC at ¶ 234. This, however, is an impermissible collateral attack on the conduct of the Prior Lawsuit.

Plaintiff is not entitled to a second bite at this apple in a different district court; review is limited to the proper appellate channels, and this lawsuit should therefore be dismissed.

## V.   THE FAC FAILS TO STATE A CLAIM.

### A.   The FAC Fails To State A Plausible Claim Against NBCU.

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires "more than 'a sheer possibility that a defendant has acted unlawfully'; and is met only when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation and internal quotation marks omitted).

Here, the FAC's allegations – concerted action by a host of competing film studios and professionals to somehow facilitate wide-ranging copyright infringement and spoliation of evidence through routine, widely-reported transactions and film deals – is inherently implausible. Even putting that inherent implausibility aside, Plaintiff peppers the FAC with possibilities, not allegations. See, e.g., FAC at ¶ 57 ("Emanuel likely received a percentage of the films"); ¶ 77

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

1    ("maybe…that could be"); ¶ 102 ("likely, Universal Pictures wouldn't put their name on the

2    film"). The FAC cannot meet the bare minimum pleading standard and must be dismissed.

3    **B.     California Law Does Not Recognize A Claim For Conspiracy.**

4         California does not recognize conspiracy as a freestanding cause of action. Kenne v.

5    Stennis, 230 Cal. App. 4th 953, 968-69 (2014) (citing Applied Equipment Corp. v. Litton Saudi

6    Arabia Ltd., 7 Cal. 4th 503, 510–11 (1994)); see also Mangindin v. Washington Mut. Bank, 637

7    F. Supp. 2d 700, 708 (N.D. Cal. 2009) ("A conspiracy is not an independent cause of action

8    …."). Rather, conspiracy is a "theory of liability" that depends on the commission of an

9    underlying tort. Kenne, 230 Cal. App. 4th at 968-69. As discussed below, Plaintiff's other

10   asserted bases for liability against NBCU fail. Because the spoliation claim is non-existent, and

11   none of the factual allegations even approach supporting a negligence or Labor Code claim

12   against NBCU, the conspiracy claim must be dismissed.

13   **C.     No Tort Claim Exists For Spoliation Under California Law.**

14        As discussed above, "a tort cause of action does not lie against a person who has

15   intentionally destroyed or suppressed evidence relevant to a lawsuit." Warden v. Cross, 94 Fed.

16   Appx. 474, 475 (9th Cir. 2004) (applying California law); see Cedars-Sinai Medical Center v.

17   Superior Court, 18 Cal. 4th 1, 17-18 (1998) (rejecting tort remedy for intentional spoliation of

18   evidence by a party to an action). In Temple Cmty. Hosp., the California Supreme Court

19   rejected a claim for alleged spoliation by a third party. 20 Cal. 4th at 473. As the Court

20   explained, its concerns about endless litigation fully apply to lawsuits against third parties: "We

21   are reluctant to provide disappointed litigants a second opportunity to seek the compensation

22   they sought in the original lawsuit, even if they seek it against a party not involved in the original

23   lawsuit." Id. at 472. But even if spoliation claims were allowed under California law, Plaintiff's

24   claim against NBCU still fails because he has not alleged any facts to support such a claim. The

25   spoliation claim must be dismissed.

26   / / /

27   / / /

28   / / /

DAVIS WRIGHT TREMAINE LLP

8

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

DAVIS WRIGHT TREMAINE LLP

**D.     The FAC Fails To Allege Any Conduct By NBCU That Supports A Negligence Claim.**

The claims for negligence and gross negligence are not supported by any factual allegations concerning NBCU.  See FAC ¶¶ 250-255.  Plaintiff does not allege that NBCU had a duty to Plaintiff, nor that it was breached.  Rather, the only factual allegations in the FAC that refer to negligence (or "neglect") concern other defendants:  MRC and Sony Pictures.  See FAC ¶¶ 166-182.  Therefore, to the extent any allegations in the FAC are colorable as negligence, they do not relate to NBCU.  Because Plaintiff's negligence and gross negligence claims against NBCU consist of "'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678, quoting Twombly, 550 U.S. at 557, they also must be dismissed as to NBCU.

**E.     The FAC Does Not Allege Any Conduct By NBCU Violating The Labor Code.**

As with the vague negligence claims, Plaintiff's claim under Cal. Labor Code § 1700.39 relates to other defendants, and is not supported by any factual allegations concerning Universal City Studios, LLC (the only NBCU entity named in this claim for relief).  FAC ¶¶ 256-258.  Specifically, the FAC includes the puzzling claim that Universal City Studios somehow ran afoul of the rule prohibiting a talent agency from dividing fees with an employer.  FAC ¶¶ 256-258.  Universal City Studios, however, is not a talent agency; the FAC does not allege otherwise, nor does the FAC allege that Universal City Studios divided any fees with a talent agency.  See id.; see also, generally, FAC.  Rather, Plaintiff claims that defendant Emanuel divided fees with defendant MRC while acting simultaneously as a talent agent and owner of MRC.  FAC ¶¶ 213, 257.  Plaintiff's conclusory and far-fetched allegations of conspiracy, see FAC ¶ 230, cannot suffice to impose liability on Universal City Studios for the alleged conduct of defendants Emanuel and MRC.  See, e.g., Twombly, 550 U.S. at 557 ("a conclusory allegation of agreement at some unidentified point" does not establish conspiracy); Buckey v. County of Los Angeles, 968 F.2d 791, 794 (9th Cir. 1992) (complaint must "allege specific facts to support the existence of a conspiracy among the defendants").  Nor does Plaintiff establish standing to complain of the alleged violation of Section 1700.39, as the FAC does not allege that Plaintiff was injured by the

9

alleged fee-splitting, as, for example, a talent agent or client of a talent agency.  Therefore, the Section 1700.39 claim must be dismissed as to NBCU.

**VI.**
**CONCLUSION**

The FAC, like the initial Complaint, does not come close to stating a viable claim against NBCU.  Plaintiff asserts claims that do not exist, or that are bereft of supporting factual allegations.  The only thing that is clear is that Plaintiff is seeking to re-litigate a lawsuit that previously was dismissed, and currently is the subject of a pending appeal.   Dismissal with prejudice is therefore warranted.

DATED: January 16, 2018

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
ROCHELLE L. WILCOX
BRENDAN N. CHARNEY

By: */s/ Rochelle L. Wilcox*
    Rochelle L. Wilcox

Attorneys for Defendants
UNIVERSAL CITY STUDIOS LLC and
NBCUNIVERSAL MEDIA, LLC

DAVIS WRIGHT TREMAINE LLP

MOTION TO DISMISS
Case No. 17-cv-06552-VC
4824-9880-1242v.4 0020040-000144

# Exhibit H

KELLI L. SAGER (State Bar No. 120162)
  kellisager@dwt.com
ROCHELLE L. WILCOX (State Bar No. 197790)
  rochellewilcox@dwt.com
BRENDAN N. CHARNEY (State Bar No. 293378)
  brendancharney@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone:     (213) 633-6800
Facsimile:      (213) 633-6899

Attorneys for Defendants
UNIVERSAL CITY STUDIOS LLC and
NBCUNIVERSAL MEDIA, LLC

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVE WILSON BRIGGS,<br><br>              Plaintiff,<br><br>       v.<br><br>UNIVERSAL CITY STUDIOS LLC;<br>NBCUNIVERSAL MEDIA, LLC;<br>SONY PICTURES ENT INC.; KEVIN<br>SPACEY; ARI (ARIEL) EMANUEL; MATT<br>DAMON; BEN AFFLECK; NEILL<br>BLOMKAMP; MORDECAI (MODI) WICZYK;<br>ASIF SATCHU; BILL BLOCK; DANA<br>BRUNETTI; MRC II DISTRIBUTION<br>COMPANY LP (AKA MRC, Media Rights<br>Capital, and all other MRC entities and<br>subsidiaries)<br><br>              Defendants. | Case No. 17-cv-06552-VC<br><br>[Hon. Vince Chhabria]<br><br>**DEFENDANTS UNIVERSAL CITY<br>STUDIOS LLC'S AND NBCUNIVERSAL<br>MEDIA, LLC'S RESPONSE TO ORDER<br>TO SHOW CAUSE** |

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1    Defendants Universal City Studios LLC and NBCUniversal Media, LLC (collectively,

2    "NBCU") respectfully submit this Response to the Court's Order to Show Cause (ECF No. 71).

3    NBCU respectfully requests that the Court address NBCU's fully briefed Motion to Dismiss

4    (ECF No. 26), and dismiss the meritless claims against NBCU with prejudice, before turning to

5    whether Defendants Kevin Spacey or Dana Brunetti were properly served, and if not, whether

6    the case should be dismissed without prejudice for lack of subject-matter jurisdiction.

7    Regardless of whether the claims against Defendants Spacey or Brunetti are ultimately

8    dismissed,[1] federal claims are currently pending and the Court therefore has jurisdiction to rule

9    on NBCU's Motion to Dismiss.  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725

10   (1966) (supplemental jurisdiction "exists whenever there is a claim 'arising under" federal law

11   (emphasis added)); Dunton v. Suffolk Cty., 580 F. Supp. 974, 977 (E.D.N.Y. 1983) (holding

12   exercise of supplemental jurisdiction proper because "[f]ederal claims against [a co party] were

13   not dismissed until well into the trial stage of this action").

14   The parties have expended substantial effort on the fully-briefed Motion to Dismiss.  If

15   the claims are dismissed without prejudice because other defendants were not properly served,

16   Plaintiff may simply re-file the case in another forum, forcing NBCU to expend more time and

17   money defending against Plaintiff's frivolous claims.  Because the Court already is familiar with

18   the issues and claims asserted, NBCU respectfully requests that the Court rule on its Motion to

19   Dismiss before resolving the service and jurisdictional issues in the Order to Show Cause.

20   Respectfully submitted this 28th day of March, 2018.

21                                      DAVIS WRIGHT TREMAINE LLP
                                        KELLI L. SAGER
22                                      ROCHELLE L. WILCOX
                                        BRENDAN N. CHARNEY
23

24                                      By: /s/Rochelle L. Wilcox
                                           Rochelle L. Wilcox
25

26                                      Attorneys for Defendants
                                           UNIVERSAL CITY STUDIOS LLC and
                                           NBCUNIVERSAL MEDIA, LLC
27

28   _____
     [1] NBCU is not in a position to assess whether agents or attorneys for these independent parties
     are authorized to accept service.

1

# Exhibit I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STEVE KENYATTA WILSON BRIGGS,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL PICTURES, et al.,<br><br>Defendants. | Case No. 17-cv-06552-VC<br><br>**ORDER DISMISSING CASE**<br><br>Re: Dkt. No. 69 |

Steve Wilson Briggs has not met his burden of establishing that he properly served either

Dana Brunetti or Kevin Spacey. He has provided no information to suggest that the purported

agents he served – or at least attempted to serve – were in fact authorized either "by appointment

or by law to receive service of process" for Spacey and Brunetti. Fed. R. Civ. P. 4(e)(2)(C). The

fact that Todd Rubenstein of Morris Yorn Barnes Levine Krintzman Rubenstein Kohner &

Gellman has represented Spacey in other actions is not evidence Rubenstein or Morris Yorn is

authorized to accept service for Spacey. Likewise, the fact that Matt DelPiano of Creative

Artists Agency is Dana Brunetti's talent agent does not suggest that DelPiano or Creative Artists

Agency is authorized to accept service for Brunetti.

Moreover, even if Todd Rubenstein or Matt DelPiano were agents to Spacey or Brunetti,

Briggs has not provided evidence to suggest that process was personally delivered to either

DelPiano or Rubenstein, as would be required under either Federal Rule of Civil Procedure

4(e)(2)(C) or California law. *See* Dkt. Nos. 46-47. Nor has he provided evidence that Morris

Yorn or Creative Artists Agency were properly served under either Federal Rule of Civil

Procedure 4(h)(1)(B) or California law. *Id.*

Briggs has not shown good cause for his failure to properly serve Spacey and Brunetti. *See* Fed. R. Civ. P. 4(m). Inadvertent failure to comply with Rule 4 does not constitute good cause. *See Townsel v. Contra Costa County*, 820 F.2d 319, 320 (9th Cir. 1987). Moreover, there is no indication that Spacey or Brunetti have actually learned of this suit. *See Boudette v. Barnette*, 923 F.2d 754, 756 (9th Cir. 1991). The Court declines to otherwise extend the time for service of process. Thus, all counts against Brunetti and Spacey are dismissed without prejudice.

There are no federal claims asserted against any of the remaining defendants, and the Court declines to exercise supplemental jurisdiction on the state-law claims. *See* 28 U.S.C. § 1367(c)(3). Thus, these remaining claims are also dismissed without prejudice.

**IT IS SO ORDERED.**

Dated: April 25, 2018

_____

VINCE CHHABRIA
United States District Judge